## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-21-101** |
| | * | |
| **MADANI ILARA TEJAN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S MOTION TO ADMIT STATEMENTS OF FERDINAND FOTACHWI PURSUANT TO FEDERAL RULE OF EVIDENCE 804(b)

The United States of America, by and through its attorney, Erek L. Barron, United States Attorney for the District of Maryland, and David L. Jaffe, Chief of the Organized Crime and Gang Section, U.S. Department of Justice, files this motion for a ruling pursuant to Federal Rule of Evidence ("FRE") 804(b), permitting the government to admit at trial statements made by Ferdinand Fotachwi (hereinafter "Fotachwi").

Fotachwi was a witness to defendant Madani Tejan's (hereinafter "Tejan") criminal activities, including driving Tejan to the purported drug deal that resulted in Anthony Freeland's murder. Following Freeland's murder, Fotachwi participated in several conversations with other associates where he described these criminal activities and admitted to his specific role in their commission. Fotachwi also described to these associates his participation in the murder of Freeland and Tejan's admissions to Fotachwi regarding the murder. The government believes that Tejan later planned and carried out Fotachwi's murder to prevent Fotachwi from continuing to reveal his knowledge about these

crimes to other witnesses[1] or possibly provide law enforcement with incriminating evidence against Tejan.

The government will offer Fotachwi's statements for the truth of the matters asserted as they are admissible as exceptions to the hearsay rule under FRE 804(b)(3). Because Tejan procured Fotachwi's unavailability as a witness, Tejan has also forfeited his right to exclude Fotachwi's statements about Tejan as hearsay, pursuant to FRE 804(b)(6) or as violations of the Confrontation Clause.

## **PROCEDURAL HISTORY**

On April 14, 2021, a federal grand jury sitting in the District of Maryland returned an Indictment against Tejan charging him with conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841 (Count Two); interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count Three); and murder resulting from the use, carrying, brandishing, and discharging of a firearm during and in relation to, and possession, brandishing, and discharging of a firearm in furtherance of a drug trafficking crime and a crime of violence, in violation of 18 U.S.C. §§ 924(c) and (j) (Count 4).

More specifically, the conspiracy charged in Count One is alleged to have begun in approximately August 2018, and continued until approximately October 20, 2018, in the District of Maryland and elsewhere. It is further alleged that during the period of the conspiracy, Tejan committed the armed

---

[1]  Each of the potential witnesses described *herein* are known to the government and have provided documented or recorded statements to law enforcement, as well as appeared before the Grand Jury (with the exception of one). Based on the investigation (as discussed further below), it is the government's belief that Tejan carried out Fotachwi's murder with the assistance of one or more other unknown individuals. Because these other individuals have not been yet identified, the government has concerns for the safety of these witness. As a result, these individuals are not named in this filing and instead have been identified as Witness 1 through Witness 6.

robbery and murder of Freeland on or about October 3, 2018. Counts Three and Four of the Indictment charge Tejan with offenses related to these crimes.

On April 27, 2022, a federal grand jury sitting in the District of Maryland returned a Superseding Indictment against Tejan. Specifically, the Superseding Indictment charged Tejan with conspiracy to distribute and possess with intent to distribute, in part, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 846 (Count One); and possession with intent to distribute a controlled substance, namely oxycodone and fentanyl, in violation of 21 U.S.C. § 841 (Count Two).[2]

The motions hearing in this matter is scheduled for July 8, 2022. Trial will begin on or about September 6, 2022.

## FACTUAL BACKGROUND

### I. The Murder of Freeland

On Wednesday, October 3, 2018, at approximately 8:51 p.m., Prince George's County Public Safety Communications received a call for a shooting on Manton Way in Lanham, Maryland. Officers responded and located Freeland at approximately 9:37 p.m. on the sidewalk near 6509 Manton Way – a section of the community that contained only two intersecting streets, Manton Way and Garrison Terrace. Freeland was found with seven gunshot wounds to the upper body. EMS also responded and attempted lifesaving measures. Despite these efforts, Freeland bled to death and responders were unable to revive him. He was pronounced dead at 9:55 p.m.

Responding officers secured the location for crime scene investigators who arrived and processed the scene. Law enforcement recovered a key fob in Freeland's back pocket and $90 in his front pocket.

---

[2] Counts Three and Four remained unchanged in the Superseding Indictment.

Officers also found a .40 caliber S&W casing in front of 6905 Manton Way, and two $100 bills, one from under a car parked at 6506 Manton Way and one from the street in front of 6507 Manton Way.

Also located on scene was Freeland's cellular phone. A review of the phone's contents revealed that two telephone numbers contacted Freeland prior to the murder with phone number (202) 746-2459 being the last number Freeland was in contact with prior to the reported shooting. Detectives also found text messages on Freeland's cellphone. These text messages indicated that the suspect who utilized (202) 746-2459 also used (202) 878-3797 to communicate with Freeland on October 3, 2018. The number (202) 878-3797 was listed in Freeland's iPhone as "Mylik" and was determined to be subscribed to and used by an individual named "NADANI TEJAN."

Following the initial call for a shooting, another 911 call was received reporting that a suspicious vehicle was parked on Bartley Way in Lanham, Maryland. At that scene, officers located a 2017 white Acura. Upon inspection, officers noticed that the vehicle's engine was running and unoccupied. Additionally, there was no key or related key fob in the vehicle.

Subsequent investigation revealed that the Acura was registered to an associate of Freeland and operated by Freeland prior to his death. The vehicle recovery location was still within the larger neighborhood (where Freeland was found), but approximately 1.5 miles from the location of the murder scene. Law enforcement further determined that the Acura was designed to shut down when it was out of range of its key fob—usually about one mile.

