## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-21-101** |
| | * | |
| **MADANI ILARA TEJAN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS [ECF NO. 44]

The United States of America, by and through its attorneys, Erek L. Barron, United States Attorney for the District of Maryland, and David L. Jaffe, Chief of the Organized Crime and Gang Section, U.S. Department of Justice, respectfully submits this response in opposition to the Motion to Suppress Statements [ECF No. 44] filed by Madani Ilara Tejan ("Tejan" or "the defendant") in the above-captioned case. For the reasons stated below, this Court should deny the defendant's motion.

### I.      PROCEDURAL HISTORY

On April 14, 2021, a federal grand jury sitting in the District of Maryland returned an Indictment against Tejan charging him with conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841 (Count Two); interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count Three); and using, carrying, brandishing, and discharging a firearm during and in relation to, and possessing, brandishing, and discharging a firearm in furtherance of, a drug

trafficking crime and a crime of violence, resulting in death, in violation of 18 U.S.C. §§ 924(c) and (j) (Count Four). [ECF No. 1][1]

On April 5, 2022, a scheduling order was issued by this Court. [ECF No. 29]. Per that order, the parties were to file pre-trial motions by May 6, 2022, as well as any oppositions and further responses prior to June 6, 2022, and June 24, 2022, respectively. Also, a motions hearing and trial date were scheduled for July 8, 2022, and September 6, 2022, respectively.

In accordance with the scheduling order, on May 6, 2022, Tejan filed various pre-trial motions. However, on or about May 8, 2022, counsel for the defendant contacted undersigned Government counsel and advised that he would be supplementing his pretrial motions with a motion to suppress all statements made by the defendant to law enforcement on or about October 20, 2018. Undersigned Government counsel consented to the late filing. Said motion was filed on or about May 29, 2022.

As fully discussed below, any statements made by Tejan were not illegally obtained by law enforcement in violation of the United States Constitution, nor the Supreme Court decision in *Miranda Arizona,* 384 U.S. 436, 444–45 (1966).[2] Accordingly, the defendant's statements should not be suppressed, and the Government respectfully requests that this Honorable Court deny his motion.

---

[1] On April 27, 2022, a Superseding Indictment was returned against the defendant.[ECF No. 30]. The Superseding Indictment amended the prior charging document to allege additional controlled substances in Counts One and Two, as well as the related drug weight. The defendant is now charged with conspiracy to distribute and possess with intent to distribute, in part, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 846 (Count One); and possession with intent to distribute a controlled substance, namely, oxycodone and fentanyl, in violation of 21 U.S.C. § 841 (Count Two). Counts Three and Four remained unchanged in the Superseding Indictment.

[2] In moving to suppress his statements, the defendant argues three main points. Specifically, the defendant contends that he "…was not timely *Mirandized*, did not formally waive his *Miranda* rights, and was questioned following his adamant invocation of his rights." [Def.'s Mot. to Suppress Stmts., ECF No. 44 at 2]. As discussed below in greater detail, at some point during the defendant's interview, he did in fact invoke his right to counsel. Due to this fact, the Government does not anticipate offering any statements made by the defendant after that invocation. Therefore, while the Government will be addressing the first

II.    **FACTUAL BASIS**

    a.  **The Murder of Anthony Freeland**

On Wednesday, October 3, 2018, at approximately 8:51 p.m., Prince George's County Public Safety Communications received a call for a shooting on Manton Way in Lanham, Maryland. Officers responded and located Freeland at approximately 9:37 p.m. on the sidewalk near 6509 Manton Way. Freeland was found with multiple gunshot wounds to the upper body. Emergency medical personnel also responded and attempted lifesaving measures. Despite these efforts, Freeland bled to death and responders were unable to revive him. He was pronounced dead at 9:55 p.m.

