<pre>
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3   _____
                                     )
 4   UNITED STATES OF AMERICA        )
          v.                         )   Case No. 8:21-cr-00101-GJH-1
 5   MADANI ILARA TEJAN,             )
                      Defendant.     )
 6   _____)

 7                              Greenbelt, Maryland
                                January 27, 2023
 8                              11:28 a.m.

 9      ARRAIGNMENT, MOTIONS HEARING, AND PRETRIAL CONFERENCE
            BEFORE THE HONORABLE GEORGE JARROD HAZEL
10
                      A P P E A R A N C E S
11
     ON BEHALF OF THE GOVERNMENT:
12
         UNITED STATES DEPARTMENT OF JUSTICE
13       1301 New York Avenue, N.W., 7th Floor
         Washington, D.C.  20005
14       BY:  GERALD AKIDA ASIM COLLINS, TRIAL ATTORNEY
              (202) 262-6484
15            Gerald.a.Collins@usdoj.gov
         BY:  LISA K. MAN, TRIAL ATTORNEY
16            (202) 598-2319
              lisa.man@usdoj.gov
17
         UNITED STATES ATTORNEY'S OFFICE
18       6500 Cherrywood Lane, Suite 200
         Greenbelt, Maryland  20770
19       BY:  CAITLIN R. COTTINGHAM, ASSISTANT U.S. ATTORNEY
              (301) 344-0862
20            caitlin.cottingham@usdoj.gov

21                         (Continued)

22

23

24

25
</pre>

1                    A P P E A R A N C E S (Cont'd)

2      ON BEHALF OF THE DEFENDANT:

3          DAVIS & DAVIS
           1350 Connecticut Avenue, N.W., Suite 202
4          Washington, D.C.  20036
           (202) 234-7300
5          BY:  CHRISTOPHER MICHAEL DAVIS, ESQUIRE
                (202) 234-7300
6               cmdavisdc@gmail.com
           BY:  MARY ELIZABETH DAVIS, ESQUIRE
7               (202) 234-7300
                dcmedavis@gmail.com
8          BY:  SEAN PAUL McCLIGGOTT, ESQUIRE
                602A North Tazewell Street
9               Arlington, Virginia  22203
                (989) 992-3537
10              seanmacklaw@gmail.com

11     ALSO PRESENT:  ALLYSON HAMLIN, PGPD

12

13

14

15

16

17

18

19

20

21

22

23
                        PATRICIA KLEPP, RMR
24                     Official Court Reporter
                   6500 Cherrywood Lane, Suite 200
25                   Greenbelt, Maryland  20770

1          P R O C E E D I N G S

2          (Call to order of the Court.)

3          THE COURTROOM DEPUTY:  All rise.  The United States

4   District Court for the District of Maryland is now in session,

5   the Honorable George Jarrod Hazel presiding.

6          THE COURT:  Good morning.  You may all be seated.

7          Government can call the case.

8          MR. COLLINS:  Good morning, Your Honor.  Gerald

9   Collins, Lisa Man, and Caitlin Cottingham on behalf of the

10  government.  The government will call United States of America

11  v. Madani Tejan, Case No. GJH-21-101.

12         THE COURT:  All right.  Good morning to each of you.

13  I was just confirming it is still morning; it is still morning.

14         MR. DAVIS:  Good morning, Your Honor.  Christopher

15  Davis and Mary Davis, and Sean McCliggott is at counsel table

16  observing today.  We're here on behalf of Mr. Tejan.

17         THE COURT:  All right.  Good morning to each of you.

18  I think I recognize counsel for the victim's family, if I'm

19  remembering correctly from the last time.  If you want to -- I

20  just remember last time you wanted to introduce yourself.  I'll

21  just give you a moment if you want to come to the podium and do

22  that.

23         MR. STONE:  Yes, Your Honor, thank you.  Victor Stone

24  on behalf of the victim's family.

25         THE COURT:  I'm sorry, I can't hear you yet; you have

1    to get to the microphone.

2          MR. STONE:  Excuse me, Your Honor, yes.  I'm Victor

3    Stone, I'm counsel for the victim's family, and we're sitting in

4    the gallery today because we don't have a particular issue yet

5    that we have to respond on.

6          THE COURT:  That's fine.

7          MR. STONE:  If we do, I'll raise my hand.

8          THE COURT:  Yeah.  No, just as a courtesy, I wanted

9    you to introduce yourself.  I remember you from the last

10   hearing.

11         MR. STONE:  Thank you so much, Your Honor.

12         THE COURT:  I just wanted to acknowledge that I

13   recognize you are here with the family.  And good morning to

14   you, and my continued condolences, of course.

15         All right.  So there are a number of things we have to

16   accomplish today.  First, before I forget, is, I'm told that

17   Mr. Tejan needs to be arraigned, still, on the superseding

18   indictment, that we didn't do that last time -- or at least it's

19   not clear.  So I'd like it to be clear.  So if we can go ahead

20   and arraign him on the superseding indictment, that would be

21   great.

22         THE COURTROOM DEPUTY:  Mr. Tejan, please stand and

23   raise your right hand.  You do solemnly promise and declare

24   under the penalties of perjury that the information you are

25   about to give to the Court in the matter now pending before it

```
1    shall be the truth, the whole truth, and nothing but the truth?

2              THE DEFENDANT:  I do.

3              THE COURTROOM DEPUTY:  You may lower your hand.  Would

4    you please move that microphone up a little bit so that we can

5    hear your answers more clearly.

6              THE COURT:  Let me also say -- and I probably should

7    take the signs down.  We're now in I think in a phase where

8    mask-wearing is optional, and so it's -- I see everybody has

9    their mask on, which tells me that we're under the impression

10   that you have to.  You can choose to keep your mask on, but it

11   is optional.

12             THE COURTROOM DEPUTY:  Sir, please state your full

13   name for the record.

14             THE DEFENDANT:  Madani Ilara Tejan.

15             THE COURTROOM DEPUTY:  What is your age?

16             THE DEFENDANT:  30.

17             THE COURTROOM DEPUTY:  In what year were you born?

18   Just the year.

19             THE DEFENDANT:  1992.

20             THE COURTROOM DEPUTY:  Have you been furnished with a

21   copy of the superseding indictment by the United States

22   Attorney?

23             THE DEFENDANT:  I have.

24             THE COURTROOM DEPUTY:  Have you read the superseding

25   indictment?
```

1          THE DEFENDANT:  I have.

2          THE COURTROOM DEPUTY:  Do you understand the charges

3    which have been placed against you?

4          THE DEFENDANT:  Yes.

5          THE COURTROOM DEPUTY:  Mr. Davis and Ms. Davis, you

6    represent the defendant.  Are you satisfied that he understands

7    what he is charged with?

8          MR. DAVIS:  We are.

9          MS. DAVIS:  Yes.

10         THE COURTROOM DEPUTY:  Thank you.

11         Mr. Tejan, you've been charged in Counts One, Two,

12   Three, and Four of the superseding indictment.  What is your

13   plea?

14         THE DEFENDANT:  Not guilty.

15         THE COURTROOM DEPUTY:  The plea is not guilty to

16   Counts One, Two, Three, and Four of the superseding indictment;

17   is that correct?

18         THE DEFENDANT:  Yes.

19         THE COURTROOM DEPUTY:  Thank you.  You may be seated.

20         THE COURT:  All right.  Thank you both.

21         The second order of business.  So the last time we

22   were here, we had a motions hearing.  It ran a little longer

23   than the Court had at least anticipated, and as a result of

24   that, I think we went a little past 5:00 when we were finishing

25   with argument.  At that time, I indicated that there was not

1    enough time for me to rule from the bench.  It's probably me

2    that had to go somewhere promptly at 5:00.

3              I indicated I might do a written ruling, but then

4    I think the pretrial conference at the time was getting close,

5    so I just issued a one-page order, just identifying my rulings

6    with a promise that I would detail them on the record at the

7    forthcoming pretrial conference that was issued on August 8th.

8    At that point I think the pretrial conference was scheduled for

9    August 20-something.  I certainly wasn't anticipating that it

10   would be January 27th before we were back in court again.

11             But I do remember -- although I do appreciate the

12   reminder from defense counsel just in case, I do remember that I

13   still need to put my reasoning for my rulings from the last

14   motion hearing on the record, so I did want to actually start by

15   doing that.  And it might take me a moment, and I have papers

16   that I'm spreading out all over the place with my various notes.

17             So there were, of course, a number of motions that

18   were before the Court.  Again, I did dispose of the motions in

19   ECF No. 66, in which I provided my rulings but did not at the

20   time, as I just indicated, provide my reasoning.  As an initial

21   matter, I want to note that at the motion hearing, the

22   government called a total of three witnesses.  There were two

23   witnesses that were relevant to the government's motion to admit

24   statements.  There was one that was relevant to the motion to

25   suppress statements.

1          The Court found all three of the witnesses to be

2     credible, thus unless expressly stated otherwise, the recitation

3     of each witness's testimony, that I will provide here, also

4     serves as the Court's finding of facts for those two respective

5     motions, which I'll address first before moving to some of the

6     others.

7          As a general matter -- apologies if I pronounce any of

8     the names incorrectly; I'll certainly do my best.  The first

9     witness we heard from was Jude Egbufoama, who testified that he

10    had previously entered a guilty plea on fraud-related crimes in

11    2019 and entered a cooperation agreement with the government,

12    was testifying pursuant to that agreement.  The witness

13    indicated that he knew a person who he knew as Billa, and that

14    he knew Billa through a friend, that he had met him a number of

15    times and was able to identify him by a photograph, which he did

16    in court.  The last time he saw Billa was on the day he died, in

17    October of 2018.  He knew Billa through Billa's best friend,

18    B.K., who was an associate of his.

19         On one occasion, Billa and B.K. came to his music

20    studio with the defendant, who was introduced to him as Dani.

21    Mr. Egbufoama -- and that's E-G-B-U-F-U-O-A [sic]-- recounted

22    the day that Billa died.  He had gone to get lunch and received

23    a call from Billa, indicating that Billa wanted to talk.  He was

24    provided an address where Billa and Dani were present.  Billa

25    did not want to talk on the phone.  It was unusual for Billa to

1  call and want talk to him, because they were not particularly

2  close.

3          When he arrived, Billa and Dani were standing in front

4  of the apartment and asked him to park in the garage.  He then

5  went inside the residence.  Billa showed him around the

6  apartment.  They spent some time there sitting around and

7  drinking.  While there, B.K. called to find out where he was,

8  and he told him he was at Dani's house with Billa.  At some

9  point, Billa went to get Chinese food.  Later, someone called

10  Dani, and another person came and dropped a package off for him.

11  The witness said he did not see inside the package but later

12  acknowledged that he had previously testified that it smelled

13  like marijuana.

14          Mr. Egbufoama's wife called him around 5:00 p.m.

15  because his son had a doctor's appointment that day, so he left.

16  Billa told him that he and Dani were going to go somewhere to

17  handle some business and to "bust a swerve."  When he came back

18  from the doctor's appointment, "he" being the witness, he

19  received a call from B.K.  It was about 8:00 in the evening.  He

20  was asked if he had seen Billa and told B.K. that he had last

21  seen him with Dani, that day.  B.K. broke down and told him that

22  Dani -- excuse me.  B.K. broke down and told him that Billa had

23  been killed.  He also said that Dani had said that he had not

24  seen Billa that day, which Mr. Egbufoama knew to be untrue.

