```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF MARYLAND

 3                           SOUTHERN DIVISION

 4   UNITED STATES OF AMERICA,      ) CRIMINAL
                                    ) NO. GJH-21-0101
 5             Plaintiff,           )
                                    )
 6   v.                             )
                                    )
 7   MADANI ILARA TEJAN,            )
                                    )
 8             Defendant.           )

 9          TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 2
                BEFORE THE HONORABLE GEORGE J. HAZEL,
10                  UNITED STATES DISTRICT JUDGE,
                             AND A JURY
11            WEDNESDAY, FEBRUARY 8, 2023; 9:38 A.M.
                         GREENBELT, MARYLAND
12   APPEARANCES:

13   FOR THE PLAINTIFF:

14             OFFICE OF THE UNITED STATES ATTORNEY
               BY:  CAITLIN R. COTTINGHAM, ESQUIRE
15             6406 Ivy Lane
               Suite 800
16             Greenbelt, Maryland  20770
               (301) 344-0862
17                    -and-
               UNITED STATES DEPARTMENT OF JUSTICE
18             BY:  GERALD A.A. COLLINS, ESQUIRE
               BY:  LISA K. MAN, ESQUIRE
19             1301 New York Avenue
               7th Floor NW
20             Washington, DC  20005
               (202) 262-6468
21


22


23   OFFICIAL COURT REPORTER:
     Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227
24
          ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
25
```

```
 1    APPEARANCES (Continued):

 2    FOR THE DEFENDANT:

 3              DAVIS AND DAVIS
              BY:  CHRISTOPHER M. DAVIS, ESQUIRE
 4              BY:  MARY E. DAVIS, ESQUIRE
              1350 Connecticut Avenue NW
 5              Suite 202
              Washington, DC  20036
 6              (202) 234-7300
                       -and-
 7              BY:  SEAN P. McCLIGGOTT, ESQUIRE
              602A North Tazewell Street
 8              Arlington, Virginia  22203
              (989) 992-3537

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (Call to order of the Court.)

2               THE COURT:  Good morning.

3           (Counsel reply, "Good morning, Your Honor.")

4               THE COURT:  You can all be seated.

5           Before we bring the jury out -- I do understand the jury

6       is here -- I do -- I did see a motion to sever Count One.

7           Good morning, Ms. Davis.

8               And the record will reflect all counsel and the defendant

9       are back and present for day two of trial.

10              MS. DAVIS:  Yes, Your Honor.  There was discussion

11      between the parties as to how to handle the Hope Village

12      incident and how to reference it.  It was suggested that a

13      residential -- a residential facility be used instead of a

14      halfway house.  However, it's our position that once the

15      witnesses from Hope Village testify, it's going to be very

16      clear it's a halfway house and that Mr. Tejan was there as --

17      as a result of an offense, and it's our position that that

18      count should be severed because under Rule 14, the prejudice is

19      certainly overwhelming.

20              THE COURT:  All right.  And so there would be no

21      mention, I presume, of why he was in the halfway house, whether

22      it was a felony, misdemeanor, the end of a sentence, instead of

23      a sentence?

24              MS. DAVIS:  Well, I mean, there is testimony that he

25      was placed there by -- that it was a BOP facility, and so I

1  think that, in and of itself, will notify the jury that he was

2  in BOP custody, and you are normally not in BOP custody for a

3  traffic offense or something minor.

4         THE COURT:  Fair enough.  I'm sorry.  Was Mr. Davis

5  about to whisper something to you?

6         MS. DAVIS:  No, Your Honor.

7         THE COURT:  Okay.  Mr. Collins.

8         MR. COLLINS:  Good morning, Your Honor.  Gerald

9  Collins on behalf of the government.

10        Your Honor, of course, we ask that you deny the motion.

11  This is clearly an issue that's been litigated already prior to

12  today.

13        While we have had discussions with counsel about this

14  issue, we do believe it's one that can be addressed in the way

15  that the questions are presented and framed to each of the

16  witnesses.  Similarly to how we are going to use information as

17  it relates to the forfeiture by wrongdoing, the situation that

18  we have going on, we think that the witnesses can be asked

19  questions -- first of all, they can be instructed not to go

20  into the fact --

21        THE COURT:  Well, let me just -- before you go on,

22  you mentioned "forfeiture by wrongdoing."  I assume those words

23  would not be said to the jury?

24        MR. COLLINS:  Oh, that's correct, Your Honor.

25        THE COURT:  Okay.

1          MR. COLLINS:  That's correct, Your Honor.

2          THE COURT:  You can continue.

3          MR. COLLINS:  This is just between us here, Your

4   Honor.

5          THE COURT:  Okay.

6          MR. COLLINS:  And, so, I think the government's

7   position is that the questions can be framed to the witnesses

8   in reference to a residential facility, which, in fact, it is.

9   I think that a residential facility can denote many things.  It

10  can be one for treatment.  It could be one for rehabilitation.

11  It could be for many things that don't have anything to do with

12  the criminal justice system, and that these residential

13  facilities, in and of themselves, have policies that prevent

14  certain items from being brought into it.

15         THE COURT:  I could also say that you can instruct

16  your witness -- I don't know how many witnesses have to talk

17  about this -- but you can instruct your witness to refer to it

18  as a residential facility.

19         MR. COLLINS:  And that's what we have done, Your

20  Honor, if I haven't made that clear.  That's what we plan to do

21  is -- is -- well, we have already instructed them.  We plan to

22  ask the questions in that fashion.  And also, Your Honor, I

23  would say in an abundance of caution, we would ask if the Court

24  could just instruct them as well.

25         Also the same thing with the forfeiture by wrongdoing

1   issue, we have instructed our witnesses as to what they should

2   not say, but just in an abundance of caution, we'd ask that the

3   Court could do that as well outside the presence of the jury.

4           THE COURT:  If you think that's necessary, I am happy

5   to do that.  I mean, it would seem to me if the prosecutor

6   calling them instructs them, that should be enough.  I am happy

7   to do that if you think it's necessary.  That's fine.

8           MR. COLLINS:  I think it may be necessary, Your

9   Honor.

10          THE COURT:  That's fine.

11      Ms. Davis looks like she wants to be heard again.

12          MS. DAVIS:  Just a quick follow up, Your Honor.  I

13  don't know how many residential facilities require someone to

14  be patted down and wanded, and I think that is going to come

15  out through the testimony of the woman who actually did the

16  search.

17          THE COURT:  All right.  All right.  So I do

18  understand the issue.  What's before me is the motion to sever

19  Count One, and I am going to deny that motion.  Even if we were

20  dealing with a situation where it was going to be referred to

21  as a halfway house and it was clear that that involved some

22  kind of criminal conduct, I would probably still deny the

23  motion because, you know, the lead charge here is a murder

24  charge.  The notion that he might have had some unknown prior

25  conviction I don't think is going to impact the jury such that

1   it would make them believe he's more likely of having committed
2   the most serious offense here, and it is okay for the Court to
3   sort of give consideration to the different charges in that
4   way.
5        But even putting that aside, the government has indicated
6   that they will find a different way, a less prejudicial way to
7   refer to the halfway house, that being by referring to it as a
8   residential facility.  So certainly with that instruction to be
9   given to the witnesses, I certainly think any prejudicial
10  impact is minimal, and so for that reason, I will deny the
11  motion to sever.
12       Anything else before we get the jury?
13            MR. COLLINS:  Yes, Your Honor.  I just wanted to
14  advise the Court that we have received from the defense at
15  least three stipulations which we believe will address multiple
16  witnesses that we intended to present throughout the case.
17            THE COURT:  Okay.
18            MR. COLLINS:  There is just one issue I just wanted
19  to talk to Mr. Davis about real quick.
20            THE COURT:  Sure.
21       (Counsel conferring.)
22            MR. COLLINS:  So that's it, Your Honor.
23            THE COURT:  All right.  So my intention is to go
24  straight from opening instructions to opening statements.  I
25  don't know if counsel -- either counsel is planning to use the

```
 1  podium because we can get that situated now so that we can go
 2  -- we can get that situated now.  And does counsel have
 3  microphones?  Do they have their lapel mics?
 4           MS. MAN:  Your Honor, I have a clip-on mic.
 5           THE COURT:  And I don't know which defense lawyer is
 6  giving opening?
 7           MS. DAVIS:  Your Honor, we are going to reserve.
 8           THE COURT:  You are not going to give an opening
 9  statement at this point?
10           MS. DAVIS:  At this point.
11           THE COURT:  That's good to know.  Thank you.
12       Last thing before we get the jury out.  In preliminary
13  jury instructions, I often will and plan to today read the
14  elements of the charges, assuming there is no disagreement.  I
15  saw the jury instructions were submitted jointly without
16  disagreement as to the elements of the crime.  Juries tend to
17  find that helpful.  So unless there is objection to that,
18  that's what I was going to do.
19           MR. COLLINS:  None from the government, Your Honor.
20           MS. DAVIS:  No, Your Honor.
21           THE COURT:  We can get the jury.
22           THE DEPUTY CLERK:  I wasn't able to make this
23  announcement to everyone who is in the gallery.  Please turn
24  your cell phones off.  It's not enough just to set them to
25  silent.  They need to be turned off because they interfere with
```

1    the court's recording system.

2           THE COURT:  And for folks in the gallery, I saw folks

3    move from this side to this side.  You are free to sit on

4    either side.  I mean, we can balance it out.  But I will leave

5    that to folks who are back there.

6           MR. COLLINS:  Your Honor, can we discuss one issue

7    right before the jury comes out?

8           THE COURT:  Do it quickly.

9           MR. COLLINS:  Does the Court have any objection to

10   some of the prosecutors maybe stepping out of the room to talk

11   to witnesses while other prosecutors are doing their --

12          THE COURT:  Try not to be too disruptive, but that's

13   fine.

14          MR. COLLINS:  Thank you.

15       (The jury panel enter the courtroom at 9:52 a.m.)

16          THE COURT:  Everyone may be seated.

17       Good morning, ladies and gentlemen.

18       (The jury panel reply, "Good morning.")

19          THE COURT:  How is everyone doing today?

20       (The jury panel reply, "Good.")

21          THE COURT:  Good to see you all.  Glad you all made

22   it in safely, and hopefully enjoyed your day off yesterday.

23       First thing:  You may have noticed as you walked into the

24   courtroom, everyone was standing.  That's simply out of respect

25   for your role as the judges of the facts.  They do that when I

1  come into the room.  It takes some getting used to it, but you

2  will eventually.  But as soon as you come in, you are free to

3  just take your seats.

4       As I think I indicated on Monday, we will start with some

5  instructions that I have to give you to guide the case, and

6  then we will go into opening statements.

7       But first, before we do that, we need to swear in the

8  jury.

9            THE DEPUTY CLERK:  Members of the jury, please stand

10 and raise your right hand.

11      Do each of you solemnly promise, declare, or affirm that

12 you shall well and truly try and a true deliverance make

13 between the United States of America vs. Madani Ilara Tejan and

14 a true verdict give according to the evidence?  If so, please

15 say "I do."

16      (Jury panel reply, "I do.")

17           THE DEPUTY CLERK:  Thank you.  You may be seated.

18           THE COURT:  Thank you.

19      Members of the jury, now that you have been sworn, I am

20 going to give you some preliminary instructions to guide you in

21 your participation in the trial.

22      It will be your duty to find from the evidence what the

23 facts are.  You and you alone will be the judges of the facts.

24 You will then have to apply to those facts the law as I will

25 instruct you.  You must follow that law whether you agree with

1    it or not.

2         Nothing that I may say or do during the course of the

3    trial is intended to indicate, nor should be taken by you as

4    indicating what your verdict should be.

5         The evidence from which you will find the facts will

6    consist of the testimony of witnesses, documents, and other

7    things received into the record as exhibits, and any facts that

8    the lawyers agree to stipulate to or that I may instruct you to

9    find.

10        Certain things are not evidence and must not be

11   considered by you.

12        I am just making sure you get your folders in case you

13   want to take notes.  You don't have to take notes, but in case

14   you want to.  As I indicated, I know some people are note

15   takers, some people are not.  I just wanted to make sure you

16   had your folders in case you do want to take notes.

17        So, as I was saying, certain things are not evidence and

18   must not be considered by you.  I will list them for you now.

19   Statements, arguments, and questions by lawyers are not

20   evidence.  Objections to questions are not evidence.  Lawyers

21   have an obligation to their clients to make objections when

22   they believe evidence being offered is improper under the rules

23   of evidence.  You should not be influenced by the objection or

24   by the Court's ruling on it.  If the objection is sustained,

25   ignore the question.  If it is overruled, treat the answer like

1   any other.  If you are instructed that some item of evidence is

2   received for a limited purpose only, you must follow that

3   instruction.

4        Testimony that I have excluded or told you to disregard

5   is not evidence and must not be considered.  Anything, anything

6   you see or hear outside the courtroom is not evidence and must

7   be disregarded.  As I told you the other day, you are to decide

8   the case solely on the evidence presented here in the

9   courtroom.

10        There are two kinds of evidence: direct and

11   circumstantial.  Direct evidence is, as the name suggests,

12   direct proof of a fact, such as testimony of an eyewitness.

13   Circumstantial evidence is proof of facts from which you may

14   infer or conclude that other facts exist.  I will give you

15   further instructions on these as well as other matters of the

16   case, but keep in mind that you may consider both kinds of

17   evidence.

18        It will be up to you to decide which witnesses to

19   believe, which witnesses not to believe, and how much of a

20   witness's testimony to accept or reject.  I will give you some

21   guidelines for determining the credibility of the witnesses at

22   the end of the case.

23        As you know, this is a criminal case, and there are some

24   basic rules about a criminal case that you must keep in mind.

25   First, the defendant is presumed innocent until proven guilty.

1    The indictment brought by the government against the defendant

2    is solely an accusation.  It is nothing more than that.  It is

3    not proof of guilt.  It is not proof of anything.  The

4    defendant, therefore, starts this trial with a clean slate.

5        Second, the burden of proof is on the government until

6    the very end of the case.  The defendant has no burden to prove

7    his innocence or to present any evidence or to testify.  Since

8    the defendant has the right to remain silent, the law prohibits

9    you from arriving at your verdict by considering whether or not

10   the defendant may testify.

11       Third, the government must prove the defendant's guilt

12   beyond a reasonable doubt.  Bear in mind that in this respect,

13   a criminal case is different from a civil case.

14       In this case, the defendant is charged with four counts:

15   conspiracy to distribute and possess with intent to distribute

16   controlled substances; possession with intent to distribute

17   controlled substances; interference with interstate commerce by

18   robbery; and murder resulting from the use, carrying,

19   brandishing, and discharging of a firearm during and in

20   relation to a drug trafficking crime and a crime of violence.

21       Because I have found that juries sometimes find this

22   helpful, I am going to give you the elements of each of these

23   crimes now so you will have them in mind.  Again, whether or

24   not you take notes is completely up to you.  You will get all

25   of this in writing at the end of the case.

 1          For Count Two -- and I am going to start with Count Two

 2     first and then go back to Count One.  In order to prove Count

 3     Two against the defendant, the government must establish beyond

 4     a reasonable doubt each of the following three elements:

 5     first, that the defendant possessed controlled substances;

 6     second, that the defendant knew that he possessed the

 7     controlled substances; and third, that the defendant possessed

 8     the controlled substance with the intent to distribute them.

 9          As to Count One, the conspiracy charge, first, that at

10     least two or more persons entered the unlawful agreement

11     charged in Count One, that is an agreement to distribute or

12     possess with intent to distribute controlled substances

13     starting in or about August of 2018; and second, that the

14     defendant knowingly and willfully became a member of that

15     conspiracy.

16          As to Count Three, the government must establish beyond a

17     reasonable doubt, first, that the defendant knowingly obtained

18     or took the personal property of another or from the presence

19     of another; second, that the defendant took this property

20     against the victim's will by actual or threatened force,

21     violence, or fear of injury whether immediately or in the

22     future; and third, that as a result of the defendant's actions,

23     interstate commerce or an item moving in interstate commerce

24     was delayed, obstructed, or affected in any way or degree.

25          And as to Count Four, the government must prove the

1  following beyond a reasonable doubt: first, that the defendant

2  committed a crime of violence or drug trafficking crime for

3  which he may be prosecuted in a court of the United States;

4  second, that the defendant knowingly used or carried a firearm

5  during and in relation to the commission of, or knowingly

6  possessed a firearm in furtherance of, the crimes charged in

7  Counts One, Two, and Three; third, that the defendant caused

8  the death of Victim 1 through the use of a firearm during the

9  perpetration of those crimes; fourth, that the defendant acted

10 with premeditation; and fifth, that the defendant acted with

11 malice aforethought.

12      Now a few words about your conduct as jurors.  You, as

13 jurors, must decide this case based solely on the evidence

14 presented within the four walls of this courtroom.  This means

15 that during the trial, you must not conduct any independent

16 research about the case, the matters of the case, or any

17 individuals or corporations involved in the case.  In other

18 words, you should not consult dictionaries or reference

19 materials, search the Internet, social media, websites, or

20 blogs, or use any other electronic tools to obtain information

21 about this case or help you decide it.  Please do not try to

22 find out any information from any source outside the confines

23 of this courtroom.

24      Until you retire to deliberate, you may not discuss this

25 case with anyone, not even your fellow jurors.  After you

1    retire to deliberate at the end of the case, you may begin

2    discussing the case with your fellow jurors, but even then, you

3    cannot discuss the case with anyone else until you have

4    returned a verdict and the case is over.

5        I know that many of you use cell phones, Smartphones,

6    iPhones, other data devices, the Internet, social media sites,

7    and you take advantage of many of the tools of technology.  You

8    simply cannot use any of them during the trial in any way that

9    relates to this case.

10       You also must not talk to anyone at any time about this

11   case or use any of those tools to communicate with anyone about

12   this case.  As I indicated the other day, that includes even

13   your friends and family.  You must not communicate with anyone

14   about this case on your cell phone, through email, iPhone, text

15   message, Twitter, Facebook, Google, My Space, LinkedIn, Snap

16   Chat, TikTok, whatever else you might be able to come up with.

17   You may not use any similar technology or social media even if

18   it's something that I don't know of yet and haven't mentioned

19   to you.

20       I expect you to inform me as soon as you become aware of

21   any juror's violation of these instructions because a juror who

22   violates these instructions jeopardizes the fairness of these

23   proceedings and a mistrial could result and we'd have to start

24   the trial all over again.

25       Finally, do not form any opinion until the evidence is

1    in.  Keep an open mind until you start your deliberations.

2         If you want to take notes, you may do so on the notepads

3    that you have now been provided.  It may be difficult to take

4    detailed notes and pay attention at the same time.  If you do

5    take notes, be sure that your note taking does not interfere

6    with you listening to and considering all of the evidence.

7    Also, if you do take notes, do not discuss them with anyone

8    before your deliberations begin.

9         You cannot take your notes home with you at the end of

10   the day or at the end of the trial.  You should leave them on

11   your seat at the end of every day, and you will leave them in

12   the jury room at the end of the trial.

13        If you choose not to take notes, remember it's your

14   individual responsibility to listen carefully to the evidence.

15   You cannot give this responsibility to someone who is taking

16   notes.  Our system depends on the judgment of all the members

17   of the jury.  You must remember the evidence in the case.

18        The trial will now begin.  First, the government will

19   make an opening statement which simply is an outline to help

20   you understand the evidence as it comes in.  Next, the

21   defendant's attorney may but does not have to make an opening

22   statement, or they may choose to wait until later in the case

23   to make their opening statement, which I understand might be

24   what they choose to do.  Opening statements are not evidence,

25   and they are not permitted to be arguments.

1          The government will then present its witnesses, and

2     counsel for the defendant may choose to cross-examine them.

3     Following the government's case, the defendants may, if he

4     wants to, he is not required to, present witnesses, whom the

5     government may cross-examine.  After all the evidence is in, I

6     will instruct you on the law; then the attorneys will present

7     their closing arguments to summarize the evidence; and then you

8     will retire to deliberate on your verdict.

9          I believe we are now ready for the opening statement of

10    the government.

11               MS. MAN:  Madam Clerk, am I on?  Can everyone hear

12    me?

13               THE COURT:  It sounds like it.

14               MS. MAN:  Good morning.

15          (The jury panel reply, "Good morning.")

16               MS. MAN:  On October 3rd of 2018, Anthony Freeland

17    spent the last moments of his life running away from someone he

18    thought was his friend.  He was running away because that

19    so-called friend, the defendant, Madani Tejan, had just shot

20    him twice and was about to shoot him one more time.

21    Mr. Freeland died of those gunshot wounds inflicted by the

22    defendant that day.

23          Earlier that evening, Mr. Freeland and the defendant had

24    made plans for Mr. Freeland to buy or trade drugs from the

25    defendant.  Mr. Freeland trusted the defendant.  They were

1   friends and business associates.  Mr. Freeland bought and sold

2   drugs.  The defendant supplied Mr. Freeland with pills,

3   fentanyl that looked like oxycodone, which he then sold.

4   Sometimes Mr. Freeland gave the defendant marijuana as payment

5   for the pills that he got.  But when they arrived at the

6   meeting spot, instead of selling Mr. Freeland drugs, the

7   defendant shot and killed him.

8         The day before the defendant murdered Mr. Freeland, the

9   two of them had made plans to meet up; however, Mr. Freeland

10  was not feeling well that evening, so they made plans for the

11  following night.

12        On October 3rd of 2018, the -- Mr. Freeland drove from

13  his house in the District of Columbia to a location told to him

14  by the defendant, a neighborhood called Glenn Estates located

15  here in Prince George's County, Lanham, Maryland.  It was a

16  neighborhood that the defendant knew well.  The defendant had

17  lived there when he was a teenager on a street called Manton

18  Way.  Mr. Freeland had no ties to that neighborhood, but the

19  defendant did.

20        Mr. Freeland entered the Glenn Estates neighborhood and

21  drove around before pulling over to wait for the defendant on

22  Manton Way.  The defendant walked up to Mr. Freeland's car.

23  Mr. Freeland rolled down his window.  And as Mr. Freeland sat

24  in his car, the defendant shot him.  One shot hit him in the

25  neck and exited out his collar bone.  The other shot went into

1    his side and went through his stomach.  When Mr. Freeland got

2    out of his car to get away from the defendant and ran down the

3    sidewalk, the defendant shot him one more time.  This shot went

4    through Mr. Freeland's back and punched out his chest.

5    Mr. Freeland fell to the sidewalk face down.  He died right

6    then and there on that sidewalk.

7         The defendant got into Mr. Freeland's car and drove away.

8    Unfortunately for the defendant, the car that Mr. Freeland was

9    driving, a white Acura, operated using a key fob.  The key fob

10   was in Mr. Freeland's pocket.  A short distance away from where

11   Mr. Freeland laid dying, the white Acura would go no further.

12   The defendant was forced to abandon the vehicle he stole from

13   Mr. Freeland.  As he got out of the car, the defendant took

14   Mr. Freeland's wallet which had been inside the car.

15        As Judge Hazel told you, the defendant is charged with

16   four counts.  Count One is conspiracy to distribute and possess

17   with intent to distribute a controlled substance; specifically,

18   fentanyl, oxycodone, and marijuana.

19        Count Two charges the defendant with possession with

20   intent to distribute those controlled substances; specifically,

21   oxycodone and fentanyl.

22        Count Three, interference with interstate commerce by

23   robbery.  This is just a fancy way of saying that the defendant

24   robbed the -- robbed Mr. Freeland of items that moved in

25   interstate commerce, that is, the property taken from

1   Mr. Freeland moved across state lines.  You will hear testimony

2   that Mr. Freeland and his property, his money, his wallet, his

3   car drove from D.C. to Maryland, which crosses state lines.

4        Count Four, murder, murder resulting from the use,

5   carrying, brandishing, and discharging during and in relation

6   to a drug trafficking crime and a crime of violence.  We have

7   the robbery of Mr. Freeland, which is a crime of violence, and

8   Mr. Freeland was killed during a drug deal, that is, during a

9   drug trafficking crime, which fulfills this element.

10       Over the next few days, the United States will present

11  evidence in the form of live witness testimony and exhibits to

12  prove that the defendant committed each of these offenses

13  beyond a reasonable doubt.

14       You will hear about the defendant's drug dealing in the

15  community.  Prior to robbing and killing Mr. Freeland, the

16  defendant was staying at Hope Village, a residential facility

17  in the District of Columbia.  Hope Village has rules for its

18  residents:  No drugs or contraband of any sort.  But the

19  evidence will show that on August the 15th of 2018, despite

20  those rules, the defendant tried to bring over 1,000 fentanyl

21  pills into the facility, pills that are evidence of the drug

22  conspiracy he was engaged in as alleged in Count One of the

23  indictment.

24       You will hear from staff members at Hope Village who were

25  just doing their jobs when the defendant tried to smuggle in

1   over 1,000 fentanyl pills.  Their staff members ended up having

2   to confiscate the fentanyl pills from the defendant.

3         You will hear testimony from the officers who responded

4   to Hope Village and took custody of the drugs and submitted

5   them for testing.  These same officers searched the defendant

6   and discovered nearly $6,000 in cash on his person.

7         You will hear from Task Force Officer Fernando Jaramillo

8   with the Drug Enforcement Administration.  TFO Jaramillo will

9   talk about the distribution of local -- of controlled

10  substances locally, including marijuana, OxyContin, and

11  fentanyl, the methods used by drug traffickers, and drug

12  prices.  He has investigated over hundreds of drug cases over

13  the course of his 24-year career.  Jaramillo will provide

14  expert testimony about what constitutes a distribution versus

15  personal amount of drugs.

16        Mr. Freeland's murder was investigated by the Prince

17  George's County Police Department, and you will hear from the

18  officers who were involved in the investigation.  You will hear

19  testimony from the officers who responded to the Glenn Estates

20  neighborhood and secured the scene with Mr. Freeland's body.

21  They also located his car a short distance later.  You will

22  hear from the evidence technicians who collected evidence

23  recovered from the scene.

24        You will hear a search -- about a search of an apartment

25  on Lottsford Road in Upper Marlboro, Maryland, which is where

1    the defendant slept.  Inside that apartment, officers

2    discovered Mr. Freeland's wallet, a prepaid Cricket phone, and

3    marijuana.  The wallet was Mr. Freeland's that the defendant

4    had taken out of the white Acura before he left.  That prepaid

5    Cricket cell phone, along with the defendant's prepaid phone --

6    the -- along with the phone number that was registered to the

7    defendant, the prepaid phone and the defendant's registered

8    phone were the last two numbers in touch with Mr. Freeland

9    before he was shot and killed.

10         You will hear from Candice Corbin.  Ms. Corbin is

11   Mr. Freeland's girlfriend.  She worked shift work, and

12   Mr. Freeland picked her up every night from work, so when he

13   didn't show up on October 3rd, she got worried.  She tracked

14   his iPhone to Manton Way, where she learned the terrible news

15   that he was dead.

16         Ms. Corbin told investigators that Mr. Freeland was going

17   to meet a "Malik" that night to buy or trade drugs, and that

18   Mr. Freeland took about $2500 out of her safe to pay for the

19   drugs.  She also did her own investigation and looked through

20   Mr. Freeland's social media accounts.  One of Mr. Freeland's

21   friends on Instagram was somebody named "Malik."  That account

22   belonged to the defendant.  The defendant's Instagram account

23   had photos of himself with Mr. Freeland.  The defendant's

24   Instagram account also had evidence of the defendant conspiring

25   to sell drugs.

1          You will hear from a series of expert witnesses,

2   including a medical examiner and an analyst from the Federal

3   Bureau of Investigation who tracked -- who tracked the

4   defendant's phones and his movements before and after the

5   murder.

6          At the end of the United States' case, the government

7   will have presented law enforcement, expert and civilian

8   witnesses, social media, phone records, audio and video

9   recordings, transcripts of those recordings, photographs and

10  video stills, and physical evidence to include the cellular

11  phones and the drug-related items seized during the course of

12  this investigation.

13         You just heard Judge Hazel talk about documents called

14  "stipulations."  Stipulations explain or confirm an agreement

15  by both parties about a specific case that's not contested.

16  Examples are that the pills seized from the defendant at Hope

17  Village are, indeed, fentanyl, and the marijuana seized from

18  his apartment is, indeed, marijuana.

19         At the end of this trial, we are going to ask that you

20  use your common sense, weigh the evidence before you in light

21  of the law given to you by the Court, and come back with the

22  only fair and just verdict in this case, that the defendant is

23  guilty as charged in the indictment.

24         Thank you.

25              THE COURT:  Thank you, Counsel.

 1          Does the defense wish to give an opening statement at

 2   this time?

 3          MR. DAVIS:  Your Honor, at this time, we'd reserve

 4   our right to give an opening statement.

 5          THE COURT:  All right.  Very well.  So we are ready

 6   for the government's first witness.

 7          MR. COLLINS:  Your Honor, the government would call

 8   Karel Blackmore.  And for the record, that's K-A-R-E-L,

 9   B-L-A-C-K-M-O-R-E.

10          THE COURT:  Very well.

11          THE DEPUTY CLERK:  Mr. Blackmore, please walk towards

12   me.  Stand right here to be sworn.  Please raise your right

13   hand.

14           KAREL BLACKMORE, GOVERNMENT'S WITNESS, SWORN

15          THE DEPUTY CLERK:  Please have a seat in the jury box

16   -- I mean in the witness box.  Watch your step as you enter.

17        And if you are fully vaccinated, you may take your mask

18   off.

19          THE WITNESS:  Got you.

20          THE DEPUTY CLERK:  But it's your choice.

21        Please speak loudly and clearly into the microphone.

22   State your name for the record and spell each name.

23          THE WITNESS:  Karel Blackmore, K-A-R-E-L,

24   B-L-A-C-K-M-O-R-E.

25          THE DEPUTY CLERK:  Thank you.