The Acura was towed to the Prince George's County Police Department's ("PGPD") evidence bay for processing. A search of the vehicle revealed blood splatter on the interior, as well as two shell casings on the passenger side floorboard closest to the door. The Acura's GPS navigation system revealed that the last address entered and plotted to was 6503 Manton Way, Lanham, Maryland.

On October 4, 2018, the Office of the Chief Medical Examiner conducted Freeland's autopsy. Freeland had three gunshot-related wounds that were associated with seven entry or exit points. The injuries were identified as being on the right-side of his back, the middle of his neck, upper right chest, upper right abdomen, left upper clavicle, right lower chin, and right thumb. The medical examiner determined the manner of death was homicide and the cause of death was gunshot wounds.

Tejan was subsequently identified as a potential suspect (as discussed further below). On October 20, 2018, Tejan was arrested and transported to the PGPD Criminal Investigation Division.[3] During his interview, Tejan admitted that he was staying at 8831 Lottsford Road, Apt. 325, Upper Marlboro, Maryland (the "Lottsford Road residence"). Tejan also admitted that he used to live at 6503 Manton Way, Lanham, Maryland, in high school. Eventually, Tejan invoked his *Miranda* rights and was transported to the Department of Corrections for processing.

While in custody, a search warrant was executed at 8831 Lottsford Road, Apt. 325, Upper Marlboro, Maryland. This location was determined to be a residence that Tejan shared with a second individual. A search of this residence resulted in the recovery of a green army-style fanny pack/backpack that contained a cellular phone. A review of cellular phone records revealed that the device was in fact a pre-paid Cricket Wireless phone utilizing (202) 746-2459—the same number that had been in touch with Freeland's phone several times during the hours leading up to his death.

Cellular tower data records placed the Cricket phone at the crime scene on the date and time of the murder. Additional review of the records associated with the number (202) 746-2459 identified that the device was physically located in the vicinity of the 8800 block of Lottsford Road, Upper Marlboro, Maryland on October 2, 2018, as well as on October 3, 2018, before and after the murder occurred.

---

[3] Tejan was arrested by Prince George's County Police Department officers for an outstanding bench warrant. This warrant was issued by the Honorable Milton C. Lee in the District of Columbia Superior Court on or about September 12, 2018, for a drug related matter under case number 2018 CF2 012086.

The government anticipates calling several witnesses at trial in this case with direct knowledge of the events leading up to Freeland's murder, as well as certain circumstances involving the murder.

One individual the government will offer testimony from is identified as Witness 1. Witness 1 knew Freeland to be a drug dealer primarily selling marijuana and buying or selling prescription pills. The night before his murder, Freeland and Witness 1 were in the white Acura when Freeland was overheard coordinating a drug deal with "Mylik" over the phone—the contact name appeared on the vehicle's dashboard monitor.[4] Witness 1 had not met "Mylik," but recognized his voice from several conversations Freeland had with "Mylik" on speaker phone. Witness 1 had previously heard them discussing drug transactions and knew from the conversations that Freeland was buying "pills" from "Mylik" and Freeland complained that "Mylik" was overcharging him.[5]

The government also anticipates offering testimony from two associates of Fotachwi, identified as Witness 2 and Witness 3. On or about October 20, 2018, investigators spoke with Witness 2 who advised that s/he had interacted with Fotachwi and Tejan in the weeks before Fotachwi's murder. In pertinent part,

---

[4] The government intends to admit the statements made by the defendant regarding the coordination of a drug transaction at trial. Under FRE 801(d)(2)(A), statements are non-hearsay if made by, and offered against, the opposing party. The rule permits a party's own statement to be offered against that party even where the statement would otherwise be inadmissible as hearsay.

[5] Furthermore, the government also intends to introduce the statements of the defendant involving his and Freeland's prior drug trafficking activity at trial. The government contends that this is not evidence of "other crimes, wrongs, or acts" pursuant to Fed. R. Evid. 404(b). Instead, this evidence stems from conduct that is related to the offenses charged in Counts One and Two of the Superseding Indictment. *See U.S. v. Seigel,* 536 F.3d 306, 320-21 (4th Cir. 2008) (evidence of prior identity theft and fraud admissible as "intrinsic" to offenses charged–of fraud, identity theft, and murder–reversing district court's pretrial ruling to the contrary); *United States v. Cooper,* 482 F.3d 658, 663-64 (4th Cir. 2007) (evidence of related violations of State environmental regulations, which were "intrinsic to the story of the crime," were not subject to the limits of Rule 404(b) or otherwise excludable under Rule 403); *United States v. Chin,* 83 F.3d 83, 87-88 (4th Cir. 1996) (approving evidence of uncharged murder and threats to murder in in prosecution of heroin distribution and other related crimes as "acts intrinsic to the alleged crime"); *U.S. v. Mark,* 943 F.2d 444, 448 (4th Cir. 1991) (evidence of uncharged criminal activity admissible where it furnishes part of the context of the crime); *U.S. v. Masters,* 622 F.2d, 83, 87 (4th Cir. 1980) (evidence of uncharged criminal conduct admissible if it "served to complete the story of the crime on trial").