Located on scene was Freeland's cellular iPhone ("Freeland's iPhone"). A review of Freeland's iPhone's contents revealed that two telephone numbers contacted Freeland prior to the murder with phone number (202) 746-2459 being the last number Freeland was in contact with prior to the reported shooting. Detectives also found text messages on Freeland's iPhone. These text messages indicated that the suspect who utilized (202) 746-2459 also used (202) 878-3797 to communicate with Freeland on October 3, 2018. The number (202) 878-3797 was listed in Freeland's phone as "Mylik." Law enforcement identified the service provider associated with (202) 878-3797 and then obtained cellular phone records for this number. After review of these records, (202) 878-3797 was determined to be subscribed to and used by an individual named "Nadani Tejan." Based on this, and other evidence discovered during the investigation, the defendant was subsequently identified as a potential suspect. [3]

and second points raised by the defendant in his motion, the remaining point is moot. Therefore, it will not be addressed *herein*.
[3]  A detailed summary of law enforcement's investigation developing the defendant as a suspect in the Freeland murder is contained in the previously filed Government's Motion to Admit Certain Statements [ECF No. 40].

**b.   The Arrest and Interview of the Defendant**

On October 20, 2018, at approximately 8:55 p.m., Tejan was arrested on an outstanding warrant issued out of the District of Columbia Superior Court in Washington, D.C.[4] After his arrest, he was transported to the Prince George's County Police Department's Criminal Investigations Division and placed in interview room # 3. [*See* Ex. #1, October 20, 2018, Video/Audio recording of the defendant, attached hereto].[5] Upon entry, the room's audio/video system began automatically recording. [Ex. #1, 21:26:31][6]. Tejan remained in the room by himself until he ultimately met with Detectives Luis Cruz and Alexander Gonzalez. [Ex. #1, 23:00:08][7]. Detective Cruz began by asking the defendant to sit up and provide his full name; to which the defendant responded, even by spelling his first, middle, and last names. [Ex. #1, 23:00:29]. Detective Cruz then asked the defendant if he used to live in Lanham and stated that he (Cruz) recognized him (Tejan) from a previous encounter in the early 2000's when he (Tejan) attended

---

[4] On or about August 15, 2018, the defendant was arrested and charged in the District of Columbia with possession with the intent to distribute a controlled substance in *United States v. Tejan*, Case No. 2018 CF2 012086.  The defendant subsequently failed to appear for court on this matter and a warrant was issued on September 12, 2018.

[5]  A copy of Ex. #1 was previously submitted to this Court on or about June 6, 2022, for consideration as an exhibit filed with the Government's Response in Opposition to Defendant's Motions to Suppress Search of Cell Phone and Tangible Evidence [ECF No. 47].

[6]  The time "21:26:31" refers to the time reflected on the progress bar located at the bottom of the recorded video/audio screen. Every citation *hereinafter* to a time stamp in connection with Ex. #1 will be the time which is reflected in the progress bar at the moment of the relevant incident being referenced.

[7]  From the time he enters the room, the defendant is by himself.  However, at approximately 22:04:22, the defendant begins knocking on the interview room door and requests to be taken to the bathroom.  In response, two detectives enter the room and escort the defendant out of the room at approximately 22:07:16.  He is returned to the room at 22:10:15 and, after unshackling him, the detectives depart the room at 22:10:55.  During this window of time, there are casual (no case-related) conversations captured on the video/audio between the defendant and the escorting detectives. Outside of this window of time, no other detectives enter the room until the defendant's interview begins.