25          The government also called, relevant to this issue,

10

```
 1   Detective Lee Littlejohn.  He was a retired homicide detective
 2   from the D.C. Metropolitan Police, involved in the murder
 3   investigation of Mr. Fotachwi.  He testified that the
 4   Metropolitan Police Department was alerted by ShotSpotter at
 5   5318 Drake Place, and when units arrived, they were flagged down
 6   by a citizen, indicating that an individual was found in a car
 7   in a parking lot who had been shot.  The shots took place at
 8   7:27 p.m.
 9          One witness described an individual seen coming from
10   the driver's side of the vehicle and ultimately running out of
11   the parking lot.  The second person of interest was seen getting
12   into the passenger side of a newer model SUV.  That person fit
13   the defendant's description.  Cartridge cases found at the scene
14   indicated there may have been two shooters.
15          Police determined that a gentleman named Keith
16   Williams shared a residence with the defendant and that an Uber
17   ride was requested by Mr. Williams to pick up an individual one
18   block from the murder around 7:33 p.m.  The person picked up by
19   the Uber was taken back to 8831 Lottsford Road, where the
20   defendant and Williams lived.  The Uber driver was interviewed
21   and stated that an individual jumped in the back of the car and
22   said, "Hurry, hurry, there has been a shooting," but would not
23   elaborate further when asked what had happened.  The driver was
24   shown a single photograph of the defendant and indicated that
25   the defendant did look like the individual who had entered his
```

1   car that night.

2            The government also included as part of its case on

3   this issue some grand jury testimony.  I think in total, there

4   were three transcripts attached.  I'm only going to refer to

5   one, so I'll just refer to it as grand jury witness 1.  This

6   person testified that in the days before Billa was killed, he

7   had a conversation about a shooting that Billa knew about.  He

8   said that he had been with the defendant, that Dani had gotten

9   out of the car, walked up to someone and a couple of minutes

10  later, ran back down to the car.  Dani had told him that whoever

11  he went to meet tried to rob him, and he shot him.  According to

12  that grand jury witness, the witness had expressed some doubt

13  about the story, and Billa went back and talked to him about

14  what happened.  Dani at some point admitted to robbing the guy

15  and then shooting him.

16           The government put forward two theories for why the

17  decedent's statement to this grand jury witness should be

18  admitted despite it being an out-of-court statement being

19  admitted for the truth.  The first was the statement against

20  penal interest exception.  Under federal rule of evidence

21  804(b)(3), certain statements are admissible if made by the

22  declarant and against their penal interests.  The Fourth

23  Circuit's test for whether a statement qualifies and may be

24  admitted under this exception is if the declarant is

25  unavailable, the statement is genuinely adverse to the

declarant's penal interests, and corroborating circumstances
clearly indicate the trustworthiness of the statement.

I think of significance, a statement against interest
is defined as one where a reasonable person in the declarant's
position would have made the statement only if the person
believed it to be true because when made, it exposed the
declarant to civil or criminal liability.  Here, I'm simply not
convinced that the government meets that standard.  In short, in
the decedent's telling of the story, he drove the defendant
somewhere to conduct a swerve, and then when the defendant came
back, he said the decedent tried to rob him.  And he -- and I'm
sorry, there are two decedents in this case.  But when the
defendant came back, he said the decedent tried to rob him, and
he shot him, and the defendant drove him away.

Driving someone away who is claiming he shot someone
in self-defense would not be a crime.  To the extent that he is
admitting he was involved in a potential drug dealing, I just
think it's important, when considering the standard that we
apply, whether it would have compelled a reasonable person to
only acknowledge it if he was telling the truth.

I think it's important to keep in mind that we're
talking about a relatively minor offense relative to his
discussing a homicide.  The Court believes that's significant,
because again, the issue that this exception goes to isn't just
the fact that he might be admitting to some crime, just however

1    minor it might be, it's whether the nature of the admission is

2    such that it lends more credibility to the rest of his story.

3    And because ultimately, that's the purpose of any hearsay

4    exception; it's not just that it meets -- it checks whatever

5    boxes, but that it's supposed to give the Court some greater

6    sense, at least as to this exception, that it's a truthful

7    statement here because he admitted to committing some other

8    crime.  I just don't feel that that meets that standard in this

9    instance.

10            However, that still leaves forfeiture by wrongdoing,

11   and here, I do think the government is on sure footing.  Federal

12   rule of evidence 804(b)(6) provides an exception to the hearsay

13   rule for statements offered against a party that wrongfully

14   caused or acquiesced in wrongfully causing the declarant's

15   unavailability as a witness and did so intending that result.

16   The advisory committee notes in the rules underscore the

17   immeasurable inequity of permitting a defendant to benefit from

18   the rule prohibiting the introduction of a statement made by an

19   unavailable declarant when the defendant made the declarant

20   unavailable by killing him.

21            Here, based on the evidence I've already discussed,

22   and which I've credited, I find by a preponderance of the

23   evidence that the defendant was responsible for the murder of

24   the potential witness and that he committed or acquiesced in

25   that murder in order to make the witness unavailable for trial.

1    Specifically, he was with the witness that day.  It's been

2    conceded that he was at the scene of the murder with him.  That

3    he fled from the scene in an Uber.  That when asked about the

4    decedent later, he lied and claimed he hadn't seen him that day.

5    That he had a motive to kill him because according to one of the

6    grand jury witnesses, the witness had been joking about

7    snitching on him.

8            Now, one thing I do want be to clear about, I'm not

9    sure that that would be significant or sufficient to get me to

10   proof beyond a reasonable doubt; it probably wouldn't be.  But

11   the Court's understanding of the standard it's the applying here

12   is preponderance of the evidence, and I do think it is

13   sufficient to establish that finding by a preponderance of the

14   evidence.  So the statements will be admitted pursuant to the

15   exception for forfeiture by wrongdoing.

16           I know -- and I recall because I went back and read

17   the discussions we had during the hearing.  I would not allow

18   the government to introduce evidence as to why the declarant is

19   unavailable for trial.  Mr. Davis indicated that he might be

20   inclined to demonstrate why the witnesses are testifying the way

21   they are; i.e., that they believe the defendant to be

22   responsible for the demise of their friend.  That's a tactical

23   choice that Mr. Davis can make, Mr. or Ms. Davis can make.

24   But -- so again, where I'll leave that is, the government can

25   introduce the statements.

1          As is often the case, the jury will not be made aware

2     as to why I'm allowing in certain hearsay statements and might

3     not allow other hearsay statements.  They will not be told why

4     the witness is unavailable, at least not by the government or in

5     the government's case.  If the defense chooses to do that,

6     again, that's their decision to make, and obviously, at that

7     point, it might open the door to further discussion of the issue

8     from the government.

9          As it relates to the motion to suppress statements --

10    and again, if I've ruled on these already, I'm just providing my

11    reasoning now.  Regarding to that motion, the government called

12    Alexander -- Detective Alexander Gonzalez.  He was assigned to

13    the homicide unit of the Prince George's County Police

14    Department.  He interviewed the defendant in regard to a

15    homicide that occurred on October 3rd, 2018.  Detectives began

16    by collecting biographical information from the defendant.  His

17    partner then began having conversations with the defendant.  The

18    conversation involved a prior contact between Detective

19    Gonzales' partner and the defendant as well as clothing that he

20    had on.  This part of the conversation took place before

21    Miranda, but the government seeks to introduce some portions of

22    that part of the conversation.

23          Detective Gonzales testified that this is typically

24    done, this kind of conversation, simply to build rapport before

25    questioning begins.  After some conversation, in this case,

1    Miranda warnings were provided.  The defendant indicated that he

2    understood the warnings, and then the questioning began.

3         Detective Gonzales also acknowledged that the

4    defendant was not informed on the front end that he was there

5    for a homicide investigation and that he had stopped talking

6    once he became aware of that.  The defendant was also told that

7    his fingerprints were found in the decedent's vehicle, even

8    though that was not true, or at least not known to the detective

9    at that time.

10        Miranda warnings are of course required whenever a

11   subject is interrogated while in custody.  Here, there's really

12   no dispute that the defendant was in custody.  Really, the

13   question is whether he was being interrogated.  Courts have

14   found previously that booking questions and -- well, primarily

15   booking questions that take place before Miranda do not

16   implicate the Miranda requirement.  Here -- first let me say,

17   here, there is no question in the Court's mind that he was given

18   Miranda and waived.  The defendant makes the point that he

19   wasn't told why he was there or why he was being questioned.

20   It's an interesting point, but the case law doesn't require that

21   the defendant be told why he's being questioned.  And I believe

22   I had invited any case law on that issue that I wasn't aware of.

23        Similarly, you know, the fact that defendant wasn't --

24   the defendant was told his fingerprints were found in the

25   decedent's vehicle, which may not have been true, it's just

1    another example of tactics that detectives use that are -- or

2    have not been rejected as allowable tactics by the Supreme Court

3    or the Fourth Circuit, or any other Court that I'm aware of,

4    frankly.

5            A closer question for the Court, as I started to

6    reference a moment ago, was the issue of the three minutes or so

7    of conversation at the beginning of the interview.  I did

8    wrestle with that before making my ruling.  Ultimately, I do

9    accept the testimony of Detective Gonzales, that his partner,

10   who he had worked with before, was just trying to build rapport

11   before going into questioning and was not seeking to interrogate

12   him at that point.  I therefore find that the beginning portion

13   of the interview can also come in under both the booking

14   exception and cases such as Payne, where the conversation was

15   not entitled -- or excuse me, was not for the purpose of trying

16   to elicit information related to the case and therefore was not

17   interrogation and did not implicate Miranda.

18           For what it's worth, I will say it's a closer call.

19   So to the extent the government, you know, has to decide whether

20   you want to leave appellate issues lingering out there, I just

21   flagged it. I think it's a close call.  But I try to view my job

22   as getting to the right answer, not getting to the answer that

23   I'm most confident will get me affirmed.  So again, I just -- I

24   indicated I think it's a close call, but ultimately, when I go

25   through it and look at the cases, I think that those three

1    minutes are still admissible and do not need to be suppressed.

2          Finally on that point, having reviewed the tape in its

3    entirety, there's nothing from which the Court would conclude

4    that the defendant's waiver of Miranda or the resulting

5    statements were involuntary in nature.

6          So those were the most detailed issues the Court had

7    left -- I don't say unresolved, I did resolve them, but that I

8    needed to provide additional detail for.  I know that there is

9    also the motion to suppress the fruits of the search warrant.

10   Given that we now have a new pending motion on that, again, I

11   had already denied it, but it probably makes sense to hear the

12   argument on that before I provide reasoning and then handle that

13   all at one time.  So I will continue to put that one to the side

14   for the moment.

15         As for the motion for a bill of particulars, very

16   briefly, I had reviewed the indictment and determined that it

17   contains the requisite specificity, and so I denied that motion

18   for the same reason I denied the motions to dismiss, which were

19   based on the defendant's claim that they were insufficiently

20   specific.

21         And then last but not least, there was a motion to

22   sever.  I found that these charges are properly joined, as the

23   facts are intertwined.  The relationship between the decedent

24   and the defendant was one based on drug activity.  I do not find

25   the defendant is prejudiced in any way.  Any suggestions he has

 1   made to the contrary have been conclusory in nature.  The Court

 2   will of course instruct the jury that they are to consider each

 3   charge individually.

 4            I think that addresses all the motions that I needed

 5   to address from the prior hearing.  Any questions about my

 6   rulings from the past hearing?  I'm not used to starting out a

 7   hearing by talking that long.  Any questions based on any of

 8   that?

 9            MR. COLLINS:  Nothing from the government, Your Honor.

10   Thank you.

11            MR. DAVIS:  Nothing from the defense, Your Honor.

12            THE COURT:  All right.  So now we move into what we

13   actually had on tap for today.