```
 1              MR. COLLINS:  Thank you, Your Honor.  May I inquire?
 2              THE COURT:  You may.
 3                          DIRECT EXAMINATION
 4  BY MR. COLLINS:
 5  Q.    Sir, how old are you?
 6  A.    Sixty.
 7  Q.    And what's your highest level of education?
 8  A.    Some college.
 9  Q.    And are you currently employed?
10  A.    No.
11  Q.    Were you -- had you previously been employed?
12  A.    Yes.
13  Q.    And where were you previously employed?
14  A.    The last one was a court security officer at the
15  Pentagon, and prior to that, United States Park Police as a
16  police officer.
17  Q.    And how long did you work for the Park Police Department?
18  A.    Thirty-two years.
19  Q.    And I want to draw your attention to the date of October
20  -- to the period of October of 2018.  Okay?
21        During that period of time, did you live in Prince
22  George's County?
23  A.    Yes.
24  Q.    And did you live in a particular neighborhood?
25  A.    Yes.
```

1  Q.    And what is that neighborhood called?

2  A.    Glenn Estates.

3  Q.    And where is that located in Prince George's County,

4  Maryland?

5  A.    In Lanham, Maryland.

6  Q.    And how long did you live in Glenn Estates total?

7  A.    Seven years, I believe.

8  Q.    And do you currently live in Glenn Estates?

9  A.    No, I do not.

10 Q.    And when would you have moved from Glenn Estates?

11 A.    2018.

12 Q.    Based on the period of time that you lived in Glenn

13 Estates, would you recognize it if you saw it on a map?

14 A.    Yes.

15 Q.    I am going to show you what's been marked as Government's

16 Exhibit first starting with 452, and you should be able to look

17 right on your screen.

18         THE COURT:  It's not up at the moment.

19         MR. COLLINS:  It's not up.  Okay.  The Court's

20 indulgence, Your Honor.

21         THE COURT:  Sure.

22 BY MR. COLLINS:

23 Q.    I am showing you what's been marked as Government's

24 Exhibit 452.

25         Do you recognize that?

 1   A.      Yes.

 2   Q.      And is that an accurate depiction of Glenn Estates?

 3   A.      Say that again.

 4   Q.      Is that an accurate depiction of Glenn Estates in 2018?

 5   A.      Yes, most of it.

 6   Q.      And when you lived in Glenn Estates, was there a

 7   particular street that you lived on?

 8   A.      Yes.

 9   Q.      And what street was that?

10   A.      Garson Terrace.

11   Q.      And what was the address that you lived at on Garson

12   Terrace back in 2018?

13   A.      10300 Garson Terrace.

14   Q.      Now, did you spend the entire seven years at that

15   address?

16   A.      Yes.

17   Q.      And are there particular cross streets where your house

18   was located in Glenn Estates?

19   A.      Yes.

20   Q.      Were there -- were there cross streets that were north of

21   the house and south of the house?

22   A.      There were -- yes.  There were cross streets to the right

23   of the house as well as to the left of the house.

24   Q.      Let's start with the right of the house.

25           What were the cross streets at that location?

1   A.      Forbes Boulevard.

2   Q.      Is that F-O-R-B-E-S?

3   A.      Yes.

4   Q.      And what was the next set of cross streets?

5   A.      The next one to my left would be Manton.

6   Q.      What I want to do is --

7           THE COURT:  Could you spell that?

8           THE WITNESS:  M-A-N-T-O-N, I believe it was.

9   BY MR. COLLINS:

10  Q.      What I am going to do is I am going to show you what's

11  been marked as Government's Exhibit 453.

12          Do you recognize this?

13  A.      Yes.

14  Q.      And what is that?

15  A.      This is an overview for around Glenn Estates.

16  Q.      And that's an accurate depiction of Glenn Estates back in

17  October of 2018?

18  A.      Yes.

19  Q.      Do you recognize where Forbes Boulevard is shown on

20  Exhibit 453?

21  A.      Yes.

22  Q.      And, sir, it's my understanding that you can actually

23  touch the screen and it will leave a mark.

24          Can you just highlight on the screen where Forbes

25  Boulevard is?

Blackmore - Direct

1   A.     Yes.  It will be all of this here (indicating).

2   Q.     And was Forbes Boulevard the main thoroughfare through

3   the neighborhood?

4   A.     Yes, it is.

5   Q.     And looking at 453, can you see where -- generally where

6   your home was located?

7   A.     A piece of it, yes.

8   Q.     Okay.  And can you just mark where that piece is for

9   right now?

10  A.     Sure.  Right here (indicating).

11  Q.     And based on the prior description you gave, which cross

12  street would that be?

13  A.     That's Garson Terrace.

14  Q.     So that would be Forbes and Garson?

15  A.     Yes, sir.

16  Q.     Now, what I want to do is I want to show you what's been

17  marked as Government's Exhibit 454.  I'm sorry.  450.  I'm

18  sorry.  Let me start with 454.

19         Do you recognize what's depicted in this image?

20  A.     Yes.

21  Q.     And what's depicted in this image?

22  A.     This is the back part of Glenn Estates.

23  Q.     And now I want to show you what's been marked now as

24  Government's Exhibit 450.

25         Do you recognize what's depicted in this image?

1   A.    Yes.

2   Q.    And what is that?

3   A.    It's the same as the previous one, the back portion of

4   Glenn Estates.

5   Q.    And this is just a more clearer version.  Is that

6   correct?

7   A.    Yes, it is.

8   Q.    And is this an accurate depiction of Glenn Estates back

9   in 2018?

10  A.    Yes, sir.

11  Q.    And does this image depict where your residence is on

12  Garson Terrace?

13  A.    Yes, sir.

14  Q.    And using 450, can you show the jury where exactly your

15  house was located?

16  A.    Right here (indicating).

17  Q.    Now, how would you describe your house to the members of

18  the jury?

19  A.    It's a two-story brick-faced house which sits on the

20  corner of Garson and Forbes Boulevard.

21  Q.    And this residence had multiple entry and exit points.

22  Is that correct?

23  A.    Yes, sir.

24  Q.    And we will talk about this a little bit more, but did it

25  also have multiple security cameras?

Blackmore - Direct

1    A.    Yes, sir.

2    Q.    Now, what I want to do is I want to draw your attention

3    specifically to the date of October 3rd, 2018.  Okay?

4    A.    Okay.

5    Q.    That evening, was there a point in time when you were not

6    at the residence?

7    A.    Correct.  Yes.

8    Q.    And where were you?

9    A.    I was at church.

10   Q.    And approximately what time did you go to church that

11   evening?

12   A.    I want to say maybe someplace around about seven, 7:30.

13   I don't recall the specific time.

14   Q.    Did there come a point in time when you left church?

15   A.    Yes.

16   Q.    And where did you go when you left church?

17   A.    On my way home.

18   Q.    And when you made your way home, did you go directly to

19   Glenn Estates?

20   A.    Yes.

21   Q.    And once you got to Glenn Estates, what was your means of

22   travel from the entry point of Glenn Estates until you got to

23   your house?

24   A.    Motor vehicle.

25   Q.    Did you take Forbes Boulevard?

1    A.    Yes.  I took Forbes Boulevard.

2    Q.    Did you take that directly from the entry point of the

3    neighborhood all the way to the residence?

4    A.    Yes, sir.

5    Q.    You said you were in a motor vehicle.

6          What type of motor vehicle were you in?

7    A.    That would be a white Chevy Equinox.

8    Q.    And were you by yourself when you were in that vehicle?

9    A.    No, I was not.

10   Q.    Now, do you recall approximately what time it was that

11   you got to the neighborhood?

12   A.    I would have to say someplace after nine, 9:30.

13   Someplace around there.  I am not quite certain what time it

14   was.

15   Q.    But did you go directly to your house?

16   A.    We were -- yes.  I was heading directly to the house but

17   detoured a little bit.

18   Q.    And why did you detour from your house?

19   A.    I wanted to drive down or go down Manton down in that

20   area down behind -- behind in that area.

21   Q.    On the way home, did you receive a call from someone in

22   the neighborhood?

23   A.    Yes, I did.

24   Q.    And were you advised that a shooting had taken place

25   possibly in the neighborhood?

1   A.    Yes.

2   Q.    And based on that information, what did you do?

3   A.    Based on that, other than going directly home, we passed

4   my home and went down Manton just to take a look down there.

5   Q.    And looking at Government's Exhibit 450, can you show the

6   ladies and gentlemen of the jury exactly where Manton Way is on

7   that exhibit?

8   A.    Manton is right here (indicating).

9   Q.    And as you travelled down Manton Way, was there any

10  particular residence that you were interested in on that

11  street?

12  A.    Yes.

13  Q.    And which residence was that?

14  A.    The second from the corner.  I think the address is 6503

15  Manton.

16  Q.    And as you drove past that location, did you make any

17  observations?

18  A.    Yes.  As I drove past that location, I mean, the house

19  looked quiet, lights were off and so forth, and we kept on

20  driving down Manton.

21  Q.    As you continued down the street, did you make any other

22  observations?

23  A.    Yes, I did.

24  Q.    And what, if anything, did you see?

25  A.    As we were driving down Manton, out of the peripheral of

1    my -- of my right -- from -- on my right side, my peripheral

2    vision, I noticed what appeared to be a body lying on the

3    sidewalk.  I then, being my wife was driving, I had her stop to

4    back up just to take a look to make sure what I saw is what I

5    saw.  She backed up, and I turned to look, got out of the car,

6    and, in fact, there was a body laying on the sidewalk.

7    Q.    And did you make any observations about the body as you

8    saw it lying?

9    A.    Yes.  After I got out of the vehicle, I approached the

10   body, and I can see blood.  I can see as though -- the body was

11   still not in -- not moving in any way.  There was no breathing

12   or anything like that.  I -- at that point, I told my wife to

13   call 911.

14   Q.    And do you recall generally what the person -- or what

15   the body had on, what type of clothing it had on?

16   A.    I don't quite remember the clothing, but the body was

17   laying face down or stomach down on the sidewalk.

18   Q.    Would you recognize the depiction of the body if you saw

19   it in a photograph?

20   A.    Yes.

21   Q.    I am going to show you what's been marked as Government's

22   Exhibit -- and I'm sorry, Government's Exhibit --

23            THE COURT:  Can we do sidebar briefly?

24            MR. COLLINS:  Sure, Your Honor.

25            (The following took place at sidebar outside the presence

1   of the jury; all counsel present.)

2          THE COURT:  I don't know if we talked about this

3   before.  I recognize the family.  Can you hear me?  Can you

4   hear me?  Can you hear me now?

5          MR. COLLINS:  Yes, I can.

6          THE COURT:  You can go to a microphone so I can hear

7   you.

8          MR. COLLINS:  Sure.  Sure.

9          THE COURT:  I don't know if we talked about this

10  before.  The family is here.  I don't know what kind of picture

11  you are about to show.

12         MR. COLLINS:  Sure.  I am not sure if the Court saw

13  me, I passed a note back to the victim advocate for the family

14  to let them know that at least one photograph will be shown

15  with this witness and multiple photographs will be shown with

16  the witness that follows, and I did look back as I started to

17  get into this line of questioning to alert the victim's

18  advocate.

19         THE COURT:  Is there a way to not show it on the --

20  on those monitors but the jury can still see it?  Is it a

21  particularly graphic photo?

22         MR. COLLINS:  It's a -- I mean, he's shot.  I mean,

23  it's not a close-up.  It's of him --

24         THE COURT:  Can you go discuss it with counsel right

25  now?

 1          MR. COLLINS:  Yes.  I can do that right now.  Thanks,

 2   Your Honor.

 3          (Pause.)

 4          MR. COLLINS:  So I have spoken to them.  They are

 5   aware and they are willing to sit through the photographs, Your

 6   Honor.

 7          THE COURT:  Because the other thing we could do is we

 8   could turn the gallery monitor away from them, although it

 9   would probably still be visible to them.  I mean, look, if you

10   have informed them and they are comfortable sitting through it,

11   then --

12          MR. COLLINS:  And I told them it's just one

13   photograph with this witness.  But before we go to the

14   additional witnesses, I will let them know it will be more

15   graphic.

16          THE COURT:  Okay.

17          MR. COLLINS:  Thank you.

18          (End of sidebar discussion.)

19          MR. COLLINS:  May I resume, Your Honor?

20          THE COURT:  You may.

21          MR. COLLINS:  Thank you.

22   BY MR. COLLINS:

23   Q.   Sir, I am going to show you what's been marked as

24   Government's Exhibit 54.

25          Do you recognize what's depicted in that photograph?

1    A.     Yes.

2    Q.     And what is that?

3    A.     That's the picture of the body that I saw.

4    Q.     And that's an accurate depiction of the photograph as you

5    saw it on October 3rd -- I'm sorry, of the body as you saw it

6    on October 3rd, 2018?

7    A.     Yes, sir.

8    Q.     And based on your inspection -- I'm sorry.  Strike that.

9    Let me back up.

10        Based on your experience as a law enforcement officer,

11   have you been involved in the investigation of homicide scenes

12   before?

13   A.     Yes, sir.

14   Q.     And have you been present for autopsies as they have

15   taken place?

16   A.     Yes, sir.

17   Q.     And are you familiar with certain observations that you

18   should make to see whether or not a person is alive?

19   A.     Yes.

20   Q.     And based on your experience and training, did you

21   observe this person to be breathing?

22   A.     No.

23   Q.     Did you observe them to be moving at all?

24   A.     No.

25   Q.     Did you observe them displaying any form of life at all?

1   A.    No.

2   Q.    Now, how did you contact law enforcement?

3         THE COURT:  Are you asking anymore questions about

4   the picture?

5         MR. COLLINS:  No.  We can take 54 down, Your Honor.

6         THE COURT:  Thank you.

7   BY MR. COLLINS:

8   Q.    And how did you contact law enforcement?

9   A.    I had my wife to call 911, and I believe, if I am

10  understanding correctly, to my understanding, she called

11  through OnStar --

12  Q.    Okay.

13  A.    -- for that to happen.

14  Q.    And OnStar is a system that's associated with your

15  vehicle.  Is that correct?

16  A.    Correct.

17  Q.    And did there come a point in time when police responded

18  to the scene?

19  A.    Yes.

20  Q.    And were you present when they responded?

21  A.    Yes.

22  Q.    And do you recall exactly what time, first, that call was

23  made to 911?

24  A.    Not off my head, no.

25  Q.    As part of your experience as a police officer, are you

1  familiar with what's called a CAD report?

2  A.    Yes.

3  Q.    Would looking at a CAD report refresh your recollection

4  about what time you made that call?

5  A.    Yes.

6         MR. COLLINS:  Court's brief indulgence.

7  BY MR. COLLINS:

8  Q.    So I am going to show you in a minute what's been marked

9  for identification purposes only as Government's Exhibit No. 1.

10        And Madam Courtroom Deputy, we'd like this only to be

11  displayed to the witness, please.

12        Looking at Government's Exhibit 1, the third line down

13  from the top, do you see the time that you placed the call?

14  And I'm sorry, sir.

15  A.    I'm sorry.

16  Q.    Just look at it first, and then either yes or no, does

17  that help refresh your recollection?

18  A.    Yes.

19        MR. COLLINS:  The Court's indulgence, Your Honor.

20        THE COURT:  Sure.

21  BY MR. COLLINS:

22  Q.    Sir, does that help refresh your recollection?

23  A.    Yes.

24  Q.    And approximately what time did you call?

25  A.    Approximately 9:37.

1   Q.    Now, once again, during your experience as a police

2   officer, are you familiar with what it means to secure a scene?

3   A.    Yes.

4   Q.    And based on your experience, what does that consist of?

5   A.    Not allowing anyone to come into a particular area as

6   much -- to keep others back, to keep people back, and not to

7   touch or move anything within that area.

8   Q.    Now, prior to officers' arrival, did you attempt to

9   secure that scene?

10  A.    Yes.

11  Q.    And what steps, specifically, did you take?

12  A.    To not allow anyone -- because at that time, you had --

13  people started to come towards the body.  I tried to keep them

14  back from the body as best as possible, probably around maybe

15  like six feet or a little bit more in terms of them getting any

16  closer.

17  Q.    And during that period of time, did you see anyone make

18  contact with the body prior to the police coming?

19  A.    No one did.

20  Q.    And did you see anyone get within that six-feet space

21  that you had now described that you secured?

22  A.    No.

23  Q.    Now, what -- what agency were the police officers

24  associated with that responded to that location?

25  A.    Prince George's County Police.

1  Q.    And did you have an opportunity to speak with officers

2  when they first arrived?

3  A.    Yes.

4  Q.    And did you brief them on the situation up to that point?

5  A.    Yes.

6  Q.    And did that include your observations of what you had

7  seen on scene?

8  A.    Yes.

9  Q.    And did that also include the steps that you took to

10 secure the scene?

11 A.    Yes.

12 Q.    And did an officer take over the scene from you at that

13 point in time?

14 A.    Yes.

15 Q.    And as you sit here today, do you recall who that officer

16 was?

17 A.    I do not recall.

18 Q.    Now, did there come a point in time when officers

19 contacted you about potential surveillance video associated

20 with your home?

21 A.    Yes.

22 Q.    And let's back up a bit.

23       Does your house -- or did your house back then have a

24 security system?

25 A.    Yes.

1    Q.     And what did that system consist of?

2    A.     A camera -- several cameras as well as motion detectors

3    and sensors.

4    Q.     And were those cameras that were on -- did that consist

5    of cameras that were on the inside of the house as well as on

6    the outside of the house?

7    A.     Yes, both inside and out.

8    Q.     And let's just focus on the outside of the house.

9    A.     Okay.

10   Q.     Approximately how many cameras did you have on the

11   outside of the house?

12   A.     Total of four, I believe.

13   Q.     And where were each one of those cameras positioned,

14   starting from the Forbes side of your house and working your

15   way around?

16   A.     On the Forbes side of the house, there was one on the

17   side of the house facing towards Forbes Boulevard.  There was

18   the doorbell which faces Manton.  Excuse me.  There is one

19   above my garage that faces Manton, in the area of Manton -- I'm

20   sorry.  The doorbell faces Garson.  The one on the garage faces

21   Garson as well -- in the area of Garson and Manton.  And then

22   there is one in the back, which is the deck.

23   Q.     Now, that security system, are you familiar with that

24   system?

25   A.     Yes.

Blackmore - Direct

1   Q.    Did you have it personally installed in the house?

2   A.    Yes.  It was -- I didn't personally install it.  It was

3   installed.

4   Q.    But you had it installed in the house?

5   A.    Yes.

6   Q.    And are you familiar with how the cameras operate?

7   A.    Yes.

8   Q.    And did you use that system regularly?

9   A.    Yes.

10  Q.    And to your knowledge, did those cameras create videos in

11  real time?

12  A.    Yes.

13  Q.    And were those videos then stored somewhere in

14  relationship to the system?

15  A.    Yes.

16  Q.    And when I say "stored," were they stored once they were

17  created?

18  A.    Yes, they were.

19  Q.    And have you ever had the opportunity to, I guess first,

20  access those videos?

21  A.    Yes.

22  Q.    And have you ever been required to retrieve those videos

23  once they have been accessed?

24  A.    Yes.

25  Q.    If you could explain to the ladies and gentlemen of the

1   jury how would you access these videos once they were created?

2   A.    I actually contacted Vivint because it would be the first

3   time I am doing this, and they actually talked me through on

4   how to do it to -- through the app on my phone, to download it

5   to my phone whatever time frame I wanted it in increments of I

6   believe it's five to ten minutes, I am not quite certain, and

7   to download it to my phone, and I can email it to wherever I

8   need it to go.

9   Q.    Let's take a step backwards.

10        Were you able to access the video from an electronic

11  device?

12  A.    Yes.

13  Q.    And would that device consist of either a phone --

14  A.    Yes.

15  Q.    -- or a computer?

16  A.    My phone.

17  Q.    So you could access your videos through your phone?

18  A.    Yes.

19  Q.    And was there a web-based portal that you had to log into

20  to get to the videos?

21  A.    There is an app on my phone --

22  Q.    Okay.

23  A.    -- that's always there.

24  Q.    Once you got to the app, what steps would you need to

25  take to get the video?

1  A.    It's going to a particular camera that I need to look at

2  and go to the particular date or time and then download it from

3  there.

4  Q.    Now, when law enforcement contacted you for the video,

5  did you take those steps?

6  A.    Yes.

7  Q.    And did they provide you with a specific window of time

8  in which they needed videos for?

9  A.    Yes, they did.

10  Q.    And do you recall when this request came in relationship

11  to -- in relationship to you finding the body?  Was it that

12  day?  The next day?

13  A.    I believe it was either a couple days later.

14  Q.    Okay.

15  A.    I don't specifically know what the date it was.

16  Q.    But you provided those videos to law enforcement?

17  A.    Yes.

18  Q.    And when law enforcement provided you with this window of

19  time, were you able to verify that that window of time was

20  accurate?

21  A.    Yes.

22  Q.    First let me ask you:  Was your system properly

23  synchronized to the correct date and time?

24  A.    To my knowledge, yes.

25  Q.    And when you retrieved this video, did you also observe

1    it?

2    A.    Yes.

3    Q.    Did you make any observations on the video that let you

4    know it was accurate in terms of date and time?

5    A.    It showed -- the video showed my wife's -- my wife, the

6    vehicle that we were in coming in as well as passing the house.

7    It verified also the fact that law enforcement had came earlier

8    and left.

9    Q.    And so these are observations that you made on the video

10   yourself?

11   A.    Yes.

12   Q.    And when you say you saw your wife's vehicle, is that

13   what you previously described when you were coming home from

14   church?

15   A.    Yes.

16   Q.    I am going to show you what's been marked as Government's

17   Exhibit No. 89.

18              MR. COLLINS:  May I approach the witness, Your Honor?

19              THE COURT:  You may.  Counsel can approach without

20   asking as they need to.

21              MR. COLLINS:  The Court's indulgence, Your Honor.

22              THE COURT:  Sure.

23   BY MR. COLLINS:

24   Q.    I am going to approach the witness with what's been

25   marked as Government's Exhibit 89, 90A through 90X, 91A through

 1  91U, and 92A through 92U.

 2          So, sir, first just starting with Government's Exhibit --

 3              MR. COLLINS:  The Court's indulgence.

 4  BY MR. COLLINS:

 5  Q.    Sir, first starting with Government's Exhibit No. 89, do

 6  you recognize that?

 7  A.    Yes, sir.

 8  Q.    And what is that?

 9  A.    This is the CD disc where the -- the videos that I

10  transmitted to Detective Burns are stored on.

11  Q.    And that is a complete set of the videos that you

12  retrieved for him from October 3rd, 2018.  Is that correct?

13  A.    Yes.

14  Q.    And that's based on the parameter or the windows of time

15  that were requested from the police.  Is that correct?

16  A.    Yes.

17  Q.    And have you had an opportunity to review that CD before?

18  A.    Yes, I did.

19  Q.    And how do you know you reviewed that CD?

20  A.    With my initials -- I placed my initials as well as the

21  date on it.

22  Q.    And based on your review of that CD, is that an accurate

23  depiction of what you saw on the video that night, you coming

24  home from church?

25  A.    Yes.

Blackmore - Direct

```
1   Q.    And are those videos in substantially the same condition
2   as when you turned them over to Detective Burns?
3   A.    Yes.  I emailed them to him.
4   Q.    Okay.  Were those in substantially the same conditions
5   when you reviewed them?
6   A.    Yes.
7              MR. COLLINS:  Your Honor, the government would move
8   89 into evidence.
9              MR. DAVIS:  No objection.
10             THE COURT:  They are in.
11  BY MR. COLLINS:
12  Q.    Now, sir, you also have up there Government's Exhibit
13  91A.  I am going to call that the "91 series."
14        Do you see that CD?
15  A.    Yes.
16  Q.    And have you had an opportunity to review that CD?
17  A.    Yes.
18  Q.    And is 91A just a subset of videos from Government's
19  Exhibit 89?
20  A.    Yes.
21  Q.    And are they substantially in the same condition -- are
22  they substantially in the same condition as the video -- as the
23  videos when they were presented to Detective Burns?
24  A.    Yes.
25             MR. COLLINS:  Your Honor, the government would move
```