Witness 2 informed investigators that Fotachwi had confided in their mutual associates about the murder of an individual (believed to be Freeland). This conversation occurred in the week or two before Fotachwi was killed. Witness 2 stated that Fotachwi admitted that on the evening of October 3, 2018, Tejan asked Fotachwi to drive him somewhere to do a "swerve"—slang for a black-market transaction. Fotachwi said he then picked up Tejan in his black 2006 Lexus where he overheard Tejan on the phone setting up a drug transaction and providing the individual with an address. Once they arrived at the location—on Garson Terrace near the intersection of Manton Way—Tejan instructed Fotachwi to pull over and park. Tejan then exited the vehicle and walked down Manton Way where he entered the other individual's vehicle. Fotachwi advised that once the shooting occurred, both he (Fotachwi) and Tejan fled. Fotachwi said that Tejan moved the other person's (Freeland's) vehicle to another location. Tejan told Fotachwi that the guy tried to rob him, they struggled, and Tejan shot him, but left the firearm. Tejan also advised that he had wiped the car down and stole the person's wallet and cell phone from the vehicle. Fotachwi then drove Tejan away from the area. A couple of days after their initial conversation, Fotachwi discussed the matter again with Witness 2. During that retelling to Witness 2, Fotachwi said that he confronted Tejan about his story and Tejan confessed that Tejan tried to rob the individual, but that he resisted, and Tejan shot and killed him.

On or about June 16, 2021, investigators spoke with Witness 3 who advised that s/he (Witness 3) was present for the one of the conversations between Witness 2 and Fotachwi described above. In pertinent part, Witness 3 stated that s/he (Witness 3) was an associate of Fotachwi who first met Tejan through Fotachwi. Witness 3 described how Fotachwi would help Tejan with conducting various illegal activities, including providing Tejan with rides for drug deals. Witness 3 advised that Fotachwi discussed a robbery and shooting that Tejan committed. Specifically, Fotachwi told Witness 3 (and Witness 2) that Tejan had asked him for a ride. Fotachwi said once they arrived at the specific location, Tejan went to another

person's car to sell drugs. However, while the transaction was occurring, Fotachwi heard a gunshot and then observed Tejan running to the car. Fotachwi told Witness 3 that Tejan told Fotachwi that he had shot someone. Fotachwi helped Tejan flee by driving them away from the scene. Fotachwi recounted Tejan's robbery and shooting to Witness 3 a couple of hours after it occurred. Upon hearing this story, Witness 3 suggested that Fotachwi and Witness 2 go to the scene of the shooting. When Fotachwi, Witness 3, and Witness 2 arrived at the scene of the shooting, they observed police in the area and left. Moreover, while driving to the area, Fotachwi conducted a video call with Tejan. Witness 3 also said that approximately a week prior to Fotachwi's murder, Tejan admitted the shooting to her/him (Witness 3). Specifically, Tejan said that after he shot the victim (believed to be Freeland), the victim begged for his life as he was dying.

## II.   <u>The Murder of Fotachwi</u>

On October 15, 2018, at approximately 7:27 p.m., members of the Metropolitan Police Department (MPD) were notified about the sounds of gunshots at 5318 Drake Place in Southeast, Washington D.C. Officers responded to a private parking lot within a residential neighborhood in the rear of 5337 D Street, Southeast. Upon arrival, they located a victim, later identified as Fotachwi, unconscious and unresponsive inside a vehicle. Fotachwi was in the driver's seat of the vehicle with the ignition running and engaged in the drive position, suffering from multiple gunshot wounds. Investigators observed fifteen .40 caliber cartridge casings scattered around Fotachwi's vehicle mainly on the driver's side. Also observed were bullet holes on the driver's side and the driver's side rear window. The driver's side window was completely down, and the front passenger side window had been smashed out. Recovered ballistics evidence revealed that there were at least two firearms used at the scene. Fire and EMS personnel arrived and pronounced Fotachwi dead at 7:47 p.m. Fotachwi was then transported to the Office of the Chief Medical Examiner where an autopsy was conducted. Per that examination, it was determined the manner of Fotachwi's death was homicide and the cause of death was gunshot wounds.

Law enforcement officers conducted interviews with several individuals, including an associate identified as Witness 4. Witness 4 advised investigators that s/he knew Fotachwi and had talked with him (Fotachwi) during the hours preceding his (Fotachwi's) death. In a statement provided on or about July 7, 2021, Witness 4 advised that "Billa" (Fotachwi) called him/her on the morning of October 15, 2018, around 11:00 a.m. Witness 4 stated that the call came from a phone different than the one Fotachwi normally used. Fotachwi stated "I need to talk to you," and wanted to meet in person. Witness 4 was directed to meet at "E's" (Tejan's) residence. Witness 4 advised that s/he knew Tejan through Fotachwi.

Witness 4 arrived at the Lottsford Road residence around noon and was directed by Fotachwi to an apartment where Tejan was also present. Witness 4 said that s/he, Fotachwi, and Tejan then hung out at that location and drank alcohol. Witness 4 left around 5 p.m. However, before Witness 4 left, another unknown individual pulled up to the residence in a white cargo van, came inside, and delivered a large, bulky package to Tejan along with a big bag of marijuana. Upon leaving, Tejan or Fotachwi told Witness 4 that they were going to Washington, D.C. to sell or buy something (to do a "swerve").

Detectives spoke with another associate of Fotachwi's, identified as Witness 5, who had talked with Fotachwi hours prior to his death.[6] Witness 5 advised that on October 15, 2018, s/he attempted to call Fotachwi around noon, but he (Fotachwi) did not answer. A few minutes later, Fotachwi called Witness 5 via a video call. Witness 5 stated that s/he could see on the video call that Fotachwi was in the car with "Dani" (Tejan). Witness 5 advised that Tejan was a person s/he and Fotachwi knew from their youth. Witness 5 further stated that they were on FaceTime for about five minutes and that Fotachwi was going to take "Dani" to Washington, D.C.