Duval High School[8]. [Ex. #1, 23:01:12]. In response, the defendant said he never lived in Lanham, but did attend Duval High School and did not remember Cruz. [Ex. #1, 23:01:19]. Detective Cruz then provided additional details about the encounter and when asked further about whether he recalled Cruz or the prior meeting, the defendant said "…kinda. It's been a while." [Ex. #1, 23:01:40]. Detective Cruz then said he recalled the encounter taking place on "Manton Drive," to which Tejan replied, "I never stayed with my father in Lanham…" [Ex. #1, 23:01:42]. The defendant further stated that Cruz was probably talking about his cousins (living over there) and not him (Tejan). [Ex. #1, 23:02:16]. After further explaining the encounter to Tejan and the defendant replying that he did not remember, Detective Cruz asked what brought him to their location, to which the defendant replied, "…that's what I'm trying to figure out." [Ex. #1, 23:02:49]

Soon thereafter, Detective Cruz said that the defendant had an outstanding warrant, but before the detectives could share any information, the defendant had to be read his *Miranda* rights. [Ex. #1, 23:03:24]. Detective Cruz then asked Tejan if he had ever been read his rights before, to which the defendant replied, "…in here?" [Ex. #1, 23:03:34]. Detective Cruz then clarified and said, "I mean just period?" to which the defendant replied, "yeah, yeah, yeah…" [Ex. #1, 23:03:36]. Detective Cruz then said "…so you are aware of your rights then?", to which the defendant replied "yeah." [Ex. #1, 23:03:38]

Detective Gonzalez then pulled out a small business-sized card, explained that he was going to read Tejan his rights, and formally introduced himself and Detective Cruz by name. [Ex. #1, 23:03:41]. Immediately thereafter, Detective Gonzalez verbally advised the defendant of his *Miranda* rights. Specifically, Detective Gonzalez stated the following:

---

[8] According to Detective Cruz, Tejan was the victim of a robbery during a period of time in which he (the defendant) was in high school. Law enforcement responded to an address on Manton Way in Lanham, Maryland, where they interviewed him.

"Alright man. So, you have a right to remain silent. Anything you say can be used against you in court. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be provided to you at no cost. If you decide to give a statement, you have the right to stop at any time so that you can speak to a lawyer."
[Ex. #1, 23:03:45].

Having heard the full warning, Tejan was asked if he understood his rights and immediately responded in the affirmative by saying "uh huh." [Ex. #1, 23:04:02]. Detective Gonzalez then said, "I need you to say yes or no," to which the defendant replied, "Yes." [Ex. #1, 23:04:03].

Following this confirmation, Detective Cruz explained to Tejan that he was brought in for a warrant and they (the police) had to "run them" (warrants). [Ex. #1, 23:04:07]. After being asked if he had "just come home," the defendant admitted that he had been previously incarcerated, the locations where he was incarcerated, and the length of his prior incarceration. [Ex. #1, 23:04:12]. During this conversation, the defendant discussed that he pled guilty in his prior case, his reasoning for why he pled guilty, the different plea offers extended to him, and his understanding of how the federal court system worked. [Ex. #1, 23:04:32]. The defendant and the detectives then proceeded to talk about his life and how he changed since being incarcerated. [Ex. #1, 23:05:20]. The defendant discussed how he found religion while incarcerated and further developed intellectually by reading literature, including Shakespeare. [Ex. #1, 23:05:50]. Detective Cruz asked the defendant where his parents currently lived and if he was staying with them, to which he replied "Upper Marlboro…. Naw. I was on the run." [Ex. #1, 23:07:44]. The defendant was then asked what happened to him in the District of Columbia (at the halfway house) and he discussed how he was not set up for success with rehabilitation or reentry because he was housed in the District of Columbia instead of Maryland where he was from. [Ex. #1, 23:08:00].