14            There is, again, as I had suggested, a motion for a

15   Franks hearing based on some information that I assume came out

16   since the last time we were together about mistakes that were

17   made in the affidavit.  And then there's also a motion for

18   statement of reasons for denial of grant of pretrial motions.  I

19   guess I'll grant that, since I did just give those reasons.  And

20   then motion in limine to exclude all evidence concerning the

21   search of the defendant.  And then finally, last but not least,

22   a motion to exclude two predicate offenses in Count Four of the

23   superseding indictment.

24            All of those I think are Defendant motions, unless I'm

25   missing anything.  Did I miss something from the government?

1          MR. COLLINS:  No, that's correct, Your Honor.

2          THE COURT:  All right.  So I'll hear from the

3     defendant first.  You can discuss as you need to, but whenever

4     you're ready, I'll hear from the defendant on those motions.

5          MR. DAVIS:  Which motion is it that you want?

6          THE COURT:  Any of the three that you want to be heard

7     on.  There's the motion for a Franks hearing filed -- I mean,

8     this was filed back on October 14th, but I haven't resolved it.

9     There was a motion for a statement of reasons, which I just

10    resolved, a motion in limine to exclude all evidence concerning

11    the search of the defendant at the halfway house that was filed

12    on January 13th, and there's a motion to exclude two predicate

13    offenses in Count Four, which is January 21st.  So those are all

14    Defendant motions.  I'll take them in either order.  You may

15    split them up, however you want to do it.

16         MS. DAVIS:  Okay.  Your Honor, where do you want us to

17    be?

18         THE COURT:  The podium's probably best, just in terms

19    of being able to hear.

20         MS. DAVIS:  Okay.  Your Honor, I'll be addressing two

21    of the motions.  The first one is to exclude predicate offenses.

22         THE COURT:  I had a feeling that one would be yours;

23    it seems up your alley.

24         MS. DAVIS:  Well, upon further review of it, you know,

25    we just want this in case the law changes in any of those cases.

```
 1    I know the Green case was argued on Tuesday.  I listened to most
 2    of it.  I don't know where it's going to go, but I --
 3              THE COURT:  I was going to say -- because I do try to
 4    track this issue, because I have to, obviously.  My
 5    understanding is that the current state of the law in the Fourth
 6    Circuit is that a Hobbs Act robbery is a crime of violence; is
 7    that --
 8              MS. DAVIS:  That's right.
 9              THE COURT:  It could change.
10              MS. DAVIS:  Right.  And because the Court issued an
11    opinion, unpublished opinion in the Pyos case.
12              THE COURT:  Right.
13              MS. DAVIS:  But I think that the argument in the Green
14    case is a little bit different, and I -- listening to the
15    argument, I thought they did a very good job of, you know,
16    saying why that case should -- Hobbs Act robbery should not
17    count as a crime of violence.  In regard to the conspiracy, as a
18    predicate, the law is always changing, so we're basically
19    putting that motion in as a placeholder in case things change.
20              THE COURT:  Sure.
21              MS. DAVIS:  Moving on to the Franks hearing, I think
22    the government's concessions that a large part of what was in
23    the affidavit was false leaves very little left on which
24    probable cause could have been established.  The government
25    tries to -- tried to convince the Court and us that the
```

```
 1   detective just confused the two numbers.  That is the one that
 2   was near the -- at the time of the murder, the 2459 number, and
 3   there were a number of text messages and calls with the victim
 4   from the 2459.  So that -- putting that in where they put it in
 5   in the affidavit clearly would establish probable cause to
 6   search Lottsford, because the affidavit stated that that number
 7   called the Lottsford number -- Williams' number.  And --
 8              THE COURT:  So let me just ask this, though.  In terms
 9   of like where I should start from with my analysis, usually, on
10   a request for a Franks hearing, the defense has come up with
11   some reason why I should disbelieve what's in the affidavit,
12   just the typical way it comes up.  The government comes in and
13   says, you know, no, it's accurate, and you know, it -- here,
14   they're actually -- and so then I might have to flesh that out,
15   right?  Here, they're conceding it's wrong, whether it's wrong
16   because he made a mistake or it's wrong because he's a liar.
17   And I'm not suggesting either one; I'm just saying, you know,
18   either way, it seems like it just gets me to the point of I
19   don't even have to figure that out, I can just go straight to
20   looking at the affidavit without it and decide whether or not
21   there's probable cause.
22              Is that a fair way to analyze it?
23              MR. DAVIS:  Right, yeah, because I think that the --
24   whether it's material, I think that's satisfied by the
25   government's concessions.  So that leaves the -- you know,
```

1   whether it was intentional or reckless.  And --

2           THE COURT:  I guess that's what I'm asking; like do I

3   still have to decide that, or can I just say, Look, it's wrong,

4   just excise it from the affidavit, and now I just decide whether

5   there's still enough left?

6           MR. DAVIS:  I wish Your Honor could do that.

7           THE COURT:  Okay.

8           MR. DAVIS:  I think the case law says that both prongs

9   have to be established before a Franks hearing could be granted,

10  and here, I think we've established at least recklessness.  I

11  mean, this is a very experienced detective.  He -- and he could

12  not have confused two phone numbers.  I mean, it just doesn't

13  make any sense that he would not -- I think it makes sense that

14  he would put in the 2459 because he knew that that would

15  establish probable cause, because that is the number that had

16  contact with the victim immediately before the shooting.

17          And I think when you talk, you know, about a person

18  who's experienced, who says that his -- whenever he submits

19  affidavits, search warrants are granted, and you know, he wins

20  everything, I think that this establishes that this was -- if

21  not intentional, it was clearly reckless on his part.  He swore

22  under oath that this were the facts.  We have to believe that he

23  read over what he submitted to the Magistrate before he

24  submitted it.  And I think we have enough to get the Franks

25  hearing, because I think we've established that there is a

```
 1    strong likelihood that what he did, he did intentionally or
 2    recklessly.
 3            THE COURT:  Let me ask my earlier question a different
 4    way; this is probably the better way to ask it.  If I decide
 5    that once I remove those issues from the affidavit -- it's a
 6    closer call but still provides probable cause; does that end the
 7    inquiry?
 8            MS. DAVIS:  I believe it should end the inquiry,
 9    because I think, clearly, there was no probable cause when --
10            THE COURT:  Right.  So yeah, so you take the position
11    that there wasn't, but -- and so if we walk through it, it
12    certainly gets significantly weaker, but I guess I'm just
13    asking ...
14            MS. DAVIS:  Well, our position is, once you take out
15    the falsehoods, there's absolutely nothing linking -- justifying
16    a search of Lottsford, because the only thing that justified the
17    search of Lottsford was the 2459 number being in the area of
18    that -- of that address.
19            THE COURT:  Well, see, and here's where I was
20    confused, and so you might be able help me, or maybe the
21    government will have to help me.  My understanding is, the part
22    that was false, as it relates to the 2459 number, was that it
23    was there just before and just after the homicide, or just after
24    the homicide, but it is still true -- and again, please correct
25    me -- I might have this confused; I read this like three times,
```

1    trying to understand it -- but my understanding is, it is still

2    true that that phone number was physically located in the

3    general vicinity of that address on October 2nd, 2018, as well

4    as on October 3rd, 2018.

5            MS. DAVIS:  And that was a false -- that was not true.

6            THE COURT:  So -- I mean, I'm kind of looking at it

7    for the government.  They wrote it in the section where it's

8    still ...

9            MS. DAVIS:  Right, they did put it in there, but

10   I think I put in a reply that that was -- that they had already

11   conceded that that was not true.  Any link between 2459 and

12   Lottsford, anything in the affidavit linking those two were not

13   true.

14           THE COURT:  All right.  Let me just -- if I can turn

15   to the government, just on this factual point, and then I know

16   you still have the floor.

17           MR. COLLINS:  Thank you, Your Honor.  Your Honor,

18   I think Ms. Davis misunderstands what we put in our response.

19   What we said is that after the murder, that phone does not go

20   back to Lottsford.

21           THE COURT:  Right.

22           MR. COLLINS:  And it does not go back -- that phone

23   turns off at 8:51 on October 3rd.  And so anything after 8:51,

24   there's no other activity that tracks it back to Lottsford.

25           THE COURT:  Right.  The government's position is that

```
 1    the phone 2459 was located in the vicinity on October 2nd and
 2    before the murder on October 3rd.
 3              MR. COLLINS:  That's correct, Your Honor.
 4              THE COURT:  But you're acknowledging it was incorrect
 5    to say that it was there after the murder.
 6              MR. COLLINS:  That's correct, Your Honor.
 7              THE COURT:  All right.  That's what I understand.  So
 8    then that's still a connection between the 2459 number and that
 9    address.
10              MS. DAVIS:  But I -- and I think the reason we raised
11    this issue was that there were no records establishing any
12    connection to Lottsford; there's just --
13              THE COURT:  I'll let you -- I don't want to keep going
14    back and forth; I'll let you have your chance in a second.
15              MS. DAVIS:  Okay.  Does Your Honor have further
16    questions?  Because maybe it would make sense for me to reply to
17    the government.
18              THE COURT:  I mean, that might be.  I mean, I --
19    because I don't have the discovery on that.  I assume they have
20    records or not, I mean, and that they're not just saying that.
21    But my understanding is, you have that, plus you also have, the
22    detectives apprehended Mr. Tejan -- it's Tejan; am I pronouncing
23    that correctly?
24              MS. DAVIS:  Yes, Your Honor, right.
25              THE COURT:  With Mr. Williams, and Mr. Williams'
```

 1   vehicle was registered.  I don't know if that by itself would be

 2   enough, I'll concede, but connected with the fact that the phone

 3   number was there.  But maybe that's the issue, if you're saying

 4   that you don't think that's accurate.

 5         MS. DAVIS:  Well, also, I think we pointed out, what

 6   was not accurate was that they had not recovered the other

 7   phone, which was not true, because they recovered it when they

 8   arrested Mr. Tejan.  And in fact, the detective put in his

 9   affidavit that Mr. Tejan had been arrested.  So it was not true

10   that they had not recovered that other phone, because they

11   recovered it when Mr. Tejan was arrested.

12         THE COURT:  Which one are you referring to?  Just by

13   number; I get confused.

14         MS. DAVIS:  I am referring to -- it would be the

15   9972 -- no, that's Williams.  Let me see.

16         MR. COLLINS:  3797.

17         THE COURT:  3797?

18         MS. DAVIS:  Yes.  Yes, thank you.  Yes.

19         THE COURT:  And so what does it get you that that

20   phone was -- just play it out for me -- that that phone was

21   recovered and they said it hadn't been.

22         MR. DAVIS:  Well, what it means is, that's another

23   thing was not true in the affidavit.

24         THE COURT:  Sure.  But again, once -- my focus is --

25   and it could just be the Court trying to avoid work it doesn't

1    have to do, right, like I don't need to decide whether or not it

2    was reckless or a lie if I look at the affidavit and can make a

3    decision one way or the other based on that.  And so that's why

4    now I'm focused on not just is it another thing that's untrue,

5    but is there something about that that negates probable cause.

6              MS. DAVIS:  Not something specifically.  I think it

7    just shows the detective's frame of mind when he was drawing up

8    the affidavit.

9              THE COURT:  The recklessness point.

10             MS. DAVIS:  Exactly, Your Honor.

11             THE COURT:  I get that, I get that.

12             MS. DAVIS:  Okay.  Any questions into --

13             THE COURT:  No, I think that's it.

14             MS. DAVIS:  Okay, great.  Thank you.

15             THE COURT:  All right, you might as well address that

16   motion, then; it sounds like maybe Mr. Davis will handle the

17   others for the defense.