```
 1   that in evidence as well.
 2            MR. DAVIS:  No objection.
 3            THE COURT:  They are admitted.
 4            MR. DAVIS:  Your Honor, if I don't object, that just
 5   means I am not objecting.
 6            THE COURT:  That's fair.
 7   BY MR. COLLINS:
 8   Q.    And you also have Government's Exhibit -- I believe the
 9   last one you looked at was 90.  Correct?
10   A.    The last one we looked at?
11   Q.    Yes.
12   A.    That was 91.
13   Q.    You have Government's Exhibit 90?
14   A.    Yes.
15   Q.    Is that also a subset of those same videos?
16   A.    Yes.
17   Q.    Substantially in the same condition?
18   A.    Yes, sir.
19   Q.    Accurately depict what occurred on October 3rd?
20   A.    Yes, sir.
21            MR. COLLINS:  Your Honor, we'd move that in evidence
22   as well.
23            THE COURT:  Admitted.
24   BY MR. COLLINS:
25   Q.    And Government's Exhibit 92, the 92 series, are those
```

1   also a subset of videos?

2   A.    Yes.

3   Q.    Derived from Government's Exhibit No. 89?

4   A.    Yes.

5   Q.    Substantially the same condition as when you turned them

6   over to Detective Burns?

7   A.    Yes.

8   Q.    Accurately depict what you viewed on the cameras that

9   night?

10  A.    Yes.

11        MR. COLLINS:  Your Honor, government would move 92 in

12  evidence.

13        THE COURT:  Admitted.

14        And Mr. Collins, you are picking up speed a little bit,

15  so if you could just slow down a little bit.

16        MR. COLLINS:  I apologize.

17  BY MR. COLLINS:

18  Q.    Now, when these videos were produced -- when these videos

19  were produced to the detective, do you recall exactly how they

20  were -- how they were itemized within the CD?

21  A.    I just downloaded it to my phone, what I can tell you,

22  and emailed them individually the various segments that -- or

23  the -- the date -- or the time caption that was needed, and I

24  just emailed them to him in that manner.

25  Q.    Let me ask you this:  You have had an opportunity to

1   review Government's Exhibit 90, though.  Is that correct?

2   A.    Yes.

3   Q.    And is that -- is it fair to say that those are the

4   camera videos that come from the Forbes side of the house?

5   A.    Yes.

6   Q.    And do 91 come from the doorbell or the Garson front side

7   of the house?

8   A.    Yes.

9   Q.    And do 92 -- does 92, the videos on that, do they come

10  from the Garson/Manton side, the garage side of the house?

11  A.    Yes.

12  Q.    Now, just so the jurors understand, you said these videos

13  are in segments.  Is that correct?

14  A.    Yes.  They are in segments.  Yes.  They are in time

15  frames.

16  Q.    So it's not one continuous stream of video?

17  A.    That's correct.

18  Q.    And, so, there are multiple videos in each subsection --

19  I'm sorry, on each CD.  Is that correct?

20  A.    Yes.

21  Q.    What I am going to do is I am going to show you what's

22  been marked and entered as Government's Exhibit 90U.

23        And you can't see that, can you?  Oh, okay.

24        Do you see what's depicted in that image?

25  A.    Yes.

1    Q.    And, for the record, the time is at three -- three

2    minutes and 41 seconds.

3          I am going to play Government's Exhibit 341 -- I'm sorry,

4    Government's Exhibit 90U at three minutes and 41 seconds.  Let

5    me know if you recognize anything depicted in this?

6          (Whereupon a video was played in open court.)

7    BY MR. COLLINS:

8    Q.    I am going to pause it right here.

9    A.    Yes.  That's my -- that's my wife's car coming in.

10   Q.    Okay.  And is that the period of time at which you

11   described that you were coming home from church?

12   A.    Yes.

13   Q.    All right.  And what's -- what exactly is being shown in

14   this image right here?

15   A.    This is the side of my home on the Forbes Boulevard side,

16   where Forbes dead ends and Garson goes off to the left.

17   Q.    And based on your seven years of living in this

18   neighborhood, approximately how long is Forbes Boulevard?  How

19   long is it through this neighborhood?

20   A.    Forbes Boulevard, I believe in that area from 450 to my

21   house, I believe it's about a mile, mile -- a little bit more

22   than a mile, I believe.

23   Q.    And when you say "450," what do you mean?

24   A.    Route 450.  It's at the entrance to the community.

25   Q.    So Route 450 is a main thoroughfare or highway that leads

Blackmore - Direct

1  -- that connects to Forbes Boulevard?

2  A.    Yes, that crosses Forbes Boulevard.

3  Q.    And based on your description, where you live is at the

4  end of Forbes Boulevard?

5  A.    Yes.  I am on the other end.

6  Q.    I am going to show you now what's been previously marked

7  and entered as Government's Exhibit 91R, and the time will be

8  at three minutes and 31 seconds.

9        And before we play it, do you recognize what's depicted

10 in this image here?

11 A.    Yes.  This is the camera from my doorbell which faces

12 Garson.

13 Q.    Now, is there anything different about this camera versus

14 the Forbes camera and the garage camera?

15 A.    This camera has sound.  The other cameras outside do not

16 have sound.

17 Q.    And are these cameras, all three of these cameras, are

18 they purely motion generated, or are they always on from what

19 you recall?

20 A.    They are -- I believe they are motion.

21 Q.    Okay.

22 A.    But I -- yes.  I believe they are motion.

23 Q.    But this camera in particular captures sound?

24 A.    This camera in particular captures sound.  Correct.

25 Q.    I am going to move to play this one.  Let me know if and

Blackmore - Direct

 1   when you recognize anything depicted in this exhibit.

 2        (Whereupon a videotape was played in open court.)

 3   BY MR. COLLINS:

 4   Q.   I am going to pause it right here at three --

 5   A.   That's my wife's car.

 6   Q.   And is that a continuation of your travel from Forbes?

 7   A.   Yes.

 8   Q.   And I am going to show you what's been marked and --

 9   previously marked and entered as Government's Exhibit 92R.

10        Do you recognize what's depicted here?

11   A.   Yes, sir.

12   Q.   And we will have the camera start at three minutes and 45

13   seconds.

14        And I'm sorry.  And this view is what?

15   A.   This is the -- the camera that's at my garage showing my

16   driveway.

17   Q.   And if -- and this vehicle that's in the driveway, that's

18   one of your vehicles?

19   A.   Yes.

20   Q.   If you are looking at this image and your vehicle is

21   considered to be on the right, where is Manton Way in

22   relationship to the vehicle?

23   A.   Manton will be off to the left.

24   Q.   So it would be to the opposite side of where the car is

25   parked?

1   A.   Correct.

2   Q.   And, so, where would your doorbell camera, what direction

3   would that be in this image?

4   A.   To the right.  There is a path right there that leads you

5   to the doorbell, to the front door.

6   Q.   I am going to play this video for you.  And let me know

7   if and when you recognize anything depicted in this video.

8        (Whereupon a video was played in open court.)

9        THE WITNESS:  Yes.  That's my wife coming in.  We

10  were getting ready to turn into the garage.  We slowed down to

11  turn in, made a slight turn to come in, and moved -- and

12  straightened back out to go into Manton.

13       MR. COLLINS:  Court's brief indulgence.

14       THE COURT:  Sure.

15       (Pause.)

16  BY MR. COLLINS:

17  Q.   Sir, all the information that you have relayed, that

18  happened here in the District of Maryland?

19  A.   Yes.

20       MR. COLLINS:  No further questions, Your Honor.

21       THE COURT:  Cross-examination.

22       MR. DAVIS:  Thank you.

23                      CROSS-EXAMINATION

24  BY MR. DAVIS:

25  Q.   Good morning, Mr. Blackmore.

Blackmore - Cross

1  A.    Good morning, sir.

2  Q.    Now, Mr. Blackmore, during your direct testimony, you

3  referenced 6503 was of interest to you when you drove down

4  Manton Way.

5        Could you elaborate on that for us?

6  A.    That house, I -- to put it in -- in a precise way for me,

7  it's kind of like the black sheep of the community based on --

8  Q.    There have been other incidents at that house.  Correct?

9  A.    Correct.

10 Q.    And, actually, there have been other incidents involving

11 gunfire that you reported.  Correct?

12 A.    No.  I didn't report gunfire from that house.  I have

13 never made a report of that.

14 Q.    On October 21st, did you have an incident involving

15 gunfire in your neighborhood?

16 A.    October 21st?

17 Q.    I'm sorry.  September 21st, about a week before this

18 murder.

19 A.    Yeah.  There was gunfire in the neighborhood.

20 Q.    And -- and did you come to learn that the source of that

21 gunfire was 6503?

22 A.    No, sir.

23 Q.    Did the police respond to that incident involving gunfire

24 on September 21st?

25 A.    The police did respond, yes.

1   Q.    And you actually had -- you actually had a window that

2   was damaged during that incident.  Is that correct?

3   A.    I did have a window that damaged, yes.

4   Q.    Was that damaged by gunfire or was that damaged by

5   something else, if you know?

6   A.    I couldn't answer that.

7   Q.    Do you recall speaking to the officers when they came out

8   that day?

9   A.    That night, yes.

10  Q.    And do you recall an Officer Hull?

11  A.    I'm sorry.  Say that question again.

12  Q.    Officer Hull from the Prince George's County Police

13  Department?

14  A.    I don't recall the name.

15  Q.    Did you ever come to learn that ammunition was recovered

16  from 6503?

17  A.    No.

18  Q.    A couple of days later, on September 21st -- or September

19  23rd, 2018 -- and this is a couple of days after the incident

20  you just described -- you contacted the Prince George's County

21  Police officer in reference to that windowpane that had been

22  knocked out.  Correct?

23  A.    I contacted -- we made contact with the police department

24  that very night it occurred.

25  Q.    And did you come -- did you deal with the same police

1  officer again, Officer Hull, that you dealt with on the 21st?

2  A.    I don't know -- I don't recall anything that you are

3  talking about September 23rd.  As I mentioned, the police

4  officer was -- the department was notified of that window being

5  broken that very same day that it happened or that very same --

6  the 21st.

7  Q.    But you -- you did not come to learn anything about 6503

8  Manton Way that day.  Correct?

9  A.    Not in related -- related to -- to that particular

10  incident, no.

11  Q.    And you don't recall hearing a gunshot that evening?

12  A.    No.  I heard gunshots that evening.

13  Q.    But you don't recall being -- coming to learn at any time

14  after that or during that incident that ammunition had been

15  recovered from 6503 --

16  A.    That is correct.

17  Q.    -- Manton Way?

18        Now, did anyone live at Manton Way?

19  A.    If anyone lived in Manton Way?

20  Q.    That's correct.

21  A.    You have several houses on Manton Way.

22  Q.    No.  In 6503.

23  A.    Oh, 6503.  I believe so, yes.

24  Q.    And were there parties in that residence?

25  A.    I am not certain.

1   Q.    You mentioned that it was the black sheep of the

2   neighborhood.  Other than the -- the incidents involving

3   gunshots, were there other incidents involving 6503 that leads

4   you to characterize it as the black sheep of the neighborhood?

5   A.    Well, I characterize it as the black sheep because I sat

6   on the Board of -- the Board of Directors for the HOA, and we

7   get complaints.

8   Q.    And what type of complaints?  Involving individuals?

9   A.    Not particular, but the condition of the house, stuff

10  like that.

11  Q.    Drug activity?

12  A.    Say that again.

13  Q.    Drug activity?  High traffic at the location?

14  A.    I am not certain about high traffic, but I do know of a

15  particular case where there was drug activity at that location,

16  yes.

17  Q.    But you are unaware of any -- either on the 21st or the

18  23rd of September, you have -- you did not come to learn

19  anything about ammunition and magazines being recovered from

20  6503 Manton Way?

21        MR. COLLINS:  Objection, Your Honor.  It's been asked

22  and answered multiple times.

23        THE COURT:  Sustained.

24        MR. DAVIS:  I will move on.

25  BY MR. DAVIS:

Blackmore - Cross

1   Q.    Now, the surveillance video.  You had a number of

2   surveillance cameras set up.  Correct?

3   A.    Yes.

4   Q.    Does the surveillance videos capture any activity of any

5   individuals that evening?

6   A.    I am sure it might have.  I wasn't -- I didn't look at

7   the -- the videos.  What I personally observed after I heard

8   the -- we are talking about the 21st of September.  Correct?

9   Q.    No.  Now I am going to October 3rd.

10  A.    October 3rd.  Okay.

11  Q.    When you found the body on Manton Way.

12  A.    Okay.  Could you give me your question again?

13  Q.    Certainly.

14        When you reviewed the video, did you see any activity of

15  any individuals captured by your surveillance system from any

16  of the cameras you had installed in your home?

17  A.    During that, there was a vehicle parked across the street

18  not directly of my garage, the driveway, but a little up front

19  in my driveway -- from my driveway on the other side of the

20  street where there is a individual coming out of a vehicle, and

21  I believe the individual went to the -- the driver's side of

22  that vehicle, and I believe sometime later, that individual

23  went towards Manton.

24  Q.    And did -- your surveillance camera, were they positioned

25  in any way to capture anything that occurred in the vicinity of

1   6503 Manton Way --

2   A.    No.

3   Q.    -- on October 3rd?

4   A.    No.

5   Q.    And the individual -- without telling us what that

6   individual told you, the individual that contacted you by

7   telephone which led you to drive down Manton Way, did that

8   individual indicate that they had seen any individuals without

9   telling us what that person said?

10  A.    No.

11        MR. DAVIS:  The Court's indulgence.

12        THE COURT:  Sure.

13        (Counsel conferring.)

14  BY MR. DAVIS:

15  Q.    You have testified that you moved away from that

16  particular neighborhood in 2018.

17  A.    Yes.

18  Q.    The -- you found the body on October 3rd.  Correct?

19  A.    Yes.

20  Q.    There had been gunshots in the neighborhood before

21  October 3rd.  Correct?

22  A.    Yes.

23  Q.    And you were on the board that dealt with complaints that

24  had been lodged against 6503.  Correct?

25  A.    Yes.  There were complaints on that.  Yes.

1   Q.    Would it be fair to say that all these factors led to

2   your decision to move out of the area?

3   A.    There were other factors as well.

4           MR. DAVIS:  Thank you, Mr. Blackmore.

5           THE COURT:  Redirect, Mr. Collins.

6           MR. COLLINS:  Just briefly.  Thank you, Your Honor.

7           THE COURT:  Sure.

8                     REDIRECT EXAMINATION

9   BY MR. COLLINS:

10  Q.    So, Mr. Blackmore, you talked about seeing a vehicle that

11  was parked across from your driveway.  Is that correct?

12  A.    Yes, a little past my driveway but on the opposite side

13  of the road.

14  Q.    And do you recall how long that vehicle appeared to be

15  parked at that location?

16  A.    I don't recall how long, but it was there for a -- I

17  guess in a -- for a little bit.

18  Q.    And based on your review of the video, you thought that

19  was suspicious?

20  A.    Not quite.  I mean, the counselor asked me if there was

21  anything else that I observed in the video, and that's one of

22  the things.  People do park on the -- on the -- on the roadway

23  as well.

24  Q.    Now, let me ask you this.

25          MR. COLLINS:  Actually, no further questions, Your

Blackmore - Cross/Redirect

1    Honor.  Thank you.

2              THE COURT:  Thank you.

3         Sir, thank you so much for your testimony.  Please don't

4    discuss your testimony with anyone until the trial has been

5    concluded.  You are excused.  Enjoy the rest of your day.

6              THE WITNESS:  Thank you, sir.

7              THE COURT:  Ladies and gentlemen, now seems like a

8    convenient time for our morning break.  I am going to give you

9    15 minutes, ask that you be back in the jury room in 15 minutes

10   ready to go.

11        Please remember my instructions -- you are going to hear

12   this over and over again -- don't discuss this case with

13   anyone; that includes even among yourselves.

14        Please enjoy your break.  I will see you in 15 minutes.

15        (The jury panel exit the courtroom at 11:08 a.m.)

16             THE COURT:  You can be seated unless addressing the

17   Court.

18        My sense is that arrangement might not be working.

19             MR. DAVIS:  Your Honor, we may want to pop open one

20   of the plugs in the floor, but we are going to need a

21   screwdriver to do that.  That's -- the way it's latched down,

22   you can't do it.

23             THE COURT:  You can talk to Ms. Derro about that when

24   she comes back.

25             MR. DAVIS:  I will.  But that's what the commotion

1  was, and we decided to pass it until the break.

2         MR. COLLINS:  Your Honor, there is one issue that we

3  wanted to discuss.

4         THE COURT:  Again, you can be seated unless

5  addressing the Court, or come and go as you wish.

6         MR. COLLINS:  There is another issue.

7         THE COURT:  I know.  I am talking to the gallery.

8         MR. COLLINS:  Okay.  We have a binder of physical

9  exhibits that we thought that we could leave up by the witness,

10 direct them to a book, and that way, we wouldn't have to travel

11 back and forth.  I didn't know if the Court was fine with us

12 setting those up on the back or maybe putting a cart back there

13 with the binders on them?

14        THE COURT:  I am fine with the general concept.

15 Anything you can make workable is fine with me.

16        MR. COLLINS:  Okay.  Perfect.  Thank you.

17        THE COURT:  See you in 15 minutes.

18        MR. COLLINS:  Thank you.

19     (Recess taken from 11:10 a.m. until 11:34 a.m.)

20        THE COURT:  You may be seated.

21     Anything before we get the jury out?

22        MS. MAN:  Yes.

23        THE COURT:  Is there anything we need to talk about

24 before we get the jury out?

25        MS. MAN:  No, Your Honor.

1          THE COURT:  Anything from the defense?

2          MR. DAVIS:  No, Your Honor.

3          THE COURT:  We can get the jury.

4          MS. COTTINGHAM:  Your Honor, would you like the

5    witness to go ahead and take the stand?

6          THE COURT:  That's fine.

7       And, of course, with the exceptions we have discussed,

8    there is the rule on witnesses.  I will leave you all to

9    monitor that.  I don't know who the witnesses are.

10      Did you all fire Mr. Collins?

11          MS. MAN:  He will be here shortly, Your Honor.

12      (The jury panel enter the courtroom at 11:35 a.m.)

13          THE COURT:  Everyone may be seated.

14      Government can call its next witness for the record.

15          MS. MAN:  Thank you.  The United States calls Officer

16   Stephen Hull.

17          THE DEPUTY CLERK:  Officer Hull, please stand and

18   raise your right hand.

19          STEPHEN HULL, GOVERNMENT'S WITNESS, SWORN

20          THE DEPUTY CLERK:  Thank you.  Please be seated.

21      If you would please speak loudly and clearly into the

22   microphone, state your name for the record, and spell each

23   name.

24          THE WITNESS:  Corporal Stephen, S-T-E-P-H-E-N, Hull,

25   H-U-L-L, of Prince George's County Police Department.

1              THE DEPUTY CLERK:  Thank you.

2              MR. COLLINS:  Your Honor, may I inquire?

3              THE COURT:  You may.

4                        DIRECT EXAMINATION

5     BY MS. MAN:

6     Q.    Good morning, sir.

7     A.    Good morning.

8     Q.    You have told us that you work for the Prince George's

9     County Police Department.

10            What is your current rank and duty assignment?

11    A.    I am a corporal and I am in the bureau of patrol, which

12    means I am the one that responds when 911 calls are placed, and

13    I have done so since I left the Academy, so ten years now.

14    Q.    Prior to being an officer for the Prince George's County

15    Police Department, were you employed?

16    A.    Yes, I was.

17    Q.    Where were you employed?

18    A.    I was a human resources and technology manager for Best

19    Buy, and also did home theater and computers, ran the Geek

20    Squad for a little bit.

21    Q.    I'd like to draw your attention to the date of October

22    3rd of 2018.

23            Were you working as a Prince George's County Police

24    officer that night?

25    A.    Yes.

1    Q.    Were you on patrol that night?

2    A.    Yes.

3    Q.    Tell us again what are some of your duties as a patrol

4    officer.

5    A.    Pretty much we are assigned a specific geographic area in

6    our place of responsibility.  On that particular day, my call

7    sign was David 5, and we are responsible for the -- all of

8    Lanham, small pockets of Bowie, and a little bit of Upper

9    Marlboro.

10   Q.    What shift were you working that night?

11   A.    We were the evening shift, which is 3:30 p.m. to 12:30

12   a.m.

13   Q.    Did there come a time when you responded to a call for

14   the sound of gunshots?

15   A.    Yes.

16   Q.    Do you recall what time that call came in?

17   A.    I do not recall the exact time.

18   Q.    Would something refresh your recollection?

19   A.    Yes.

20   Q.    Madam Deputy, if I could have for the witness only, I'd

21   like to show you what's been marked for identification purposes

22   only as Government's Exhibit 4.

23   A.    Okay.

24   Q.    Does that refresh your recollection?

25   A.    Yes.

1  Q.    About what time did you get a call for a sound of

2  gunshots?

3  A.    At 8:51 p.m.

4  Q.    And as a result of that call for the sound of gunshots,

5  what did you do?

6  A.    So, the neighborhood where the call for service came

7  from, it's a neighborhood where there is only one way in and

8  one way out.  You access that community by way of Forbes

9  Boulevard, which is directly off of Annapolis Road in Lanham,

10  and you can take it all the way to the end of the neighborhood,

11  and then it just stops.  There is a metal barrier and then it

12  becomes parkland, and then the rest is all single family homes

13  in that entire neighborhood.

14       This particular call for service just happened to be on

15  the very last street and the very last intersection of that

16  neighborhood.  So I drove down Forbes Boulevard, and then I

17  went into the area where the call for service was placed,

18  checked the area, listened for additional gunshots, waited to

19  see if anybody flagged me down with regards to anything that

20  was seen or heard.  No citizens approached me.

21       My squad mate showed up as well.  Same thing.  We drove

22  up and down Manton Way and Forbes Boulevard.  No additional

23  gunshots were heard.  Nobody flagged us down for anything.

24  Q.    Let me back you up a little bit.

25       When you went into the neighborhood, did you go down

1  Manton Way or did you go down Garson Terrace?

2  A.    Well, they are in the same intersection -- oh, Garson

3  Terrace.

4  Q.    Okay.  So at this particular time, you went down Garson

5  Terrace for the sound of gunshots?

6  A.    Yes.

7  Q.    You did not go down Manton Way?

8  A.    Not yet.

9  Q.    And you said when you went down Garson Terrace -- does

10  Garson Terrace dead end at some point?

11  A.    Yes, it does.

12  Q.    I am going to show you what's been marked and admitted

13  into evidence as Government's 450.

14      Do you recognize what's in Government's 450?

15  A.    Yes, I do.

16  Q.    What is that?

17  A.    So, if you are looking at this picture, that row of the

18  vehicles down towards the center bottom, that is the end of

19  Forbes Boulevard.  And then if you make your immediate right,

20  that's Garson Terrace.  Down to the circle and back in the

21  immediate road that goes all the way down to the end of the

22  neighborhood is Manton Way.

23  Q.    So why don't you show us where you went down that night

24  on Garson Terrace.  You can mark it on the screen, sir.

25  A.    Okay.  So we came down here (indicating), drove here

1  (indicating), all the way down here (indicating), did a circle,

2  came back, kind of hovered right at this intersection for a

3  while (indicating), and just waited around to see if we heard

4  anything else or if anybody approached us with regards to

5  anything.

6  Q.    Now, you can see by that map, which is -- is that an

7  accurate map of the neighborhood?

8  A.    Yes, it is.

9  Q.    This is a residential neighborhood.  Correct?

10  A.    Yes, it is.

11  Q.    And there were people living at those residences when you

12  went there that night?

13  A.    Yes.

14  Q.    And no civilians flagged you down?

15  A.    No.

16  Q.    And when you were driving, did you hear anything?

17  A.    No.

18  Q.    And as a result of no civilians flagging you down or not

19  hearing anything, what did you do?

20  A.    We cleared the call.  Nothing heard.  Nothing found.

21  Q.    And are you familiar with that area?

22  A.    Very familiar.

23  Q.    Is that part of your routine patrol area?

24  A.    At the time, David 5 would be, yes.

25  Q.    And how many times have you been out to that area?

1   A.     In my career, probably close to 100.

2   Q.     Now, did there come a time later on that day -- that

3   evening when you returned to that same neighborhood?

4   A.     Yes.

5   Q.     Do you remember what time that was?

6   A.     I don't recall the exact time.

7   Q.     Would something refresh your recollection?

8   A.     Yes.

9   Q.     Showing you -- showing you -- Madam Deputy, just for the

10  witness -- for identification purposes only Government Exhibit

11  6.

12         Is your recollection refreshed?

13  A.     Yes.

14  Q.     Do you remember what time later on that evening you went

15  out to that neighborhood again?

16  A.     The call for service came in at 9:36 p.m.

17  Q.     And what was the call for this time?

18  A.     The call came out as an actual shooting, and those types

19  of calls are placed only when somebody is stating that they

20  have observed a person that has been shot.

21  Q.     And so that's different from the first call, which is

22  sound of gunshots?

23  A.     Sound of gunshots.

24  Q.     Correct?

25  A.     It's a very common call for service in Prince George's

1  County.

2  Q.    When you went back to the neighborhood this time, where

3  did you go?

4  A.    So, I went up Garson Terrace and made the left on Manton

5  Way and drove until I found the alleged possible body on the

6  sidewalk.  I pulled up next to --

7  Q.    I will show you what's been marked as Government 450

8  again.

9  A.    Sure.

10  Q.    Now, this time when you drove into that same

11  neighborhood, where did you go this time?  You can indicate

12  with your finger, please.

13  A.    (Indicating.)

14  Q.    When you drove up Manton Way, what, if anything, did you

15  see?

16  A.    I observed a person laying on the ground and a pool of

17  blood.

18  Q.    Do you remember what you did when you saw the person

19  laying?

20  A.    Yeah.  I positioned my car in a tactical position to give

21  me a little bit of cover in case suspects were still in the

22  area.  I got out of my vehicle, I walked up to the victim,

23  checked for a pulse.

24  Q.    Did you find one?

25  A.    No.

1  Q.    What did you do after that?

2  A.    I immediately notified my chain of command because there

3  is a lot of notifications that have to be made when we come

4  across a person who is passed away, and immediately we began to

5  secure the crime scene.

6  Q.    Now, what do you mean by "secure the crime scene"?

7  A.    So, in order to preserve the integrity of any evidence,

8  we begin to put up crime scene tape -- you know, the yellow

9  crime scene tape that everybody has seen -- trying to block off

10 as much of the area as possible so that we could try and find

11 any additional evidence that might be connected to this person

12 who we found dead.

13 Q.    During the time that you were on scene, did anybody cross

14 the crime scene tape that wasn't supposed to?

15 A.    No.

16 Q.    Was a neighborhood canvas conducted?

17 A.    Yes.

18 Q.    What does a neighborhood canvas do?

19 A.    So, after I found the decedent, my job was to make sure

20 that nobody messed with the body at all.  So my squad mates and

21 our sister squad from the Largo area came over, started going

22 door to door up and down the neighborhood seeing if any Ring

23 cameras existed, if anybody had any descriptions of any

24 vehicles, any suspects, anything of that nature.

25 Q.    Did there come a time when officers searched for evidence

1    on the scene?

2    A.    Yes.

3    Q.    How did they do that?

4    A.    Even though there are street lights in that neighborhood,

5    it's still fairly dark, so we used flashlights and marked off

6    any pieces that might have been considered evidence with

7    numbered placards, yellow placards with numbers.

8    Q.    Do you remember if you observed any items of evidence on

9    the scene?

10   A.    Yes.

11   Q.    What did you -- what do you remember seeing there?

12   A.    There was some money, glasses, cell phone, shell casings,

13   which would -- which would say that a gun had been fired.  When

14   you fire a bullet, there is a casing to the bullet and it

15   ejects from the gun after you fire it, so there was a couple

16   shell casings.

17   Q.    Now, when you see these items, what, if anything, is done

18   to mark them as items of evidence?

19   A.    We just use those placards to -- and put it next to them.

20   Q.    Did there come a time when you waited for other officers

21   to arrive?

22   A.    Yeah.

23   Q.    Did you check the area for any civilians?

24   A.    I, myself, didn't really look around much because I was

25   staying with the decedent the majority of the time, but other

1    officers did.

2    Q.    And there were no civilians present on scene that you

3    remember.  Correct?

4    A.    Not -- not at first, no.

5    Q.    Any weapons present?

6    A.    No.

7    Q.    Now, you said the scene was secured.

8          Why is it so important to secure the scene?

9    A.    Well, when we find a person who's a victim of a possible

10   homicide, we need to make sure that all the evidence is not

11   touched so that proper DNA techniques could be performed,

12   fingerprinting, things of that nature.  You know, our job is to

13   make sure that nothing is compromised so that the investigation

14   can proceed accurately.

15   Q.    And did there come a time when homicide detectives

16   arrived on scene?

17   A.    Yes.

18   Q.    And when they arrived, did you speak to them?

19   A.    I did not because they were down further at the -- where

20   the end of the crime scene tape had been, and they were going

21   around with officers talking to people.  They were doing their

22   thing.

23   Q.    Now, you said you remained with the body.  Correct?

24   A.    Yes.

25   Q.    Did there come a time when the medical examiner arrived?

1  A.     Yes.

2  Q.     Did you watch the medical examiner examine the body?

3  A.     Yes.

4  Q.     Did there come a time when the medical examiner took away

5  the body?

6  A.     Yes.

7  Q.     To the best of your knowledge, were photos taken that

8  night?

9  A.     Yes.

10 Q.     And have you had an opportunity to view those photos

11 before today's court hearing?

12 A.     I have.

13 Q.     And were they an accurate depiction of the photograph --

14 of the way the scene looked as you recall that night?

15 A.     They are an accurate depiction.

16 Q.     I am going to show you what's been marked as Government's

17 Exhibit 13.

18        Do you recognize this?

19 A.     Yes.  It's the street sign for the intersection of Manton

20 Way and Garson Terrace.

21        MS. MAN:  Government would move to admit Government's

22 No. 13.

23        THE COURT:  It's admitted.

24 BY MS. MAN:

25 Q.     I am showing you what's been marked as Government's

1   Exhibit 14.

2        Do you recognize this?

3   A.    Yes.  That is a -- you can see at the end of the street,

4   that's my police cruiser, so this is Manton Way.

5        MS. MAN:  Government would move No. 14 into evidence.

6        THE COURT:  It's admitted.

7   BY MS. MAN:

8   Q.    And you said -- can you put back up 14 again?

9        Why did you park your cruiser in that specific location?

10  A.    So, I pulled up right next to the victim, and, again, I

11  positioned my vehicle in a way that I could use it for cover

12  just in case there were additional suspects in the area.  You

13  never quite know, when you come across somebody in that state,

14  what else is around.  Suspects hang around sometimes.  So I had

15  myself blocked off, but I also was able to be with the victim

16  for as long as needed.

17  Q.    Showing you what's been marked as Government's Exhibit

18  25.

19        What are we looking at at 25?

20  A.    So, you see some of those evidence placards that I

21  mentioned previously, the little yellow placards with the

22  numbers on them, and then you see my cruiser again and it's

23  very close to where the decedent was found.

24        MS. MAN:  Government would move No. 25 into evidence.

25        THE COURT:  It's admitted.

1   BY MS. MAN:

2   Q.    I am showing you what's been marked as Government Exhibit

3   26.

4         What are we looking at, Corporal Hull?

5   A.    Just a slightly closer view of my police cruiser, and to

6   the right, you can see the body of the decedent.

7               MS. MAN:  Government would move No. 26 into evidence.

8               THE COURT:  It's admitted.

9   BY MS. MAN:

10  Q.    I am showing you what's been marked as Government Exhibit

11  27.

12  A.    Just a more closer up view of my police cruiser and then

13  the body of the decedent to the right.

14  Q.    Showing you what's been marked as Government Exhibit 19.

15        Do you recognize this?

16  A.    This is the mailbox for 6507 Manton Way.

17  Q.    What is the significance of this mailbox?

18  A.    That's the -- I believe that's the mailbox that the

19  decedent was found closest to.

20  Q.    And so where is the location of the victim in relation to

21  this mailbox?

22  A.    At least on my screen, it's a little dark, but --

23  Q.    Let's see if we can find a better picture of that.

24        Showing you what's been --

25              MS. MAN:  Move in evidence No. 19.

1              THE COURT:  It's admitted.

2    BY MS. MAN:

3    Q.     And showing you Government's Exhibit 21.

4    A.     So you have a similar angle.  You have the body of the

5    decedent to the left, and you can see the crime scene tape as

6    well.  We try to create as large of a crime scene perimeter as

7    possible.

8    Q.     Showing you what's been marked as Government Exhibit 51.

9    A.     So you have the mailbox for 6509 Manton Way, and to the

10   left, you can see the body of the decedent.

11             MS. MAN:  Your Honor, I forgot to move No. 21 into

12   evidence and move No. 21 and No. 51 into evidence.

13             THE COURT:  It's admitted.  As soon as you put it on

14   the screen, it's admitted.

15             MS. MAN:  Perfect.

16   BY MS. MAN:

17   Q.     Showing you what's been marked as Government's Exhibit

18   52.

19   A.     So you can see my police cruiser to the left and the body

20   of the decedent in the middle of the sidewalk.

21   Q.     So with that mailbox we just saw at 6509 Manton Way,

22   would that be to the left of the screen just out of frame?

23   A.     Yes.

24   Q.     Showing you what's been marked as No. 53.

25          Is this how the victim looked when you saw him?

1    A.      Yes.

2    Q.      Showing you what's been marked as Government's 54.

3            What are we looking at, Corporal Hull?

4    A.      You are looking at the view of the victim from the other

5    angle.  It's just a -- just another view, but this is exactly

6    how I found him.

7    Q.      And you said nobody had interfered with him at all?

8    A.      No, ma'am.

9    Q.      What about Government's 55?

10   A.      It's just the same picture, just from the opposite side.

11   Q.      And that cruiser we see behind --

12   A.      That's my police cruiser, 5253.

13   Q.      Now, you told us earlier that the crime scene had been

14   secured?

15   A.      Mm-hmm.

16   Q.      What was it secured with?

17   A.      Crime scene tape and other officers because, obviously,

18   once we started setting up, people were coming outside of their

19   houses to kind of see what was going on with all the activity,

20   but nobody crossed the crime scene tape that wasn't there in an

21   official capacity.

22   Q.      I will show you what's been marked as Government's

23   Exhibit -- marked and admitted as Government's Exhibit 15.

24           What is that, sir?

25   A.      That's just another residence on Manton Way with more

1  crime scene tape.

2  Q.    And Government's Exhibit 16.  Is that more crime scene

3  tape?

4  A.    More crime scene tape as well as an evidence placard down

5  on the bottom.

6  Q.    What do we see on the right side of this -- of the screen

7  at the bottom on the ground?

8  A.    The evidence placards?

9  Q.    Yep.  Would that have been one of the evidence placards

10 that you put down?

11 A.    Yes.

12 Q.    Government's Exhibit 17.

13 A.    So this is basically just a -- a little further up the

14 street of the -- a continuation of the vehicle in the previous

15 photo on Manton Way with more crime scene tape.

16 Q.    Government Exhibit No. 18.

17 A.    You can see more crime scene tape.  This is still Manton

18 Way with evidence placards --

19 Q.    And there is --

20 A.    -- and some evidence tape down at the bottom, too.  If we

21 run out of placards, sometimes we will just ball up some

22 evidence tape and put it next to something until the evidence

23 team comes out to recover whatever it is we found.

24 Q.    And Exhibit No. 19.

25 A.    It's the mailbox for 6507 Manton Way.

1    Q.    That's a zoom in of what we just saw a few minutes ago?

2    A.    Yes.

3    Q.    A couple seconds ago?

4          Government's Exhibit 20.

5    A.    This is just another picture further up Manton Way.  More

6    crime scene tape as you can see.

7    Q.    Government's Exhibit 21 -- actually, no.  We just saw 21.

8          Government's Exhibit 22.

9    A.    This is just a length-wise view of Manton Way.  Again,

10   you can see evidence placards, crime scene tape, and my police

11   cruiser towards the end of the photo.

12   Q.    I'd like to show you what's been marked as Government's

13   Exhibit 23.

14   A.    This is just a little more zoomed-in shot of the same --

15   same photo previously with evidence placards to the left and my

16   police cruiser in the middle towards the end of Manton Way.

17   Q.    And Government's Exhibit 24.

18   A.    This is just a little bit further up passed the -- the

19   white working van.  Evidence placard in the middle and you can

20   see my police cruiser a little further up.

21   Q.    Government's Exhibit 30.

22   A.    It's just a -- a different shot further back.  Evidence

23   placards, crime scene tape, and I believe that's the 360

24   scanner for the evidence team as well.

25   Q.    Now I will show you -- the tag numbers that are on the

1    bottom, what are the tag numbers on the bottom of the screen

2    that we can see?

3    A.    Looks like placards 1, 2, and 3.

4    Q.    Let's look at evidence tag No. 1, Government's Exhibit

5    31.

6    A.    That's just a picture of the evidence placard --

7    Q.    Okay.

8    A.    -- just from the other side.

9    Q.    Let's take a closer look.  Government's Exhibit 39.

10   A.    It's a little more closed up shot of evidence placard 1.

11   Q.    Can you tell what that is at that point?  Let's see if

12   you can get a little closer --

13   A.    Yeah, if you have one more closer shot.

14   Q.    40, please.

15   A.    So that is evidence placard 1 with a spent shell casing,

16   meaning it came from a fired bullet.

17   Q.    Government's Exhibit 33.

18   A.    This picture has evidence placards 1, 2, 3, and 4.

19   Q.    So that -- that photo we just looked at with evidence

20   placard 1, that is behind the van.  Correct?

21   A.    Evidence placard 1 should be directly across from 2.

22   Q.    So let's look at No. 2, Government's Exhibit 41.

23   A.    That appears to be glasses next to placard 2.

24   Q.    Let's take a little bit of a closer look.

25         Government's Exhibit 42.

1   A.     Yeah.  It's glasses and evidence placard 2.

2   Q.     Let's look at Government's Exhibit 43.

3   A.     You have evidence placard 3 and a little bit of crime

4   scene tape.

5   Q.     Let's zoom in a little bit.  Government's Exhibit 44.

6   Can you see anything on the screen?  It's a little hard to see.

7   Let's see if we can zoom in a little bit.

8   A.     Evidence placard 3 and a lens from glasses.

9   Q.     Government's Exhibit 45.  What shot are we looking at at

10  Government's 45?

11  A.     Evidence placard 4, and I believe that's money.  If you

12  have a zoomed up shot?

13  Q.     We do.  But where is Government's Exhibit [sic] 4?  It

14  looks like there is something --

15  A.     It's directly beneath the white work van that's been in

16  several of the photos.

17  Q.     Let's look at Government's Exhibit 46.

18  A.     So you have a $100 bill next to evidence placard 4.

19  Q.     And that was underneath the van?

20  A.     Yes, ma'am.

21  Q.     Government's Exhibit 35.

22  A.     So you have evidence placards 5 and 6 and additional

23  crime scene tape.

24  Q.     Government's Exhibit 47.

25  A.     So you have the mailbox to 6507 Manton, and this appears

1    to be another 100 or 50 -- it's a little blurry.  I can't tell

2    the denomination.

3    Q.    Is this just another view from Government's Exhibit 35?

4    A.    Yes.

5    Q.    Let's zoom in a little bit.  Government's Exhibit 48.

6    A.    Okay.  You have a $100 bill next to evidence placard 5.

7    Q.    And that was just the view from -- zoomed in from what we

8    just saw before?

9    A.    Yes.

10   Q.    Government's Exhibit 36.

11   A.    So, again, you have the mailbox to 6507 Manton Way, and

12   you can see evidence placard 6 to the left.

13   Q.    Now, evidence tag 5 that we just talked about would just

14   be outer frame on the left side.  Correct?

15   A.    Yes.

16   Q.    Government's Exhibit 49.

17   A.    So you have evidence placard 6 and a cell phone.

18   Q.    Government's Exhibit 50.

19   A.    This is a zoomed-up view of the cell phone from the

20   previous photo.

21   Q.    Government's Exhibit 34.

22   A.    So you have the side view of Manton Way with the white

23   work van and additional crime scene tape.

24   Q.    Thank you.

25         Corporal Hull, how long did you stay on scene that

1  evening?

2  A.    I left once evidence was done, so it was close to six

3  hours.

4  Q.    So, my math is a little bit faulty.  Would something

5  refresh your recollection about when you left?

6  A.    Yes.

7  Q.    I am going to show for the witness' screen only, Madam

8  Deputy, Government's Exhibit 1 marked for identification

9  purposes only.

10  A.    I closed the call at 3:07 a.m.

11  Q.    3:07 a.m.

12        And during the time that you were on scene, no

13  unauthorized persons interfered with the scene?

14  A.    No.

15  Q.    And the crime scene was secured the entire time you were

16  there?

17  A.    Yes, ma'am.

18  Q.    That's because you were the one securing the scene?

19  A.    Yes, ma'am.

20        MS. MAN:  Thank you.  No further questions for

21  Corporal Hull.

22        THE COURT:  Cross-examination.

23        MR. DAVIS:  Thank you, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. DAVIS:

1   Q.    Officer Hull, you said you have responded to hundreds of

2   calls in the area.

3         Were you referring to the area where this homicide took

4   place, or were you referring to the general area that you work?

5   A.    I mean, I have responded to thousands of calls for

6   service, but for that specific neighborhood, I have been in

7   there probably close to 100 times, if not more.  I can't give

8   you an exact number.

9   Q.    And have you responded to certain addresses on Manton Way

10  in the past?

11  A.    Yes, I have.

12  Q.    Have there been problems on Manton Way with gunshots

13  being fired?

14  A.    Yeah.  That first corner house right at Manton and

15  Garson.

16  Q.    Would that be 6503 Manton Way?

17  A.    Without a photo, I couldn't confirm, but that sounds

18  close to correct.

19  Q.    Actually, you went out there about a week before in

20  response to gunshots fired on September 21st, 2018?

21  A.    Yes.

22  Q.    And that was for gunshots having been fired from 6503.

23  Correct?

24  A.    (Witness nods.)

25            THE COURT:  I'm sorry.  You have to say yes or no.