Detectives also interviewed a person identified as Witness 6. Witness 6 admitted to being in touch with Tejan before and after Freeland's death on October 3, 2018. Based on this interview, a search warrant

---

[6] Witness 5 has not testified before the Grand Jury.

was obtained for Witness 6's cellular phone. Recovered from this phone were several pieces of evidence that were relevant to law enforcement's investigation. In particular, observed in the phone was a screenshot image of an Uber pick-up confirmation for 5312 E Street, Southeast, that was sent to Tejan's phone on October 15, 2018, at 7:33 p.m.—mere minutes after Fotachwi's shooting was reported.[7] The Uber trip receipt featured a color photograph of the driver and the make and model of the vehicle. The receipt also contained the driver's route to the scheduled pick-up location which was one block from where Fotachwi was found deceased.[8] The search of Witness 6's phone also revealed that there had been Google searches on October 16, 2018, at approximately 4:00 a.m. The Google searches were for information related to the Fotachwi murder (which occurred approximately around 7:30 p.m. the day before) but prior to any information about the murder being released to the media.[9]

In interviews with investigators, Witness 3 told investigators that s/he was notified about Fotachwi's murder by a mutual friend on the night that he was killed. Witness 3 advised that s/he did not believe the news at first but called Tejan on that same night to discuss.[10] During the conversation, Tejan stated he knew nothing about Fotachwi's murder and denied seeing Fotachwi at all on the day of the murder. However, Witness 3 stated they had spoken to Witness 4 prior to the call and learned that Tejan, Fotachwi, and Witness 4 were together earlier in the day. Witness 3 believed that Tejan was lying about his involvement and became suspicious of Tejan.

---

[7] Witness 6 also testified that s/he ordered and paid for the Uber trip via their own account at the request of Tejan. This is further corroborated by business records provided by Uber pursuant to legal process.

[8] A review of Tejan's cellular phone records also mirrored the path of travel associated with the Uber trip ride from E Street Southeast, Washington D.C. to Lottsford Road, Upper Marlboro, Maryland.

[9] Witness 6 testified before the Grand Jury that Tejan had access to her/his cellular phone and could have used it while at the Lottsford Road apartment.

[10] Witness 2 testified in Grand Jury that s/he was also present with Witness 3 for the respective phone calls with Tejan and Witness 4 after Fotachwi's murder.

On or about June 16, 2021, Witness 3 further advised investigators that Fotachwi would talk openly about Freeland's murder. Witness 3 further explained that Fotachwi would at times make statements about the crime in the presence of Tejan. Witness 3 described an occasion where Fotachwi, while hanging out with other associates, discussed the murder. During that conversation, Fotachwi jokingly stated to Tejan "I'm going to snitch on you…" in reference to Freeland's murder.[11] Witness 3 further stated that, based on her/his personal familiarity with Fotachwi, Fotachwi would not proactively speak with law enforcement. However, Witness 3 stated that s/he believed that, if confronted by the police, Fotachwi would have confessed to what happened—consistent with Fotachwi not being a "street guy"—and that Tejan was aware of this fact and therefore feared that Fotachwi would speak with law enforcement.

## ARGUMENT

### I.     Fotachwi's Statements are Admissible as Statements Against Interest

At trial, the government will seek to admit Fotachwi's hearsay statements to Witnesses 2 and 3 for their truth pursuant to the statement against penal interest exception, as permitted by the Federal Rules of Evidence and settled Fourth Circuit case law.

Hearsay is "a statement, other than one made by the declarant while testifying at a trial or a hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), and "is not admissible except as provided by these rules..." Fed. R. Evid. 802. In general, out-of-court testimonial statements are inadmissible under both the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment. *Id; see also Crawford v. Washington*, 541 U.S. 36 (2004).

---

[11]   Alternatively, Fotachwi's statement is admissible and is offered not for the truth of the matter asserted but is being offered to show the statement's effect on the hearers. *Lee v. City of Richmond, Va*, 100 F. Supp. 3d 528, 528 n.3 (E.D. Va. 2015); *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (citing *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986)).

However, under FRE 804(b)(3), certain statements are admissible if made by the declarant and against their penal interest. The Fourth Circuit's test for whether a statement qualifies for and may be admitted under this particular hearsay exception is if: (1) the declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal interest, and (3) "corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Alvarado*, 816 F.3d 242, 250 (4th Cir. 2016) (citing *United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995)). Pursuant to FRE 804(a)(4), a declarant is considered to be an unavailable witness if s/he "cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." *Id.* A statement against interest is defined as one where "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it… expose[d] the declarant to civil or criminal liability." *See* Fed. R. Evid. 804(b)(3)(A). "'[S]tatements that are on their face neutral,' 'statements that give the police significant details about [a] crime,' and 'statements that a reasonable person in the declarant's position would realize implicate him in a conspiracy, all may be self-inculpatory for purposes of Rule 804(b)(3).'" *United States v. Udeozor*, 515 F.3d 260, 267 (4th Cir. 2008) (quoting *Williamson v. United States*, 512 U.S. 594, 603 (1994)). Furthermore, to assess the level of corroboration required to determine trustworthiness, the court in *Bumpass* relied upon six relevant factors: "(1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement; (2) the declarant's motive in making the statement and whether there was a reason for the declarant to lie; (3) whether the declarant repeated the statement and did so consistently; (4) the parties to whom the statement was made; (5) the relationship of the declarant with the accused; and (6) the nature and strength of the independent evidence relevant to the conduct in question." *Bumpass*, 60 F.3d at 1102. Therefore, statements made by a declarant that meet these requirements are admissible evidence. *Id.*