Detective Gonzalez then re-directed the conversation to why they were there and allowed Detective Cruz to take over the discussion. [Ex. #1, 23:09:37]. Detective Cruz then asked what Tejan's relationship was with "Keith" and how long he had been staying with him (Keith), to which the defendant

replied, "we talk... I wasn't really staying with him." [Ex. #11, 23:10:01]. Detective Cruz then rephrased the question and asked Tejan how long he had been "hanging out" with Keith, to which the defendant replied, "I can't really tell you." [Ex. #1, 23:10:06]. Tejan then expressed his frustration with the questioning and asked the detectives to get to why he (Tejan) was there. [Ex. #1, 23:10:17]. Detective Cruz explained that the defendant was there for his warrant, and they were asking about Keith because he (Tejan) was a fugitive from justice and was apprehended with Keith that day. [Ex. #1, 23:10:38]. The defendant then explained that he had been in consultation with his lawyer about identifying a date to turn himself in on the outstanding warrant. [Ex. #1, 23:11:00]. When asked again whether he had been staying with Keith or going between his parents' home, the defendant replied that he didn't stay with his parents. [Ex. #1, 23:11:50].

Detective Cruz then told Tejan that they also wanted to speak with him because he (Tejan) came up in a murder investigation (involving Freeland) and explained details of the investigation to the defendant. [Ex. #1, 23:12:14]. When Detective Cruz explained that there were cameras throughout the neighborhood where the murder took place, the defendant replied, "I know that neighborhood" and Detective Cruz said "Yeah... cause you used to stay there," to which the defendant replied, "uh huh." [Ex. #1, 23:15:08]. Detective Cruz then explained that one of the vehicles involved in the murder was found, the defendant's fingerprints were discovered in the car, and that it is known to law enforcement that two suspects were involved with the murder. [Ex. #1, 23:15:23]. Detective Cruz told the defendant that although his prints were in the car, that did not mean he was the shooter. [Ex. #1, 23:15:38]. The defendant then asked, "Can you tell me who the person is?" and Detective Cruz replied "Bleezy." [Ex. #1, 23:15:44]. Detective Cruz told Tejan that his Instagram posts showed that they (the defendant and Bleezy) were friends, and the defendant asked Detective Cruz to repeat the name again. [Ex. #1, 23:15:49]. After Detective Cruz repeated the name, the defendant then replied "Bleezy. Yeah. I know who you talking

about. Bleezy." [Ex. #1,  23:15:58]. Detective Cruz then explained that he had seen Bleezy's phone, that there were messages between the two men (Tejan and Bleezy), and that the defendant's number was saved as "Mylik" in Bleezy's phone, to which the defendant replied, "He had me saved as what?" and Detective Cruz responded "Mylik." [Ex. #1, 23:16:00]. Detective Cruz then told the defendant that he wanted to hear from him in his own words what happened. [Ex. #1, 23:16:24]. The defendant then asked twice "My name came up?" to which Detective Cruz replied, "absolutely." [Ex.# 1, 23:16:40]. Detectives Cruz and Gonzalez then attempted to encourage the defendant to explain what happened and why. [Ex. #1, 23:17:04]. The defendant asked if "Lo" (Keith) was alright and Detective Cruz replied to the defendant's question by saying, "He's a little upset" and that he (Cruz) knows that the two care about each other. [Ex. #1, 23:18:34]. Detective Cruz then explained that he (Cruz) did not believe Keith is involved but they are still investigating. [Ex. #1, 23:19:01]. Detectives Cruz and Gonzalez again tried to encourage the defendant to explain what happened in his own words. [Ex. #1, 23:19:28]. Eventually, the defendant asked to speak with a lawyer. [Ex. #1, 23:20:47].

### III.   ARGUMENT AND AUTHORITY

#### a.   The Defendant was Advised of his *Miranda* Rights in a Timely Manner and Made Statements After Being so Advised

*Miranda* warnings are required when a subject is interrogated while in custody. *Miranda v. Arizona*, 384 U.S. 436 (1996); *accord Dickerson v. United States,* 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule that Congress may not supersede legislatively," reversing unique Fourth Circuit holding to the contrary). The test for determining whether an individual is "in custody" for *Miranda* purposes is if, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984) (internal quotations omitted). *See, e.g., United States v. Giddens,* 858 F.3d 870, 879 (4th Cir. 2017); *United States v. Hargrove,* 625 F.3d 170, 178 (4th Cir. 2010), *cert. denied,* 565 U.S. 899 (2011). *Miranda* warnings

make a defendant "...aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." *Miranda,* 384 U.S. at 469. Statements then made by a defendant to police officers following a valid *Miranda* waiver are deemed admissible. *Id.*