18             MR. COLLINS:  Thank you, Your Honor.  Your Honor, the

19   government would request that the Court deny the motion.  And I

20   think the Court has already kind of touched on how the analysis

21   should go.  There should be a two-stage showing, and first, the

22   defense has to make this substantial preliminary showing that

23   there was a false statement that was knowingly, intentionally,

24   or with reckless disregard for the truth.

25             And I think we kind of break this down very, very

1  clearly in other in our response.  Yes, we acknowledge that the

2  flipping of the two numbers in some portions of the affidavit

3  are incorrect.  However, we do not believe that the defense has

4  shown that this was a -- this was something that was

5  intentionally done by the officer or that it was done with the

6  intent to mislead.  And so --

7            THE COURT:  What about recklessness?

8            MR. COLLINS:  So Your Honor, I think, even when you

9  look at the reckless standard, Your Honor, it requires some kind

10  of level or intentionality to deceive the Magistrate as it

11  regards the reckless.  And as we outline in our response --

12            THE COURT:  Well, does it, or does it have to just

13  be -- you know, I'm just -- it's beyond negligent -- beyond

14  negligence, I just made a mistake, right, but my understanding

15  of recklessness comes a little short of intent.  It's just,

16  you know, someone just sort of being haphazard, not even -- just

17  not paying attention to how important this is.  I mean, there

18  are a lot of errors, it's not just, you know, one error.

19            MR. COLLINS:  And so Your Honor, just to draw the

20  Court's attention to our response where we kind of flesh this

21  out.

22            THE COURT:  Sure.

23            MR. COLLINS:  And the Court's indulgence, Your Honor.

24            THE COURT:  Take your time.

25            MR. COLLINS:  So Your Honor, we kind of fleshed this

1   out.  We discussed factually on page 11 the first paragraph, the

2   first complete paragraph, where we talk about why it doesn't

3   rise to the level of reckless disregard.  And you know,

4   Your Honor, based on the facts in this case, like we said in our

5   response, there are three phone numbers that are primary

6   interests of this investigation.  Two of them are tied to the

7   defendant, the 3797 phone, as well as the -- the other phone,

8   which is the 26 --

9            THE COURT:  2459?

10           MR. COLLINS:  2459.

11           THE COURT:  No, actually, it makes -- both counsel

12   might be making the point as to how hard it is to keep these

13   numbers straight, but ...

14           MR. COLLINS:  So those two numbers are tied to the

15   defendant, Your Honor.  Then, of course, the 9972 is tied to the

16   individual that's an associate of the defendant.  And as the

17   government has pointed out in our response, you know, if this

18   detective was being reckless -- well, first, being intentional

19   in his desire to mislead the Court, or even being reckless,

20   Your Honor, it just wouldn't make sense.

21           That first number, the 3797 number is a number that's

22   registered to the defendant.  It's an absolute known number that

23   comes back to the defendant.  And so it's our position that the

24   probable cause would have been stronger had the officer listed

25   the numbers the way that they were supposed to be listed.  And

1  so -- because at that point, Your Honor, you know for a fact

2  that the person who is definitely communicating with the witness

3  is, in fact, the defendant because it's his registered phone.

4  So for him to flip-flop the numbers, that's clearly got to be an

5  error.  That's clearly got to be an error on his part and an

6  error that he would not have done either on an intentional

7  standard or a reckless standard.

8          THE COURT:  I'm sorry, just to make sure I'm

9  following, like what -- give me one second.

10          So I just want to make sure I'm following which error

11  you're referring to.  There's the error that 2459 was in contact

12  with 9972, which is Mr. Williams' phone.

13          MR. COLLINS:  That should be 3797.  That -- for it to

14  be accurate, it should be 3797 was in contact with Mr. Williams.

15          THE COURT:  And you're saying that's also the

16  defendant's phone.  And so --

17          MR. COLLINS:  That's his registered phone.

18          THE COURT:  Okay.

19          MR. COLLINS:  3797 is his registered phone.

20          THE COURT:  Okay.  So your point there -- and I'm just

21  repeating it back to make sure I'm following it.  Your point

22  there is that, if anything, if he had gotten it right, it makes

23  that stronger.

24          MR. COLLINS:  Yes.

25          THE COURT:  Okay.  But then the other issue was

1   whether or not the device returned after the murder.  Now, are

2   you saying that's the same issue, or is that a different issue?

3            MR. COLLINS:  So that's the same issue.  So

4   Your Honor, just factually, so the Court understands, both the

5   2459 and the 3797 are at the Lottsford address on October 2nd

6   and October 3rd.  It's only the 3797 that goes back after the

7   murder.

8            THE COURT:  And that's still -- if they had gotten

9   that right, that's still the defendant's number.

10           MR. COLLINS:  That's correct, Your Honor.  And so

11  that's the number that detectives can point at and say

12  affirmatively, that's his, because it's registered to him.  The

13  2459 number is what we would I guess call like a burner phone,

14  or that's at least how the government looks at it.  And so

15  because this phone, the 3797 number, is something that's

16  specifically tied to the thing, it makes no sense that the

17  officer would flip it for the burner, because it would

18  definitely show a tie to the defendant in all these situations.

19           And so Your Honor, when you look at whether or not,

20  you know, it was an intentional act by the officer to mislead or

21  even something that was reckless, I mean, I think in order for

22  it to be reckless, the officer would have had to have recognized

23  that there was some issue and then totally disregard it in order

24  to present it to the Magistrate in this fashion.  And clearly,

25  he didn't.  He clearly didn't.  It was a mistake on his part.

1    And we acknowledge it was a mistake.  I man, I think that's very

2    clear in our filing.

3         And so we don't believe that it rises to the level of

4    either standard, Your Honor, the intentional or the reckless.

5    And we don't think the defense makes it to even get to the

6    second part of this analysis.  But I think, you know, even if

7    you excise that information, there's still enough probable cause

8    to get to this residence.  I think the government only has to

9    show that it's the defendant, he's tied to the criminal

10   activity, and he's somehow tied to this residence.

11        And you know, when the government looks at this, we

12   kind of liken this almost to, you know, when a police officer

13   sees someone go to a house, leave that house -- you know, you

14   meet with somebody, leave that house, drive off down street and

15   get stopped, and there's drugs in the car, you know, based on

16   something they've actually seen.

17        It's a similar type of analysis, where these officers

18   are able to -- they're able to get information that the decedent

19   is going to meet with somebody named Malik, they're able to

20   determine that Malik is the defendant.  When they look through

21   the defendant -- I'm sorry, through the decedent's phone, they

22   see the 3797 number, which is under the name Malik,

23   corresponding with the decedent, as well as the 2459 number, and

24   based off the nature of the conversations, they realize it's all

25   the same person.

1           And so they know that the phone, the 2459, has been at

2    the residence, you know, prior to -- the day before the murder

3    and the day of the murder.  They know the meeting was supposed

4    to take place later on that day in the evening, because that's

5    when they find the decedent, later on in the evening.  And then

6    from there -- you know, when they come into contact with the

7    defendant, he's with somebody who has a vehicle registered to

8    that address, a person they know lives at that address, and

9    that's actually -- they come into contact with him on the 20th,

10   which is, what, 17 days later.

11          So you know there's still a continuous connection to

12   that address.  And so that's why I say it's likened to,

13   you know, when officers see somebody at a house and they leave

14   the house, you don't necessarily have to see the person, you

15   know, have a drug interaction, what you believe to be a drug

16   interaction at their house, leave, and then come back to the

17   house for there to be probable cause to go to the house.  The

18   fact that there's any connection to the house --

19          THE COURT:  Slow down -- if you could slow down a

20   little.

21          MR. COLLINS:  I apologize.  The fact that there's any

22   connection, I think, to the house, even on the front end,

23   established that.  But the government believes that we even

24   establish it on the back end, and the fact that the defendant is

25   associated with somebody, 17 days later, that's tied to that

1    address.  And so we believe that there is enough for -- it was

2    Judge Carrington who reviewed this.  There was enough for the

3    Judge to have reviewed this, even if you excised those mistakes

4    by the officer, to show there was still probable cause to search

5    that residence.

6            And so for those reasons, we ask that you deny the

7    motion.

8            THE COURT:  So let me ask -- and I don't want go down

9    the path of a Franks hearing; this is what we're trying to --

10   well, what the government's trying to avoid, they're trying to

11   get, but you know, Ms. Davis at least suggested, I think in

12   writing but certainly here in court that the records don't show

13   the phone returning to -- or the phone being in the vicinity of

14   8800 block of Lottsford Road, or at least that's what I took to

15   be her response to my raising that.

16           MR. COLLINS:  Sure.

17           THE COURT:  I don't know if you -- lot of records, I'm

18   sure, have gone back and forth.

19           MR. COLLINS:  Sure, sure, sure.  And Your Honor, we

20   have disclosed phone records related to this case I think as far

21   back as our first phone production.  I know that there were some

22   issues as it relates to the phone records, and we've disclosed

23   them multiple times.  In addition to that, you know, once we

24   proceed to trial, Your Honor, we're going to put on evidence

25   with a CAST expert.  We provided draft CAST reports that also

```
 1   show the location of these phones.  And so that information has
 2   been provided to the defense.  I'm not sure if, you know,
 3   because of the volume of the records or the nature of the
 4   records, they don't interpret it the way that the government
 5   does, but those records have been provided.
 6            THE COURT:  All right.  And in fairness, they're not
 7   showing me an -- I'm just processing it for my analytical
 8   purposes today.  I guess they would have the burden, I guess, of
 9   showing me something that suggests it's inaccurate rather than
10   you having the burden at this point of proving that it is
11   accurate.
12            MR. COLLINS:  And I believe that is true, Your Honor,
13   which I don't believe they've met the -- I don't believe they've
14   met that.
15            THE COURT:  Okay, all right.
16            MR. COLLINS:  Okay.
17            THE COURT:  Ms. Davis.
18            MS. DAVIS:  Yes, Your Honor.  I just want to make it
19   clear for the record what the government conceded, and their
20   concessions --
21            THE COURT:  I appreciate that.
22            MR. DAVIS:  Their concessions are on page 9 and 10 of
23   their response.  And briefly, it says, In the affidavit,
24   Detective Burns states the phone number --
25            THE COURT:  If you could pull the microphone down just
```

1    a little bit.

2           MS. DAVIS:  Oh, I'm sorry.

3           THE COURT:  That's all right.

4           MS. DAVIS:  Detective Burns states the phone number

5    2459 was in contact with 9972 before and after Freeland's

6    murder.

7           THE COURT:  And just to keep it straight, my

8    understanding is, 9972 is Mr. Williams' phone.

9           MS. DAVIS:  That's correct.  They're saying that that

10   was inaccurate.  In footnote 6 on page 9, they say, A review of

11   records associated with both phones indicates that neither phone

12   number 2459 nor phone number 9972 was in touch with the other

13   before or after the murder of Freeland.  They go on to state

14   that -- let me see.  The warrant also states the device was

15   physically located in the general vicinity of the 8800 block of

16   Lottsford Road on October 2nd as well as on October 3rd after

17   the murder occurred, and electronic data also showed the device

18   returned to the general vicinity several times the following --

19   several days following the murder.  And the government concedes

20   that that is also not true.

21           So our position is that if you take that out of the --

22   those false statements out, then there's nothing to tie --

23   there's nothing to justify the search of Lottsford Road.