```
 1              THE WITNESS:  Yes.
 2   BY MR. DAVIS:
 3   Q.    And you actually entered the home and interviewed the
 4   people that were in the home.  Correct?
 5   A.    Correct.
 6   Q.    And you actually recovered 9 millimeter ammunition from
 7   the home.  Correct?
 8              MS. MAN:  Objection.
 9              THE COURT:  Basis?
10              MS. MAN:  Calls for relevance.
11              THE COURT:  Overruled.
12              THE WITNESS:  Yes.
13   BY MR. DAVIS:
14   Q.    And then two days later, you received a call from
15   Mr. Blackmore from the neighborhood.
16         Does that call -- does that name ring a bell?
17   A.    Yes.
18   Q.    And Mr. Blackmore is a former United States Capitol -- or
19   United States Park Police officer?
20   A.    Yes, sir.
21   Q.    And he had reported a gunshot having been heard in the
22   neighborhood.  Correct?
23   A.    Yes.
24   Q.    And, again, after doing a little investigation, you ended
25   up back at 6503 Manton Way on that occasion?
```

1  A.     That sounds correct.  I can't 100 percent recall, but

2  that sounds correct.

3  Q.     And, again, you went through the home, and this time you

4  found the magazine with 50 rounds of 9 millimeter ammo?

5  A.     That sounds about correct, yes.

6  Q.     Did you have any reports of drug activity coming out of

7  that house, 6503?

8  A.     Me specifically, no, but I did speak with our specialty

9  units and that had been identified as a problem house.

10 Q.     And is there another problem house out there on Garson

11 Terrace that you are aware of?

12 A.     Not that I am aware of, sir.

13 Q.     Does the name Horn mean anything to you, the last name

14 Horn?

15 A.     Not that I can recall, sir.

16 Q.     And does the last name Grant, the Grant family mean

17 anything to you, again, from Garson place -- or Garson Terrace?

18 A.     Not that I can recall, sir.

19            MR. DAVIS:  Thank you.

20            THE COURT:  Redirect.

21            MS. MAN:  Nothing based on that, Your Honor.

22            THE COURT:  Thank you so much for your testimony.

23 Don't discuss your testimony with anyone until the trial is

24 over.  You are excused.  Enjoy the rest of your day.

25            THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  You are welcome.

2       The next government witness.

3          MR. COLLINS:  The United States calls Detective

4    Joshua Malinowski.

5          THE DEPUTY CLERK:  Detective, please walk towards me

6    through that small opening.  Stand right here to be sworn.

7    Please raise your right hand.

8          JOSHUA MALINOWSKI, GOVERNMENT'S WITNESS, SWORN

9          THE DEPUTY CLERK:  Please have a seat in the witness

10   box.

11      Please speak loudly and clearly into the microphone,

12   state your name for the record, and spell each name.

13         THE WITNESS:  First name is Joshua, J-O-S-H-U-A; last

14   name Malinowski, M-A-L-I-N-O-W-S-K-I.

15         THE DEPUTY CLERK:  Thank you.

16         MS. MAN:  Your Honor, may I inquire?

17         THE COURT:  You can.

18                      DIRECT EXAMINATION

19   BY MS. MAN:

20   Q.    Good morning, sir.

21   A.    Good morning.

22   Q.    Where are you employed, please?

23   A.    I am currently employed with the Prince George's County

24   Police Department.

25   Q.    What is your current duty station with the Prince

1  George's County Police Department?

2  A.     I am currently assigned to the Major Crimes Division and

3  with the Cross Border Task Force.

4  Q.     How long have you been a member of the Prince George's

5  County Police Department?

6  A.     It will be 18 years in May.

7  Q.     You said you are currently with the Cross Border Task

8  Force.

9         Prior to that, where were you stationed within the Prince

10 George's County Police Department?

11 A.     I was a member of the homicide unit for approximately

12 seven and a half years.

13 Q.     Prior to being a member of homicide, where were you

14 assigned?

15 A.     I was assigned to the county wide sexual assault unit for

16 two and a half years.

17 Q.     And prior to being with the sexual assault unit, where

18 were you employed?

19 A.     The District II robbery suppression team for three and a

20 half years.

21 Q.     Prior to the robbery squad, what was your duty

22 assignment?

23 A.     The District II special assignment team.  I was there

24 approximately two and a half years, I believe.

25 Q.     And prior to that, what were you assigned -- where were

1  you assigned within the Prince George's County Police

2  Department?

3  A.    The District II -- District II station, specifically

4  David sector patrol, which covers Bowie, Lanham, and Greenbelt.

5  Q.    Prior to Prince George's County Police Department, what

6  was your employment?

7  A.    I spent six months in the Prince George's County Police

8  Academy.  Prior to that, I was in college and worked at a

9  grocery store.

10 Q.    And on October 3rd of 2018, were you working in your

11 capacity as a Prince George's County Police Department?

12 A.    Yes, I was.

13 Q.    You told us about your extensive time with Prince

14 George's County Police Department.

15        Would it be fair to say that you were very familiar with

16 the Lanham area?

17 A.    I am, yes.

18 Q.    On that day, were you assigned to an investigation of a

19 homicide involving a person named Anthony Freeland?

20 A.    Yes.

21 Q.    What was your role in the murder of Mr. Freeland's case?

22 A.    So that particular day, I was the midnight homicide

23 detective responsible for responding to any homicides or deaths

24 within the county.  Shortly after going in service, a little

25 after ten p.m., I received a call for a homicide that occurred

1    on Manton Way in Lanham, Prince George's County, Maryland.

2    Q.    Who was the lead investigator for that homicide?

3    A.    Detective Hamlin.

4    Q.    What is Detective Hamlin's first name?

5    A.    Allyson.

6    Q.    Explain how you got involved in the investigation --

7    well, how are you assigned to a case?

8    A.    So the best way I can describe it is the rotation is most

9    -- is -- most resembles like a baseball rotation.  So as the

10   homicides come in, a squad -- a squad is taken off the board to

11   handle each -- each respective investigation.  So, typically,

12   if you are not on duty when it's your squad up for the next

13   case, what you would do is respond to the scene, notify the

14   detective and/or the detective supervisor, and basically hold

15   the scene, gather all the pertinent information until the

16   oncoming squad that's responsible for that investigation is

17   there.  Once they show up, you transfer the investigation to

18   them, and then you either help them out or go back in service.

19   Q.    And is that what occurred on October the 3rd?

20   A.    That is correct.  Yes.

21   Q.    About what time did you respond to that scene?

22   A.    Approximately 10:30 p.m.

23   Q.    And during that time, were there other officers on scene?

24   A.    Yes.  Uniform -- from what I recall, uniform patrol

25   officers.

Manchowski - Direct

1   Q.    Do you recall which patrol officers were on scene?

2   A.    I don't.

3   Q.    When you show up on scene, are you briefed?

4   A.    Yes.

5   Q.    And as a result, what, if anything, do you do?

6   A.    So, my basic task is just to gather the evidence, make

7   sure the scene is secure, make sure that no evidence is being

8   tampered with; jot down notes as far as what is initially seen

9   as far as evidence; notate time of death, as well as any

10  witnesses that may have seen anything or called 911, stuff like

11  that.

12  Q.    And is all that information then forwarded -- well, what

13  do you do with that information?

14  A.    I forward it to the -- the oncoming squad.

15  Q.    Now, you said before -- even before October 3rd of 2018,

16  when you responded to Manton Way, you were familiar with that

17  area?

18  A.    Yes.

19  Q.    And how are you familiar with that area?

20  A.    So, like I stated before, I worked at -- initially at the

21  District II station, and part of my patrol responsibilities

22  covered the Lanham and Greenbelt area.  From there, when I was

23  transferred to the District II special assignment team, Lanham

24  and Greenbelt was -- was another area of my responsibility.

25  And then when I went to the robbery suppression team, the

1    Greenbelt and Lanham areas again were my responsibilities to

2    handle any sort of robbery or carjacking investigation that

3    occurred within that area.

4    Q.    Would it be fair to say that you are familiar with the

5    area and multiple citizens that live in that area?

6    A.    That is correct.

7    Q.    To your knowledge, did there come a time when a suspect

8    was identified --

9    A.    Yes.

10   Q.    -- as -- as part of the investigation?

11   A.    Yes, there was.

12   Q.    What was the name of that suspect?

13   A.    Madani Tejan.

14   Q.    Were you familiar with a person with that name?

15   A.    Yes, I was.

16   Q.    Prior to October of 2018, had you ever met Madani Tejan

17   before?

18   A.    Yes, I had.

19   Q.    Could you explain how you had met him before?

20   A.    So, back in 2009 or 2010, I came in contact with him as a

21   part of an investigation.

22   Q.    Did there -- did you have the opportunity back in -- back

23   then to meet with him?

24   A.    Yes, I did.

25   Q.    Where did you meet with him?

1  A.    At an address on Manton Way.

2  Q.    What -- what, if anything, about Madani Tejan stuck out

3  to you?

4  A.    So, when I went to interview him, I noticed that he had

5  still been wearing a -- the football pants, the bottom half of

6  football pants that you wear when you are playing football that

7  consist of kneepads and thigh pads.

8  Q.    Now, you must have interviewed hundreds of people in your

9  career.

10       How did this stick out to you?

11 A.    Well, first of all, he was the only one during my almost

12 18-year career where I have ever come in contact with somebody

13 who is still wearing this equipment.  You know, I played

14 football, and I am sure many of you have played sports such as

15 hockey and lacrosse where you are wearing these pads.  They are

16 dirty.  They are grimy.  They are nasty.  And normally, like,

17 the first thing you do once you are done practice or a game is

18 you strip them so you are not getting in a car or in a house.

19 And for me just to see him still wearing them, kind of hanging

20 out wearing them, like, it struck me as odd.

21 Q.    How old was Madani Tejan when you first came into contact

22 with him?

23 A.    He had to be in his teens.

24 Q.    The person that you previously met in 20 -- 2009, do you

25 see that person in court today?

1    A.    I do.

2    Q.    Could you identify him based on an article of clothing he

3    is wearing and where he is seated in the courtroom?

4    A.    He is sitting to my right at the defense table.  He's

5    wearing black glasses, a gray blazer, and a black T-shirt

6    underneath the blazer.

7          MS. MAN:  Your Honor, if the record could reflect

8    that Detective Malinowski has identified the defendant, Madani

9    Tejan.

10          MR. DAVIS:  No objection.

11          THE COURT:  The record will reflect that.

12   BY MS. MAN:

13   Q.    What was the address that you met the defendant at?

14   A.    I believe it was 6503 Manton Way, Lanham, Prince George's

15   County, Maryland.

16   Q.    Where was this address in relation to the homicide

17   involving Mr. Freeland?

18   A.    A few houses down.

19   Q.    Based on your familiarity with the area, do you know what

20   high school the neighborhood kids in the Glenn Estates area go

21   to high school?

22   A.    Duvall High School.

23   Q.    Did there come a time when a subpoena was issued to

24   Duvall High School to obtain certified medical records of the

25   defendant?

Matthews - Direct

1   A.     Yes, school records.

2   Q.     Did law enforcement ever receive those records?

3   A.     Yes.

4   Q.     Did you have an opportunity to review said records?

5   A.     Yes, I did.

6   Q.     And I am showing you what's been marked and admitted into

7   evidence -- well, it will be as soon as it comes up -- as 347A.

8          Do you recognize 347A?

9   A.     Yes, I do.

10  Q.     What about 347A jumps out to you?

11  A.     If you look towards the bottom of the screen, you see

12  several different addresses.  The address in the middle where

13  you have move-in date and move-out date August 24th, 2009 to

14  September 2nd, 2010, it has Mr. Tejan's address listed at 6503

15  Manton Way, Lanham, Maryland.

16  Q.     And these are records from the Prince George's County

17  Board of Education?

18  A.     That is correct, yes.

19  Q.     And so it would show where the defendant lived when he

20  was in school?

21  A.     Yes.

22  Q.     And he lived there from August 24th, 2009 to September

23  10th -- excuse me, September 2nd of 2010?

24  A.     Yes.

25  Q.     And was this the same address that you met with the

1    defendant at previously?

2    A.    Yes, I did.

3    Q.    I am going to show you what's been marked as Government's

4    Exhibit 451.

5          Do you recognize this?

6    A.    Yes, I do.

7    Q.    What is this?

8    A.    It's an aerial view of Manton Way and the surrounding

9    streets that connect to it.

10   Q.    And do you see the address where you met with the

11   defendant back in 2009, 2010?

12   A.    Yes, I do.

13   Q.    Where is that?

14   A.    6503 Manton Way.  Close to the intersection of Garson

15   Terrace.

16   Q.    You can circle it on the screen.

17   A.    (Witness complies.)

18   Q.    And I am going to show you what's been marked and

19   admitted as Government's Exhibit 51.  Sorry.  Let me clear

20   that.

21         Do you recognize that?

22   A.    Yes, I do.

23   Q.    What is that?

24   A.    So that's a crime scene photograph of the deceased in the

25   background, and in the foreground, there is a mailbox with the

1  letters 6509 on the mailbox post.

2  Q.    Let's go back to 451.

3        Where is that in relation to 6503?

4  A.    A few houses up.

5  Q.    From where you previously met with the defendant?

6  A.    Yes.

7  Q.    And where he previously lived?

8  A.    Yes.  Correct.

9        MS. MAN:  No further questions for Detective

10 Malinowski.

11       THE COURT:  Cross-examination.

12       MR. DAVIS:  Thank you, Your Honor.

13                   CROSS-EXAMINATION

14 BY MR. DAVIS:

15 Q.    Officer Malinowski, you indicated that when you first

16 arrived at the scene on October 3rd that you did, like, a

17 preliminary investigation.  Correct?

18 A.    Yes.  Correct.

19 Q.    And then after that preliminary investigation, did you

20 turn over the investigation or the interview process to the

21 detectives and others that arrived, or did you continue to

22 assist them?

23 A.    No, sir.  Once -- once others from Detective Hamlin's

24 squad arrived, I transferred everything to them and went back

25 in service.

1    Q.    Now, had you been out to that area prior to October 3rd?

2    A.    Not that I can recall, no.

3    Q.    So 6503 was of no significance to you until October 3rd?

4    A.    No, sir.

5    Q.    Now, when you spoke to Mr. Tejan, you indicated he was

6    still a teenager.  Correct?

7    A.    Correct.

8    Q.    So would it be fair to say, and I am not holding you to

9    exact years, but we are talking ten -- over ten years ago.

10   Correct?

11   A.    Yes.

12   Q.    Now, do you even know who owns the home at 6503 Manton

13   Way?

14   A.    Not for certain, no.

15   Q.    Does the name Kamara ring a bell?

16   A.    No, sir.

17   Q.    Did you speak to the neighbors about that house when you

18   were out there on October 3rd?

19   A.    So I did speak to -- I did speak to some neighbors.  I

20   believe I notated it in my notes that there was a problem house

21   on Manton Way.

22   Q.    And that would be the 6503.  Correct?

23   A.    I believe so, yes.

24   Q.    Did you determine whether anyone was in 6503 on October

25   3rd when you arrived and conducted your preliminary

Malinowski - Cross