This issue was addressed at length in *United States v. Jordan*, 509 F.3d 191 (4th Cir. 2007). In that matter, a jury convicted the defendant and a co-conspirator of murder while engaged in a drug trafficking crime and related firearms offenses. At trial, the government sought to introduce statements made by a deceased alleged co-conspirator, Octavia Brown[12] (hereinafter "Brown"), to an associate. *Id.* at 194. Brown's statements not only included admissions that she participated in the murder, but also implicated the defendant as well. *Id.* at 200. The defendant objected to the admission of the statements, arguing that they were "testimonial" and thus barred by the Sixth Amendment's Confrontation Clause. *Id.* He also argued that the statements were inadmissible hearsay. *Id.* The district court rejected these arguments and admitted the statements, concluding that the statements were non-testimonial and admissible under FRE 804(b)(3) as statements against penal interest. *Id.* at 201. On appeal, the defendant contended that Brown's statements did not expose her to criminal liability. In the alternative, he argued that the statement consisted of both self-inculpatory and non-self-inculpatory parts. The Fourth Circuit disagreed with his initial argument and found, that as a co-conspirator, Brown was legally responsible for all reasonably foreseeable acts her co-conspirators undertook in furtherance of the conspiracy. *Id.* at 202 (citing *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946).) The court also held the self-inculpatory nature of a statement can only be determined "by viewing [the statement] in context." *Jordan*, 509 F.3d at 202 (citing *Williamson*, 512 U.S. at 603). In determining admissibility, the court reasoned that while "Brown's statements to Adams inculpated [the defendant], they also subjected *her* to criminal liability for a drug conspiracy, and by extension… a murder." *Jordan*, 509 F.3d at 203 (emphasis in original). As the Fourth Circuit found, "Brown made the statements to a friend in an effort to relieve herself of guilt, not to law enforcement in an effort to minimize culpability or criminal exposure." *Id.* Accordingly, the statements were correctly admissible under FRE 804(b)(3).

---

[12]  Brown was incarcerated on matters unrelated to the case and committed suicide in 2002.

Similar to *Jordan*, the government anticipates admitting statements made by Fotachwi, as heard and relayed by Witnesses 2 and 3, at trial based on the statements against penal interest exception to the hearsay rule as outlined in FRE 804(b)(3). The statements meet each of the requirements to qualify for the exception.

First, it is without question that the declarant, Fotachwi, is unavailable as he was murdered on or about October 15, 2018. Second, the statements made by Fotachwi are also "genuinely adverse" to his penal interest. Fotachwi confessed to assisting with a drug deal between Tejan and Freeland. During that same drug deal, Tejan robbed, shot, and killed Freeland. Following these crimes, Fotachwi helped Tejan cover up the criminal conduct and flee from the scene. As a result, it was reasonable for Fotachwi to believe he could be criminally liable for the crimes that occurred, potentially as a co-conspirator, aider and abettor, or accessory after the fact. *See Jordan*, 509 F.3d at 203 (finding that though declarant's statements inculpated the defendant, they also subjected her to criminal liability for the drug conspiracy and the murder); *United States v. Ceja-Rangel*, No. 5:14-CR-00556-JMC, 2015 WL 1650979, at *2 (D.S.C. Apr. 14, 2015) (noting that statements and note were "intrinsically inculpatory as they demonstrated significant details about the crime.")

Third, the trustworthiness of Fotachwi's statements is supported by significant corroborating circumstances. At the time he made the statements, hours and then days after Freeland's murder, Fotachwi knew that law enforcement was investigating Freeland's murder, as Fotachwi and Witnesses 2 and 3 had returned to the scene of Freeland's murder a couple of hours later and observed the presence of law enforcement. *See United States v. Blanchard*, 652 F. App'x 194, 196 (4th Cir. 2016) (noting that declarant was "aware that law enforcement was investigating" the codefendant and the declarant). Tejan would not be arrested for the murder until October 20, 2018, two and a half weeks after Fotachwi made those statements. In light of law enforcement's active investigation, Fotachwi had no motive to lie considering

the potential criminal penalties he might face. The government anticipates Witness 3 will testify at trial that, unlike Tejan, Fotachwi was not a "street guy" or into the drug dealing lifestyle and thus was also unlikely to lie about such an incident. Moreover, the statements were made to friends and thus there was no obvious motive to shift blame or curry favor. *See Ceja-Rangel*, 2015 WL 1650979, at *2 (finding same since statements were made to a cellmate). Supporting the trustworthiness of Fotachwi's statements, Fotachwi repeated the same statements and description of the events surrounding Freeland's murder— including identifying Tejan as going to the location to engage in a drug deal and then proceeding to shoot the victim. Fotachwi's statements were consistent whether in the hours after the murder (when he recounted the incident to Witness 3) or in the weeks before his death (when he repeated the details of the murder to Witness 2). *See Blanchard*, 652 F. App'x at 196 (affirming admission of statement against penal interest where declaration "did not repeat the statements a large number of times," but made several statements over the course of several months.) Fotachwi's statements were made to friends; these friends (Witnesses 2 and 3) describe Fotachwi and Tejan as being close and conducting various illegal activities— including Fotachwi acting as Tejan's driver—in the months before Freeland and Fotachwi's death. Finally, the nature and strength of the independent evidence supports the trustworthiness of Fotachwi's statements to Witnesses 2 and 3: (i) Cellular phone text messages and social media messages demonstrate that Tejan was a drug dealer and was coordinating drug dealing activities with individuals, including Freeland; (ii) Witness 1 overheard Tejan and Freeland coordinating a drug deal for the date of his (Freeland's) murder; (iii) Tejan had a conversation about the crime with Witness 3 where Tejan admitted to the Freeland murder;[13] (iv) per the GPS system in the vehicle Freeland was operating, Freeland was traveling to a residence that Tejan used to live at and Freeland was found deceased in a neighborhood