The defendant argues: "there were no warnings given at the start of questioning. As such statements made by Tejan at this stage of questioning must be suppressed." [Def.'s Mtn to Suppress Stmts., ECF No. 44 at 3]. As summarized above, the defendant was clearly in custody, having been arrested on an outstanding warrant issued by the District of Columbia Superior Court. Upon entering interview room #3, Detective Cruz engaged in questioning and conversations with the defendant for approximately 3 minutes. Among the things discussed with the defendant were personal information consisting of his full name and whether he and Detective Cruz had ever encountered each other before. Also discussed was whether the defendant ever attended Duval High School or lived on Manton Way.

Generally, *Miranda* warnings are required to be given before an individual "in custody" may be interrogated. However, there are some exceptions to this rule. For example, under the "booking exception," personal information taken to establish identity, place of residence, etc., does not constitute "interrogation" for purposes of *Miranda. See, e.g., Pennsylvania v. Muniz,* 496 U.S. 582 (1990); *United States v. D'Anjou,* 16 F.3d 604, 608–09 (4th Cir. 1994) (INS agent eliciting standard background information from resident alien who was also subject of drug investigation not required to give *Miranda* warnings under "booking exception"); *United States v. Allen,* 13 F.3d 105, 109–10 (4th Cir. 1993) (probation office employee eliciting financial information to determine whether defendant qualified for court-appointed counsel not required to give *Miranda* warnings). Also, casual conversations or statements of agents about evidence which were not designed to elicit an incriminating response are not "interrogation" for *Miranda* purposes. *See United States v. Payne,* 954 F.2d 199 (4th Cir. 1992). The

statements provided by the defendant fall into these two exceptions. Questions regarding the defendant's name, where he resided, and where he went to school are consistent with eliciting personal information as discussed in *Muniz*. Because obtaining standard background information is a normal part of the booking process, Detective Cruz was not required to give *Miranda* warnings at that time. The same can be said for the discussion regarding whether the defendant and Detective Cruz had previously met. Like *Payne,* the questions by Detective Cruz and responses by the defendant were casual in nature, and therefore, do not implicate *Miranda.*

Following the rights, as read by Detective Gonzalez, the statements obtained from the defendant were in fact the direct product of a valid *Miranda* waiver. The validity of this waiver is demonstrated by the entire exchange between the three men. First and foremost, the interview established that Detective Gonzalez not only made the defendant aware of his privilege against self-incrimination, but also the consequences related to giving up these rights. A review of the recorded interview demonstrates that Detective Gonzalez was noticeably intentional and deliberate in his presentation of the defendant's *Miranda* rights. He did not attempt to recite the rights from memory or in an unscripted manner. Instead, Detective Gonzalez clearly and concisely read a prepared statement contained on a printed card. The statement advised the defendant that he did not have to speak with the detectives but, if he did, his statements could be used to his detriment. Detective Gonzalez then advised the defendant of his rights to an attorney to assist him in the process, and if needed, an attorney could be obtained for the defendant despite his financial situation. The advice given by Detective Gonzalez was entirely proper and presented in such a fashion that it enabled the defendant to understand the process and intelligently exercise his rights.

It was also apparent from the recorded interview that the defendant clearly understood the conversation. This was evidenced by his responses to questions posed by the detectives, as well as the

overall general back and forth communications between the three men. As already discussed, in the moments prior to the *Miranda* warnings, Detective Cruz engaged the defendant in a concise discussion regarding his identifying information; where the defendant lived and/or had lived previously; whether the defendant and Detective Cruz had met before; and why the defendant was arrested. Throughout the discussion, it was firmly established that the defendant was intellectually sound. He was able to clearly articulate his personal experiences with the legal system, and in turn, his understanding of how the system worked. He also stated that he improved himself while incarcerated by studying religion and reading various forms of poems and literature, including the Shakespearean tragedy MacBeth. While communicating, he appeared to respond to Detective Cruz's questions and comments without confusion or hesitation. Also, his responses were intentional, well thought out, clear, and to the point. At no time did he have trouble communicating with the detectives, nor appear to not understand what was being discussed.