24           THE COURT:  I guess to now give you a chance to

25   respond to Mr. Collins' point, in terms of intentional or

1   reckless, Mr. Collins' response to that, which I have a better

2   understanding of now, is that it's not like the mistake is that

3   it was really my phone and they substituted one of the

4   defendant's phones.  The mistake is that it was the defendant's

5   other phone, in fact, his registered phone.

6           MS. DAVIS:  But I think our response to that is that

7   the 2459 number was the number that was directly in touch with

8   the victim, the shooting victim, right before the shooting took

9   place.  There were text messages and phone calls with 2459.  So

10  just because there is another number tied to Mr. Tejan, there --

11  I'm thinking that they put the other number in there.  That

12  would not establish probable cause, because that doesn't --

13  there's no link to Mr. Tejan -- there's -- I'm trying to get

14  this straight in my head.

15          THE COURT:  It's all right; take your time.

16          MS. DAVIS:  One minute to think.  I think if they had

17  put in the correct number, that still wouldn't be sufficient,

18  because there would be nothing tying that number to the

19  shooting.

20          THE COURT:  I guess the point being that maybe it

21  feels like more of a reach to say he's using one phone, 2459,

22  and that's the phone that's otherwise connected to the shooting,

23  and then he would have had to have switched to the second phone,

24  which previously had not been tied in with the murder.  I don't

25  know if that's what you're suggesting.

1          MS. DAVIS:  Right, exactly, Your Honor.  And there

2    is -- but there is nothing -- take -- if you look just at the

3    four corners of the affidavit, which I think is what we're

4    limited to, if you switch -- you can't switch the numbers

5    around.  The government can't say, well, if we had put the right

6    number in, we would have established it.  That -- you can't --

7          THE COURT:  I think that's -- I think that's right in

8    terms of -- in terms of the second prong, right, I don't -- they

9    don't get to put the accurate information in.

10          MS. DAVIS:  Right.

11          THE COURT:  Well, that's arguable, but maybe that's

12    another point, that's another conversation for another day.

13    Because I -- actually, now that I think about it, usually, part

14    of the analysis is, well, okay, if they had put in the correct

15    information in, not just redacted, but if they had put the

16    correct information in, what would the analysis be, and now the

17    government's telling me that the correct information is another

18    phone number of the defendant.

19          MS. DAVIS:  But I think -- I don't think Your Honor

20    can go that far, because they didn't put the correct number in,

21    and by putting in the incorrect number, the 2459, that directly

22    linked -- linked the -- that phone at the murder scene to

23    Lottsford Road.  And there -- and that is the basis of our

24    argument.  And the government can't go beyond that, and they

25    can't say, well, if we had done this, if we had done that.  They

1  didn't do it.  And that would be our position, unless Your Honor

2  has some more questions.

3            THE COURT:  No, I think you've addressed them.

4            MS. DAVIS:  Okay, thank you.

5            THE COURT:  Thank you so much.

6            MR. COLLINS:  Your Honor, could I just be heard

7  briefly on that last point?

8            THE COURT:  Very briefly.

9            MR. COLLINS:  Thank you, Your Honor.  And just so that

10  the record's clear, Your Honor, the government's not trying to

11  insert the correct information for the purpose of probable

12  cause; we just want the Court to have the perspective --

13            THE COURT:  I understand.

14            MR. COLLINS:  -- to understand why the first prong

15  isn't satisfied.  I think if the Court looks to our response,

16  pages 12 and 13, I think there are enough -- there's enough

17  information the detectives make to connect that 3797 and 2459

18  are the same person, and that's based on the communications in

19  the phone that they see from the text messages.  They then see

20  that 3797 is linked to or in the contact list.  It's identified

21  as Malik.  And then based on the witness statement, officers

22  know that the -- that Malik was supposed to meet with the

23  decedent the evening of the -- and so once you just look at

24  those three things, it's very clear that the 2459 number, the

25  3797 number, and Malik are the same person.

1       And so -- and then once you follow the rest of the

2  trail, the rest of the information they put into the affidavit,

3  then it's clear to see what the connection is with that one

4  person to the residence.  And so once again, Your Honor, we ask

5  that you deny the motion.

6       THE COURT:  All right. I saw counsel consulting.  I

7  don't know if that means you want a final surrebuttal.  You

8  don't have to; I just -- I'm trying to be fair.

9       (Conference between Ms. Davis and Mr. Davis.)

10       MS. DAVIS:  Yes.  Your Honor, without the 2459, again,

11  there's no link to that apartment.  There was nothing to

12  establish --

13       THE COURT:  Well, you can't -- I mean, without the

14  2459, I mean, it -- I'm sorry, go ahead.  We went back and forth

15  on that already, so I won't want to go back and forth again.

16       MS. DAVIS:  Okay, right.  I think -- yeah.  And the

17  other point I'd like to make is that even if the phone was in

18  the vicinity of Lottsford Road, that doesn't establish any right

19  to search the -- Williams' apartment.  Merely being in the

20  vicinity isn't sufficient to link -- to link Mr. Tejan to

21  Williams' apartment.  Just being in the vicinity is not

22  sufficient.

23       One second.

24       THE COURT:  Sure, that's fine.  That's the challenge

25  of having co-counsel.

1              (Conference between Ms. Davis and Mr. Davis.)

2              MS. DAVIS:  We're choosing not to repeat ourselves,

3    okay.

4              THE COURT:  Okay, fair.

5              MS. DAVIS:  Okay.

6              THE COURT:  All right.

7              MS. DAVIS:  All right, thank you.

8              THE COURT:  Thank you.  All right.

9              All right.  So I know we -- I think we have one more

10   motion to get to, but let me resolve this while it's relatively

11   fresh in my mind.  So first, as to the motion to exclude

12   predicate offenses in Count Four of the superseding indictment,

13   my understanding, based on the current state of the law, is that

14   it requires denial of the motion, that the predicates listed do,

15   as we sit here today, on January 27th, 2023, still make for

16   viable predicates.

17             Any of us who have been doing this work for any period

18   of time know that by tomorrow, or the next day, or six months

19   from now, that could change.  And so I certainly understand why

20   counsel wants to maintain it for appellate purposes.  It is so

21   maintained.  But at least as of today, I find that the state of

22   the law requires me to deny ECF 83, motion to exclude predicate

23   offenses.

24             That turns us back to the search warrant.  Just first,

25   in terms of the motion to suppress in its original form, that I

43

1    denied back on August 8th, I'll just say as a general matter, I

2    think there were two, actually, one regarding one of the

3    cell phones, one regarding the residence.  I reviewed the

4    affidavits for both, and as they stood at that time, they -- I

5    found that they were both sufficient and denied the motion on

6    that ground.

7            Now before the Court is a motion for Franks hearing

8    that's based on what seems to be agreement, concession from the

9    government that there was a mistake in relation to some of the

10   information placed in the affidavit, specifically as it relates

11   to which phone number was in contact with Mr. Williams' phone as

12   well as which phone number then made an appearance, so to speak,

13   back at the 8800 block of Lottsford Road after the murder.

14           I think it is important to note that the defendant, in

15   order to get the hearing it wishes, must show there is a false

16   statement knowingly intentionally made or with reckless

17   disregard for the truth.  And then second, that the offending

18   information must be essential to the probable cause

19   determination; that is, if it's excluded and probable cause

20   still remains, no hearing is required.

21           I actually take and am more convinced by the

22   government's argument than I was coming in their point that the

23   false statement -- that there's not a preliminary showing here

24   that the false statement was knowing and intentional or with

25   reckless disregard for the truth, in a situation where, if the

1    correct information -- and I want to be careful as to how I'm

2    considering this.

3         If the correct information was put in the search

4    warrant, it's arguably stronger.  It's hard to argue that it

5    would be weaker, although I guess one could always find a way,

6    but it's hard to argue that it would be weaker.  It's probably

7    stronger because it is his registered phone.  And so I don't

8    find that they make the first showing that the false statement

9    was knowing and intentionally or with reckless disregard.  It

10   sounds like it was negligent, it was sloppy, it was many other

11   things.  I don't want to criticize the detective.  I don't know

12   if the detective is here or not.  But it sounds like, you know,

13   it was a mistake, but it does not sound like it was

14   intentionally or with reckless disregard.

15        But even when we go to the second part of the

16   analysis, whether it's essential to the probable cause

17   determination, for the purpose of that analysis, if I were to

18   exclude the information, I think it becomes a close call.  It

19   certainly -- again, I want to be clear.  If I am excluding, not

20   replacing, if I am just excluding it, it becomes a closer call,

21   but I do still think there's probable cause to search the

22   residence.

23        Even with that mistake corrected, you have -- you

24   still have information connecting Mr. Freeland's phone to the

25   2459 phone, that being the last number Mr. Freeland exchanged

1   phone calls with and text messages with, text messages on

2   Mr. Freeland's phone indicating he did also communicate -- the

3   defendant, that is -- communicate with Mr. Freeland using the

4   3797 phone as well, the fact that the 3797 phone is stored as

5   Malik, which later became known as a nickname of the defendant,

6   the fact that it was known that Mr. Freeland was supposed to

7   meet with a Malik to purchase Percocet pills, the fact that it

8   was known that Mr. Williams listed the 8831 Lottsford Road

9   address as his address, that Mr. Tejan was found with

10  Mr. Williams at some point thereafter, with Mr. Williams'

11  vehicle being registered to the Lottsford Road address, and that

12  at some point, although it wasn't the time in the affidavit, it

13  was earlier than that, October 2nd and earlier on October 3rd,

14  that the 2459 number was, in fact, at that address or at the

15  8800 block of Lottsford Road.

16         The connection to the residence is weakened without

17  the information that was incorrect, but it is still probable

18  cause, probable cause being, we always have to remind ourselves,

19  the lowest standard that we have -- well, I guess not the

20  lowest, but a low standard of proof, a low burden of proof.  And

21  so I do find that even with the information excised, it would

22  still have been sufficient.

23         So the defendant doesn't make either ground for a

24  Franks hearing, and so ECF No. 73 will be denied.  That still

25  leaves -- I feel like there was one more.  The D.C. halfway

1   house issue?

2          MS. DAVIS:  Your Honor, if I could -- that's

3   Mr. Davis', but I just wanted to make --

4          THE COURT:  Sure; did I get something wrong?

5          MS. DAVIS:  -- a point for the record, that we would

6   like to renew the motion to suppress the search and also the

7   search of the phone in the -- just for the purposes of the

8   record --

9          THE COURT:  That's fine.

10          MS. DAVIS:  -- should this go up.

11          THE COURT:  Yeah, I think the record already covers

12   that, but that's fine; it can be renewed.  It's denied again.

13   Having reviewed the affidavits, I do find, you know, looking at

14   the four corners of the documents that there was sufficient

15   probable cause in both of those documents to justify the

16   searches.  I just went in detail through one of them, but it is

17   certainly preserved for the record.

18          MS. DAVIS:  Okay.  Thank you, Your Honor.

19          THE COURT:  Sure.

20          Mr. Davis.

21          MR. DAVIS:  Yes.  Your Honor, ECF 79 deals with two

22   issues.  One, we seek to have the evidence of the money that was

23   recovered allegedly from Mr. Tejan and the drugs that were

24   allegedly recovered from him excluded from trial.

25          THE COURT:  This is what was recovered at the halfway

1  house.

2          MR. DAVIS:  That is correct, Your Honor.  That's the

3  first part.