```
 1  investigation in response to the 911 call for the shooting?
 2  A.    No, I did not.
 3            MR. DAVIS:  The Court's indulgence.
 4        (Counsel conferring.)
 5            MR. DAVIS:  Thank you, Officer Malinowski.
 6            THE COURT:  Redirect.
 7            MS. MAN:  Your Honor, nothing based on that.
 8            THE COURT:  Sir, thank you so much for your
 9  testimony.  Don't discuss it with anyone until the trial is
10  concluded.  Enjoy the rest of your day.  You are excused.
11        Next government witness.
12            MS. MAN:  The United States would call Corporal
13  Geoffrey Boris.
14            THE COURT:  Very well.
15            THE DEPUTY CLERK:  Corporal Boris, please walk
16  towards me.  Stand right here to be sworn.  Please raise your
17  right hand.
18             GEOFFREY BORIS, GOVERNMENT'S WITNESS, SWORN
19            THE DEPUTY CLERK:  Please have a seat in the witness
20  box.  And if you would please speak loudly and clearly into the
21  microphone, state your name for the record, and spell each
22  name.
23            THE WITNESS:  Geoffrey, G-E-O-F-F-R-E-Y, Matthew,
24  M-A-T-T-H-E-W, Boris, B-O-R-I-S.
25            THE DEPUTY CLERK:  Thank you.
```

Boris - Direct

```
 1              MS. MAN:  May I proceed?
 2                      DIRECT EXAMINATION
 3   BY MS. MAN:
 4   Q.    Corporal Boris, good afternoon.
 5   A.    Good afternoon.
 6   Q.    Where are you employed, Corporal Boris?
 7   A.    Prince George's County Police Department.
 8   Q.    What is your duty assignment?
 9   A.    Right now, I am in the COPS unit, community-oriented
10   policing unit, and prior to that, patrol.
11   Q.    How long have you been with the Prince George's County
12   Police Department?
13   A.    This Sunday will be 22 years.
14   Q.    And you said prior to being in COPS, you were on patrol?
15   A.    Yes.
16   Q.    How long were you on patrol?
17   A.    Twenty-one years.
18   Q.    Were you working in your capacity as a patrol officer on
19   October 3rd of 2018?
20   A.    Yes.
21   Q.    What shift were you working that night?
22   A.    The evening shift.
23   Q.    What hours is the evening shift?
24   A.    3:30 in the afternoon to 1:30 in the morning.
25   Q.    Now, what were some of your duties as a patrol officer?
```

Borris - Direct

1    A.    That night, I was the nine car, the senior corporal,

2    which is the assistant to the sergeant.  Patrol duties

3    throughout the day responding to calls for service, enforcing

4    traffic and criminal law.

5    Q.    Now, did there come a time when you assisted with a

6    homicide investigation that evening?

7    A.    Yes.

8    Q.    Do you recall where it was?

9    A.    If you have something to refresh my memory?

10   Q.    Let's show you Government's Exhibit 5 for identification

11   purposes only.

12            MS. MAN:  Madam Deputy, if it could only be up on his

13   screen.

14            THE WITNESS:  Yes.  The shooting was at -- well,

15   that's the vehicle right there (indicating).

16   BY MS. MAN:

17   Q.    Let's show you Government's Exhibit -- what's been marked

18   for identification purposes as Government 6.

19   A.    Yes.  Lowmoor Court and Garson Terrace.  Or Garson

20   Terrace and Lowmoor Court.

21   Q.    Those are the cross streets.

22            Do you recall which location you responded to?

23   A.    What was that?  I'm sorry.

24   Q.    Those are the cross streets.

25            Do you remember which location you responded to?

Boris - Direct

1  A.    It was on Garson Terrace prior to Lowmoor.

2  Q.    I will zoom in a little bit.

3  A.    6509 Manton Way.

4  Q.    What kind of scene was that?  Was it a residential?

5  A.    Yes, a residential neighborhood.

6  Q.    Commercial?

7         THE COURT:  I'm sorry.  Try not to talk over each

8  other, please.

9         THE WITNESS:  Oh, I'm sorry.

10        MS. MAN:  Wait for me to finish the question, please,

11 sir.

12 BY MS. MAN:

13 Q.    Were those townhouses or single family homes or

14 apartments?

15 A.    Single family homes.

16 Q.    Do you recall what time you responded to the shooting?

17 A.    It looks like 9:38 p.m.

18 Q.    And are you familiar with that location, sir?

19 A.    Yes, ma'am.

20 Q.    How are you familiar with that location?

21 A.    I have patrolled the area for at least 12 years.  I had

22 numerous calls for service down in the neighborhood.

23 Q.    Now, would you recognize it if you saw it on a map?

24 A.    Yes, ma'am.

25 Q.    I'd like to show you what's been admitted as Government's

Bott - Direct

1    Exhibit 450.

2         Do you recognize what's in Government's 450?

3    A.    Yes, ma'am.

4    Q.    What is that?

5    A.    That is the neighborhood.

6    Q.    The neighborhood that we just spoke about that you

7    responded to?

8    A.    Yes, ma'am.

9    Q.    You said you responded to that location for assistance

10   with a homicide scene.  Correct?

11   A.    Yes, ma'am.

12   Q.    Now I am going to show you what's been marked as

13   Government's -- and admitted as Government's 452.

14        Do you recognize Government's 452?

15   A.    Yes, ma'am.

16   Q.    What is that?

17   A.    The same neighborhood just extended out a little bit.

18   Q.    So the map we just saw in 450, where is that in

19   relation -- is that at the top of the screen in Government's

20   452?

21   A.    Yes.

22   Q.    Did there come a time when you assisted with this -- how

23   did you assist with this homicide investigation?

24   A.    First, we secured the first scene which was right here on

25   Manton, and then there was a second call for a suspicious

Bartley - Direct

1  vehicle on Bartley Way.

2  Q.    And did you go to Bartley Way?

3  A.    Yes, ma'am.

4  Q.    Now, can you show us on Government's Exhibit 452 where

5  Bartley Way is?

6  A.    Right here (indicating).  This road right here

7  (indicating).

8  Q.    What, if anything, did you discover at that location?

9  A.    A white vehicle with a D.C. registration plate was left

10 running unattended in front of somebody's house.

11 Q.    So what was the condition of the vehicle when you saw it?

12 A.    It appeared to be normal.  Nobody -- no occupants, but

13 there was what appeared to be a blood stain on the rear driver

14 door.

15 Q.    And you said there were no occupants inside?

16 A.    No, ma'am.

17 Q.    Were the doors open or closed?

18 A.    They were closed, ma'am.

19 Q.    Could you hear the car running?

20 A.    Excuse me?

21 Q.    Could you hear the car running?

22 A.    Yes, ma'am.

23 Q.    As a result of you discovering the vehicle, did other --

24 any other investigators come out to the scene?

25 A.    Yes, ma'am.

1    Q.    Did you remain with the vehicle?

2    A.    Yes, ma'am.

3    Q.    During the time you remained with the vehicle, did any

4    unauthorized citizens approach the vehicle?

5    A.    No, ma'am.

6    Q.    What would have happened if somebody had tried to

7    approach that vehicle that wasn't supposed to?

8    A.    I would have stopped them from approaching it, ma'am.

9    Q.    And why would that be?

10   A.    Because it was part of an investigation scene and it was

11   evidence.

12   Q.    Ultimately what happened to the vehicle?

13   A.    It was towed to our I.D. bay.

14   Q.    Where is the I.D. bay?

15   A.    On Brightseat Road.

16   Q.    Were you present when that happened?

17   A.    Yes.  I followed it, yes.

18   Q.    Before the vehicle got towed, was the scene photographed?

19   A.    Yes.

20   Q.    Did this happen while you were present?

21   A.    Yes.

22   Q.    Showing you what's been marked as Government's Exhibit

23   76.  Let me clear this.  Here we go.

24         What are we looking at, Corporal Boris, in 76?

25   A.    That is the vehicle in question.

 1   Q.    Now, on the bottom half of the screen, there is another

 2   vehicle.

 3         Whose vehicle is that?

 4   A.    The cruiser is my vehicle.

 5   Q.    So you pulled up and found the vehicle?

 6   A.    Yes, ma'am.

 7   Q.    And is that an accurate picture of the vehicle?

 8   A.    Yes, ma'am.

 9   Q.    Showing you what's been marked as Government's 77.

10         What is this?

11   A.    That is the vehicle.

12   Q.    Government's Exhibit 78, please.

13         What is this, sir?

14   A.    The same vehicle profile.

15   Q.    Now, you mentioned that you thought you saw blood?

16   A.    Yes, ma'am.

17   Q.    Could you point out to the jury where that is?  You can

18   circle it again.

19   A.    (Witness complies.)

20   Q.    And were those the blood spatters that you saw that

21   evening?

22   A.    Yes, ma'am.

23   Q.    Government's Exhibit 49.  Excuse me.  79.  79.  I'm

24   sorry.

25         What is this, Corporal Boris?

1  A.    The front of the vehicle.

2  Q.    And the police cruiser that we see behind, is that your

3  cruiser that you previously referenced?

4  A.    Yes, ma'am.

5  Q.    Government's Exhibit 80.

6         MS. PANNELL:  8?

7         MS. MAN:  Eight-zero.  Oh, that's not it.  Oh, wait.

8  Sorry.  My apologies, Corporal Boris.

9  BY MS. MAN:

10 Q.    What is in Government's 80?

11 A.    That was the house it was parked in front of.

12 Q.    And 81, please.

13 A.    And that's the shot from the front of the house towards

14 the street.

15 Q.    So in Government's 80, that would be someone standing on

16 a stoop taking that photograph?

17 A.    Yes.

18 Q.    Now, you told us earlier that the car was eventually

19 towed to the evidence bay.

20 A.    Yes.

21 Q.    And during the time -- between the time you discovered

22 this vehicle and the time that it was towed to the evidence

23 bay, did anybody that was not supposed to access that vehicle?

24 A.    Correct.

25 Q.    I am showing you what's been marked as Government's

1  Exhibit 101.

2       What is this, Corporal Boris?

3  A.   That is the vehicle in the identification bay.

4  Q.   And it's in exactly the same condition as it was when you

5  first discovered it.  Correct?

6  A.   Yes, ma'am.

7            MS. MAN:  Thank you.  I have no further questions for

8  Corporal Boris.

9            THE COURT:  Cross-examination.  Cross-examination.

10           MR. DAVIS:  Yes, Your Honor.  Thank you.

11                       CROSS-EXAMINATION

12 BY MR. DAVIS:

13 Q.   Good afternoon, Officer Boris.

14 A.   Good afternoon.

15 Q.   You indicated that you had responded to this location a

16 number of times in the past.

17 A.   Yes.

18 Q.   Did I hear you correctly?

19 A.   Yes.

20 Q.   And was that in reference to 911 calls?

21 A.   Yes.  Other calls for service in the neighborhood, yes.

22 Q.   Now, would you characterize this as a nice neighborhood

23 just looking at the homes that were in the area and how they

24 were kept?

25 A.   Yes.

1    Q.    The houses of relatively high value?

2    A.    Yes.

3    Q.    Definitely middle to upper middle class.  Correct?

4    A.    Yes.

5    Q.    Now, during the times that you have responded to that

6    area, had you ever been directed to 6503 Manton Way?

7    A.    You mean prior to the call or --

8    Q.    That's correct.  Prior to the call on October 3rd.

9    A.    The specific address, I don't -- I don't know.

10   Q.    Had you been -- had you responded to incidents of

11   gunshots being fired in the past?

12   A.    I don't recall.

13   Q.    Or respond to -- anything significant stick to your mind

14   for the prior responses to the neighborhood?

15   A.    I mean, we had had loud parties, break-ins, things of

16   that nature.

17   Q.    Not parties, but was there drug activity that you recall?

18   A.    There would be suspicious occupied vehicle calls back

19   there.

20   Q.    People -- vehicles backed up in the streets, things of

21   that nature?

22   A.    Yes.

23   Q.    Did they involve Manton Way, if you recall?

24   A.    I don't recall.

25   Q.    Did they involve Garson Terrace, if you recall?

Borris - Cross

```
 1   A.    I don't recall either.

 2   Q.    Do you recall how far the Acura was from where the body

 3   was found on Manton Way, approximately?

 4   A.    If I had the map -- it's probably less than a half a

 5   mile, quarter mile maybe.

 6         MR. DAVIS:  The Court's indulgence.

 7         THE WITNESS:  Like two blocks.

 8   BY MR. DAVIS:

 9   Q.    About two blocks?

10   A.    Around there.

11         MR. DAVIS:  Thank you.

12         THE WITNESS:  You are welcome.

13         THE COURT:  Redirect.

14                     REDIRECT EXAMINATION

15   BY MS. MAN:

16   Q.    I'd like to ask you about what Mr. Davis just talked

17   about.

18         If I could have 452.

19         Where is Bartley Way, please?

20   A.    Right here (indicating).

21   Q.    And where is Manton Way?

22   A.    Right here (indicating).

23   Q.    And so the body was found on Manton Way.  Correct?

24   A.    Correct.

25   Q.    And the car was found on Bartley?
```

```
 1  A.    Correct.

 2          MS. MAN:  Nothing further.

 3          THE COURT:  Sir, thank you so much for your

 4  testimony.  Don't discuss your testimony with anyone until the

 5  trial is over.  Thank you so much.  You are excused.  Enjoy the

 6  rest of your day.

 7          THE WITNESS:  Thank you.  I appreciate you.

 8          THE COURT:  You are welcome.

 9      Next government witness.

10          MS. MAN:  Your Honor, the government is going to ask

11  --

12          MS. COTTINGHAM:  Your Honor, the government is going

13  to call Corporal Jerry Montgomery at this time.

14          THE COURT:  Okay.  Corporal Montgomery, please walk

15  towards me through that narrow opening there.  Please stand

16  right here to be sworn.  Please raise your right hand.

17      JERRY MONTGOMERY, GOVERNMENT'S WITNESS, SWORN

18          THE DEPUTY CLERK:  Please have a seat in the witness

19  box.

20      If you would please speak loudly and clearly into the

21  microphone, state your name for the record, and spell each

22  name.

23          THE WITNESS:  Yes, ma'am.  Jerry Montgomery,

24  J-E-R-R-Y, M-O-N-T-G-O-M-E-R-Y.

25          THE DEPUTY CLERK:  Thank you.
```

```
 1                      DIRECT EXAMINATION
 2  BY MS. COTTINGHAM:
 3  Q.    Good afternoon.
 4  A.    Good afternoon, ma'am.
 5  Q.    Officer Montgomery, could you tell us where do you
 6  currently work?
 7  A.    I am currently employed with the Prince George's County
 8  Police Department's property evidence -- property warehouse
 9  division.
10  Q.    How long have you been with the property warehouse
11  division, Officer Montgomery?
12  A.    I have been there since January of 2021 after I retired
13  as a corporal from the department.
14  Q.    And how long were you a corporal with the department
15  prior to your current role?
16  A.    I actually served 20 years in the department.  My last
17  rank was a corporal.
18  Q.    And what were -- what was your job title right before
19  your retirement?
20  A.    Before my retirement, I was assigned to the crime scene
21  investigation division for the department as a crime scene
22  investigator.
23  Q.    Can you describe for the jury what were your
24  responsibilities in that role?
25  A.    As a crime scene investigator, we responded to scenes of
```

1  crime, basically, and we would do whatever is needed as far as
2  collecting evidence, whether it's taking photographs,
3  collecting items of evidence, doing, you know, different scene
4  measurements.  Processing the scene is what we call it.  We
5  also responded to the OCME's office, Office of the Chief
6  Medical Examiner, for -- to observe autopsies.  We would do
7  search warrants, things of that nature.
8  Q.    And Corporal Montgomery, you said you would work with the
9  Office of the Chief Medical Examiner I believe you just
10 testified?
11 A.    Yes, ma'am.
12 Q.    Can you describe what your role was with respect to
13 autopsies performed by the Office of the Chief Medical
14 Examiner?
15 A.    When we responded to their office, we were there to
16 observe the postmortem examinations of decedents.  We would
17 have to arrive there, we would communicate with the doctor who
18 was performing the procedure to inform them if anything -- any
19 certain specifics that the detectives were looking for, and
20 then we would actually observe the entire autopsy.
21 Q.    So when the Office of the Chief Medical Examiner was
22 performing an autopsy, there would be someone from your squad
23 assigned in that role.  Is that right?
24 A.    Yes, ma'am.
25 Q.    And did you have any involvement in actually performing

1   the autopsy in any way?

2   A.    No, ma'am.  We actually are assigned to an observatory

3   room which is right above where they are doing the autopsies.

4   For lack of a better way to describe it for everybody to

5   understand, it's like looking in a fish bowl watching everyone

6   as you are watching the doctors perform the procedures.  The

7   only thing we do is at the end, we would photograph -- I'm

8   sorry, fingerprint the decedents.  That's it.

9   Q.    Corporal Montgomery, you mentioned photographs.  Other

10  than -- excuse me, fingerprints.  Are there -- in the course of

11  working with the Office of the Chief Medical Examiner, would

12  you be involved in photographs of the body?

13  A.    No, ma'am.  The Office of Chief Medical Examiner in the

14  State of Maryland has their own photographer that takes all of

15  the photographs.  They just give us a download of the

16  photographs at the end of the procedure.

17  Q.    And Corporal Montgomery, in addition to the role

18  observing, if there -- what happens to any evidence that is

19  identified on a decedent during the course of an autopsy by the

20  Office of Chief Medical Examiner?

21  A.    If the decedent is clothed, they remove the clothing and

22  they bag the clothing up individually in different bags for us

23  to take back as evidence to -- we take it back to our office,

24  enter it into the system, and send it to the property

25  warehouse.  Any other items they may recover from inside the

1    victim, they may also give us that that we take back to put

2    into the property warehouse.

3    Q.    So is it your responsibility as the officer who is

4    involved in the autopsy to ensure the custody of any evidence

5    that's identified during the course of the autopsy?

6    A.    It's my responsibility to make sure it gets back and gets

7    filed, cataloged, and logged into the system appropriately,

8    yes, ma'am.

9    Q.    Now, Corporal Montgomery, were you -- in October of 2018,

10   were you in this role as a crime scene tech. as you had just

11   described?

12   A.    Yes, ma'am, I was.

13   Q.    And were you involved in the autopsy of an individual

14   named Anthony Freeland?

15   A.    Yes, ma'am.

16   Q.    I am going to -- we are going to ask to pull up Exhibit

17   371.

18         Corporal Montgomery, do you recognize this document?

19   A.    Yes, ma'am.  This is the report that I filed when I

20   returned back to my office from observing -- doing the autopsy.

21   Q.    And in -- was your role in observing the autopsy

22   described here consistent with the practices you have just

23   testified about here today?

24   A.    Yes, ma'am.

25   Q.    And Corporal Montgomery, can you just describe briefly

1    for me when you first arrive at the scene -- not at the scene,

2    excuse me.

3          When you first arrive at the Office of the Chief Medical

4    Examiner with respect to the autopsy of Mr. Freeland, what

5    happens first when you arrive there?

6    A.    When I arrive there, I meet with the doctor who is

7    performing the autopsy -- well, I find out who the doctor --

8    which doctor is assigned to our case, and I meet with that

9    doctor and let them know if the detectives have anything

10   special that they are interested in them looking for in regards

11   to the decedent.

12   Q.    And in this case, who was the doctor who performed the

13   autopsy?

14   A.    It's listed here in my report, Dr. Allan.

15   Q.    And there are a number of items listed here below as

16   physical evidence on the bottom right side of this exhibit.

17         Do you see those?

18   A.    Yes, ma'am.

19   Q.    What do the letters JM indicate?

20   A.    Those are my initials, ma'am.

21   Q.    And what does this list of physical evidence, what does

22   this describe?

23   A.    This describes the items of evidence that was turned over

24   to me from the Office of Chief Medical Examiner for me to take

25   back and have properly filed away in our property warehouse.

1   Q.    And you testified earlier that, I believe, that there --

2   you would be involved in fingerprints.

3         Is that one of the pieces of evidence you may collect?

4   A.    Yes, ma'am.  We have to fingerprint the decedents once

5   they have finished everything, and then those fingerprints are

6   taken back -- packaged up and sent off to Regional Area

7   Fingerprint Examination.

8   Q.    And Corporal Montgomery, I am just going to draw your

9   attention to the items listed JM12 and JM13.

10        What do these two describe?

11  A.    Both of them were bullet fragments that were --

12  apparently the doctor found inside the decedent, and they

13  packaged them up for us to return back to the office.

14  Q.    And when in the course of -- when in the course of the

15  autopsy were these identified?

16  A.    They were done during the entire course of it.  I don't

17  know exact time that they found those items.  As I said, I

18  watched the whole thing, but I don't know the exact time that

19  they recovered those items from them.  That's something the

20  doctor would have to explain.

21  Q.    I am going to approach at this time.

22        Corporal Montgomery, do you recognize -- do you recognize

23  that item right there?

24  A.    Yes, ma'am.  This is one of the items that I collected

25  from the OCME, yes, ma'am.

1          MS. COTTINGHAM:  And for the record, Your Honor, this
2    is Exhibit 471.
3    BY MS. COTTINGHAM:
4    Q.    And same question there, Corporal Montgomery:  Do you
5    recognize this item?
6    A.    Yes, ma'am.  That's one of the other items that I
7    collected from the OCME's office.
8    Q.    Corporal Montgomery, so the -- now that the jury can see
9    this, can you again just explain what is Exhibit 471?
10   A.    It's bullet fragments, ma'am.
11   Q.    I will just do that so the jury can see it.
12         And are these your initials right here, Corporal
13   Montgomery?
14   A.    Yes, ma'am.
15   Q.    And these were recovered during the autopsy.  Is that
16   correct?
17   A.    Yes, ma'am.
18   Q.    And the same question for 472, Corporal:  Can you explain
19   to the jury what these items are?
20   A.    That is another bullet fragment as well, ma'am.
21   Q.    Corporal Montgomery, I am going to pull back up Exhibit
22   -- Government's Exhibit -- excuse me -- 371 if we can.  And I
23   am going to go to the second page if we can, please.
24         Corporal Montgomery, can you explain what is shown on
25   this second page of this document?

1  A.    Just as it's titled at the top, Victim -- I'm sorry,

2  Victim Injury Diagram.  What that is is when we arrive there as

3  we are watching the postmortem examination, any defect that is

4  visibly, you know, that you could actually see without touching

5  just to look at the decedent, we make a diagram showing where

6  the -- the -- the defect is on the body.

7  Q.    And when you say "defect," can you describe some examples

8  of what that would include?

9  A.    It could be anything from a bullet wound whether it's an

10 entry or exit point, which is determined by the doctor, a

11 scrape, cut, anything of that nature.  Any defect to the -- to

12 the body itself.

13 Q.    And this is done after the clothing is removed and before

14 the autopsy has begun.  Is that right?

15 A.    Yes, ma'am.

16        MS. COTTINGHAM:  The Court's indulgence.

17 BY MS. COTTINGHAM:

18 Q.    And Corporal Montgomery, can I just ask, since there is

19 both defects and -- and tattoos indicated here, can you just

20 point out where -- and you can circle on the screen if you'd

21 like -- where the defects were on Mr. Freeland during the

22 autopsy that you identified?

23 A.    Where you see the circles with the letter "X," those are

24 defects.  Where you see the circles with the letter "T," those

25 are tattoos.

1   Q.    So starting on the left-hand side on his -- one on the
2   neck and one on the back, defects on both of those.  Is that
3   accurate?
4   A.    Yes, ma'am.  Again, where you see the letters "X," yes.
5   Q.    And on the front of Mr. Freeland's body, were there
6   multiple defects in this case?
7   A.    That's correct.
8   Q.    And were there defects -- were all of the defects in this
9   case gunshot wounds?
10  A.    As far as I know, ma'am.  That was something the doctor
11  would have to advise on.
12  Q.    And Corporal Montgomery, you testified to your role in
13  observing the autopsy and observing the photos.
14        After the conclusion of the autopsy when you draft this
15  report, is anything else included in this report as part of
16  your final report on the autopsy?
17  A.    What I -- when I get back to my office and I do that
18  report, that is my report listing the items that I recovered.
19  For items that were what we call firearms evidence, bullet
20  fragments, bullets, there is an additional report that's done,
21  an analysis report that is typed up, and that is sent with the
22  items itself, the bullet fragments in this case, Items 12 and
23  13, over to the firearms examination unit.
24  Q.    And between the time you obtain these bullet fragments
25  and they went to the firearms examination, did they remain in

1  the sealed envelopes as you have seen in Exhibits 471 and 472?

2  A.    Yes, ma'am.  They come -- they give it to us in sealed

3  envelopes.  We do not open them.  We just put them inside of

4  another envelope, which is the larger brown envelope that you

5  have there that my label is attached to.

6           MS. COTTINGHAM:  Thank you.  Nothing further, Your

7  Honor.

8           THE COURT:  Cross-examination.

9           MR. DAVIS:  Nothing, Your Honor.

10          THE COURT:  Sir, thank you so much for your

11  testimony.  Don't discuss it with anyone else until the trial

12  is over.  You are excused.  Please enjoy the rest of your day.

13          THE WITNESS:  Thank you very much.

14          THE COURT:  Ladies and gentlemen, this seems like a

15  convenient time for our lunch break.  I am going to ask that

16  you be back in the jury room at two p.m. ready to continue from

17  there.

18     Remember my instruction not to discuss this case with

19  anyone, even among yourselves.  Everything you learn about this

20  case you have to learn in this courtroom.

21     I will see you at 2:00.  Enjoy your lunch.

22     (The jury panel exit the courtroom at 12:53 p.m.)

23          THE COURT:  Anything we need to discuss before the

24  lunch break?

25          MR. DAVIS:  Nothing from the defense.

1          MS. COTTINGHAM:  Your Honor, I think it's possible

2    that one of our witnesses -- we will discuss internally, but

3    it's possible that maybe we come back a few minutes early.  We

4    may want to have the Court give that instruction to this next

5    witness, but we will have a final answer for you right before.

6          THE COURT:  Okay.  All right.  I'm sorry.  Is the

7    issue that -- are we talking about the forfeiture by wrongdoing

8    issue?

9          MS. COTTINGHAM:  Yes, Your Honor.

10          THE COURT:  And there is some concern that even with

11   the government's instruction --

12          MS. COTTINGHAM:  We are going to discuss internally

13   whether it might be beneficial for everyone to have the Court

14   reiterate that instruction.

15          THE COURT:  Okay.

16       (Recess taken from 12:54 p.m. until 2:03 p.m.)

17          THE COURT:  You may be seated.

18       I hear the government wanted to discuss something.

19          MR. COLLINS:  Yes, Your Honor.  Thank you.

20       Your Honor, the government has a witness who we plan to

21   call next who has expressed serious safety concerns and

22   reservations about testifying in open court.  The witness -- I

23   think the Court may have noticed I wasn't here for a portion of

24   the morning, and I was trying to talk with the witness about

25   those concerns.  And what the witness -- the witness just has

1    concerns, Your Honor.  And so the Court wanted to make -- I

2    mean the government wanted to make the Court aware of that

3    issue.  We plan to call the witness.  We think that there may

4    be points in time where the witness may need to understand what

5    his obligations are in appearing today in terms of, you know,

6    he's required to testify.

7         And so I just wanted to bring that to the Court's

8    attention before we called the witness.  We anticipate it may

9    be a challenging witness, but I just wanted to bring that to

10   the Court's attention before we got started, and hopefully I

11   can get some leeway in the way I phrase the questions based on

12   how the witness responds.

13        THE COURT:  Well, if the witness -- if the witness

14   begins to seem hostile toward the government and you need to

15   lead at that point, I will make that assessment at the time.

16        MR. COLLINS:  Sure.

17        THE COURT:  But I understand your overall concern.

18        MR. COLLINS:  Okay.  And I believe that's the only

19   issue we have.

20        THE COURT:  The other issue that you raised before is

21   not an issue for this witness?

22        MS. COTTINGHAM:  So I think we will see how it goes.

23   I think it's all tied up in the same --

24        MR. COLLINS:  I'm sorry.  That's correct, Your Honor.

25   This is also a witness who probably needs to be advised on the

1  record of -- that he can't get into the forfeiture by

2  wrongdoing.

3          THE COURT:  I probably wouldn't use that language

4  with a witness.

5          MR. COLLINS:  I got it.  He doesn't -- we have never

6  said that to him, but that he cannot refer to who -- the person

7  we call Victim 2, or he can't refer --

8          THE COURT:  Remind me of the name of Victim 2.

9          MR. COLLINS:  So his name is Ferdinand Fotachwi.  He

10 also goes by the name "Billa."

11         THE COURT:  Fotachwi?

12         MR. COLLINS:  Fotachwi.  It's F-O-T-A-C-H-W-I, and he

13 also goes by the name of "Billa," B-I-L-L-A, and he is

14 sometimes referred to as "Guwop," G-U-W-O-P.  So he's been

15 instructed that he can talk about this individual, but he

16 cannot talk about this individual now being deceased or the

17 manner in which he became deceased or any theories that he has

18 about how he became deceased.

19         THE COURT:  And so I guess the question is:  I assume

20 the government has instructed him on that.  The sense I was

21 getting from Ms. Cottingham before the break is that you might

22 need the Court to reinforce that.  I will do that if you want

23 me to.  I mean, it's your witness.  If you feel that's not

24 going to be an issue, then --

25         MR. COLLINS:  Your Honor, I would just say in an

 1  abundance of caution, the government would ask that the Court

 2  also instruct him as well.

 3           THE COURT:  Well, then you can bring the witness in.

 4           MR. COLLINS:  Sure.

 5           THE COURT:  One thing that was mentioned earlier is

 6  that the defendant's birth date was on one of the exhibits.  If

 7  we could just make sure that gets redacted?

 8           MS. COTTINGHAM:  Yes, Your Honor.  We are working on

 9  it.

10           THE COURT:  You are not getting the jury, are we?

11           THE DEPUTY CLERK:  No.  I am just standing here.

12      (Pause.)

13           THE COURT:  Someone is getting the witness?

14           MR. COLLINS:  Yes, Your Honor.  Yes, they are.

15           THE COURT:  Okay.  I presume the witness is under

16  subpoena?

17           MR. COLLINS:  Yes, he is, Your Honor.

18      (Pause.)

19           MR. COLLINS:  Your Honor, do you mind if I just step

20  out and make sure everything is -- okay.  Thank you.

21      (Pause.)

22      (Whereupon the testimony of Blake Ndi was ordered

23  transcribed and is filed under separate cover on CM/ECF.)

24      (Recess taken from 2:50 p.m. until 3:13 p.m.)

25           THE COURT:  Everyone be seated.

1          I understand we are taking a witness out of order?

2          MS. COTTINGHAM:  Yes, Your Honor.  I am waiting for

3    Ms. Essex to call.

4          MR. COLLINS:  Your Honor, the government will be

5    calling Forest, Matt Forest.

6          THE COURT:  Okay.  I assume we are ready for the

7    jury.  You can have this back if you want, Mr. Collins or

8    somebody.  Mr. Collins, you can have this back.

9          MR. COLLINS:  Thank you.

10         THE COURT:  You are welcome.

11       (Whereupon the next witness, Matt Forest, enters the

12   courtroom and approaches the witness stand.)

13         THE COURT:  You can just hang tight.  You can sit

14   down for a minute.

15       (The jury panel enter the courtroom at 3:15 p.m.)

16         THE COURT:  You may all be seated.

17       Good afternoon again, ladies and gentlemen.  Apologies

18   for the delay.  I am going to guess you are sophisticated

19   enough to figure out for yourselves that we have a different

20   witness up here now, and so we are going to allow the

21   government to call this witness out of order, and we will

22   proceed in that way.

23       You may -- we still have to swear the witness.  If you

24   could call the witness for the record.

25         MS. MAN:  The United States calls crime scene

1  investigator Matthew Forest.

2         THE DEPUTY CLERK:  Mr. Forest, please stand and raise

3  your right hand.

4          MATTHEW FOREST, GOVERNMENT'S WITNESS, SWORN

5         THE DEPUTY CLERK:  Thank you.  You may be seated.

6      Please speak loudly and clearly into the microphone,

7  state your name for the record, and spell each name.

8         THE WITNESS:  My name is Matthew Forest,

9  M-A-T-T-H-E-W, F-O-R-E-S-T.

10        THE DEPUTY CLERK:  Thank you.

11        MS. MAN:  May I inquire?

12                     DIRECT EXAMINATION

13  BY MS. MAN:

14  Q.    Good afternoon, sir.

15  A.    Good afternoon.

16  Q.    Sir, this afternoon when you address the Court, I am

17  going to ask that you keep your voice up and speak slowly or

18  else madam court reporter will be unhappy with us.

19  A.    Okay.

20  Q.    Where are you employed?

21  A.    The Prince George's County Police Department.

22  Q.    What do you do for the Prince George's County Police

23  Department?

24  A.    I am a crime scene investigator.

25  Q.    How long have you worked as a crime scene investigator?

1  A.     About four and a half years.

2  Q.     Prior to being a crime scene investigator with the Prince

3  George's County Police Department, what other employment did --

4  do you have?

5  A.     Yeah.  I was a graduate student at the time.

6  Q.     Where did you get your graduate degree?

7  A.     University of New Haven in Connecticut.

8  Q.     What is your Master's degree in?

9  A.     Forensic technology.

10 Q.     What year did you graduate from the University of New

11 Haven?

12 A.     2018.

13 Q.     Where did you do your undergraduate studies?  I assume if

14 you did a graduate degree, you did undergraduate studies.

15 A.     I went to Hofstra University.

16 Q.     What year did you graduate from Hofstra?

17 A.     2014.

18 Q.     Prior to becoming a crime scene investigator, did you

19 take part in any internships that were relevant to being a

20 crime scene investigator?

21 A.     I did.

22 Q.     What were those internships?

23 A.     So I did a internship as the Suffolk County Crime Lab in

24 Long Island, New York, and I also did one at Meriden Police

25 Department in Connecticut.

1    Q.    CSI Forest, what do you need to do -- what training do

2    you need to do to become a crime scene investigator?

3    A.    Once I was hired, I had to do about six months of

4    training where I had a field training officer or FTO.  During

5    that time, I was taught the standard operating procedures that

6    we have, as well as take exams to pass proficiency before I

7    could handle casework.

8    Q.    Did you have -- did you have to study any operations?

9    A.    Did I have to study any what?

10   Q.    Any operations.

11   A.    Yes.

12   Q.    Did you have -- is there any internal testing that the

13   Prince George's County Police Department has you do before you

14   are let out on your own, so to speak?

15   A.    Yes.

16   Q.    What kind of testing is there?

17   A.    There is report writing, scene processing, as well as

18   evidence collection and processing.

19   Q.    What does "processing" mean?

20   A.    Processing can mean many things.  It can mean swabbing

21   for DNA.  It can also mean using black powder trying to get

22   fingerprints off the item.  Those are just the two most common

23   examples.

24   Q.    And do you have any testing on photography?

25   A.    Yes, we do.

1  Q.    Tell us about what the testing in photography consists

2  of.

3  A.    So we have to know all the settings of the camera, how

4  different settings affect different photographs, and when each

5  setting is required and what type of setting.

6  Q.    What are some of your duties as a crime scene

7  investigator?

8  A.    We respond to search warrants and do autopsies and other

9  things that require collection of evidence related to casework.

10 Q.    You mentioned earlier that you process a scene.

11       What is done to process a scene?

12 A.    On every scene, we will photograph a crime scene.  Once

13 we arrive, we will document it through notes.  And then we will

14 recover items of evidence, I will photograph those items

15 specifically, and then -- and there might be some other

16 processing of, like, for DNA or fingerprints as well.

17 Q.    Does what you do on the scene to process a scene vary

18 from case to case?

19 A.    It does.

20 Q.    During the time you are processing a scene, what contact,

21 if any, do you have with the lead investigator in the case?

22 A.    I have a decent amount of contact.  Depending on the

23 situation, I might come into a scene where I am not familiar

24 with the case, so I will be communicating with the detective a

25 lot to know -- to learn the facts of the case, what items of

Forest - Direct 05/10/23