---

[13]   As similarly described *supra* (regarding Witness 1) in footnote 3, the government intends to admit this statement at trial pursuant to Fed. R. Evid. 801(d)(2)(A).

where Tejan previously resided; (v) cellular phone data associated with a phone used by Tejan placed him (Tejan) at or near the scene of Freeland's murder on the date and time it occurred; and (vi) residential cameras in the neighborhood where Freeland was murdered—Tejan's old neighborhood—captured a car matching Fotachwi's arrive shortly before the murder and park by Manton Way, show an individual exit the vehicle and proceed on Manton Way, and after the murder, captured the white Acura belonging to Witness 1 drive out of the neighborhood followed by the vehicle matching Fotachwi's.

Similar to the defendant and declarant in *Jordan,* there is a concomitant relationship between the criminal activity of Tejan and Fotachwi. The participation of both actors in the events of October 3, 2018, is so intertwined that each person is integral to the joint commission of the crimes that occurred that night. Moreover, Fotachwi's knowledge of the crime and the important details he provided regarding the setting up of the drug deal, the travel to the area where Tejan previously resided, his observation of Tejan's movements, the gunshots, his statements with Tejan right after the murder, and his role as the getaway driver from the crime scene implicate him both in the drug dealing conspiracy and as an accessory after the fact to the murder. *See United States v. Dargan*, 738 F.3d 643, 649 (4th Cir. 2013) (finding that the statements to a cellmate were "intrinsically inculpatory to the extent they demonstrate [the declarant's] knowledge of 'significant details about the crime' and 'implicate him in a conspiracy'" and that the declarant's "admission that he committed the robbery with the assistance of two co-conspirators not only revealed his knowledge of the number of participants, but also potentially subjected him to conspiracy liability."); *Udeozor*, 515 F.3d at 267 (affirming district court admission of statements against penal interest where the "statements in context demonstrate[] that they were 'sufficiently against [the declarant's] penal interest that a reasonable person in [his] position would not have made the statement[s] unless believing them to be true.'") (quoting *Williamson*, 512 U.S. at 603-04). Notwithstanding this, should the Court find that Fotachwi's statements, as relayed to Witnesses 2 and 3, contain both self-

inculpatory and non-self-inculpatory portions, for a finder of fact to properly assess the self-inculpatory nature of Fotachwi's statements, a thorough contextual examination of the entire statement is required. Additionally, as previously set forth, the statements are largely corroborated by other sufficiently independent and strong evidence. Therefore, Fotachwi's statements to Witnesses 2 and 3 should be admissible at trial.

Furthermore, introducing Fotachwi's statements to Witnesses 2 and 3 do not violate the Confrontation Clause of the Sixth Amendment. That is because certain out-of-court statements, including the type described herein, are not testimonial in nature. *See Crawford*, 541 U.S. at 55 ("Most of the hearsay exceptions cover[] statements that by their nature [are] not testimonial—for example, business records or statements in furtherance of a conspiracy."). The Fourth Circuit and other courts have concurred with this position, particularly when dealing with statements made to friends and associates of a declarant. *See Dargan*, 738 F.3d at 650 ("Harvey made the challenged statements to a cellmate in an informal setting—a scenario far afield from the type of declarations that represented the focus of Crawford's concern."); *Udeozor*, 515 F.3d at 270 ("Because [the defendant] plainly did not think he was giving any sort of testimony when making his statements to the victim during the recorded telephone calls, the admission of these two taped conversations into evidence did not violate [the defendant's] rights under the Confrontation Clause."); *United States v. Smalls*, 605 F.3d 765, 776–80 (10th Cir. 2010) (statement made by co-conspirator to fellow inmate implicating defendant was nontestimonial); *United States v. Spotted Elk*, 548 F.3d 641, 662 (2d Cir. 2008) (holding that a co-defendant's in-jail statements made to a co-conspirator were not testimonial, and thus did not violate the defendant's Sixth Amendment rights).

As the Fourth Circuit noted in *Jordan*, "Even assuming that statements to friends or associates may be considered testimonial in the rare case…[t]he critical *Crawford* issue here is whether [the declarant], at the time she made her statements…reasonably believed these statements would be later used

at trial." 509 F.3d at 201 (omitting quotations). Here, Fotachwi made his statements to friends and not law enforcement. *See United States v. Benson*, 957 F.3d 218, 230 (4th Cir.), cert. denied sub nom. *Brown v. United States*, 141 S. Ct. 934 (2020), and cert. denied sub nom. *Wallace v. United States*, 141 S. Ct. 935 (2020) (finding that statements to a "longtime personal friend" that were made "maybe a week or more" after the victims' death were non-testimonial.) Accordingly, there was no indication that when Fotachwi made the statements he "would be called upon to testify" or had any "knowledge that the statements would later be used in court." *Id.*; *see also Ceja-Rangel*, 2015 WL 1650979, at *2 (noting that statements made by declarants "were not made with an eye towards trial" and thus did not run afoul of the Confrontation Clause.)

Based on all of the above, the Government submits that Fotachwi's hearsay statements to Witnesses 2 and 3 meet the exception set forth in FRE 804(b)(3) as statements against penal interest and thus the Court should admit them at trial.

## II.    Fotachwi's Statements are Alternatively Admissible Under the Forfeiture by Wrongdoing Exception

Because the government can establish by a preponderance of the evidence that Tejan intentionally procured the unavailability of Fotachwi as a witness, Fotachwi's statements about Tejan are admissible under the forfeiture by wrongdoing exception to the hearsay rule and the Confrontation Clause.