The interview also confirmed that the defendant acknowledged his understanding of the rights as explained. Assuming *Miranda* applies, a subject may nevertheless waive his rights and voluntarily submit to custodial interrogation. To be valid, the waiver "need not be explicit, but may be inferred from all the circumstances." *United States v. Hicks,* 748 F.2d 854, 859 (4th Cir. 1984). *Accord Moran v. Burbine,* 475 U.S. 412, 421 (1986); *United States v. Cardwell, 433* F.3d 378, 389–90 (4th Cir. 2005) (finding "implied waiver" in defendant's willingness to answer questions after being advised of rights), *cert. denied,* 547 U.S. 1061 (2006); *United States v. Frankson,* 83 F.3d 79, 82–83 (4th Cir. 1996); *United States v. Gordon,* 895 F.2d 932, 939 (4th Cir. 1990). When Detective Gonzalez asked the defendant if he understood his rights, the defendant immediately responded in the affirmative by saying "uh huh." However, to make sure there was no confusion, the defendant was asked to say "yes or no." In response, the defendant said "yes." Immediately following this confirmation, the defendant then knowingly waived his rights by

continuing to communicate and interact with the detectives; something he did for approximately seventeen more minutes. *See Hicks,* 748 F.2d at 859 (waiver inferred by surrounding circumstances). Based on the proper administration of his *Miranda* rights and a valid waiver, the subsequent statements made by the defendant are therefore admissible.

### b.   The Defendant's Statements Were Voluntary

Just because *Miranda* warnings are required with custodial interrogation does not "…dispense with the voluntariness inquiry." *Dickerson v. United States,* 530 U.S. 428, 444 (2000). In determining voluntariness, the crucial inquiry is whether the subject's will has been "overborne" or "his capacity for self-determination critically impaired." *United State v. Pelton,* 835 F.2d 1067, 1071–72 (4th Cir. 1987). *Accord Hutto v. Ross*, 429 U.S. 28, 30 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Holmes,* 670 F.3d 586, 591–92 (4th Cir.), *cert. denied,* 568 U.S. 941 (2012); *United States v. Byers,* 649 F.3d 197, 214–17 (4th Cir.), *cert. denied,* 565 U.S. 969 (2011); *United States v. Cristobal,* 293 F.3d 134, 140 (4th Cir.), *cert. denied,* 537 U.S. 963 (2002).

Nothing in Tejan's recorded interview would have one believe that the defendant's will was overborne or that his capacity for self-determination was critically impaired. Clearly, the defendant possessed the requisite mental state or capacity to knowingly waive *Miranda*. At the time of arrest, the defendant was an adult male who had a high school education.[9] There was no indication (verbally or otherwise) that anything affected the defendant's ability to understand the circumstances or conversation with the detectives. Instead, he appeared to be very articulate, intelligent, and knowledgeable; especially during his discussions involving the court system, rehabilitation, religion, and literature. He was

---

[9] As discussed previously, Detective Cruz said that he had met the defendant previously when he was at DuVal High School in the early 2000's. As described, that period would have been approximately 13 to 18 years prior.

conversational with the detectives and communicated clearly and effectively with them. He listened intently to what was said and did not just accept or agree with everything that was conveyed. At times during the meeting, the defendant asked questions for clarity and then responded. The defendant even pushed back on the detectives' assertions or interpretations stating, "that's your perspective," thereby showing his assertiveness in the situation. The interactions between the defendant and the detectives, as well as his responses to their questions and directions, were that of an individual who fully comprehended the situation at hand. Individually and collectively, these characteristics demonstrated that the defendant had the ability to understand, and in fact did understand, the *Miranda* warnings. As a result, he knowingly, intelligently, and voluntarily relinquished the rights explained to him by continuing to engage with the detectives.