4          And the second part is, in the event Your Honor

5  disagrees with us that it's a violation of due process -- the

6  destruction of the tape, I'm referring to -- then we would be

7  asking for an adverse inference instruction in front of the

8  jury.  And I think the Johnson case we cited is instructive

9  here.  But initially, dealing with the exclusion of the

10 evidence, there are no reports from Hope Village.  Not only is

11 there no videotape, but there are no reports; there's nothing.

12         THE COURT:  Let me ask, do I consider Hope Village

13 part of the government for this purpose?

14         MR. DAVIS:  No, but if you take a look at Defendant's

15 Exhibit No. 2, where Mr. Sheffey, who is the manager of

16 Hope Village, is exchanging a colloquy with the law enforcement

17 that came there, there was discussion of the tape and how it's

18 protocol.  They have a camera that's focused where the

19 individuals are searched when they come in.  And there are going

20 to be a couple of issues with this at trial.  Number one,

21 Mr. Tejan -- and this was captured on videotape.  That's not

22 part of this motion, but Your Honor will certainly see at trial,

23 Mr. Tejan has a backpack on when the law enforcement go up,

24 probably 20, 30 minutes later, to where he's in his room, and

25 that backpack contains money.  There's no explanation why that

1    money wasn't seized when he came in if he had it.

2           The United States -- I will agree, we have a very

3    tough hill to climb when we need to establish that the tape

4    would provide exculpatory evidence, but even the United States

5    concedes that if the events did not occur as the staff

6    described -- and I am assuming that means, when they testify

7    here at trial, that would -- there's one lady in particular that

8    did the search, then they concede that that would be remotely

9    exculpatory.

10          THE COURT:  Sure.  But just to put a fine point on

11   that -- I mean, that's always true, right, like if there's

12   evidence that exists in the world that counters the government's

13   theory of the case, it's exculpatory, but is there anything at

14   all -- I think I know the answer to this; I just want to make

15   sure for the record -- is there any reason at all to believe

16   that that would have been exculpatory, other than your client

17   maybe saying it didn't happen?

18          MR. DAVIS:  Well, I looked through some of the

19   materials that I obtained during the Rule 16 process, and there

20   was a letter from someone to the U.S. Attorney's Office in D.C.

21   indicating that the drugs were theirs and they were left in a

22   laundry bag.  Of course, I'm going to also submit that there was

23   a follow-up conversation and a notation by the assistant in D.C.

24   that that individual called back and recanted that statement.

25          But it's -- you know, it's enough -- there's going to

1    be an issue on where these drugs were recovered, I can tell

2    Your Honor that, and that's going to come out through

3    cross-examination of the woman that searched Mr. Tejan when he

4    came in.  And there's going to be an issue about, if she

5    actually searched and found drugs in Mr. Tejan's possession, why

6    was he allowed to go back up to the room, and why was he allowed

7    to enter the halfway house with a cell phone and in excess of

8    $5,000?

9            And it just doesn't add up, and we just -- we just

10   believe that the videotape of that would be helpful, and

11   probably exculpatory, at least in the sense that it's going to

12   contradict the versions that have been reported before by the

13   staff.

14           I think it's pretty clear that it was reckless.  If

15   Your Honor -- I'm certain you viewed those short clips I

16   attached to my motion.  Mr. Sheffey's talking to law

17   enforcement, and they're specifically asking him if there's a

18   tape of this, and he goes, Yes, you know, we tape them all, it's

19   routine, it's protocol.

20           So law enforcement knows it, we know that it's

21   routine, yet they choose not to go back to get it.  I think that

22   rises to the level of recklessness, given the fact that it's

23   routine procedure to tape these events.  The officers knew about

24   it, and someone has the obligation to go back, and they chose

25   not to, whether it be the assistant that screened the case when

1   it came in to Superior Court or the officers, but it was not

2   done, and now we're left with a gaping hole in what occurred

3   there.

4           Moving on to the adverse inference instruction,

5   I think that -- I don't think there's any question that it rises

6   to the level of intentional failure to preserve the evidence.   I

7   mean, they knew it was there, they had the opportunity to go

8   back, and they chose not to.   I don't think it's terribly

9   different from the Johnson case, when that detective -- I think

10  it was Investigator Bean -- handed the cell phone back to the

11  family.   I mean, he knew that there was -- you know, that that

12  would be relevant evidence, and he just let it go.

13          And actually, in the Johnson case -- I think we're

14  even better situated than the Johnson case, because in the

15  Johnson case, he thought the man had pled guilty and his plea

16  was going to be accepted, and he didn't find out until after he

17  returned the phone to the family and it was lost.   He didn't

18  find out until after that -- all that occurred that the man was

19  going to be going to trial.   The Judge rejected the C plea, and

20  the man went to trial.

21          Kind of ironic; I was having dinner with a man that

22  actually argued that last night.   I didn't realize it until I

23  was reviewing the cases yesterday.   They're from out of town;

24  they're from the Northern District of West Virginia.

25          THE COURT:   Small world.

1      MR. DAVIS:  Yeah, it is.  We can't replicate this

2  tape, and it's going to contradict the staff.  It would have,

3  because I'm going to submit -- and it's on belief, and more so

4  than anything else at this point, but it's going to be

5  contradictory testimony about what occurred here.

6      THE COURT:  And so there will be, what I'm gathering,

7  and I never -- I wouldn't pin you down unless you're offering to

8  be pinned down, in terms of what you're going to display at

9  trial, but you seem to be suggesting that you will have some

10 evidence or will try to establish evidence that it wasn't -- it

11 wouldn't have shown what the government is saying it would show.

12      MR. DAVIS:  I -- well, there's grand jury testimony

13 that's been provided to us, and then there's the body-worn

14 camera footage of the officers.  And the officers interviewed

15 the individual that did the search, and that individual

16 testifies before the grand jury.

17      THE COURT:  Because the reason I raise that is

18 because, you know, obviously, I don't have to make a final

19 decision on whether I would give you an adverse inference

20 instruction today.

21      MR. DAVIS:  That is true, but I just wanted to -- I

22 wanted to bring this up at this point in time.  If Your Honor

23 were not in agreement with us on the violation of due process

24 for destroying exculpatory evidence, I wanted to bring this to

25 the Court's attention.  Obviously --

1           THE COURT:  Sure.

2           MR. DAVIS:  -- it is probably going to be an issue

3    during the trial.

4           THE COURT:  Right.  And so to my point, if it is, then

5    maybe I'll be persuaded that you've done enough to do -- to get

6    at least the adverse inference.

7           MR. DAVIS:  So I would ask Your Honor to reserve on

8    that part of the motion until after the trial.

9           THE COURT:  I am inclined to do that.

10          MR. DAVIS:  Thank you.

11          THE COURT:  I'll hear from the government.

12          MR. COLLINS:  Thank you, Your Honor.  And

13   Your Honor -- once again, Your Honor, we ask that you deny this

14   motion as well.  And I know it's already been touched on in some

15   of the discussion and clearly in our file and --

16          THE COURT:  Slow down.

17          MR. COLLINS:  I apologize.

18          THE COURT:  The shaking head is always the cue.

19          MR. COLLINS:  I apologize.  I'm going to look at you.

20          THE COURT:  Yeah.  You're better off, actually.

21          MR. COLLINS:  And so, Your Honor, we don't believe

22   that the defense has met the two-prong standard, once again, as

23   it relates to this issue in regards to the suppression of the

24   evidence.  As we've outlined in our response, there has to be a

25   showing that the evidence has some kind of exculpatory value

1    that's apparent on its face.  And as we've discussed, I think at

2    fair length, I think, in our response, there is nothing to

3    suggest that what was on the tape would be exculpatory as it

4    relates to the defendant.

5            What you have is, you have Department of Corrections

6    staff who say that certain facts occurred.  They believe that it

7    is, in fact, true.  When I say "they," their supervisors believe

8    that it's in fact true.  They contact the Metropolitan Police

9    Department, who respond to the scene.  The staff relays the same

10   information to the Metropolitan Police Department.

11           THE COURT:  But you would agree ultimately, though,

12   the reason we'll never know whether or not it was exculpatory is

13   because the government didn't secure it.

14           MR. COLLINS:  So Your Honor, I think in our second

15   part of our argument, we believe that there is comparable

16   evidence.  There's comparable evidence which consists of the

17   staff member.  There are other individuals who -- this is not --

18   this is not like, you know, the defendant in a bubble at this

19   place.  There are other people who were at that residence who

20   the defense -- look, I think the defendant's in a better

21   position than us.  He knows who were there, who may have been

22   coming in at the door with him.  There are potential witnesses

23   to what occurred.

24           And so we believe that there is comparable evidence

25   which would then be the second prong -- there would be

1    comparable evidence, Your Honor, that they could flesh out what

2    occurred without the assistance of the video.

3           Now, to Your Honor's point, did the officers not go

4    back to get it?  Yes, they did not go back to get it.  I think

5    that's very clear from our response; we knowledge that.  But

6    you know, when you go back -- when you go to the second

7    argument, as it relates to an adverse instruction, we don't

8    believe that it rises to recklessness.  We think that, look, the

9    officers made a mistake, it may be negligent, but that

10   negligence does not rise to the level of recklessness.

11          And I know the defense points out the Johnson case.

12   We looked at the Johnson case too.  We think that there is

13   language in that case that specifically says that you have to

14   get to a reckless intent, and that reckless intent requires some

15   kind of willful conduct by the officers, and in this instance,

16   we don't think it's willful conduct.  Do we acknowledge that it

17   may have been negligent?  It may have been negligent, but that's

18   not enough for the standard, and so Your Honor, we'd ask that

19   you deny the motion -- well, I guess, on the second issue,

20   you're going to reserve for now, it sounds like.

21          THE COURT:  I'm inclined to reserve on the second

22   issue.

23          MR. COLLINS:  All right.  Thank you, Your Honor.

24          THE COURT:  Mr. Davis, you can have the last word if

25   you want it.

1          MR. DAVIS:  No, Your Honor.

2          THE COURT:  Okay.

3          All right.  So I'm going to deny this motion in part

4   and reserve in part.  Regarding exclusion, you know, that would

5   require a finding that the evidence possesses an exculpatory

6   value that was apparent to the police before the evidence was

7   destroyed and be of such a nature that the defendant would be

8   unable to obtain comparable evidence by other reasonably

9   available means.  I highlight here the word "and" between the

10  two factors, because the second one is -- is questionable.  I

11  don't know if I agree with Mr. Collins that having people who

12  can testify to it is as good as having a video.

13          But I do agree with the government and Mr. Collins

14  that -- and as to the first, we don't know if it was

15  exculpatory.  And I certainly have no reason to believe as I sit

16  here today that its exculpatory value was apparent to the police

17  before it was destroyed or not recovered.  You know, one can

18  just sort of make a leap to that by just, you know, accepting

19  the defense position that, you know, it's a lie, and it didn't

20  happen, and the video would show that.  But that's sort of

21  conclusory in nature.

22          There's nothing as I sit here today that tells me that

23  the officers knew that it was exculpatory and that's why they

24  didn't recover it.  Nothing has been shown to me to convince me

25  to make that finding, so I do deny that part of the motion.

1           Regarding the adverse inference, again, you know, the

2     defense has indicated that there will be discussion about this

3     at trial, and so I'll have the opportunity to make an assessment

4     and may feel that an adverse instruction or adverse inference

5     instruction is appropriate.  And so you know, we'll see what the

6     evidence shows me in that regard at trial.  So I will reserve on

7     the defense's request for an adverse inference jury instruction.

8           All right.  I think those were all the filed motions,

9     unless I'm forgetting anything.  Am I forgetting anything?

10          MR. COLLINS:  No, Your Honor, that's what the

11    government looked on the docket and confirmed this morning.