```
 1    evidence they might be looking for, or what their goals are on
 2    that particular day.
 3    Q.    Would it be fair to say it's you -- it is imperative that
 4    you know the nature of the case before going into a scene?
 5    A.    Before heading into it, no.
 6    Q.    But once you are there --
 7    A.    But once I am there, I do learn the -- the details of the
 8    case that are necessary for me to do my job in an adequate
 9    fashion.
10    Q.    So you wouldn't begin to process a scene before you know
11    these details?
12    A.    No.
13    Q.    I'd like to draw your attention to October 21st of 2018.
14          Did there come a time when you were working in your
15    capacity as a crime scene investigator?
16    A.    Yes.
17    Q.    Did there come a time when you responded to the location
18    of 8831 Lottsford Road, Apartment 325?
19    A.    Yes.
20    Q.    Why did you go to that location?  Actually, which city is
21    that in?
22    A.    I believe Landover.  I don't recall specifically.
23    Q.    Would it be fair to say that it's in the District of
24    Maryland?
25    A.    Yes.
```

1    Q.    Why did you respond to that scene?

2    A.    I was notified that they had a search warrant for the

3    location.

4    Q.    What type of scene was that?

5    A.    It was a single bedroom apartment.

6    Q.    Was it in a neighborhood?  Was it an apartment complex?

7    What was it?

8    A.    Yeah.  It was an apartment complex, townhome type.

9    Q.    When you arrived on scene -- when you arrived, were there

10   any officers on scene?

11   A.    There were.

12   Q.    Who were they, if you recall?

13   A.    One of the ones that I recall was Detective Cruz.

14   Q.    What was your purpose at that apartment?

15   A.    I was to photograph the scene, document it, and recover

16   any items of evidence that we located.

17   Q.    Walk us through what happened when you arrived at

18   Apartment 325.

19   A.    Yes.  So once I arrived, a lot of times I will ask any

20   detectives or any people inside the apartment to leave.  That's

21   when I take my overall photographs.  Basically, I document the

22   scene as I find it before anyone searches or touches anything

23   in the apartment.  Once I have taken my overall photographs,

24   detectives and myself will begin to search the apartment.  And

25   then once we locate items of evidence, I will then photograph

Forest - Direct

1   them, I will recover them, and I will bring them back to our

2   office where I will then submit them into evidence.

3   Q.    And is that what you did on October the 21st?

4   A.    It is.

5   Q.    What kind of apartment is Apartment 325?

6   A.    It's a one-bedroom apartment.

7   Q.    What were your observations of this one-bedroom apartment

8   when you walked in?

9   A.    It was -- I mean, there wasn't too much to it.  I mean,

10  it was a normal apartment to me.

11  Q.    Did there come a time when you photographed the scene?

12  A.    There was.

13  Q.    And that includes any evidence that was recovered?

14  A.    Yes.

15  Q.    Now, you told us earlier that you photographed the scene

16  before any of the -- anybody does any sort of searching.  Is

17  that correct?

18  A.    Correct.

19  Q.    And why is that important?

20  A.    Again, it just shows the apartment in the state that it

21  was initially found in.  Again, it just -- it also protects us

22  as far as any previous damage that was done before our arrival.

23  It's just to document anything that basically -- any damages to

24  say we didn't cause it.  Again, it's just more of a safety

25  precaution.

Forest - Direct

1   Q.   Showing you Government's Exhibit 180.

2        CSI Forest, what are we looking at at 180?

3   A.   This is the entryway into the apartment.

4   Q.   And I know prior to today's hearing -- hearing, you have

5   reviewed these photographs.  Correct?

6   A.   I did.

7   Q.   And are they -- do they accurately represent the scene as

8   you remember it that day?

9   A.   Yes.

10  Q.   Showing you what's been marked as and admitted as 181.

11       What is 181?

12  A.   This is a photograph of, again, of the entryway into the

13  apartment and the lettering of the building.

14  Q.   This is before you entered the apartment?

15  A.   Yes.

16  Q.   Exhibit No. 182.

17       Where is this photograph taken from?

18  A.   This is the front door of the apartment.

19  Q.   So this is before you walk into the apartment?

20  A.   Yes.

21  Q.   183.

22       What is in 183?

23  A.   This is the living room area for the apartment.

24  Q.   And where is the door that we just saw in 182?

25  A.   Directly behind me.

1  Q.     184.

2         What is 184?

3  A.     This is another photograph of the apartment living room

4  area.

5  Q.     Now, the red couches we see on the left-hand screen of

6  184, those are the same couches we saw in the prior photo, 183.

7  Correct?

8  A.     Yes.

9  Q.     185.

10        What is in 185?

11 A.     This is a picture of a door to a walk-in closet that's

12 just off of the living room area.

13 Q.     Now, is that walk-in closet -- where is that walk-in

14 closet in relation to the television?

15 A.     To the left.

16 Q.     Is there a bedroom in this photograph?

17 A.     In this photograph, no.

18 Q.     186.

19        What are we looking at in 186?

20 A.     Again, this is a photograph of the living room area.

21 Q.     Do we see the bedroom now?

22 A.     Yeah.  The bedroom is on the left-hand side.

23 Q.     Is that the door next to the green painting?

24 A.     Yes.  To the right of it, yes.

25 Q.     187.

Forest - Direct

```
 1          What is 187?
 2   A.     A photograph of the living room area.
 3   Q.     How about 188?
 4   A.     This is a photograph of that walk-in closet previously
 5   shown.
 6   Q.     So the television that we saw earlier, where is that in
 7   relation to this?
 8   A.     It would be just to the right-hand side of this door.
 9   Q.     189.
10          What is 189?
11   A.     It's another photograph of that walk-in closet.
12   Q.     How about 190?
13   A.     And this is a photograph of that walk-in closet.
14   Q.     Closer view?
15   A.     Mm-hmm.  Yes.
16   Q.     191?
17   A.     And this is a photograph of the kitchen.
18   Q.     And that bedroom we spoke about is where?
19   A.     It's right behind that body-shaped lamp.
20   Q.     192?
21   A.     And then this is a photograph of the doorway looking into
22   that bedroom.
23   Q.     Did there come a time when you photographed the bedroom?
24   A.     There was.
25   Q.     193.
```

1        What is this?

2   A.   This is a photograph of the bedroom.

3   Q.   What about 194?

4   A.   A photograph of the bedroom.

5   Q.   195?

6   A.   A photograph of the bedroom.

7   Q.   And 196?

8   A.   A photograph of the bedroom.

9   Q.   Is there anything in 196 that was of significant interest

10  to the investigators?

11  A.   There was.

12  Q.   What was that?

13  A.   There is, like, a green fanny pack that's hanging on the

14  doorknob on the back side of the door.

15  Q.   And can you circle on the screen where that is?

16  A.   Yeah.  Right there (indicating).

17  Q.   And 197.  That's not what I wanted next.

18       Let's look at 198.  Nope.

19       Okay.  Let's go back to 197.  I'm sorry.  We will come

20  back to that in a second, folks.

21       What's in 197?

22  A.   It's a photograph of a wallet.

23  Q.   And was this of significance to the investigators?

24  A.   It was.

25  Q.   I am showing you what's been marked as 198.

1         What is 198?

2    A.    198 is that same wallet.

3    Q.    Did there come a time when you collected this item of

4    evidence?

5    A.    There was.

6    Q.    How did you collect this item of evidence?

7    A.    I used a pair of clean gloves and I placed it into a

8    brown paper bag where I then sealed it with evidence tape,

9    initialled it with my I.D. and initials.

10   Q.    Do you remember what you labelled it?

11   A.    I do not.

12   Q.    I am going to show you -- would something refresh your

13   recollection?

14   A.    Yes.

15   Q.    I am showing you for your purposes only on your screen,

16   Madam Deputy only, please, Exhibit 370.  Take a look at that

17   and read it quietly to yourself.

18   A.    (Witness complies.)

19   Q.    Do you remember what you labelled --

20         THE COURT:  There is nothing up yet.  Were you still

21   going to show him 370?

22         MS. MAN:  We are working on it.

23         THE COURT:  Oh, okay.

24   BY MS. MAN:

25   Q.    This is Exhibit 370.

1    A.    Okay.

2    Q.    After looking at Government's Exhibit 370, do you now

3    recall what you labelled that wallet that you found on scene?

4    A.    I do.

5    Q.    What was it?

6    A.    It was item evidence 1.

7    Q.    What does the MF stand for?

8    A.    We designate all items of evidence that are recovered

9    with the person's initials.  My name is Matthew Forest, so I

10   used the initials MF before the item number to say that I had

11   collected the item.

12   Q.    I put up there on the stand in front of you an item

13   that's marked Government's Exhibit 456.

14         Do you see that?

15   A.    I do.

16   Q.    What is that?

17   A.    This is the brown paper bag where I sealed the wallet

18   inside.

19   Q.    And how do we know that what's in Government's Exhibit

20   456 is the same as that photograph that we saw of the same

21   wallet?

22   A.    Yeah.  So it has my seal of evidence which also has my

23   initials and my I.D. on it.

24   Q.    Does it also -- what identification that you just told us

25   about is also on the packaging for 456?

1  A.    So it also has the item number MF1 as well as the case

2  number written on it.

3  Q.    If you wouldn't mind, CSI Forest, putting on the gloves

4  and opening up evidence item 456 for us.

5  A.    Yeah.

6  Q.    What's inside?

7  A.    It is the wallet that I photographed that night on scene.

8  Q.    And is it in the same condition as it was when you

9  recovered it that day?

10 A.    Yes.

11 Q.    If you wouldn't mind just putting it on top of that bag

12 and I will grab it from you.

13 A.    (Witness complies.)

14 Q.    I'd like to draw your attention to Government's Exhibit

15 198.

16       CSI Forest, do you remember why this wallet was important

17 to the investigators?

18 A.    No, I do not.

19 Q.    I'd like to show you Government's Exhibit 198.  I have to

20 switch it over.  I'm sorry.

21       So that's the same wallet that's in 198, the one that's

22 on the document camera?

23 A.    Yes.

24 Q.    What about 199?

25 A.    That's the same wallet.

1    Q.    Can you see who the maker of the wallet is?

2    A.    Aldo.

3    Q.    Were there any items in that wallet?

4    A.    No.

5    Q.    Government's Exhibit 200.

6          What are we looking at here?

7    A.    This is a photograph of the kitchen counter where there

8    is a bag of suspected marijuana.

9    Q.    What, if anything, did do you with the bag of suspected

10   marijuana in --

11   A.    Yeah.  I recovered the -- the items.  When I brought it

12   back to our office, I weighed it, and then I then placed it in

13   a drug bag and heat sealed it and sent it off to our drug lab

14   for analysis.

15   Q.    I will show you what's been marked as 457.

16         Do you recognize that, sir?

17   A.    Yes.

18   Q.    What is that?

19   A.    It's the -- part of the heat sealed bags that I submitted

20   that night from -- from the scene.

21   Q.    And is that the same item of evidence that you recovered

22   in photograph 200?

23   A.    Can you repeat that question?

24   Q.    Is the item that you have in your hand right now,

25   Government's Exhibit 457, the same suspected -- the same

Forest - Direct

1   marijuana that you recovered from that evening at that

2   apartment that's depicted in Government's Exhibit 200?

3   A.    Yes.

4   Q.    How do you know?

5   A.    Part of the -- I have the submitting form here that has

6   my initials, as well as the packaging inside, although I can't

7   quite see my signature on it.

8   Q.    But it's there?

9   A.    It is the same, yes.

10  Q.    Government's Exhibit 201.

11        What's 201?

12  A.    It's a closer-up photo of the two bags of suspected

13  marijuana.

14  Q.    What about 203 -- 202?  Excuse me.  I'm sorry.

15  A.    This is a close-up photograph of that green fanny pack

16  that I circled earlier.

17  Q.    And I am actually going to go back to that picture.  Can

18  you go back to 196, please?  I'm sorry for jumping around.

19        Okay.  196.  Can you circle that one more time?

20  A.    Yeah.  Yeah.  (Indicating.)

21  Q.    Did there come a time when you photographed what's

22  circled in Government's 196?

23  A.    There was.

24  Q.    Let's look at 202.

25        What is 202?

Forest - Direct

 1   A.   It's a close-up photograph of that green fanny pack.

 2   Q.   Was that green fanny pack searched?

 3   A.   It was.

 4   Q.   What, if anything, was found inside that green fanny

 5   pack?

 6   A.   There was a Cricket cell phone that was recovered.

 7   Q.   Did you get a chance to look at that Cricket cell phone?

 8   A.   I did.

 9   Q.   Let's look at 203.

10        What's 203?

11   A.   This is that Cricket cell phone that was located inside

12   that green fanny pack.

13   Q.   And was this phone recovered?

14   A.   It was.

15   Q.   Who recovered it?

16   A.   Detective Cruz.

17   Q.   Did he recover it in your presence?

18   A.   Yes.

19   Q.   Why did Detective Cruz recover this phone when you

20   recovered everything else?

21   A.   So, a lot of times, it seems like this.  When we find

22   cell phones, I will release the items of evidence to the

23   detective.  A lot of times, they want to get the phone analyzed

24   quickly, get the information off the phone, so by releasing it

25   to the detectives, they are able to start that process a lot

Forest - Cross

1  quicker to aid in their investigation.

2  Q.    I am going to put up on the document camera Exhibit 461.

3  I am going to focus.

4        Do you see what's on the document camera as 461?

5  A.    I do.

6  Q.    Does that look like the same Cricket phone that Detective

7  Cruz recovered that night?

8  A.    It does.

9        MS. MAN:  Your Honor, I have no further questions for

10 CSI Forest.

11       THE COURT:  Cross.

12       MR. DAVIS:  Thank you, Your Honor.

13                   CROSS-EXAMINATION

14 BY MR. DAVIS:

15 Q.    So, good afternoon.

16 A.    Good afternoon.

17 Q.    It would be fair to say no guns were recovered from

18 Lottsford Road.  Correct?

19 A.    Correct.

20 Q.    It would be fair to say that no ammunition was recovered

21 from Lottsford.  Correct?

22 A.    Correct.

23 Q.    It's fair to say that no scales were recovered from

24 Lottsford?

25 A.    What type of scales?

Forest - Cross

1   Q.    Weighing scales.

2   A.    Correct.

3   Q.    No money -- large amounts of money were recovered from

4   Lottsford?

5   A.    Correct.

6   Q.    And no drug ledgers that you observed were recovered from

7   Lottsford.  Correct?

8   A.    Correct.

9   Q.    And you have testified that the wallet that was recovered

10  had no information in it.  Correct?

11  A.    Correct.

12  Q.    It was completely empty?

13  A.    Correct.

14  Q.    Was it new?  Do you even recall -- that's not really a

15  fair question.  This was some years ago.

16  A.    I wouldn't say it was a worn out wallet.

17  Q.    Did you -- you indicated you picked it up with some type

18  of device?

19  A.    The wallet?  With gloves.

20  Q.    With gloves.

21        Is that so that if you wanted to process it later on, it

22  could be processed?

23  A.    Yes.

24  Q.    Do you know if it was processed?

25  A.    I do not.

1  Q.    And the marijuana that was recovered, that was the extent

2  of the narcotics that were recovered.  Correct?

3  A.    Correct.

4  Q.    And that was the bag of marijuana.  Correct?

5  A.    Correct.

6  Q.    Bear with me one second.

7        Now, you have in front of you your report that you did in

8  reference to the -- this collection of evidence.  Correct?

9  A.    Correct.

10 Q.    I am trying to get this plugged in here.

11       I am going to show you what's been marked as -- well,

12 maybe I am not showing you what's been marked.  There we go.

13       I show you what's been marked as Government's Exhibit No.

14 202.

15       That is the fanny pack you referenced.  Correct?

16 A.    Correct.

17 Q.    And directing your attention to the report that you

18 generated, did you indicate that a fanny pack was recovered in

19 that report?

20 A.    In the report, I did not recover the fanny pack.

21 Q.    So it was not --

22 A.    I did not recover it, no.

23 Q.    Anything you recovered would be -- would have MF next to

24 it.  Correct?

25 A.    Correct.

Forest Cross

1  Q.    Directing your attention to the second page of the

2  report, the handwritten notes you wrote if you need to refer to

3  that to refresh your recollection.

4        Does that -- does that indicate that the fanny pack was

5  recovered?

6  A.    It does not.

7  Q.    It does not?

8  A.    It was -- yeah.  I did not recover the fanny pack.

9  Q.    So on the second page of the rough notes, it doesn't

10  indicate that?

11  A.    Correct.

12        MR. DAVIS:  Your Honor, could we -- Madam Clerk,

13  could we just have this for the witness?

14        THE DEPUTY CLERK:  Mr. Davis, just for the record,

15  that last exhibit regarding the notes was Government Exhibit

16  370 for I.D. only?

17        MR. DAVIS:  That is correct.

18  BY MR. DAVIS:

19  Q.    Now, looking at your rough notes, does that refresh your

20  recollection as to whether or not you recorded the fanny pack

21  being recovered?

22  A.    Yeah.  So I did write down that it was not recovered.

23  Q.    And that indicates -- what are the initials next to the

24  fanny pack notation?

25  A.    MF3.

1   Q.    And directing your attention back to your report that you

2   typed up, is there an item labelled MF3?

3   A.    Yes.

4   Q.    And that item reflects a GoPro camera recovered from a

5   white couch in the living room.  Correct?

6   A.    Yes.

7   Q.    However, the fanny pack has the same number, MF3, and

8   that indicates a fanny pack containing a phone?

9   A.    Mm-hmm.  So when I took the notes, this was the night of

10  the search warrant, so as I am collecting items, I am writing

11  them down and where I recovered them.  So when I located the

12  item, I wrote down that it -- on the notes that it was going to

13  be MF3, but subsequently when I then released the item to

14  Detective Cruz, it was no longer an item of evidence from my

15  report, so that's why things were renumbered subsequently in my

16  final report.

17  Q.    And you kept the evidence report.  You were the seizing

18  officer.  Correct?

19  A.    Yes.

20  Q.    And you would turn the evidence in to the evidence

21  storage facility.  Correct?

22  A.    The ones on my report, yes.

23  Q.    What happened to the -- to the fanny pack?

24  A.    It was left on scene.

25  Q.    So it was never recovered at all?

Forest - Cross

```
1    A.    Correct.
2    Q.    And then there was a phone that was recovered.  If we
3    could bring this next one up for -- for the jury's
4    consideration.  Let me find the exhibit.
5         This phone that was recovered, that is the phone you
6    testified was recovered in the fanny pack.  Correct?
7    A.    Correct.
8    Q.    And looking at your rough notes, you also indicated --
9    you gave this phone a number, too.  Correct?
10   A.    No, I did not.
11   Q.    If you could -- would anything refresh your recollection?
12   Perhaps the rough notes you took?
13   A.    Are you referring to item MF5?
14   Q.    Yes.
15   A.    Item MF5 was a combination of six different cell phones
16   that were recovered from a kitchen drawer from a separate
17   location.
18   Q.    So there is no indication that this phone was recovered
19   in your report.  Correct?
20   A.    Correct.
21   Q.    And you gave it to Detective Cruz.  Correct?
22   A.    Correct.
23   Q.    And what happened with it after that?
24   A.    That would be under whatever -- whatever Detective Cruz
25   did.
```

1  Q.    So you have no idea what happened with it?

2  A.    I do not.

3  Q.    I will show you Exhibit 461.  This is the Cricket cell

4  phone that was recovered when you collected the evidence at

5  Lottsford.

6        Is there any indication on who took possession of that

7  cell phone and the date they took possession of it or where it

8  was stored?

9  A.    No.  I see the case number.

10 Q.    Well, isn't the idea behind documenting these things so

11 that the integrity of the evidence is preserved so that there

12 is what we call a chain of custody so that you know where

13 things came from and who had them at what time and where they

14 move throughout the system?

15 A.    Yes.

16 Q.    And that is not recorded, is it?

17 A.    I do not see it, no.

18 Q.    And, again, you testified it's not in the evidence report

19 that you generated from the evidence you collected from

20 Lottsford because you indicated that you did not keep it; you

21 gave that to Detective Cruz.  Correct?

22 A.    Correct.

23        MR. DAVIS:  The Court's indulgence.

24        THE COURT:  Sure.

25        MR. DAVIS:  Thank you.

Forest - Redirect

```
1            THE COURT:  Redirect examination.