Federal Rule of Evidence 804(b)(6) provides an exception to the hearsay rule for statements offered "against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness and did so intending that result." Fed. R. Evid. 804(b)(6). The Advisory Committee Notes to the Rules underscore the immeasurable inequity of permitting a defendant to benefit from the rule prohibiting the introduction of a statement made by an unavailable declarant when the defendant made the declarant unavailable by killing him:

> Rule 804(b)(6) has been added to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness. This recognizes the need for a prophylactic rule to deal with abhorrent behavior "which strikes at the heart of the system of justice itself."

Fed. R. Evid. 804 (b)(6), Advisory Committee's Note - 1997 (*citing United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982)).

Just as the hearsay rules provide no protection for a defendant's "abhorrent" attempt to subvert the pursuit of justice, a defendant likewise finds no relief in the Confrontation Clause. The common law doctrine of "forfeiture by wrongdoing" provides an exception to the Confrontation Clause if the defendant "engaged in conduct *designed* to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 358 (2008) (emphasis in original). Indeed, in *Crawford* itself, the Supreme Court specifically distinguished the rule of forfeiture by wrongdoing as an accepted exception to the Confrontation Clause. *Crawford*, 541 U.S. at 54. Simply put, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813 (2006).[14]

For the forfeiture by wrongdoing exception to apply, the defendant must have both caused the witness to be absent and intended to prevent the witness from giving evidence against him. This Circuit recognized as much in *United States v. Gray,* 405 F.3d 227 (4th Cir. 2005). In that case, the defendant was indicted and convicted on five counts of mail fraud and three counts of wire fraud relating to her receipt

---

[14]  The Supreme Court could not have been clearer in its insistence that a defendant shall not benefit from the protections of either the hearsay rules or the Confrontation Clause when the defendant himself makes a declarant unavailable to testify in court. "[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that 'the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds.' 541 U.S. at 62. That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833.

of insurance proceeds following the deaths of her second husband and a former paramour. *Id.* at 230. After trial, the district court sentenced the defendant to 40 years of imprisonment. The convictions were based, in large part, on witness testimony that the defendant had admitted to killing her husband and an accomplice named Clarence Goode (hereinafter "Goode"). *Id.* at 231. The defendant confessed to witnesses that Goode "had tried to blackmail her," demanding money in exchange for his silence about the murder of her husband, so "she had to get rid of him too." *Id.* In further support of this evidence, the government also introduced several out-of-court statements made by the defendant's husband during the three months preceding his murder. These statements consisted of the victim's various communications to others (including to law enforcement) in advance of a state court proceeding where he detailed the prior threats and attempts on his life as committed by the defendant and Goode. After careful consideration, the district court held "[a]lthough out-of-court statements ordinarily may not be admitted to prove the truth of the matters asserted, the doctrine of forfeiture by wrongdoing allows such statements to be admitted where the defendant's own misconduct rendered the declarant unavailable as a witness at trial." *Id.* at 240. On appeal, the defendant challenged the admission of these statements and the Fourth Circuit affirmed the district court, holding that "the forfeiture-by-wrongdoing exception… ensures that a defendant will not be permitted to avoid the evidentiary impact of statements made by his victim, whether or not he suspected that the victim would be a witness at the trial in which the evidence is offered against him." *Id.* at 242.

Although the Supreme Court has declined to outline a particular standard in the Confrontation Clause context, the Court has described FRE 804(b)(6) as "[codifying] the forfeiture doctrine," implying that a similar standard would be appropriate in the constitutional context and recognized that courts "have generally held the government to the preponderance-of-the-evidence standard." *Davis*, 547 U.S. at 833. This Circuit applied the preponderance of the evidence standard in *Gray*, 405 F.3d at 243, and other circuits have adopted the same standard. *See, e.g.*, *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir.

1996); *United States v. Dhinsa,* 243 F.3d 635, 653-54 (2d Cir. 2001); *Steele v. Taylor,* 684 F.2d 1193, 1203 (6th Cir. 1982); *United States. v. Scott,* 284 F.3d 758, 762 (7th Cir. 2002); *United States v. Emery*, 186 F.3d 921, 926-27 (8th Cir. 1999); *United States v. Johnson*, 767 F.3d 815, 822-23 (9th Cir. 2014); United *States v. Cherry,* 217 F.3d 811, 815 (10th Cir. 2000); *United States v. Zlatogur,* 271 F.3d 1025, 1028 (11th Cir. 2001); *United States v.  White*, 116 F.3d 903, 912 (D.C. Cir. 1997).

Furthermore, when determining whether the out of court statements of an unavailable declarant are admissible under the forfeiture by wrongdoing doctrine, the Court may properly forgo a pretrial hearing and admit the deceased declarant's statements at trial subject to the prosecution making the necessary connection.  *See, e.g., United States v. Elsheikh*, 1:20-cr-239 (E.D. Va. Apr. 12, 2022); *Gray,* 405 F.3d 227; *United States v. Johnson*, 219 F.3d 349, 356 (4th Cir. 2000) (citing *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999)) (holding that a trial court need not hold a hearing under Rule 806(b)(6), but rather that it can admit the evidence at trial "contingent upon proof of the underlying murder by a preponderance of the evidence.")