In further determining the voluntariness of a statement, the court will examine "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *United States v. Ellie,* 111 F.3d 1135, 1143–44 (4th Cir. 1997); *Pelton,* 835 F.2d at 1071; *accord United States v. Van Metre,* 150 F.3d 339, 348–49 (4th Cir. 1998) (fifty-five-hour delay between arrest and initial court appearance did not render confessions involuntary in light of "totality of circumstances," noting absence of "coercive police misconduct"). In the instant matter, when considering the totality of the circumstances, it is unquestionable that the defendant's statements were voluntarily given. Considering the factors in *Ellie,* the statements provided by Tejan occurred within a relatively short period following his arrest on October 20, 2018 (approximately 2 hours and 25 minutes between his arrest by police and the time he requested an attorney). The interrogation took place in a standard interview room. Though there were two detectives present, mainly Detective Cruz interviewed the defendant, in a relaxed, non-confrontational manner. Tejan was treated well by investigators; they removed his restraints before questioning, answered questions he

posed, escorted him to use the bathroom, agreed to get him something to drink, and overall were polite and professional the entire time. Though the defendant initially said he was tired, at no time did he exhibit signs of extreme physical discomfort or evidence that the detectives' questioning was affecting his physical well-being. There was no indication that Tejan did not understand the detectives, their questions or directions or lacked the capacity to do so. To the contrary, the defendant was responsive, calm, and coherent throughout the interview.

Ultimately, Tejan made statements in response to the detectives' questioning that were relevant to the crimes being investigated. Though his statements were made without counsel, the defendant was accustomed to the process and knew the value of having an attorney. Early in the conversation, the defendant explained to detectives the circumstances around his prior criminal conviction and the negotiation process resulting in his incarceration. When discussing his warrant status, the defendant told the detectives that he had a lawyer who was helping him with the procedure for turning himself in. Tejan also stated that he had previously been advised of his rights to a lawyer and understood his rights. Indeed, the defendant was so accustomed with the process that he understood that he could stop questioning at any time by informing the police he was done – which he in fact elected to do. The instructions given to him by Detective Gonzalez, the defendant's prior contacts with the criminal justice system, as well as the manner he conducted himself with law enforcement that night, demonstrate his familiarity with the process and indicate that he was well-aware of his rights and how to exercise them.

Despite this, Tejan argues that the behavior of the detectives was somehow coercive and, therefore, his statement was involuntarily obtained. The defendant takes specific issue with the fact that Detective Cruz repeatedly said his fingerprints were discovered in one of the suspect vehicles and commented that his friend Keith cared about him and was upset (about the situation). [*See* Def.'s Mtn to Suppress Stmts., ECF No. 44 at 2]. A condition precedent to a finding of involuntariness is coercive government conduct.

*Colorado v. Connelly,* 479 U.S. 157, 165 (1986) (even if mentally ill defendant "ordered by the voice of God" to confess felt "coerced" the coercion was not attributable to the government). *Accord Florida v. Bostick,* 501 U.S. 429, 436 (1991) (even though defendant's movements were restricted, these restrictions were not the result of *government* conduct); *Cristobal,* 293 F.3d at 140–41 (statements taken from defendant on narcotic painkillers the morning after surgery, but who appeared to be lucid, held voluntary); *United States v. Braxton,* 112 F.3d 777, 781–83 (4th Cir. 1997) (neither statements by agents that they "needed" to speak to defendant nor their warning that he would "face five years" if he did not "come clean" sufficiently coercive to render subsequent statement involuntary); *Ellie,* 111 F.3d at 1143–44 ("coercive police activity is a necessary predicate to a finding that a statement is not voluntary within the meaning of the due process clause"). For a statement to be involuntary under the Due Process Clause, it must be "extracted by... threats or violence"; or "obtained by ...direct or implied promises" or "the exertion of ... improper influence." *Braxton,* 112 F.3d at 780. On the other hand, to be voluntary, the circumstances surrounding the interrogation or interview need not be entirely free from intimidation. *Id.* at 780–82; *Pelton,* 835 F.2d at 1072. Rather, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton,* 112 F.3d at 782 (internal quotation omitted) (approving the practice of warning subject of additional charges and penalties he may face for making false statements to interviewing agents or officers), *citing Pelton,* 585 F.2d at 1073.