12          THE COURT:  Anything I'm forgetting, Mr. Davis?

13          MR. DAVIS:  No, I think we've covered everything,

14    Your Honor.  Thank you.

15          THE COURT:  All right.  I have a couple of thoughts

16    that I always share before trial, but I usually start by asking

17    whether or not there are really questions that either side --

18    looking around, I'm not sure if anyone here has tried a case in

19    front of me.  Maybe Mr. Davis?

20          MR. DAVIS:  I have, Your Honor.

21          THE COURT:  I thought so, okay.

22          MR. DAVIS:  A couple of years ago.

23          THE COURT:  Yeah, it was a little while ago.  But I

24    don't know if anyone has questions in terms of trial before I

25    just give a couple of thoughts.

1      MR. COLLINS:  Your Honor, we do have a couple of

2  questions that we had outlined and we were going to discuss with

3  the Court.  I didn't know if the Court was going to cover them,

4  so I thought might be best to hear the Court's ...

5      THE COURT:  I will confess that my thoughts are often

6  stream of consciousness.  I always say I'm going to do a better

7  job of ahead of time writing them all out, but I'm happy to do

8  that, and then all the things that I did not address, you can

9  then follow up on at that point.  I'm fine to do it that way.

10     MR. COLLINS:  Sure.  So I know one of the things that

11 the government wanted some clarity on was what the Court's

12 thoughts were around schedule, so schedule from week to week and

13 schedule within a day, like the hours that we would be here.  We

14 talked about this earlier.  I know there are trials that we've

15 done where some Courts will reserve, you know, the full

16 eight-hour day, but the last half hour would be reserved to

17 discussing the issues for the next day.  You know, so those are

18 things -- those are one of the issues that we wanted to get

19 clarity on.

20     THE COURT:  Sure.  So in terms of time during the

21 day -- that's an interesting approach.  I don't do that, though.

22 I usually seek to start at 9:30 when I have an incarcerated

23 defendant, just because it usually takes the Marshals at least

24 that long to get the person here.  Otherwise, I like to start at

25 9:00, but I just have found that we rarely are able to

1   accomplish it, so 9:30.  I take a morning break at some point, a

2   one-hour lunch, afternoon break, and I usually go till 5:00.

3   And I'm usually pretty good about keeping breaks roughly

4   15 minutes and starting on time and going to the end of the day.

5          And I try not to -- if I can, if I can, I try not to

6   interrupt questioning.  So you know, unless you tell me it's

7   going to be another hour, if it's 5:00 and you have, you know,

8   15, 20 minutes left, I will usually try to let you finish,

9   with- -- so within reason; I try not to break up witnesses.  But

10  we go to at least 5:00.

11         MR. COLLINS:  And then, Your Honor, it was our

12  understanding that there may be certain days -- and I'll be

13  honest, Your Honor, it's been a while since I've tried a case

14  here.  There may be certain days of the week where the Court or

15  the courthouse in general might not hold trial dates.

16         THE COURT:  Yeah, so -- and that's something that's

17  gone back and forth.  It used to be -- this is going back a

18  ways, now.  It used to be that Baltimore didn't sit on Fridays

19  and Greenbelt didn't sit on Mondays.  I think now it tends to be

20  more Judge-specific.  In a multi-week trial, I usually will not

21  sit more than four days in a row, for the lawyers' benefit,

22  frankly, because I know that can get tiring.

23         So it actually -- and my calendar's not up,

24  unfortunately, so it might be useful, though, for us to go

25  through that.  We can go through that now.  I don't know if

1    there's a way to get my calendar up.  Maybe I can -- I can

2    probably handle that.

3           Because obviously, I mean, it goes without saying, you

4    know, even more so than in a usual trial, we need to be done by

5    a certain point, and so my biggest issue here is making sure we

6    are leaving enough time to get done.

7           MR. DAVIS:  I think we had discussed selecting the

8    jury on the 6th and --

9           THE COURT:  Yeah, I'm just waiting for my calendar to

10   come up, and then I'll be able to follow along.

11          It's coming, no, it's coming; I was able to figure

12   that part out.  I got it.  I do have limited abilities, but I

13   was able to accomplish this much.

14          All right, right.  So we had -- we talked about

15   picking the jury on the 6th and then not sitting on the 7th; is

16   that my -- is that correct?

17          MR. COLLINS:  That is my understanding.

18          THE COURT:  I remember somebody had an issue; I don't

19   know who it was.  And so I would -- I would assume we would just

20   go the rest of the week, then.  So I'll sit on Friday; there's

21   no prohibition against sitting on Fridays.  I just wanted to

22   make sure I don't have anything else scheduled that I would have

23   to do.  No.  All right.  And then the following week, I guess my

24   question would be, as you sit here now -- like I'd be inclined

25   to then go the 13th through the 16th, unless we start getting

1    nervous about not finishing in time.  Again, in time for me,

2    meaning the 24th.

3                 So how many trial dates does the government believe --

4    now that you've had some more time to look at your case, how

5    many trial dates do you actually think the government's going to

6    need?

7                 MR. COLLINS:  The Court's indulgence, Your Honor.

8                 THE COURT:  Sure.

9                 MR. COLLINS:  I just want to check one thing.

10               So Your Honor, as we have it mapped out -- I'm sorry,

11   Court's indulgence.

12               THE COURT:  Yeah, take your time.

13               MR. COLLINS:  So Your Honor, we anticipate five to six

14   full trial days.

15               THE COURT:  Oh, so that's -- yeah, so that's plenty,

16   then.  So if we go the 6th, the 8th, the 9th, the 10th, come

17   back on the 13th -- let's see, that would be one, two, three,

18   four -- and you think you'll rest about the 14th or the 15th?

19               MR. COLLINS:  Actually, Your Honor, I think we may go

20   a little bit longer that week.  I would say, to be safe, maybe

21   the 16th, to be safe.

22               THE COURT:  Okay.  I mean, I have that much blocked

23   off, so that's fine.

24               MR. COLLINS:  Okay.

25               THE COURT:  All right.  At this point, do you

```
 1   anticipate a case?  Obviously --
 2           MR. DAVIS:  It's possible.  I would reserve a day.
 3   Conservatively speaking, I'd reserve a day; I think that's best.
 4           THE COURT:  All right.  So --
 5           MR. DAVIS:  I think we're not going to be here on the
 6   20th and the 21st.
 7           MR. COLLINS:  Yeah, I think we flagged that for the
 8   Court already, the 20th and the 21st.  I think the 20th is a
 9   holiday, and the 21st --
10           THE COURT:  All right.  So given that, then, let's go
11   through the end of that week, because four days would be a long
12   time not to sit and then have the jury come in and hear closings
13   or hear -- or have to deliberate.  So let's see if we can get it
14   done by the 17th.  So we'll plan to sit the 6th, go dark on the
15   7th, 8th through the 10th, and then the 13th through the 17th.
16           MR. COLLINS:  Thank you, Your Honor.
17           THE COURT:  All right.  And again, my usual approach
18   is 9:30 to 5:00, but you know, with caveats as needed.
19           MR. COLLINS:  And in terms of -- also in terms of
20   schedule, I didn't know if the Court was going to issue a
21   calendar in terms of when jury instructions and voir dire are
22   due, you know, stuff of that nature.
23           THE COURT:  What I -- sure, yeah, that's on my list,
24   but I don't mind --
25           MR. COLLINS:  Okay.
```

1    THE COURT:  I don't mind doing it in response to

2    questions.  Yeah, what I always ask for is, if I could get joint

3    voir dire and joint instructions three business days before the

4    first day of trial.  We might actually already be close to that.

5    Not quite.  Next -- I guess that would be next Wednesday.  And

6    you know, when I say "joint voir dire" and "joint jury

7    instructions," what I mean by that is, I want one document.

8    What I don't like is when I have two separate documents and I

9    have to do the work of comparing the two to see what's agreed

10   to.  One document; these are all the questions both sides want.

11   And then after that, you can have -- and these are the

12   additional ones the government wants that the defense objects to

13   and vice versa.

14          I've also seen people do it as a red line and submit

15   it to me as a red line.  I'm fine with that too, frankly, you

16   know, the government's questions and then the defense sort of

17   red lines it and you submit it as a red line.  I'm fine with

18   that, as long as it's one document.  That's the only thing that

19   I insist on.  I want one joint document for voir dire and jury

20   instructions three days before trial.

21          MR. COLLINS:  And then, Your Honor, I didn't know if

22   the Court had any -- you know, this morning when we came up and

23   everybody had on masks, and we saw the setup, and we thought

24   there might be some kind of restrictions, you know, in terms of

25   moving around the court.  I wasn't sure what the Court's

1   practice was or policy was around that.

2           THE COURT:  Sure.

3           MR. COLLINS:  And I guess also as it relates to the

4   jurors and voir dire and stuff like that.

5           THE COURT:  So in terms of movement around the

6   courtroom, I don't mind counsel moving about.  You don't need

7   permission to approach a witness, if you want to ask questions

8   from the well or from the back of the courtroom, or you know,

9   hang from the camera.  I -- you know, I -- really, I tend to be

10  really open about that, whatever your creative heart desires.

11  But obviously, you know, guided by common sense.

12          But the only thing I do ask is you always have to be

13  speaking into a microphone.  And so there's more than one way to

14  accomplish that.  The easiest way is to just question from the

15  podium, because you have a mic there.  But if you are -- and

16  again, I've never seen you try a case, so if you are someone who

17  likes to move about -- and this is obviously for all counsel --

18  you can wear a lapel mic.  Ms. Derro, if she's our CRD, can

19  provide you with a lapel mic.  And if you want to move about

20  while you're questioning, that's fine, but then make sure you

21  have a lapel mic.

22          The only thing I will -- I will nag you about is if

23  we're having a hard time hearing you because you're not speaking

24  into a microphone.  But beyond that, I let counsel move about as

25  they wish.

```
 1              MR. COLLINS:  Okay.  I think -- the only other thing
 2   that I think we had discussed, being the government, is that,
 3   you know, just recognizing I guess the broader schedule that we
 4   have, the government anticipates having a substantial amount of
 5   witnesses.  I know we've talked with defense counsel about
 6   stipulations, and I guess those are conversations that we'll
 7   continue to have to kind of figure out, you know, what the true
 8   volume of witnesses will be.  Actually, I guess I'm putting this
 9   out to kind of get what the defense's position is to some of
10   that right now, but that's probably the only other issue I think
11   that we had to discuss.
12              THE COURT:  Yeah, so again, my sense was, that wasn't
13   so much directed to me as to --
14              MR. COLLINS:  That's correct, Your Honor.
15              THE COURT:  Okay.  So fine.  Yeah, so you all should
16   talk about stipulations and resolve that.  That's fine.
17              MR. COLLINS:  All right.  And if we are able to reach
18   stipulations and that changes the length of time, we'll let the
19   Court know.
20              MS. COTTINGHAM:  Your Honor, the only other logistical
21   point is, I think we had asked if the Court -- my understanding
22   is, we'll be picking the jury on Monday, will not actually begin
23   presentation of evidence or anything until Wednesday -- if the
24   Court would be willing hold on swearing the jury until that
25   Wednesday morning.
```

1          THE COURT:  Yeah, that's usually -- that's usually my

2     approach.