2            MS. MAN:  Briefly, please.

3                     REDIRECT EXAMINATION

4    BY MS. MAN:

5    Q.    CSI Forest, Mr. Davis asked you multiple questions about

6    your report and your rough notes.  Correct?

7    A.    Correct.

8    Q.    And in your evidence report, do you document items of

9    evidence that somebody else recovers?

10   A.    In my notes, yes.

11   Q.    But in your final written report?

12   A.    I do not dictate that, no.

13   Q.    And why not?

14   A.    Again, it's not the evidence that I recovered, so,

15   therefore, I can't put -- list it in my report that I recovered

16   the item of evidence.

17   Q.    And so initially, the fanny pack was written that -- it

18   was initially given a number, MF3.  Correct?

19   A.    Correct.  And after discussion with the detectives, the

20   fanny pack itself did not have any importance to their case, so

21   it was a judgment call on not collecting it.

22   Q.    And when the fanny pack was not collected, you wrote that

23   in your notes to reflect that?

24   A.    Yes.

25   Q.    And now since the fanny pack wasn't being recovered, this
```

1   was an item that no longer needed one of your numbers?

2   A.    Correct.

3   Q.    So everything else moved up?

4   A.    Yes.

5   Q.    And a detective knows the case presumably better than you

6   do; would that be fair to say?

7   A.    Yes.

8   Q.    And so when a detective tells you that an item of

9   evidence has no evidentiary value, do you listen to that

10  detective?

11  A.    I do.

12  Q.    So when Detective Cruz told you that the fanny pack was

13  no longer something that they wanted to take, you left it for

14  its owner?

15  A.    Yes.

16  Q.    Mr. Davis also asked you about the Cricket phone that was

17  found in that fanny pack.

18  A.    Yes.

19  Q.    To the best of your knowledge, when you executed that

20  search warrant, the crime you were investigating had not been

21  solved.  Correct?

22  A.    Correct.

23  Q.    And it was your understanding that any item of evidence

24  you collected would go back to the evidence room?

25  A.    Correct.

1  Q.    And Detective Cruz wanted the contents of that phone

2  analyzed?

3  A.    Yes.

4  Q.    And one of the ways to do that quickly is for him to take

5  it himself?

6  A.    Correct.

7  Q.    Rather than have you package it and then you put it in

8  evidence, take it out of evidence, and then go to the phone

9  unit?

10 A.    Correct.

11 Q.    So by taking the phone directly from the search warrant

12 to the phone unit, Detective Cruz was able to get that process

13 started sooner than if you had taken that phone?

14 A.    Correct.

15       MS. MAN:  No further questions.

16       THE COURT:  Sir, thank you so much for your

17 testimony.  Please don't discuss your testimony with anyone

18 until the trial has been concluded.  Enjoy the rest of your

19 day.  You are excused.

20       Next -- okay.  Looks like counsel wants a sidebar.

21 Sidebar.

22       (The following took place at sidebar outside the presence

23 of the jury; all counsel present.)

24       MS. COTTINGHAM:  Yes.  Just briefly, Your Honor.

25 Mr. Hall is on his way.  He will be here in about ten or 15

```
 1   minutes, so we should be able to move forward with that once he
 2   gets here.
 3            THE COURT:  Do we have another witness in the
 4   meantime?
 5            MR. COLLINS:  Yes, we do.
 6            MS. COTTINGHAM:  I just wanted to give you that
 7   update.
 8            THE COURT:  Sure.
 9            MR. COLLINS:  Yes, we do, Your Honor.  We have
10   another witness.
11       (End of sidebar discussion.)
12            THE COURT:  Government's next witness.
13            MR. COLLINS:  Your Honor, the government -- the
14   government will call Crime Scene Tech Yuan.  And I'm sorry,
15   it's Vincent Yuan, Y-U-A-N.
16            THE COURT:  I was going to ask if that was a first or
17   a last name.
18            MR. COLLINS:  I apologize.
19            THE COURT:  That's okay.
20            MR. COLLINS:  May I approach the exhibit binders?
21   Thank you.
22            THE COURT:  You can come forward, sir.
23            THE DEPUTY CLERK:  Mr. Yuan, please walk towards me.
24   Try and make your way through that narrow opening.  Stand right
25   here to be sworn.
```

Yuan - Direct

1          VINCENT YUAN, GOVERNMENT'S WITNESS, SWORN

2          THE DEPUTY CLERK:  Please have a seat in the jury

3   [sic] box.  Watch your step as you enter.

4          And if you would please speak loudly and clearly into the

5   microphone, state your name for the record, and spell each

6   name.

7          THE WITNESS:  First name Vincent, V-I-N-C-E-N-T; last

8   name Yuan, spelled Y-U-A-N.

9          THE DEPUTY CLERK:  Thank you.

10                   DIRECT EXAMINATION

11  BY MR. COLLINS:

12  Q.    Sir, where are you currently employed?

13  A.    Prince George's County Police Department.

14  Q.    And what is your role with the Prince George's County

15  Police Department?

16  A.    I am a crime scene investigator.

17  Q.    And how long have you been with that agency?

18  A.    Four and a half years.

19  Q.    Could you explain to the ladies and gentlemen of the jury

20  what a crime scene investigator does?

21  A.    We attend scenes, and we assess, observe, process,

22  photograph, document the crime scene and items of evidence.

23  Q.    I want to draw your attention to the date of October 3rd,

24  2018.

25          Were you requested to assist with the processing of a

1    scene on that evening?

2    A.    Yes.

3    Q.    And do you recall -- did you specifically respond to a

4    street called Manton Way?

5    A.    I did.

6    Q.    Is that in Prince George's County, Maryland?

7    A.    Yes.

8    Q.    And how were you contacted to assist with this

9    investigation?

10   A.    I was the primary crime scene investigator where I

11   photographed and collected all the items of evidence.

12   Q.    Was there a specific law enforcement officer who

13   contacted you to assist with this scene?

14   A.    Detective Hamlin.

15   Q.    And do you recall around what time you responded to that

16   location?

17   A.    Around 10:39 p.m.

18   Q.    And once you got to that location -- well, first of all,

19   how would you describe that location?  Is it a business?

20   Residential area?  How would you describe it?

21   A.    Residential.

22   Q.    And when you got there, did anyone come with you to

23   assist?

24   A.    Yes.

25   Q.    And who was that?

```
 1   A.    Other crime scene investigators who responded with me.
 2   Q.    And approximately do you recall how many other crime
 3   scene investigators responded to that particular location on
 4   Manton Way?
 5   A.    About five.
 6   Q.    Now, once you all arrived on scene, was there a specific
 7   point of contact on scene?
 8   A.    Detective Hamlin.
 9   Q.    Now, were you briefed about -- were you briefed about the
10   situation?
11   A.    It was an initial briefing.
12   Q.    And what was your role once you responded to the scene?
13   It sounds like there were five of you.  What was your specific
14   role?
15   A.    To photograph the scene.
16   Q.    Now, had you received training in how to handle a crime
17   scene or how to process a crime scene?
18   A.    At the time, I was under the FTO training or the field
19   training officer.
20   Q.    And what does that consist of?  What does that field
21   training officer training consist of?
22   A.    I am with a field training officer for six months, and
23   then I am -- I am by myself for about six months, which is the
24   probationary period before I respond to crime scenes solely by
25   myself.
```

1  Q.    And, you know, in having this role as a crime scene

2  investigator, is your education taken into any consideration as

3  well?

4  A.    Yes.

5  Q.    And what was your educational background at the time that

6  you took on this job as a crime scene investigator?

7  A.    I got my Bachelor of Arts from Syracuse University in

8  forensic science and anthropology, and I got my Master's of

9  Science from George Washington University in crime scene

10  investigation.

11  Q.    Now -- now, once you met with Detective Hamlin, you said

12  you were briefed on -- on the situation.  Is that correct?

13  A.    Yes.

14  Q.    And did you have an opportunity to then check the crime

15  scene?

16  A.    Yes.

17  Q.    And if you could explain to the ladies and gentlemen of

18  the jury what the normal process is when you come to a crime

19  scene, like, what are you expected to do?

20  A.    To observe the crime scene, see what the situation is,

21  whether the crime scene needs to be expanded or if -- and

22  usually patrol officers like to put down what they believe to

23  be items of evidence, and from my determination, I will choose

24  whether or not it's relevant to the case or not.

25  Q.    Now, just for clarification, you said that patrol

Yuan - Direct

1  officers will put down what they believe to be items of

2  evidence.

3          You mean they would put down markers next to items of

4  evidence.  Is that correct?

5  A.      Correct.

6  Q.      And when you got on this scene, had the scene been

7  secured?

8  A.      Yes.

9  Q.      And when we use the term "secured," what does that mean?

10 A.      Crime scene tape has been put.  There is a -- a border

11 and officers are on both sides making sure that nobody enters

12 -- enters the scene that's not supposed to be there.

13 Q.      And had that been done on this scene when you arrived?

14 A.      Yes.

15 Q.      And did you have -- if you could just give a description

16 to the ladies and gentlemen of the actual -- what consisted of

17 the crime -- I'm sorry, of the crime scene?  What was that

18 area?

19 A.      It was a residential area, about three to four houses,

20 and it consisted of the street and the sidewalk.

21 Q.      And when you started to do your investigation, did you

22 start at one end of the crime scene and walk all the way

23 through?

24 A.      Yes.

25 Q.      And -- and once you did that, did there come a point in

1    time when you actually photographed the crime scene as it was?

2    A.    Yes.

3    Q.    Could you explain to the ladies and gentlemen of the jury

4    what the process is for photographing a crime scene?

5    A.    When -- when I arrive to a crime scene, I photograph the

6    scene the way I see it when I arrive.  And then I put down

7    what's called placards with numbers of them showing the item of

8    evidence, and I photograph them after it's been placed down.

9         And I have -- as a crime scene investigator, we have

10   three different types of photographs we have to take.  The

11   first one is the overall showing where everything is in the

12   crime scene; then we have the -- the mid-range showing where

13   the item of evidence is within the crime scene; and then we

14   have a close-up photograph showing the item of evidence with

15   the placard.

16   Q.    And is that the process that you -- you took -- or that

17   you did on this scene?

18   A.    Yes.

19   Q.    What I'd like to do is I'd like to direct your attention

20   -- right behind you is a binder.  On that exhibit tab, it

21   should be No. 1 through I believe it's in the hundreds.  Do you

22   see that?  What I'd like to do is direct your attention to the

23   tab that starts at No. 13.  And let me know when you get to 13,

24   please.

25   A.    Okay.

1    Q.    And looking at tab items 13 -- what I'd like to do is

2    show you what's been marked and previously entered as

3    Government's Exhibit 13 through 55.

4          Can you look at those photographs for me?

5    A.    Yes.

6    Q.    And once you are done, let me know when you are done

7    looking at them.

8          MR. COLLINS:  The Court's brief indulgence, Your

9    Honor.

10   BY MR. COLLINS:

11   Q.    And are those pictures -- are those all pictures that you

12   took that evening?

13   A.    Yes.

14   Q.    And are they an accurate depiction of the crime scene as

15   you saw it that evening?

16   A.    Yes.

17         MR. COLLINS:  So, Your Honor, at this time, the

18   government would move to admit the remaining photographs that

19   have not been admitted, which would be 28 and 29 and 32.

20         THE COURT:  They are admitted.

21         MR. COLLINS:  Thank you.

22   BY MR. COLLINS:

23   Q.    And, sir, once you photographed the scene, what was the

24   next part of your investigation?

25   A.    I placed placards down on items of evidence to collect.

1   Q.    And when you say you "placed placards down," could you

2   describe the placards that you actually put at the location?

3   A.    It's a yellow kind of like a triangle type of object with

4   numbers on them.

5   Q.    And you have already described this, you said that when

6   you get on scene, patrol sometimes also puts markers down.  Is

7   that correct?

8   A.    Correct.

9   Q.    And were there any markers that had been placed on the

10  scene when you first got there?

11  A.    Yes.

12  Q.    And, ultimately, did your placards replace those placards

13  that were put down?

14  A.    Yes.

15  Q.    Now, once you placed the placards down, what was the next

16  step in your process?

17  A.    It was to rephotograph the scene with the placards that I

18  put down.

19  Q.    And then once you placed -- I'm sorry.  Once you took

20  those photographs, what did you do next?

21  A.    I photographed the items of evidence using the mid-range

22  and close-up photographs.

23  Q.    Now, during the course of your observations, did you

24  notice anything that you believed may be relevant to the

25  investigation?

1  A.    Yes.

2  Q.    And approximately how many placards did you put down to

3  identify these pieces of evidence?

4  A.    Approximately six.

5  Q.    What I want to do is I want to direct your attention to

6  what's been previously marked and entered as Government's

7  Exhibit No. 40.

8        Do you recognize what's depicted in this item?

9  A.    Yes.

10 Q.    And what is that?

11 A.    This is the close-up photograph of the first item of

12 evidence with the placard 1.

13 Q.    And how did you identify this piece of evidence besides

14 using placard No. 1?

15 A.    You mean like after, like when I -- when I collected the

16 item?

17 Q.    That's correct.  Yes.

18 A.    I put the case number and the item number on the bag

19 itself before I put the item of evidence into the bag.

20 Q.    And then is there an internal process by which all crime

21 scene techs. identify an individual piece of item -- item of

22 evidence?

23 A.    Yes.

24 Q.    And how is that?

25 A.    We use our initials.

1    Q.    And, so, as part of your collection, this item was

2    identified as what on your report?

3    A.    VY1.

4    Q.    I am going to show you what's been marked as Government's

5    Exhibit 458.

6          Do you recognize that item?

7    A.    Yes.

8    Q.    And what is that item?

9    A.    This is VY1 from the photograph.

10   Q.    And once you recovered this item, could you explain what

11   you did with that items -- with that item?

12   A.    I packaged it up and submitted it to the firearms

13   examination unit.

14   Q.    As you look at that item 458 right there today, is it in

15   substantially the same condition as when you collected it?

16   A.    Yes.

17         MR. COLLINS:  Your Honor, the government would move

18   458 into evidence.

19         THE COURT:  It's admitted.

20   BY MR. COLLINS:

21   Q.    Now what I'd like to do is show you Government's Exhibit

22   No. 41.

23         Do you recognize what's depicted in this item?

24   A.    Yes.

25   Q.    And what is that?

1  A.    This is the mid-range shot showing the second item of

2  evidence.

3  Q.    And did you collect this item of evidence as well?

4  A.    I did.

5  Q.    And I would like to show you what's been marked and

6  entered as Government's Exhibit No. 42.

7        And what's depicted in this photograph?

8  A.    This is a close-up of VY2 with the placard 2 on it.

9  Q.    And once you collected -- did you collect this item as

10  well?

11  A.    I did.

12  Q.    And once you collected this item, what did you do with

13  it?

14  A.    I packaged it up and sent it to the property warehouse.

15  Q.    And just so it's clear, when you say you "packaged it

16  up," what does that process entail?

17  A.    Closing up the bag, sealing it with evidence tape, and

18  writing my initials and my I.D. number across the tape.

19  Q.    And is that the same process that you did -- did you do

20  that same process with the prior item, with 458?

21  A.    Yes.

22  Q.    I am going to now approach and show you what's been

23  marked as Government's Exhibit 459.

24        Do you recognize that item?

25  A.    Yes.

Yuan - Direct

1   Q.    And how do you recognize it?

2   A.    It has the case number, the item number, it has the --

3   the evidence sticker on it, and it has my initials across the

4   --

5   Q.    And when you say "case number," what exactly do you mean

6   when you say "case number"?

7   A.    Do you want me to tell you the case number?

8   Q.    Well, let me rephrase that question.

9         Is each investigation -- does it have its own independent

10  identification number?

11  A.    Yes.

12  Q.    And was there an identification number given for this

13  investigation?

14  A.    Yes.

15  Q.    And is that -- is that an identification number that --

16  that is consistent throughout the case?

17  A.    Yes.

18  Q.    And does it apply to pieces of evidence as it goes

19  through different laboratories to be tested and examined?

20  A.    Yes.

21  Q.    And is that case number also consistent through the

22  various reports that are generated by other officers and other

23  detectives?

24  A.    Yes.

25  Q.    And what was the case number assigned to this