In the instant case, the evidence proffered *herein* more than suffices to establish, by a preponderance of the evidence, that Tejan orchestrated the murder of Fotachwi to prevent Fotachwi from potentially testifying or providing information to law enforcement regarding the crimes committed by Tejan, including the Freeland murder. As a coconspirator to Tejan's drug deal with Freeland and accomplice to the ensuing murder, Fotachwi had intricate knowledge of Tejan's criminal conduct and—since he was not a "street guy," *i.e.,* one who would speak with police if confronted by them and had joked to Tejan on more than one occasion that he would "snitch" on him—Tejan had a motive for eliminating Fotachwi. This desire to prevent Fotachwi from ever possibly testifying against him "was a 'precipitating' and 'substantial' reason why" Tejan murdered Fotachwi.  *See United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) (noting and affirming that a defendant need not "make a witness unavailable with the sole

motivation of preventing the witness from testifying."); *see also Gray*, 405 F.3d at 227 (noting that defendant need not have an intent to make the witness unavailable "as a witness at *this* trial" and that the exception applies "*whenever* the defendant's wrongdoing was intended to, and did, render the declarant unavailable as a witness against the defendant, without regard to the nature of the charges at the trial in which the declarant's statements are offered.") (emphasis in original); *United States v. Miller*, 116 F.3d 641, 668 (2d Cir. 1997) (noting that the forfeiture principle applies even to situations where "there was [no] ongoing proceeding in which the declarant was scheduled to testify.") *Cf. United States v. Hanna*, 353 F. App'x 806, 808 (4th Cir. 2009) (finding that district court erred where defendant killed declarant for the insurance proceeds and not with the purpose of making her unavailable to testify).

Witness 4 will testify that they were with Fotachwi and Tejan in the hours before Fotachwi's death. This was approximately twelve days after Freeland's murder. Following a call by Fotachwi, Witness 4 met Fotachwi and Tejan at the Lottsford Road residence. Witness 4 hung out with them and another individual until approximately 5 p.m. When Witness 4 was departing, Tejan or Fotachwi told Witness 4 that they were going to Washington, D.C. to do a swerve, *e.g.,* engage in some illegal activity. The fact that Fotachwi was with Tejan on the day of his (Fotachwi's) death was also confirmed by Witness 5's statement to law enforcement. Fotachwi also told Witness 5 that Fotachwi was going to take Tejan to Washington, D.C. Approximately two and a half hours after Witness 4 left Fotachwi and Tejan, law enforcement was notified about shots fired in Southeast, Washington, D.C. and located Fotachwi's body at the scene.

Approximately five minutes after Fotachwi's murder, Tejan was picked up by an Uber approximately one block from the murder scene. Witness 6 confirmed that they had ordered the Uber for Tejan and Uber records show that the driver dropped Tejan by the Lottsford Road residence, which was mirrored by Tejan's cellular phone records. Additionally, on Witness 6's phone, law enforcement

recovered Google searches for information related to Fotachwi's murder. These searches were conducted on October 16, 2018, at approximately 4:00 a.m.—around nine hours after Fotachwi's murder and before any information was released to the media. Witness 6 confirmed to law enforcement that Tejan regularly used Witness 6's phone.

Finally, Witness 3 told law enforcement that when they were informed of Fotachwi's murder they reached out to Tejan. Tejan denied seeing Fotachwi on the day of Fotachwi's death. Witness 3 knew this to be false as Witness 4 had confirmed that Tejan and Fotachwi were together on the day of Fotachwi's murder.

The government has proffered more than sufficient evidence to connect Tejan to Fotachwi's murder and to establish that Tejan procured the murder of Fotachwi for the purpose of preventing Fotachwi from potentially testifying or providing information to law enforcement against Tejan for Freeland's murder. *See United States v. Williams*, No. CRIM. WDQ-07-0402, 2008 WL 2091152, at \*3 (D. Md. May 16, 2008), *aff'd*, 343 F. App'x 912 (4th Cir. 2009) (finding from recorded threats, the defendant's visit to the declarant's workplace and "dirty looks" at her, the defendant's father's provision of a .357 revolver to him and the lack of shell casings at the scene (indicative of a revolver rather than a semiautomatic pistol), and the defendant's laughter when informed of the declarant's murder, among other factors, that the government had established that it was more likely than not that the defendant caused the declarant's death and unavailability as a witness at his trial.); *see also United States v. Baskerville*, 448 F. App'x 243, 249 (3d Cir. 2011) (finding that district court did not abuse its discretion by requesting a proffer from the government to demonstrate that declarant's statements should be admitted at trial). Moreover, while "[a]ctive participation or engagement, or…the personal commission of the crime, is not required," the government has demonstrated by a preponderance of the evidence that Tejan actively participated in Fotachwi's murder and that he did so with the intent of ensuring that Fotachwi would not be available as

a witness against him. *See United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005); *see also United States v. Adoma*, 781 F. App'x 199, 204 (4th Cir. 2019) (finding that personal participation in the witness' murder was not required where it was reasonably foreseeable as part of the conspiracy); *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012) (same).

Accordingly, the Court should admit Fotachwi's statements to Witnesses 2 and 3 under the forfeiture by wrongdoing standard and admit such evidence without the need for a pretrial hearing based on the sufficient showing in this motion.

## CONCLUSION

Based on the foregoing, the government respectfully requests that this Court rule that, at trial, the government may admit the statements of the late Ferdinand Fotachwi as statements against penal interest and/or based on forfeiture by wrongdoing, pursuant to Federal Rule of Evidence 804(b).

Respectfully submitted,

Erek L. Barron
United States Attorney
for the District of Maryland

By: _____/s/_____
Rajeev R. Raghavan
Assistant United States Attorney


David L. Jaffe
Chief, Organized Crime and Gang Section
Criminal Division
U.S. Department of Justice

By: _____/s/_____
Gerald A.A. Collins
Trial Attorney

By: _____/s/_____
Lisa K. Man
Trial Attorney