Tejan's statements are also voluntary because they meet the requirements set forth in *Braxton* and *Pelton.* At no point did the detectives make any threat or promise, either express or implied, to induce the defendant's statement. Instead, the detectives explained why the defendant was arrested (the warrant) and then discussed the Freeland murder. They explained their investigation, even telling the defendant some of the facts potentially linking him to the crime. While stating that his prints were in the car, and even

referencing Keith (in response to the defendant's own question about Keith's well-being), none of these comments rise to the level of a threat or exertion of improper influence. Nor were they intended to. Assuming *arguendo* that Detective Cruz's statements regarding the fingerprint evidence were misleading, that does not end the Court's inquiry as to whether the defendant's waiver was involuntary. *See United States v. Breeden*, 149 Fed. Appx. 197, 202 (4th Cir. 2005) (stating that "[w]hile [the] law enforcement officers' deception is relevant in determining the voluntariness of a confession, it is not determinative"). Instead, the Court must determine whether the statement was "so manipulative or coercive that [it] deprived [the defendant] of his ability to make an unconstrained, autonomous decision to" waive his rights. *United States v. Walton*, 10 F.3d 1024, 1030 (4th Cir. 1993).

Looking at the totality of the circumstances involving the interrogation, the detective's actions were not so coercive or manipulative to improperly persuade Tejan to invovluntarily waive his rights. It is evident from the interview that the detectives never engaged the defendant in an argumentative manner, accusatory tone, or with raised voices. To the contrary, the detectives specifically told Tejan they wanted to give him the opportunity to tell his side of the story and encouraged him to do so. Interrogating the defendant in this fashion, even with the type of dialogue that Tejan complains of, is in no way coercive and is therefore, permissible.

## CONCLUSION

The statements obtained by law enforcement from the defendant were not in violation of the United States Constitution nor the Supreme Court decision in *Miranda*. Instead, they were the product of the defendant's knowing and voluntary waiver of the *Miranda* rights that were properly administered and explained to the defendant. For the foregoing reasons, and any others that may be presented at a future hearing, the Government respectfully requests that this Honorable Court deny the defendant's Motion to Suppress Statements [ECF No. 44].

Respectfully submitted,

EREK L. BARRON
United States Attorney
for the District of Maryland

By:     */s/ Rajeev Raghavan*
        Rajeev R. Raghavan
        Assistant United States Attorney
        6406 Ivy Lane Suite 800
        Greenbelt, MD 20770
        (301) 344-4031

        DAVID L. JAFFE
        Chief, Organized Crime and Gang Section
        Criminal Division
        U.S. Department of Justice

By:     */s/ Gerald A.A. Collins*
        GERALD A.A. COLLINS
        Trial Attorney
        Organized Crime and Gang Section
        Criminal Division
        U.S. Department of Justice

By:     */s/ Lisa K. Man              .*
        LISA K. MAN
        Trial Attorney
        Organized Crime and Gang Section
        Criminal Division
        U.S. Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2022, I electronically served one copy of the Government's Response to Defendant's Motions to Suppress Statements by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel for the defendant.

*/s/ Gerald A.A. Collins*

GERALD A.A. COLLINS
Trial Attorney