3          MS. COTTINGHAM:  All right.  Thank you, Your Honor.

4          THE COURT:  Sure.

5          All right.  So yeah, so Mr. Collins' useful questions

6     I think address most of the things that I would usually flag.

7     The only other thing I would add is, I -- well, first as a

8     question, regarding COVID -- and obviously our views on COVID

9     continue to evolve.  Maybe it's not as much of an issue as it

10    was a year ago when we were trying cases.  I have typically, at

11    least since -- I don't know if we're post COVID; I don't know

12    what we call it now, but since we started trying cases again

13    after COVID started, I at least always ask a question of the

14    jurors, have you been vaccinated and if you are not vaccinated,

15    would you be willing to take a COVID test at the start of every

16    morning.

17         And if the answer to both questions is no, I would be

18    inclined to exclude them; i.e., that they are -- if someone is

19    not vaccinated and not willing to take a COVID test every

20    morning, I have typically been inclined to exclude that person,

21    but I will ask both sides whether or not there's any objection

22    to that approach.

23         MS. DAVIS:  We have no objection, Your Honor.

24         THE COURT:  Any objections from the government on that

25    approach?

1           MR. COLLINS:  No, Your Honor, none at all.

2           THE COURT:  All right.  So you can save me some time

3    in adding that into the voir dire; one question, are you fully

4    vaccinated, second question, if you're not fully vaccinated,

5    would you be willing to take a COVID test every morning.

6           My understanding is we are still using COVID -- what I

7    call COVID procedures in that the jury will be arranged in the

8    jury room downstairs.  Is that still -- that's not true anymore?

9    Okay.  I'm getting updated information.  We'll be in the

10   courtroom, then.  Okay.  But with masks on.

11          Well, I'll get confirmation.

12          THE COURTROOM DEPUTY:  Yes, Your Honor, with masks on

13   and --

14          THE COURT:  Okay, I do remember that now.

15          THE COURTROOM DEPUTY:  Yeah.

16          THE COURT:  All right.

17          THE COURTROOM DEPUTY:  Thanks.

18          THE COURT:  That's right.  So this will be my first

19   trial since we've gone back to that.  Until recently, we've been

20   leaving people downstairs and having them come up one at a time.

21   I do remember, now that I say that.  We will now be -- we will

22   now have all the jurors in here in the room but with masks on,

23   because I think if you have some number which we will pass, then

24   you need to have everybody wearing masks.  So during jury

25   selection, we'll have masks on just because of the volume of

1    people that will be in here.  So be prepared for that.

2             I ask yes-or-no questions, so as you are framing the

3    voir dire questions, keep that in mind.  If they're not

4    yes-or-no questions, I will turn them into yes-or-no questions,

5    because I do not ask follow-up questions while they're in the --

6    while they're still in the gallery.  Any follow-up questions

7    will be asked -- I guess we'll still bring them one at a time up

8    to the microphone, though, rather than having them come all the

9    way up here?

10            THE COURTROOM DEPUTY:  I believe that's correct, but I

11   will confirm.

12            THE COURT:  Yeah, we'll put the husher on, and we'll

13   have the headphones.  Okay.

14            And so after asking yes-or-no questions, I will have

15   given each of them an answer sheet where they can mark yes or no

16   on the answer sheet, and then anybody who has a yes answer to

17   the question -- to any question, we will have follow-up

18   questions.  They will come to -- it used to be up here.  They'll

19   come to the podium.  We'll give them a headset.  You all will

20   have headsets, and with the husher on, we'll ask the follow-up

21   questions of each juror.

22            I allow attorneys to ask follow-up questions as long

23   as they don't turn it into a deposition.  If I feel that either

24   side is asking too many follow-ups, I usually will give a

25   warning that you're asking too many follow-ups.  I sometimes ask

1   too many follow-ups, and so that alone is usually enough; I

2   usually cover it.  And so if I feel like counsel is asking too

3   many, then at some point, I might cut it off and say the Court

4   only, but I usually give a warning first.

5          As the witness -- excuse me, juror, potential juror is

6   returning to their seat, that is the time to raise any for cause

7   objection or for cause strike that you wish to convey.  So

8   that's jury selection.

9          In terms of numbers, let's see, it's a two-week trial,

10  and so -- I don't know, I guess I'm open to suggestion.  We

11  could either go with two alternates or three alternates.  For a

12  two-week trial, maybe we'd go with three.  That's two weeks in a

13  still COVID-y time frame, so maybe three alternates.  I'm

14  looking to see if there's any opinion on it either way.

15         MR. COLLINS:  Your Honor, we would -- the government

16  would think that three would be best.

17         MR. DAVIS:  We have no objection to that.

18         THE COURT:  All right, so we'll do three alternates.

19  I'll talk with jury about how many we need to have in the pool

20  in order to make sure we get to that number.  It's a violent

21  crime case, so there might be some more who have -- who are

22  squeamish about that, so I'll try to come up with a number, but

23  three alternates is -- will be where -- what we're aiming for.

24         It is Local Rule, and I do enforce it here, that no

25  later than the evening before, you need to alert the other side

1    to which witnesses and which exhibits you are planning to call

2    and use prospectively the next day.  And it's then my preference

3    that if the other side knows that they have an objection to an

4    exhibit or anticipate an objection to testimony of a witness,

5    that you alert me through the CRD that we need to have a

6    conversation before the jury comes out so that we can try to

7    resolve as much as we can before we bring the jury out.

8          And of course, that does not mean that you can't

9    object in live time, you certainly can, and I won't give you a

10   hard time for it, but certainly, anything that we can resolve

11   before the jury is in the box is always good to do.

12         Again, Local Rule, once something's on the monitor,

13   unless there's an immediate objection or once something -- you

14   don't have to formally move things into evidence.  Once

15   something's mentioned or placed on the monitor, unless there's

16   an immediate objection, it's considered admitted.  Often

17   counsel, either out of force of habit or personal preference,

18   will still go through the process of moving things into

19   admission.  I won't make fun of you in front of the jury if you

20   do that because that's your normal practice.  I will go along

21   with you and say it's admitted.

22         But just so you know, Local Rule doesn't require that.

23   If -- as long as it's -- once you announce it.  And the reason

24   for that is because of the previous rule, which is that the

25   expectation is that counsel have already discussed all the

1  exhibits that are coming in the next day.  And so there are --

2  there should be no surprises, and therefore no reason to have a

3  lengthy process in terms of moving in exhibits in front of the

4  jury.  So you should know what's coming, but if there is an

5  objection, as soon as you see it, make it, and we'll deal with

6  that.

7       All right.

8       THE COURTROOM DEPUTY:  Your Honor, I'm sorry to

9  interrupt.

10       THE COURT:  No, please.

11       THE COURTROOM DEPUTY:  I just wanted to put everyone

12  on alert that we have three jury trials starting that day and a

13  bench trial.  So our jury assembly room is going to be very

14  full.  I just wanted you all to know that, because you're going

15  to be coming and going, and so are the jurors.

16       THE COURT:  All three of us are picking a jury on the

17  same day?

18       THE COURTROOM DEPUTY:  Correct.

19       THE COURT:  I didn't know that.  Okay.

20       All right.  Any questions, any other questions from

21  either side?  You both started to move, and then you both

22  stopped.

23       MR. DAVIS:  I have no questions on that, Your Honor,

24  no.

25       THE COURT:  Okay.

1        MR. COLLINS:  Your Honor, I did just -- as we were

2   sitting here, I thought of one other thing.

3        THE COURT:  Sure.

4        MR. COLLINS:  So we're going to have a lot of moving

5   parts, exhibits, and witnesses, and stuff like that.  We

6   anticipate using two case agents to help us.  I didn't know what

7   the Court's posture was on having two case agents sit at the

8   table with us and the movement of those agents sometimes as we

9   might need evidence or witnesses to come in and out of the

10  courtroom.

11       THE COURT:  The only question is, you know, in terms

12  of rule on witnesses, are they both testifying?  Usually, I

13  allow the government to have one person exempted from the rule

14  on witnesses, that person being your case agent, because I

15  know -- I get that you need the assistance.  You know, if I

16  don't put some limitation on that, you could have your whole

17  team over there.  So -- I mean, are they both testifying, or can

18  one be someone who's not testifying but could still be useful to

19  you?

20       MR. COLLINS:  So Your Honor, at this juncture, we

21  anticipate only one would be testifying.

22       THE COURT:  So I have no problem -- I mean, subject to

23  objection, but I have no problem with two case agents sitting

24  over there if only one them is testifying.

25       MR. DAVIS:  It's norm for one -- for the case agent to

```
 1  sit at the table, but I would agree with Your Honor, as long as
 2  one them is not testifying.  I would be a little bit more
 3  uncomfortable with that if they were both going to testify.
 4           THE COURT:  So you can have one testifying case agent
 5  and one non-testifying case agent at counsel table.
 6           MR. COLLINS:  I just wanted the Court to be aware that
 7  there might be two people actually working and moving stuff
 8  around.
 9           THE COURT:  No, that part is fine, yeah, do what you
10  need to do.
11           MR. DAVIS:  You know, Your Honor, I don't know if I
12  was the cause us not sitting on the 7th of February.
13           THE COURT:  I don't remember at this point.
14           MR. DAVIS:  I had a hearing scheduled before
15  Judge Chuang on the 7th, and that looks like it may be
16  continued, and if I was the only holdup on that, I would have no
17  problems with coming in on the 7th rather than the 6th.
18           THE COURT:  All right.  Let me check to make sure it
19  wasn't me.  I don't think it was.
20           Yeah.  If we did that, I would probably give you the
21  10th off.  Well, it looks like I did go ahead and schedule a
22  sentencing for the 7th because I thought I -- we wouldn't be
23  sitting.
24           MR. DAVIS:  That's fine.
25           THE COURT:  So I'd rather not move that at this point.
```

```
 1   So let's keep that.  And again, running out of time, so I've got
 2   to get that done.  All right.
 3            Oh, all right.  The only thing, I was just alerted, if
 4   you want water, you need to bring your own.  We used to, but I
 5   guess now we just provide it for the jury, and witnesses, and
 6   for the Court.  So bring your own water.  BYOW, bring your own
 7   water.
 8            MR. DAVIS:  Your Honor, I don't know if Your Honor can
 9   do anything about this.  Mr. Tejan is transported from Orange,
10   Virginia, and he will be transported daily during the trial.
11   And he told this morning that they get him up at 3:00 a.m., and
12   they put him in a cell, and he just sits there for about three
13   hours.  And he's asking if there's anything that could be done
14   so that he isn't -- they don't wake him up at 3:00 a.m. if it
15   isn't necessary, because it's going to be a pretty long day for
16   him if they do.
17            THE COURT:  That's a new one.  I hadn't heard that one
18   before.  We'll make inquiries.  I can't guarantee; they might
19   have a reason that's security related, but I'll make inquiries.
20            MR. DAVIS:  Thank you, Your Honor.
21            THE COURT:  All right.  Anything else?
22            MR. COLLINS:  Your Honor, nothing further from the
23   government, thank you.
24            THE COURT:  Anything else from the defense?
25            MR. DAVIS:  Nothing, Your Honor.
```

1          THE COURT:  All right.  I look forward to seeing

2   you all on the 6th.  Take care.

3          THE COURTROOM DEPUTY:  All rise.  This Honorable Court

4   stands adjourned.

5      (The proceedings were adjourned at 1:11 p.m.)

1        CERTIFICATE OF OFFICIAL REPORTER

2        I, Patricia Klepp, Registered Merit Reporter, in and for

3   the United States District Court for the District of Maryland,

4   do hereby certify, pursuant to 28 U.S.C. § 753, that the

5   foregoing is a true and correct transcript of the

6   stenographically-reported proceedings held in the above-entitled

7   matter and the transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9                        Dated this 29th day of March, 2023.

10

11

12                    _____/s/_____
                      PATRICIA KLEPP, RMR
13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25