```
 1   investigation?
 2   A.    18-0059927.
 3   Q.    And that's indicated on that item.  Is that correct?
 4   A.    Correct.
 5   Q.    Could you open Government's Exhibit 459?
 6   A.    (Witness complies.)
 7   Q.    Is that the same item that's depicted in Government's
 8   Exhibit 42?
 9   A.    Yes.
10   Q.    Substantially in the same condition as when you collected
11   it on October 3rd, 2018?
12   A.    Yes.
13         MR. COLLINS:  Your Honor, the government would move
14   459 in evidence.
15         THE COURT:  It's admitted.
16   BY MR. COLLINS:
17   Q.    I'd like to direct your attention to what's been marked
18   and entered as Government's Exhibit 44.
19         Do you recognize what's depicted in this photograph?
20   A.    Yes.
21   Q.    And what's depicted in this photograph?
22   A.    It's the third item that I collected with the placard 3.
23   Q.    And do you recall what that item was?
24   A.    It's the lens.
25   Q.    And --
```

Yuan - Direct

1   A.    Or piece of lens.

2   Q.    If you could circle where that item is in this image?

3   A.    (Witness complies.)

4   Q.    And did you seize that item as well?

5   A.    Yes.

6   Q.    And did you package it in the same manner that you have

7   described already for the first two items?

8   A.    Yes.

9   Q.    I am going to approach with what's been marked as

10  Government's Exhibit 460.

11        Do you recognize that item?

12  A.    Yes.

13  Q.    And what is that item?

14  A.    It's item VY3.

15  Q.    And how do you recognize that you seized that item?

16  A.    It has the evidence label on it with all the information.

17  Q.    Can you open that item for me, please?

18  A.    Do you mind if I get gloves?

19  Q.    Sure.   Sorry.

20  A.    Thank you.

21  Q.    Do you recognize that item?

22  A.    Yes.

23  Q.    Same item as in Government's Exhibit 44?

24  A.    Yes.

25  Q.    Substantially in the same condition as when you collected

1  it on October 3rd, 2018?

2  A.    Yes.

3        MR. COLLINS:  Your Honor, government would move 460

4  in evidence.

5        THE COURT:  It's admitted.

6  BY MR. COLLINS:

7  Q.    Now I want to draw your attention to what's been marked

8  and entered as Government's Exhibit 46.

9        Do you recognize that item?

10  A.    Yes.

11  Q.    I'm sorry.  Do you recognize what's depicted in this

12  image?

13  A.    Yes.

14  Q.    And what is that?

15  A.    It's a $100 bill with a placard 4.

16  Q.    I want to show you what's been marked and previously

17  entered as Government's Exhibit No. 48.  I'm sorry.  48.

18        Do you recognize what's depicted in this image?

19  A.    Yes.

20  Q.    And what is that?

21  A.    It's a $100 bill with the placard 5.

22  Q.    Was this item that you have identified as 5 collected?

23  A.    Yes.

24  Q.    And how about No. 4, was that collected as well?

25  A.    Yes.

1  Q.    I am going to approach with what's been marked as

2  Government's Exhibit 474A and 474B.

3        Starting with 474A, do you recognize what's -- what's --

4  do you recognize that item?

5  A.    Yes.

6  Q.    And what is that?

7  A.    It's item 4, VY4, $100 bill.

8  Q.    And how do you know that's the item that you seized?

9  A.    It has the evidence label on it.

10 Q.    Substantially in the same condition as when you collected

11 it on that evening?

12 A.    Yes.

13 Q.    And looking at 474B, do you recognize that item?

14 A.    Yes.

15 Q.    And what is that?

16 A.    It's item VY5, $100 bill.

17 Q.    And how do you know that you seized that item?

18 A.    It has the case number, the item number, the evidence

19 label on it, and my -- my initials and my I.D. across the tape.

20 Q.    Substantially in the same condition as when you recovered

21 it that evening?

22 A.    Yes.

23        MR. COLLINS:  Your Honor, the government would move

24 474A and B into evidence.

25        THE COURT:  It's admitted.

1   BY MR. COLLINS:

2   Q.    Now I'd like to show you what's been marked and entered

3   as Government's Exhibit No. 49.

4         Do you recognize that item?

5   A.    Yes.

6   Q.    And what is that?

7   A.    It's a cell phone with the placard 6.

8   Q.    And what I'd like to do is show you what's been marked

9   and entered as Government's Exhibit No. 50.

10        Do you recognize that?

11  A.    Yes.

12  Q.    And what is that?

13  A.    It's a close-up picture of the cell phone.

14  Q.    Now, did you have an opportunity to visually handle and

15  inspect that phone?

16  A.    Yes.

17  Q.    I want to show you what's been marked as Government's

18  Exhibit No. 463.

19        Do you recognize that item?

20  A.    Yes.

21  Q.    And what is that?

22  A.    It's the cell phone.

23  Q.    And is that the same cell phone as depicted in

24  Government's Exhibit No. 50?

25  A.    Yes.

Yuan - Direct

1  Q.   Does it appear to be in substantially the same condition

2  as when you saw it that evening?

3  A.   Yes.

4        MR. COLLINS:  Your Honor, the government would move

5  that exhibit into evidence, 463.

6        THE COURT:  Admitted.

7  BY MR. COLLINS:

8  Q.   Now -- now, as you processed the scene, were there other

9  items of evidence that you collected at that location?

10  A.   Yes.

11  Q.   And these other crime scene techs. that were present,

12  they assisted you with this processing?

13  A.   Yes.

14  Q.   And, in fact, did you and another crime scene tech.

15  assist in preparing a sketch of this location?

16  A.   Yes.

17  Q.   I am going to direct your attention to what's been marked

18  as Government's Exhibit No. 12 in that book.

19       Let me know when you have had an opportunity to view

20  that.

21  A.   Okay.

22  Q.   Do you recognize that item?

23  A.   Yes.

24  Q.   And what is that?

25  A.   It's a -- it's a diagram created by one of the crime

Yuan - Direct

 1  scene investigators.

 2  Q.    Is that Crime Scene Investigator Forest?

 3  A.    Yes.

 4  Q.    And did he construct this diagram in consultation with

 5  the other crime scene techs. and the evidence that was

 6  collected on scene?

 7  A.    Yes.

 8  Q.    And is that diagram an accurate depiction of how that

 9  crime scene looked on October 3rd, 2018?

10  A.    Yes.

11        MR. COLLINS:  Your Honor, the government would move

12  12 into evidence.

13        THE COURT:  It's admitted as soon as it's on the

14  screen.

15        MR. COLLINS:  Oh, I didn't know.  Thank you.

16  BY MR. COLLINS:

17  Q.    What I'd like to do is --

18        MR. COLLINS:  The Court's indulgence, Your Honor.

19        THE COURT:  Sure.

20  BY MR. COLLINS:

21  Q.    What's the importance of this diagram that the jury is

22  looking at?

23  A.    It shows where the items of evidence are within the crime

24  scene.

25  Q.    First starting with Government's Exhibit 458, do you see

1    that on the -- on the overhead?

2    A.    Yes.

3    Q.    What is that depicted in Government's Exhibit No. 12?

4    I'm sorry.

5          In Government's Exhibit 459, where is that located in

6    Government's Exhibit -- I'm sorry, in Government's Exhibit No.

7    12?

8    A.    I'm sorry.  Could you repeat that?

9    Q.    Yes.  Where is Government's Exhibit 459, VY2, where is

10   that located in Government's Exhibit No. 12?

11   A.    (Indicating.)

12   Q.    And where was VY3 located or what's been marked and

13   entered as Government's Exhibit 460?

14   A.    (Indicating.)

15   Q.    And where was VY4, which is Government's Exhibit No.

16   474A, the first $100 bill?

17   A.    (Indicating.)

18   Q.    And in that -- in that depiction, No. 4 is underneath a

19   vehicle that's at that location.  Is that correct?

20   A.    Correct.

21   Q.    And where is VY5 which has been entered as Government's

22   Exhibit No. 474B located?

23   A.    (Indicating.)

24   Q.    And then 463, where is that located?

25   A.    That's VY6?

 1  Q.    I'm sorry.  VY6.  That's correct.

 2  A.    (Indicating.)

 3  Q.    Now, did there come a point in time when you actually

 4  located the decedent -- a decedent at that location?

 5  A.    Yes.

 6  Q.    And starting from your initial starting point, where was

 7  the decedent located on that crime scene?  First tell me where

 8  he was located, and then I will direct you to point out if it's

 9  on this diagram.

10  A.    He was located on the sidewalk between 6509 and 6511.

11  Q.    And is -- is where the decedent was located, is that

12  depicted in this image 12?

13  A.    Yes.

14  Q.    And can you identify where he was on 12?

15  A.    (Witness complies.)

16  Q.    Now, did you have an opportunity to inspect the decedent

17  at that location?

18  A.    Yes.

19  Q.    And what, if anything, did you find on the decedent?

20  A.    I recovered a key fob.

21  Q.    And did you recover anything else?

22  A.    Can I refer to my report?

23  Q.    Sure.  Would that help refresh your recollection?

24  A.    Yes.

25        MR. COLLINS:  The Court's indulgence.

Yuan - Direct

1    BY MR. COLLINS:

2    Q.    Sir, what I'd like to do is direct your attention to

3    Government's Exhibit 372.

4          Can you look at that for me?

5    A.    (Witness complies.)

6    Q.    And do you recognize that item?

7    A.    Yes.

8    Q.    And is that the report that you generated in relationship

9    to this investigation?

10   A.    Yes.

11   Q.    And would that report help refresh your recollection?

12   A.    Yes.

13   Q.    If you could take a look at that report and let me know

14   when you have had an opportunity to look at it.

15   A.    Okay.

16   Q.    What, if anything else, did you recover from the

17   decedent?

18   A.    $90 in U.S. currency and a Rolex watch.

19   Q.    Starting with the currency, how did you identify that

20   item of evidence?

21   A.    I labeled it as VY8.

22   Q.    And then the Rolex, how did you identify that item of

23   evidence?

24   A.    I labelled it as VY9.

25   Q.    And then you also said that you recovered a key fob.  Is

1    that correct?

2    A.    Correct.

3    Q.    And how did you identify that item?

4    A.    VY7.

5    Q.    I am going to show you what's been marked as Government's

6    Exhibit 474C.

7          Do you recognize that item?

8    A.    Yes.

9    Q.    And what is it?

10   A.    It's VY8, $90 in U.S. currency.

11   Q.    And is that item -- how do you know that you recovered

12   that item?

13   A.    It has the case number, the item number.  It has the

14   evidence label on it.  It has my initials and I.D. across the

15   tape.

16   Q.    Is that item in substantially the same condition as when

17   you collected it on that evening?

18   A.    Yes.

19        MR. COLLINS:  Your Honor, government would move

20   Government's Exhibit 474C into evidence.

21        THE COURT:  It's admitted.

22   BY MR. COLLINS:

23   Q.    Now, when you inspected the decedent, did you find

24   anything else on his person?

25   A.    Just the three items.

1    Q.    Did you find a wallet?

2    A.    No.

3    Q.    Any identification?

4    A.    No.

5    Q.    Now, once these items of evidence were collected, prior

6    to -- once they were collected, did you do anything else with

7    these items of evidence?

8    A.    Could you repeat the question?

9    Q.    Once these items of evidence were collected, did you do

10   any other form of processing with these items of evidence?

11   A.    No.

12   Q.    Did you attempt to swab these items for DNA?

13   A.    No.

14   Q.    Did you attempt to fingerprint these items at all?

15   A.    No.

16   Q.    And why not?

17   A.    Swabbing and fingerprinting most of these items would --

18   would not --

19            MR. DAVIS:  Objection.

20            THE COURT:  Overruled.  Overruled.

21   BY MR. COLLINS:

22   Q.    And just why didn't you swab these items of evidence?

23   A.    I didn't swab them because they are either from the

24   decedent, or, like, U.S. currency is not going -- is not going

25   to have -- is not going to hold DNA.  There is a -- there is

Yuan - Direct

1   other substances that they have more of.

2   Q.    So based on your training and experience, you didn't

3   believe that you could collect that type of evidence from these

4   items?

5   A.    Correct.

6   Q.    I am going to show you Government's Exhibit 463, the

7   cellular phone.

8         What did you do with that item of evidence?

9   A.    It was given to Detective Cruz.

10  Q.    And why did you give this item to Detective Cruz?

11  A.    There was information that he needed to get from the cell

12  phone.

13  Q.    And as part of your -- does your agency have a -- like a

14  electronic analysis unit that looks at cell phones?

15  A.    Yes.

16  Q.    And, to your knowledge, was Detective Cruz going to

17  submit this to that -- that laboratory section?

18  A.    Yes.

19  Q.    Now, did there come a point in time when you left the

20  scene?

21  A.    Yes.

22  Q.    Do you recall roughly around what time that was?

23  A.    At 2:45 on October 4th.

24  Q.    So that's 2:45 a.m.?

25  A.    Yes.

1  Q.    And what did you do once you left that location?

2  A.    I went back to the office and I packaged the -- all the

3  items of evidence and I submitted them.

4  Q.    And if you could explain -- and when you say packaged

5  them, you are talking about the process that you have already

6  discussed.  Is that correct?

7  A.    Correct.

8  Q.    You put it in a bag, you put a label on it.  Is that

9  correct?

10 A.    Correct.

11 Q.    And you make sure that the case identifying information

12 is on it.  Is that what you mean?

13 A.    Yes.

14 Q.    And your initials are on it.  Is that correct?

15 A.    Yes.

16 Q.    And once you package each of these items of evidence,

17 what do you do with them next?

18 A.    I place them into the evidence locker ready for pick up.

19 So, for any type of firearms evidence, they would be brought to

20 the firearms unit.  Anything that's property wise, they would

21 come and recover it.

22 Q.    And this evidence locker, is this a -- a secure device

23 that you submit it to?

24 A.    Yes.

25 Q.    And if you could describe what it's like to the ladies

Yuan - Direct

1   and gentlemen of the jury.

2   A.    Our building is a secured facility.  It requires a

3   certain scan card to get into it.  And in order to get into the

4   evidence locker, you would have to -- you would have to scan at

5   least two or three times into the building, and then you need a

6   specific key in order to get into the locker.

7   Q.    And then once you use that key to open it up, you put the

8   items in.  Is that correct?

9   A.    Yes.

10  Q.    And then based on that, another laboratory section would

11  pick up the items.  Is that correct?

12  A.    Correct.

13  Q.    Now, did you have any further involvement with this

14  investigation?

15  A.    I do.

16  Q.    And what did that further involvement consist of?

17  A.    I processed the white Acura that was found like a mile

18  and a half from the crime scene.

19  Q.    And where did that processing take place?

20  A.    At our I.D. bay.

21  Q.    And is that a location that's also in Prince George's

22  County, Maryland?

23  A.    Yes.

24  Q.    And is that off of Brightseat Road somewhere in the

25  county?

1    A.    Yes.

2    Q.    And when exactly did you process this vehicle?

3    A.    October 10th.

4    Q.    And that would have been seven days after the original

5    incident.  Is that correct?

6    A.    Correct.

7    Q.    And approximately what time did you respond to process

8    that vehicle?

9    A.    8:30 a.m.

10   Q.    And you processed the vehicle at the direction of whom?

11   A.    Detective Burns.

12   Q.    And was that processing and examination of the vehicle

13   pursuant to a search warrant?

14   A.    Yes.

15   Q.    And what did your processing consist of as it related to

16   this vehicle?

17   A.    Photographing, swabbing for DNA, fingerprinting for

18   latent fingerprints, and searching the vehicle for any type of

19   evidence.

20         MR. COLLINS:  The Court's indulgence, Your Honor.

21         THE COURT:  Sure.

22   BY MR. COLLINS:

23   Q.    As part of this processing, did you take photographs?

24   A.    Yes.

25   Q.    And were those photographs taken in the same or

1    consistent manner as to which you have described before?

2    A.    Yes.

3    Q.    And when I said that, I mean a far away, mid-range,

4    close-up, is that how you did it?

5    A.    Yes.

6    Q.    And was there a specific process by which you

7    photographed the vehicle?

8    A.    I photograph the exterior from -- from driver to

9    passenger.  I will open up the doors, front -- front into the

10   interior, driver to passenger.

11   Q.    Okay.  And during the course of that photographing of the

12   vehicle, did you observe any items that you believed had

13   evidentiary value?

14   A.    Yes.

15   Q.    And were those items captured in your photographs?

16   A.    Yes.

17   Q.    What I'd like to do is draw your attention to the book

18   over there.  I will get it for you.  What I'd like to do is

19   leaf through and look at Government's Exhibits 101 through 134.

20   Okay?  And let me know when you have had an opportunity to look

21   at each one of those exhibits.

22            THE COURT:  Looks like he's ready.

23            MR. COLLINS:  Thank you.

24   BY MR. COLLINS:

25   Q.    Do you recognize the images depicted in each of those

Yuan - Direct

1   photographs?

2   A.    Yes.

3   Q.    And how do you recognize those images?

4   A.    These are photographs that I took when I processed the

5   white Acura.

6   Q.    And do they accurately depict your -- what you saw during

7   the course of your investigation that day?

8   A.    Yes.

9         MR. COLLINS:  Your Honor, the government would move

10  101 through 13 -- 134 in evidence.

11        THE COURT:  Admitted.

12        MR. COLLINS:  Thank you.

13  BY MR. COLLINS:

14  Q.    Sir, starting with Government's Exhibit No. 101, can you

15  explain what's depicted in this 101?  If you could explain

16  what's depicted in this image, please.

17        THE COURT:  You need to switch the screen.

18        MR. COLLINS:  Yes, sir.

19        THE WITNESS:  It's the front of the white Acura.

20  BY MR. COLLINS:

21  Q.    And I am going to show you now 102.

22  A.    It's the driver's side of the white Acura.

23  Q.    And 103.

24  A.    The rear of the white Acura.

25  Q.    And 104.

Yuan - Direct

```
 1  A.    The passenger side.

 2  Q.    And why do you take that panoramic view of the vehicle

 3  like that?

 4  A.    To show the vehicle when I first began the processing.

 5  Q.    I am going to show you what's been marked and entered as

 6  105.

 7        And what's depicted in this image?

 8  A.    That's the D.C. registration that was on the vehicle.

 9  Q.    And I am going to show you 106.

10  A.    That's the sticker on the windshield.

11  Q.    And 107.

12  A.    That's the picture of the VIN number on the dash.

13  Q.    And for the record, what was the VIN number that you were

14  able to capture in this image?

15  A.    19UUB1F56HAQ08101.

16  Q.    I am going to show you Government's Exhibit 108.

17        And what's depicted in this image?

18  A.    It's the driver's side with red stains.

19  Q.    And was this relevant to your investigation?

20  A.    Yes.

21  Q.    And why is that?

22  A.    It shows that some -- somebody was I guess bleeding in

23  the vicinity of the vehicle.

24  Q.    I am going to show you 110.

25        And what's depicted in 110?
```

1   A.    That's a close-up picture of the red stains.

2   Q.    And what are those two blue items?  What's the purpose of

3   those two blue items in 110?

4   A.    They are scales, and it's just to show the -- the size of

5   the red stains.

6   Q.    I will show you 111.

7         What's depicted in 111?

8   A.    It's another red stain on the vehicle.

9   Q.    And do you recall where this was on -- on the vehicle as

10  depicted in this image?

11  A.    Can I flip through the pictures again?

12  Q.    Sure.  Do you have it right there in front of you?

13  A.    It's on the rear driver door.

14  Q.    Is that the driver's door or the passenger door?

15  A.    Rear driver.

16  Q.    Let me show you 112.

17        And what's depicted in that item -- I'm sorry, in that

18  image?

19  A.    The lower part of the driver's side.

20  Q.    And 113.

21  A.    This is after I processed the vehicle for print and DNA,

22  I opened up the vehicle.

23  Q.    And that grayish hue, what is that on the vehicle?

24  A.    That's black powder.

25  Q.    And why is there black powder on the vehicle?

Yuan - Direct

```
 1   A.      Black powder is used to process for latent fingerprints
 2   and it makes it visible.
 3   Q.      And in looking at Government's Exhibit 113, that inner
 4   door column or inner door frame for the driver's side, did you
 5   make anything -- or make any observations once you opened the
 6   door that were relevant to your investigation?
 7   A.      There appears to be blood on the interior B pillar.
 8   Q.      And why would that be relevant to your investigation?
 9   A.      That means that the -- the door was opened when somebody
10   was injured.
11   Q.      Government's Exhibit No. 114, can you look at that one,
12   please?
13           And what's depicted in this image?
14   A.      The trunk of the vehicle.
15   Q.      And 115.
16           And what's depicted in this image?
17   A.      The passenger side view.
18   Q.      And this is the passenger side view with the doors open.
19   Is that correct?
20   A.      Correct.
21   Q.      And 116, please.
22           What's depicted in this image?
23   A.      The driver's door with the defect to it.
24   Q.      And when you say "defect," what exactly do you mean?
25   A.      In this case, it's a -- a bullet hole.
```

Yuan - Direct

1    Q.    And why is that relevant to your investigation?

2    A.    That means that the -- that a firearm was fired and it

3    hit the driver -- the interior driver door.

4    Q.    I will show you Government's 117.

5          What's depicted in this image?

6    A.    It's a close-up of the defect with a scale.

7    Q.    And I am going to show you Government's Exhibit 118.

8          What's depicted in this image?

9    A.    It's the blood on the interior driver B pillar.

10   Q.    And this is just a close-up of the prior exhibit that you

11   looked at.  Is that correct?

12   A.    Correct.

13   Q.    Government's Exhibit 119.

14         And what's depicted in this image?

15   A.    The bullet fragment that's on the driver's seat.

16   Q.    And can you circle in 119 where the bullet fragment is?

17   A.    (Witness complies.)

18   Q.    And when you say "bullet fragment," what exactly do you

19   mean?

20   A.    Well, this specifically is a copper jacket.

21   Q.    And so is that a piece of a bullet?

22   A.    Yes.

23   Q.    Would that be a piece of a fired bullet?

24   A.    Yes.

25   Q.    I am going to show you Government's Exhibit 120.

Yuan - Direct

1        And what's depicted in this image?  What's depicted in

2   this image?

3   A.     It's blood on the -- on the armrest.

4   Q.     When you say the "armrest," which side of the vehicle,

5   the driver's side or the passenger's side?

6   A.     The driver's side.

7   Q.     And why was this relevant to your investigation?

8   A.     It shows that the incident happened within the vehicle.

9   Q.     I will show you Government's Exhibit 121.

10       What's this depict?

11   A.     The blood that's on the center console.

12   Q.     Can you circle that for the ladies and gentlemen of the

13   jury?

14   A.     (Witness complies.)

15   Q.     And was that relevant to your investigation?

16   A.     Yes.

17   Q.     And why?

18   A.     Just it shows more evidence that the incident happened

19   within the vehicle.

20   Q.     I am going to show you Government's Exhibit 122.

21       What's -- I'm sorry.  What's depicted in this image?

22   A.     It's the front roof of the vehicle.

23   Q.     And what was -- was this relevant to your investigation?

24   A.     Yes.

25   Q.     And why was that?

1  A.    It shows that -- it shows blood, which means that the

2  incident happened within the vehicle.

3  Q.    I am going to show you Government's Exhibit 123.

4        What's depicted in this image?

5  A.    It's a mid-range shot showing items of evidence in the

6  cup -- in the center console.

7  Q.    And this is on the passenger side door.  Is that correct?

8  A.    Yes.

9  Q.    I am going to show you Government's Exhibit 124.

10       What's depicted in this image?

11 A.    It's an unfired bullet.

12 Q.    And was this relevant to your investigation?

13 A.    Yes.

14 Q.    And why is that?

15 A.    It's a piece of firearm evidence.

16 Q.    I am going to show you what's been marked as Government's

17 Exhibit 125.

18       What side of the vehicle is depicted here?

19 A.    The front passenger side.

20 Q.    And why is this -- well, is this image relevant to your

21 investigation?

22 A.    This is to show the items of evidence of where I

23 recovered it.

24 Q.    And in particular, what items of evidence did you recover

25 from this side of the vehicle?

Yuan - Direct

1    A.    I recovered two fired shell casings.

2    Q.    I am going to show you Government's Exhibit 126.

3          What's depicted in 126?

4    A.    It's two fired shell casings on the floorboard on the

5    front passenger.

6    Q.    And going back to Government's Exhibit 125, if you could

7    just draw an arrow indicating where those two shell casings

8    were found in 125?

9    A.    (Witness complies.)

10   Q.    I am going to show you what's been marked as Government's

11   Exhibit 127.

12         And what's depicted in 127?

13   A.    It's a close-up of the two fired cartridge casings.

14   Q.    And when you say shell -- let me back up.

15         Are you -- are you trained to collect ballistics-related

16   evidence?

17   A.    Yes.

18   Q.    And what's the different type of ballistic evidence that

19   you are trained to collect?

20   A.    Firearms, unfired cartridges, casings, bullets,

21   fragments.

22   Q.    And these two items, you described them as what?

23   A.    Cartridge casings.

24   Q.    And are these two items relevant to your investigation?

25   A.    Yes.

Yuan - Direct

```
 1   Q.    And why is that?

 2   A.    It shows that the incident happened within the vehicle

 3   and the shell casings were left in the vehicle.

 4   Q.    And were you -- when you say "shell casings," are these

 5   the remains of a fired bullet?

 6   A.    Yes.  This is what's ejected from the firearm after it's

 7   been fired.

 8            THE COURT:  How much longer on direct, Mr. Collins?

 9            MR. COLLINS:  Your Honor, hopefully 10 to 15 minutes,

10   Your Honor.

11            THE COURT:  All right.  If it's closer to ten, you

12   can finish up.

13            MR. COLLINS:  Okay.

14   BY MR. COLLINS:

15   Q.    128, please.

16         What's depicted here?

17   A.    The center console.

18   Q.    And 129.

19   A.    A close-up of the center console.

20   Q.    130.

21   A.    It's the -- the last addresses put into the vehicle.

22   Q.    And was this relevant to your investigation?

23   A.    Yes.

24   Q.    And why is that?

25   A.    It shows that whoever was driving the vehicle was headed
```

Yuan - Direct

1    towards the crime scene or the vicinity.

2    Q.    And how far away was the decedent found from the address

3    -- I'm sorry, this address that's in the navigation system?

4    A.    A few houses down.

5    Q.    And 131.

6          What's depicted here?

7    A.    This is the -- the driver door taken apart to recover the

8    firearms evidence.

9    Q.    And 132.

10   A.    That's the fired bullet from the driver's door.

11   Q.    And that's once you pulled the outer layer of the door

12   back.  Is that correct?

13   A.    Correct.

14   Q.    And 133.

15   A.    That's the fired bullet taken out of the vehicle.

16   Q.    And 134.

17   A.    That is the registration that was found within the

18   vehicle.

19   Q.    Now, each of the items of evidence that you saw in the

20   car, did you collect those items?

21   A.    Yes.

22   Q.    And what did you do with each of those items once you

23   collected them?

24   A.    I collected the firearms evidence and I processed the

25   unfired cartridge for latent fingerprints with no results on

Yuan - Direct

1    it, and I packaged everything up.  I packaged the -- all the

2    firearms evidence, taped it up, put my initials, my I.D., put

3    an evidence label on it, and submitted it to the firearms

4    examination unit.

5             MR. COLLINS:  The Court's indulgence, Your Honor.

6             THE COURT:  Sure.

7    BY MR. COLLINS:

8    Q.    And when you collected those items, did you collect them

9    in -- I'm sorry.

10             When you packaged those items, did you package them in

11   the same manner as you described before?

12   A.    Yes.

13   Q.    And what did you do with each of those items once you

14   collected them?

15   A.    I'm sorry.  Could you repeat that?

16   Q.    What did you do with each one of those items once you

17   collected them?

18   A.    I submitted them to the firearms examination unit.

19   Q.    And did you do it by way of the same vault that you

20   described before?

21   A.    Yes.

22   Q.    And did you provide -- did you have to go through the

23   same security steps in order to secure those items within the

24   vault?

25   A.    Yes.

1          MR. COLLINS:  The Court's indulgence, Your Honor.

2          THE COURT:  Mr. Collins, I assume Mr. Davis is going

3     to have some cross for this witness in any event, so this might

4     just be a good time to take our evening break.

5          MR. COLLINS:  Thank you, Your Honor.

6          THE COURT:  I apologize, sir.  It does look like you

7     will have to come back tomorrow.

8          But ladies and gentlemen, let's take our evening break at

9     this point.  I will ask that you enjoy your evening, get some

10    rest.  Remember my instructions not to discuss this case with

11    anyone, including even among yourselves.  Don't go out looking

12    for any information about this case.  Please return tomorrow at

13    9:30 a.m. so we can pick up where we are.  Enjoy your evening.

14    Take care.

15          (The jury panel exit the courtroom at 5:05 p.m.)

16          THE COURT:  Sir, you are excused until tomorrow

17    morning.

18          You could be seated unless addressing the Court.

19          You are excused until tomorrow morning.

20          THE WITNESS:  9:30?

21          THE COURT:  9:30, yeah.  I do see we have Mr. Hall

22    back there.  I assume he's not just watching court.

23          MR. MARC HALL:  I am here, Your Honor, at your

24    request.

25          THE COURT:  And so I don't know where we are on that

1    issue or what we need to do now.

2         MS. COTTINGHAM:  So, Your Honor, I think -- I think

3    where we are is I think he's not formally invoked, but we have

4    had Mr. Hall here in an abundance of caution.  I would propose

5    that we go ahead and appoint him at this stage and then we can

6    discuss what to do with the witness, but I do think it makes

7    sense to -- and Ms. Essex asks that we go ahead and get him

8    appointed in the first instance.

9         THE COURT:  Yeah.  I mean, whatever needs to happen,

10   I hereby formally appoint you, and you are welcome to approach.

11   I don't know if you have had a chance to talk to your client?

12        MR. MARC HALL:  I have, Your Honor.  I have had a

13   chance to talk to him.

14        THE COURT:  If you could come to the microphone.

15        MR. MARC HALL:  Yes, Your Honor.  I have had a chance

16   to speak to the witness that I was asked to represent here

17   today, and I am prepared to -- I have advised him of what his

18   rights are under these circumstances.

19        THE COURT:  Do you know whether he would intend to

20   invoke his Fifth Amendment rights or testify?

21        MR. MARC HALL:  I have advised him that based upon

22   what I have -- he has told me and what I have read in his grand

23   jury testimony, I don't believe that he has a legitimate Fifth

24   Amendment claim at this time.

25        THE COURT:  Okay.  All right.  So given the time of

1    day, I don't know, do we just want to -- I could order him to

2    return tomorrow.  I don't know if you are available tomorrow.

3              MR. MARC HALL:  I am.  I will move some things to

4    accommodate the Court.

5              THE COURT:  All right.  And we can pick up with this

6    issue first thing in the morning.  It would seem like the best

7    way to handle it at this point.

8              MR. COLLINS:  The government agrees, Your Honor.

9    Thank you.

10             THE COURT:  All right.  Anything else from the

11   defense on that?

12             MS. DAVIS:  That's fine, Your Honor.  Yes.

13             THE COURT:  Is your client still physically here?

14             MR. MARC HALL:  Yes, Your Honor.  Do you want him

15   brought in?

16             THE COURT:  Yes, please.

17         Sir, you can just come to the podium.

18             MR. MARC HALL:  Come up here so the judge can hear

19   you through the microphone.

20             THE COURT:  If you could just state your name again.

21             MR. BLAKE NDI:  My name is Blake Ndi.

22             THE COURT:  I appreciate you sticking around all day

23   today.  You have had a chance to consult with your attorney.

24   We are going to pick back up with you tomorrow morning, and so

25   you are still under subpoena, you do have to return tomorrow

1    morning.  I know that's inconvenient so I do apologize for

2    that.

3             MR. BLAKE NDI:  I have a business to run.  Like, I

4    just missed the whole day today --

5             THE COURT:  I understand that.

6             MR. BLAKE NDI: -- with everything I am doing, and you

7    want me to come back tomorrow?

8             THE COURT:  Yes.  And I apologize for that, but I am

9    ordering you to return tomorrow so that we can pick up with

10   your testimony.  I don't know if you need to be here at 9:30.

11   I am looking at government's counsel.  I don't know how much

12   longer you have with the witness we were finishing.

13            MR. COLLINS:  Your Honor, I think that we would

14   probably, like I said, maybe have five more minutes with the

15   other witness, and then we would figure out who we would call

16   next.

17            MR. MARC HALL:  Well, if I may, Your Honor?  If you

18   are not going to call him next, then I wouldn't want him to be

19   put out of his business any more than necessary.  Could we be a

20   little more definite on that?

21            THE COURT:  That's a fair request.

22            MR. COLLINS:  We will call him next, Your Honor.

23            THE COURT:  So I ask you to be here at 9:30, and we

24   will try to get you done as soon as we can.  All right?  Do you

25   understand, sir?

1          MR. BLAKE NDI:  I understand.

2          THE COURT:  All right.  I know it's inconvenient and

3    I'm sorry about that, but we will see you tomorrow at 9:30.

4          MR. BLAKE NDI:  I am just tired of everything.

5          THE COURT:  I get it.  I get it.

6          MR. MARC HALL:  Your Honor, if I may be excused?

7          THE COURT:  You may.  I will see you tomorrow

8    morning.  Thank you for your help, sir.

9       Anything else that we need to do today?

10          MR. DAVIS:  Not that I can think of, Your Honor.

11          MR. COLLINS:  No, Your Honor.  Thanks.

12          THE COURT:  See you all in the morning.

13       (The proceedings were concluded at 5:11 p.m.)

14

15                    - - - - -

16

17

18

19

20

21

22

23

24

25

INDEX TO TESTIMONY


GOVERNMENT'S WITNESSES:

KAREL BLACKMORE                                          PAGE


        Direct examination by Mr. Collins              26
        Cross-examination by Mr. Davis                 56
        Redirect examination by Mr. Collins            63

STEPHEN HULL                                            PAGE

        Direct examination by Ms. Man                  67
        Cross-examination by Mr. Davis                 87

JOSHUA MALINOWSKI                                       PAGE

        Direct examination by Ms. Man                  91
        Cross-examination by Mr. Davis                 101

GEOFFREY BORIS                                          PAGE

        Direct examination by Ms. Man                  104
        Cross-examination by Mr. Davis                 112
        Redirect examination by Ms. Man                114

JERRY MONTGOMERY                                        PAGE

        Direct examination by Ms. Cottingham           116

BLAKE NDI                                               PAGE

        (Transcribed and filed under separate cover on CM/ECF)

MATTHEW FOREST                                          PAGE

        Direct examination by Ms. Man                  131
        Cross-examination by Mr. Davis                 148
        Redirect examination by Ms. Man                155

VINCENT YUAN                                            PAGE

        Direct examination by Mr. Collins              159

1                    C E R T I F I C A T E

2              I, Renee A. Ewing, an Official Court Reporter

3    for the United States District Court for the District of

4    Maryland, do hereby certify that the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    taken on the date and time previously stated in the above

7    matter; that the testimony of witnesses and statements of the

8    parties were correctly recorded in machine shorthand by me and

9    thereafter transcribed under my supervision with computer-aided

10   transcription to the best of my ability; and that I am neither

11   of counsel nor kin to any party in said action, nor interested

12   in the outcome thereof.

13

14

              Renee A  Ewing
15                                                     _____

              Renee A. Ewing, RPR, RMR, CRR
16            Official Court Reporter
              February 22, 2023
17

18

19

20

21

22

23

24

25