IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA : 

: 

v. : Criminal Case No. DKC 21-0101

: 

MADANI ILARA TEJAN : 

: 

**MEMORANDUM OPINION**

Madani Ilara Tejan filed a motion for judgment of acquittal or, in the alternative, for a new trial, after he was found guilty of conspiracy to distribute and possess with intent to distribute a controlled substance, possession with intent to distribute a controlled substance, interference with interstate commerce by robbery, and murder resulting from the use, carrying, brandishing, and discharging of a firearm during and in relation to a crime of violence. (ECF No. 105). He asserts that there was insufficient evidence to support a finding of guilt on any charge. He argues that the evidence in the case was "at odds with each other" and that the "inconsistencies are of no small consequence." (ECF No. 105, at 3).

I. **Standards of Review**

A. **Motion for a Judgment of Acquittal**

Federal Rule of Criminal Procedure 29(c)(1) provides that a defendant may move for, or renew, a motion for judgment of

acquittal within 14 days after a guilty verdict.  Such a motion challenges the sufficiency of the evidence.  The inquiry is whether "as a matter of law the government's evidence is insufficient to 'establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144 (1986)).  The court views the evidence in the light most favorable to the government and determines whether there is substantial evidence to sustain the verdict.  "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (citing *United States v. Smith*, 29 F.3d 914, 917 (4th Cir. 1994), *cert. denied*, 513 U.S. 976 (1994).  Another district judge recently synthesized the proper approach:

> In deciding whether substantial and competent evidence exists, the Court should not decide whether the evidence convinces it beyond a reasonable doubt of the defendant's guilt, only whether evidence exists "that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). Importantly, the Court may not weigh the evidence, draw inferences from the facts, resolve evidentiary conflicts or assess the credibility of witnesses, for such functions fall within the province of the jury. *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983). "Further, 'if the evidence

> supports different, reasonable interpretations, the jury decides the interpretation to believe.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (quoting *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994)). Deference to the jury requires the Court to "construe the evidence in the light most favorable to the Government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." *United States v. Johnson*, 55 F.3d 976, 979 (4th Cir. 1995). Ultimately, a defendant challenging the sufficiency of the evidence supporting his conviction "must overcome a heavy burden." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995).

*United States v. Archible*, No. 4:20-cr-15-DJN, 2021 WL 3192167, at *3 (E.D.Va. July 28, 2021), *aff'd,* No. 21-4428, 2022 WL 2951754 (4th Cir. July 26, 2022).

**B. Motion for a New Trial**

Under Federal Rule of Criminal Procedure 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Judges have discretion to "grant a new trial if [they] think[] the verdict is against the weight of the evidence, and it is [their] duty to do so if [they are] convinced that permitting the verdict to stand would result in a miscarriage of justice." *United States v. Shipp*, 409 F.2d 33, 36-37 (4th Cir. 1969). Unlike in a motion to acquit, "[i]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the

3

witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).

Although district courts enjoy considerable discretion to grant a new trial, the United States Court of Appeals for the Fourth Circuit has held that "a trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). "A new trial is warranted only '[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" *United States v. Millender*, 970 F.3d 523, 531 (4th Cir. 2020) (quoting *Arrington*, 757 F.2d at 1485). Fourth Circuit "cases stress that a district court should not lightly overturn a jury verdict," and thus the standard for doing so is "demanding." *Id.*

As the Fourth Circuit recently explained,

> A new trial . . . may be granted where the government *has* presented sufficient evidence for a reasonable jury to convict, but the court nevertheless disagrees with the jurors' weighing of the evidence in finding the defendant guilty. So in determining whether a new trial is warranted, the district court— sitting as a thirteenth juror—conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor . . . [T]he district court is permitted to conduct its own assessment of witness credibility and to re-

4

weigh the evidence to determine whether a new
trial is warranted.    And the court may
properly conclude that a new trial is
warranted based on the cumulative weight of
the evidence . . . The key question in
determining whether a new trial is warranted
under Rule 33 is not what *kinds* of evidence
support the verdict, but the *weight* of that
evidence . . . The ultimate test of whether a
new trial is warranted is whether letting a
guilty verdict stand would be a manifest
injustice.  And a guilty verdict can effect a
manifest injustice regardless of the nature of
the evidence supporting it.

*United States v. Rafiekian*, 68 F.4th 177, 186, 187, 189, 190 (4th
Cir. 2023) (internal citations and quotations omitted).

### C. Standard for When a Successor Judge Must Grant a New Trial

This case was transferred to the undersigned when the original
trial judge, George J. Hazel, resigned from the bench, just after
the jury trial and the filing of the motion for a new trial.
Federal Rule of Criminal Procedure 25(a) provides that if "the
judge before whom the trial began cannot proceed because of death,
sickness, or other disability," any other "judge regularly sitting
in or assigned to the court may complete a jury trial" upon
"certify[ing] familiarity with the trial record."  Rule 25(b), on
the other hand, provides that if a successor judge is "satisfied"
that "a judge other than the one who presided at the trial cannot
perform the post-trial duties" or that it is "necessary for some
other reason," that judge may "grant a new trial."  The Fourth
Circuit has not addressed whether a successor judge must grant a

retrial when the defendant argues that studying the trial transcript, listening to the audio, and looking at the video and documentary evidence cannot effectuate adequate "familiarity with the trial record." Fed.R.Crim.P. 25(a).

Several other circuits, however, have explained how district courts can adequately certify familiarity with the trial record. *See, e.g.*, *United States v. Colon-Munoz*, 318 F.3d 348, 356 (1st Cir. 2003) (finding that a successor judge "did not abuse his discretion by denying the motion to retransfer the case back to the original judge" because his "detailed treatment of the new trial motion and sentencing objections bears out [his] familiarity [with the record], and there is no indication that reassignment adversely affected the interests of justice in this case"); *United States v. Bourgeois*, 950 F.2d 980, 988 (5th Cir. 1992) (holding that a successor judge is "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record" and that the judge "displayed a familiarity with the record at the sentencing hearing that reflects such a thorough review"); *United States v. Whitfield*, 874 F.2d 591, 593 (8th Cir. 1989) (finding "no abuse of discretion" in "sentencing appellant" because a "successor judge is given broad discretion in determining whether he properly can perform his sentencing duties in a case upon which he did not preside at trial"); *United States v. Spinney*, 795 F.2d 1410, 1413 (9th Cir. 1986) (finding that the successor

judge "demonstrated his familiarity" with the record because he "received the jury's verdict; he sentenced [the defendant]; he read the presentence report prepared for all three defendants; he read the sentencing memorandum prepared by the government and the defendant's response" even though he "did not read the trial transcript," which "is not required in every case").

Mr. Tejan argues that the undersigned cannot properly weigh the credibility of witnesses because the visual cues inherent in watching the testimony cannot be recreated and, in this case, are critical.  After a careful review of the record, including reading the transcript and listening to the audio of some witnesses, the court rejects that argument.  The parties and the presiding judge provided insight into some of the interactions taking place in the courtroom.  For example, it is abundantly clear that Blake Ndi was a highly reluctant witness and expressed dislike and disrespect for Mr. Tejan.  The parties can point to discrepancies within a witness's testimony or between the testimony of two or more witnesses just as effectively now as they did during closing arguments.

The inability to see the witnesses does not fatally undermine a person's ability to assess credibility.  In the past, some might have thought that a blind person can never serve as a juror.  One court has suggested that such a view might be "outdated."  *United States v. Watson*, 483 F.3d 828, 834 (D.C.Cir. 2007).  Instead, a

case-by-case evaluation, based on the nature of the anticipated evidence, should be conducted.  The undersigned can see and has access to the documentary evidence, so the only aspect of trial that cannot be "viewed" are the witnesses on the stand.  The Fourth Circuit recently recognized that credibility determinations turn on many factors and the inability to view a witness's face does not, by itself, contravene the confrontation clause:  jurors assess credibility not only by facial expressions, but also by "the words the witnesses said . . . how they said them . . . their body language, their pauses, their mannerisms[,] and all the other intangible factors that are present in a trial."  *Burgess v. Goldstein*, 997 F.3d 541, 554 (4th Cir. 2021); *see also United States v. Maynard*, No. 22-4178, 2024 WL 118221, at *4 (4th Cir. Jan. 11, 2024) (finding that the witnesses' masks did not hinder the jury's ability to assess their credibility).

Ordinarily, of course, a court reviewing a trial based only on a transcript is not called upon to make credibility determinations.  Here, however, the court must evaluate and assess credibility issues in the course of deciding whether a new trial is appropriate.  In this context, the undersigned certifies that sufficient familiarity with the record can be obtained from the sources noted above.

## II.  Analysis

### A. Background and Testimony Overview

On October 3, 2018, Anthony Freeland was found on a sidewalk in a residential neighborhood suffering from multiple gunshot wounds to the upper body.  He was pronounced dead a short time later.  Mr. Tejan was convicted of his murder, resulting from the use of a firearm during a robbery.  The jury found that the drug conspiracy involved fentanyl and marijuana.  The possession with intent to distribute charge involved fentanyl.  The robbery count was premised on drugs, drug proceeds, and a car allegedly taken from Mr. Freeland.

The evidence presented at trial and at a motions hearing establishes (without much controversy) that, in a period of less than two weeks in October of 2018, Mr. Tejan twice travelled in a car driven by Ferdinand Fotachwi (nicknamed "Billa" or "Guwop") in order to conduct a drug deal when someone was shot, fatally.  In the first instance, on October 3, the deceased was Anthony Freeland, whom the Government believes was Mr. Tejan's customer. On October 15, the deceased was Mr. Fotachwi, who the Government believes was killed because he knew something about the shooting on October 3.  Mr. Tejan does not seriously contest the sufficiency of the evidence placing him at the scene of each homicide but does contest the adequacy of the evidence establishing that he was the shooter (or one of them or acquiesced in the second murder.)  At

Mr. Tejan's trial for the October 3 charges, Judge Hazel permitted the Government to present the testimony of Blake Ndi who testified, inter alia, to what Mr. Fotachwi told him about Mr. Tejan's conduct and words on October 3.   Judge Hazel's forfeiture by wrongdoing decision appears at ECF No. 116, transcript of hearing on January 27, 2023, at pages 13-14.

The Government presented testimony from a variety of witnesses, some civilian and some law enforcement.  Briefly, that testimony consisted of the following:

Karel Blackmore, a homeowner and retired police officer, drove home that evening and found the body on the sidewalk.  (ECF No. 117, at 35).  He secured the scene and called 911.  (ECF No. 117, at 39, 41).  He also had video cameras on his home and described the vehicles seen.  (ECF No. 117, at 42, 53, 55).

Corporal Stephen Hull, a police officer, responded to a call for the sound of gunshots.  (ECF No. 117, at 68).  He found a person lying on the ground in a pool of blood.  (ECF No. 117, at 73).  He found no pulse and secured the scene.  (ECF No. 117, at 73-74).   He observed money, glasses, a cell phone, and shell casings at the scene.  (ECF No. 117, at 75).

Detective Joshua Malinowski also responded to the scene.  He conducted a preliminary investigation and then transferred everything to Detective Hamlin when her squad arrived.  (ECF No. 117, at 95, 101).  He had met Mr. Tejan before during an

investigation in the same neighborhood on Manton Way when Mr. Tejan was a teenager.  (ECF No. 117, at 97-98).

Corporal Geoffrey Boris, another officer, also responded to the scene.  He secured the scene and then went to Bartley Way after a receiving a call for a suspicious vehicle there.  (ECF No. 117, at 107-08).   On Bartley Way, about two blocks from where the body was found on Manton Way, he discovered a white vehicle with D.C. registration that was left running, but unattended.  (ECF No. 117, at 108, 114).   He saw what appeared to be a blood stain on the rear driver door.  (ECF No. 117, at 108).

Corporal Jerry Montgomery, a now-retired crime scene investigator, observed the body's autopsy.  (ECF No. 117, at 119). The doctor performing the autopsy found bullet fragments in the decedent.  (ECF No. 117, at 121).   Corporal Montgomery filed the evidence, including the bullet fragments, in the Police Department's property warehouse.  (ECF No. 117, at 120).

Blake Ndi was Mr. Fotachwi's friend.  His testimony will be detailed later.

Matthew Forest, a crime scene investigator, responded to a one-bedroom apartment at 8831 Lottsford Road, Apt. 325 on October 21, 2018.  He took photographs of the apartment and observed an empty wallet, marijuana, and Cricket cell phone in a fanny pack. (ECF No. 117, at 141-42, 145-47).   No guns, ammunition, scales,

large amounts of money, or drug ledgers were recovered from the apartment.  (ECF No. 117, at 148-49).

Vincent Yuan, a crime scene investigator, responded to Manton Way.  He photographed the scene, packaged the evidence, and sent it to the firearms examination unit and property warehouse.  (ECF No. 117, at 163-64, 168-69, 184, 197-98).  He found a $100 bill and cell phone.  (ECF No. 117, at 173-75).  On the decedent, he found a key fob, $90 in currency, and a Rolex watch.  (ECF Nos. 117, at 179-80; 118, at 12).  He did not find a wallet or any identification.  (ECF No. 117, at 182).  He processed the white Acura that was found near the scene and an unfired bullet, two fired shell casings, a fired bullet, and registration discovered inside the car.  (ECF Nos. 117, at 185, 195, 197; 118, at 5-6).  He also observed the last addresses put in the car's navigation system, which showed that the driver was headed to a house a few houses down from the crime scene.  (ECF No. 117, at 196-97).  He testified that both the decedent and shooter would have been in the vehicle because of the cartridges and blood found on the driver door and roof.  (ECF No. 118, at 14).

Richard Moorer is a real estate agent who lived in neighborhood, about five houses down from 105 Bartley Way.  (ECF No. 118, at 35, 43).  On October 4, Detective Burns reached out to him asking to see video footage from the camera on Mr. Moorer's house.  (ECF No. 118, at 38).  The footage showed two cars, the

first light-colored and the second dark-colored, turning onto Bartley Way from Forbes.  (ECF No. 118, at 44).

Sergeant Luis Cruz, assistant detective to the lead investigator, Detective Allyson Hamlin, also responded to Manton Way on October 3.  (ECF No. 118, at 47-48).  He observed that the decedent's cell phone was being pinged by a contact named Candice.  (ECF No. 118, at 50-51).  He transported the phone to the Police Department's phone unit.  (ECF No. 118, at 51).  He also spoke to Candice Corbin at the scene.  (ECF No. 118, at 53).  She told him she was the owner of the phone and was using the "Find My iPhone" application to look for her boyfriend.  (ECF No. 118, at 53-54).  She asked where her car was and explained it was a white Acura.  (ECF No. 118, at 55).  She said she gave the car to the decedent earlier in the day.  (ECF No. 118, at 56).  She said the car had a fob and that if the car and fob were separated, the car would turn off.  (*Id.*).  She then met Sergeant Cruz at the police station, where he interviewed her.  (ECF No. 118, at 57-58).  She told him that earlier that evening, she was in the car with the decedent, who received a call from a subject named "Malik" and that the decedent was supposed to meet "Malik" in this neighborhood to purchase some Percocets.  (ECF No. 118, at 58).  Sergeant Cruz copied the phone number at which the decedent spoke with "Malik."  (*Id.*).  Ms. Corbin also showed Sergeant Cruz the Stil_i_rise

Instagram profile page, which she thought belonged to "Malik." (ECF No. 118, at 83).

Sergeant Cruz also interviewed the defendant, whom he mis-identified as "Tejan Madani," on October 20 when he was brought into the police station on an unrelated charge. (ECF No. 118, at 60). Mr. Tejan told Sergeant Cruz his address was 8831 Lottsford Road, Apt. 325, Largo, Maryland. (ECF No. 118, at 62-63). Sergeant Cruz asked him if he ever lived at the Manton Way address. (ECF No. 118, at 64-65). Initially, Mr. Tejan said he did not live there, but later admitted he had. (ECF No. 118, at 65). Mr. Tejan also stated that he was familiar with the Manton Way neighborhood and knew someone named Bleezy. (ECF No. 118, at 75-76).

Directly after interviewing Mr. Tejan, Sergeant Cruz searched 8831 Lottsford Road, Apt. 325. (ECF No. 118, at 77). He observed a wallet and Cricket cell phone that had a matching IMEI number to the cell phone the officers were looking for in the investigation. (ECF No. 118, at 79-82). He transported the phone to the homicide division, where he gave it to Detective Hamlin to execute a search warrant on it. (ECF No. 118, at 83).

Peter Glanville is an associate professor of Arabic at the University of Maryland. Law enforcement officials contacted him requesting that he translate a symbol on a social media page. ECF No. 118, at 98-99). He said the symbol translated to "Malik,"

which is a man's name and means owner or possessor of something. (ECF No. 118, at 100).

Michael Edmondson is a network engineer for the federal government who lived on Manton Way. (ECF No. 118, at 104). On October 3, he came home around 8:00 pm and saw a white Acura stopped away from curb. (ECF No. 118, at 108-09). As he was going inside his house, he saw that the white Acura had apparently made a U-turn and was coming up the street past his house. (ECF No. 118, at 109). Later that night, he was napping when a neighbor called him and told him someone had been shot nearby. (ECF No. 118, at 110). He did not see or hear any shots. (*Id.*). He showed a police officer footage on his phone from his house's surveillance cameras. (ECF No. 118, at 111). The footage showed him turning into his driveway and the white Acura. (ECF No. 118, at 116).

Keith Williams is a hair stylist who was living at 8831 Lottsford Road, Apt. 325. In 2018, he met someone named Dani online when trying to buy marijuana. (ECF No. 118, at 122, 139). Dani also went by "Malik," and his government name was Madani Tejan. (ECF No. 118, at 122-23). Mr. Tejan stayed at Mr. Williams's apartment for 30 days in September and October and kept personal items there. (ECF No. 118, at 125, 128). When showed a picture of his apartment, Mr. Williams identified "Dani's" Gucci headband and cross-body bag but said he had never seen the wallet before. (ECF No. 118, at 135-36). He said Mr. Tejan had multiple

phones including a regular Android and a smaller flip-phone.  (ECF No. 118, at 141).  Mr. Tejan told Mr. Williams that his friend Anthony Freeland, who he called "Black Ant," got killed and he appeared sad as if he had been crying.  (ECF No. 118, at 160, 167).

Dr. Carol Allan, a now-retired assistant medical examiner, performed the autopsy on the decedent.  She observed that his clothing was bloodstained and found a bullet fragment under the clothing in the left armpit and four gunshot wounds.  (ECF No. 119, at 13).  She determined that the cause of death was multiple gunshot wounds, the most significant of which was to his back.  (ECF No. 119, at 14, 27).  She said it was possible that a shot was fired from above where the decedent was sitting and that an abrasion was caused by a seatbelt, and concluded that the gun was fired within close range.  (ECF No. 119, at 20, 27-28, 30).

Candace Corbin was the decedent's girlfriend.  Her testimony will be detailed later.

Tyesha Tyson used to work at a residential facility called Hope Village, where Mr. Tejan was a resident.  (ECF No. 119, at 46).  While working there, she confiscated pills from him after finding them in his bag.  (ECF No. 119, at 47).  Mr. Tejan tried to take the pills back.  (ECF No. 119, at 50-52).

Joseph Sheffey, a now-retired supervisor at Hope Village, testified that he confiscated the pills found by Ms. Tyson, counted 1,013 pills, and called the police.  (ECF No. 119, at 62-63).

16

Officer Jendy Olivo, an officer at the Metropolitan Police Department in Washington D.C., responded to the call for assistance on August 15, 2018 in Hope Village. He recognized the pills, which were in a clear bag, as "Oxies." (ECF No. 119, at 76). He arrested Mr. Tejan, who was wearing a black single-strap backpack containing $5,971 in currency. (ECF No. 119, at 77).

Lucas Lawrenz is a Drug Enforcement Administration ("DEA") special agent and former police officer with Metropolitan Police Department. He responded to Hope Village on August 15, 2018 and took custody of the pills. (ECF No. 119, at 91, 93).

Derrick Garnett is an investigator in the legal affairs unit at the Prince George's County Department of Corrections. The Department of Corrections used a phone system called Global Tel Link, and incarcerated people each had an individual TID number and pin number which they used to make phone calls. (ECF No. 119, at 106-07, 112). His agency was served a subpoena for records relating to a phone call on February 21, 2019, and he created a CD of the call. (ECF No. 119, at 108).

Detective Fernando Jaramillo is a narcotics detective at the Montgomery County Police Department and task force officer with the DEA. He served as an expert in the investigation of narcotics trafficking, including the pricing, packaging, distribution, and methods of narcotics traffickers and their use of coded language. (ECF No. 119, at 133). He testified that drug dealers typically

17

(1) use burner phones, which are prepaid phones not linked to their name; (2) if they do not have access to a stash house, they keep their narcotics and money on them; (3) ask customers to meet at locations they know well, but not near their primary residence; (4) use coded language; and (5) use nicknames, not government names. (ECF No. 119, at 133-36). He reviewed a chat on Mr. Tejan's Instagram account from September 19, 2018 in which someone asked to buy pills and Mr. Tejan gave the address 14105 Bramble Lane, Laurel, Maryland and phone number (202) 878-3797. (ECF No. 119, at 141, 142). He testified that holding 1,013 fentanyl pills on one's person is indicative of distribution, not personal use. (ECF No. 119, at 155).

Detective Christopher Wheeler is a member of the Prince George's County Police Department strategic investigations division of the fugitive unit. He was asked to assist in or around October 20, 2018, in locating and apprehending Mr. Tejan. (ECF No. 120, at 5-6). He followed Mr. Tejan's suspected white Lincoln MKZ from 8831 Lottsford Road, tracking Mr. Williams's cell phone while the car travelled from Virginia to Cadillac Ranch Restaurant in the National Harbor in Maryland. (ECF No. 120, at 8-10). There, Mr. Tejan was taken into custody. (ECF No. 120, at 11). Detective Wheeler seized cell phones from Mr. Williams and Mr. Tejan. (ECF No. 120, at 12). He then transported Mr. Tejan and

the cell phones to Detective Hamlin at the police station.   (ECF No. 120, at 12-13).

Special Agent Michael Fowler, a special agent with the FBI, served as an expert in the field of cellular record analysis.   He was assigned to look at where four phone numbers—two belonging to Mr. Tejan, one to Ferdinand Fotachwi, and one to Keith Williams— were located on October 2 and 3, 2018.   (ECF No. 120, at 20, 26-105).

Detective Allyson Hamlin was a member of the Prince George's County homicide unit in October 2018.   She was assigned as the lead investigator for the murder of Anthony Freeland.   (ECF No. 120, at 109-10).   She responded to the 6500 block of Manton Way on October 3, 2018.   (ECF No. 120, at 112).   The initial call for shots was at 8:51 pm, and the decedent was located at 9:36 pm. (ECF No. 120, at 114-15).   She observed a shell casing, damaged glasses missing lenses, the missing lens, $100 bills, and a cell phone.   (ECF No. 120, at 117).   There was a call for a suspicious vehicle at 10:21 pm on Bartley Way.   (ECF No. 120, at 118).   It was a white Acura TSX that was running with the lights on.   (ECF No. 120, at 119).   On the console, the last address programmed was 6503 Manton Way.   A key fob was located in the decedent's back left pocket.   (ECF No. 120, at 120).   Mr. Tejan's DNA and fingerprints were not found in the car.   (ECF No. 120, at 122).

Detective Hamlin testified that Ms. Corbin had come to the scene and was taken to the police station, where she told investigators that the decedent was going to meet someone for a drug deal. (ECF No. 120, at 124-25, 128). The police identified Alonzo Campbell, ("Tubby"), a long-time friend of the decedent, as a potential suspect because he had been in contact with the decedent that night. (ECF No. 120, at 130). His phone records, however, showed that he was not in the area that night. (ECF No. 120, at 131).

Detective Hamlin testified that no eyewitnesses were found, but surveillance cameras were reviewed. (ECF No. 120, at 133). The cameras revealed that the decedent's white Acura approached at 8:43 pm, the black suspect vehicle made a U-turn and followed the white Acura, and the black suspect vehicle parked at 8:44 pm. (ECF No. 120, at 139-40, 142-43). The passenger exited the black suspect vehicle, approached the driver's side, and then left. (ECF No. 120, at 144-45). The white Acura passed the black suspect vehicle. (ECF No. 120, at 152). The sound of gunshots was heard on a camera at 8:50 pm. (ECF No. 120, at 156, 160). A few seconds later, the white Acura turned from Manton onto Garson and left off of Forbes, and the black suspect vehicle made a U-turn and followed the white Acura out. (ECF No. 120, at 162).

Mr. Freeland's black iPhone encased in a hard black cover was found on the curb of Manton Way. (ECF No. 120, at 171-72). Ms.

Corbin, who had been calling the phone, provided the password. (ECF No. 120, at 172-73).   The investigators put the phone in airplane mode and accessed the call log, which showed an outgoing call at 7:53 pm with one of Mr. Tejan's phone numbers, listed as "Mylik," and text messages exchanged with Mr. Tejan's other phone, indicating that Mr. Tejan switched phones that night.   (ECF No. 120, at 173, 178-79).

Detective Hamlin testified that Ms. Corbin directed the investigators to Mr. Tejan's Stil_i_rise Instagram account, which had a picture and Arabic symbol.   (ECF No. 120, at 193).   It contained multiple pictures of Mr. Tejan, including one with Mr. Tejan and the decedent together.   (ECF No. 120, at 194).   It also showed frequent interactions with the account "Savage_Joe_Bleeze," belonging to the decedent.   (ECF No. 120, at 194-95).   Mr. Williams's phone contained pictures of Mr. Tejan that helped identify Mr. Tejan's Instagram page.   (ECF No. 120, at 200-03).

The investigators began following Mr. Tejan to discover whether he was staying at 8831 Lottsford Road, Apt. 325.   (ECF No. 120, at 203, 205).   He was arrested on October 20 and brought directly to Detective Hamlin, who seized his silver LG cell phone. (ECF No. 121, at 32-33).

Detective Hamlin investigated two individuals associated with 6503 Manton Way regarding two incidents on September 21 and 23. (ECF No. 121, at 41-42).   It was a nuisance abatement situation in

a foreclosed house in which the Kamaras—Mr. Tejan's family—were not paying for the house but their relatives and friends were staying there. (ECF No. 121, at 42). A surveillance camera on the opposite side of the Manton and Garson corner facing the backyard showed no activity from the hour before the shooting, but showed people walking towards Manton after the shooting. (ECF No. 121, at 43-46). Detective Hamlin received a tip that two young men who lived nearby in the Horn residence and Grant residence could be suspects. (ECF No. 121, at 46). She began investigating them, but found that their photos did not match with anyone on the surveillance videos and found no connections between them and the decedent. (ECF No. 121, at 46-50). She discovered through DuVal High School records that Mr. Tejan had lived at 6503 Manton Way in 2009-2010. (ECF No. 121, at 51-52). She concluded that Mr. Tejan knew the neighborhood well but the decedent did not know where he was going, which could explain why the white Acura passed the black suspect vehicle and why there was a flurry of phone calls back and forth as the decedent ostensibly figured out where to go. (ECF No. 121, at 53).

Detective Hamlin spoke with Mr. Fotachwi ("Billa" and "Guwop"), Mr. Tejan's friend and former high school classmate. (ECF No. 121, at 63-64). Law enforcement saw Mr. Tejan and Mr. Fotachwi together on October 7 in a 2006 black Lexus driven by Mr. Fotachwi. (ECF No. 121, at 64). Mr. Fotachwi's car matched the

description of the car recovered from Garson Terrace. (ECF No. 121, at 67). Detective Hamlin also spoke with Blake Ndi, a friend of Mr. Fotachwi's. (ECF No. 121, at 71).

Detective Hamlin reviewed Mr. Tejan's phone calls from jail. (ECF No. 121, at 104). In one of the calls, Mr. Tejan indicated that he had been advised the police were looking for him. (ECF No. 121, at 122). Detective Hamlin concluded that a tip-off gave him time to clean his apartment before his arrest. (ECF No. 121, at 123). Mr. Tejan also referenced "cleaning" money and spending $100,000 in the phone calls. (ECF No. 121, at 126, 128).

**B. Contentions and Arguments**

The jury found that a Hobbs Act Robbery provided a predicate for the murder count because they found Mr. Tejan guilty of interference with interstate commerce by robbery. (ECF No. 103); 18 U.S.C. § 924(j). Mr. Tejan contends that there was no "credible" evidence that he took drugs from the decedent, or that he took drug proceeds, or that he stole the Acura. The wallet found in the apartment on Lottsford Road was not the subject of the Hobbs Act robbery charge and did not match the description of the decedent's wallet, and the wallet could not have been proceeds of drug dealing. (ECF No. 105, at 7-8).

The Government argues that Mr. Ndi's testimony alone is sufficient to establish guilt in the conspiracy as well as the robbery and murder. Mr. Fotachwi, a friend of Mr. Ndi, told Mr.

23

Ndi about an incident with Mr. Tejan.  (ECF No. 108, at 11-13).
According to Mr. Ndi, Mr. Fotachwi said Mr. Tejan asked him for a
ride to a location to complete a drug deal.  (ECF No. 108, at 16).
Mr. Fotachwi gave Mr. Tejan the ride.  (*Id.*).  Once they reached
the destination, Mr. Tejan left Mr. Fotachwi's car, Mr. Fotachwi
heard gunshots, and Mr. Tejan ran back to the car with an amount
of marijuana.  (*Id.*).  Mr. Fotachwi drove both of them away from
the scene.  (*Id.*).  A while later, Mr. Ndi had Mr. Fotachwi drive
himself and another person to the scene where this happened, and
they saw police in the area.  (ECF No. 108, at 21).  They contacted
Mr. Tejan via a video call to tell him that the police were present.
(ECF No. 108, at 22).  A few days after that, Mr. Tejan himself
told Mr. Ndi about the murder, saying that, after he shot Mr.
Freeland, Mr. Freeland begged for his life as he was dying.  (ECF
No. 108, at 24).

Ms. Corbin was the decedent's girlfriend.  The two lived
together and she often let Mr. Freeland use her car, a white Acura.
(ECF No. 111, at 6, 15-18, 53).  Mr. Freeland was a drug dealer,
selling marijuana, and he kept a safe in their residence for
firearms, money, and drugs.  (ECF No. 111, at 9, 23).

The night before his murder, Ms. Corbin and Mr. Freeland were
in her car when she heard Mr. Freeland speaking with "Mylik", whose
contact information appeared on the car's dashboard, to set up a
drug transaction for pills.  (ECF No. 111, at 21-23).

Ms. Corbin told police on the scene about the call with "Mylik," and helped them access his phone. (ECF No. 111, at 28-29). Eventually, she also told the police about the Stil_i_rise Instagram account that had been in regular contact with Mr. Freeland. (ECF No. 111, at 31). The profile page had a photo of Mr. Tejan and an Arabic symbol that translated to the name "Malik." (ECF No. 111, at 30).

Ms. Corbin described a wallet (two-toned blue denim and brown leather) that Mr. Freeland purchased for himself at Aldo Shoes where he worked at times. (ECF No. 111, at 13). After his murder, she looked for the wallet (which had not been recovered from his body) but could not find it anywhere. (ECF No. 111, at 32). A wallet was found at Mr. Williams's apartment, but Mr. Tejan argues that it does not match the description given by Ms. Corbin. (ECF No. 105, at 8).

In reply, Mr. Tejan contends that the Government has ignored the differences in the testimony of Mr. Ndi and Ms. Corbin, has failed to address the testimony of an independent witness, and has not recognized the problems with Detective Hamlin's testimony.

He points to Mr. Ndi's contradictory statements, initial refusal to testify, claims of failed memory, and close relationship with Mr. Fotachwi ("Billa" and "Guwop"), whom the Government believes was also killed by Mr. Tejan. Mr. Ndi also said "Enjoy

your holiday" to Mr. Tejan as he was leaving the courtroom.  (ECF No. 118, at 69).

Mr. Tejan argues that Mr. Ndi's testimony was based solely on hearsay, and Ms. Corbin's testimony was inconsistent and implausible because she was "intrinsically involved in criminal activity but never charged."  (ECF No. 105, at 6).  Mr. Ndi testified that Mr. Fotachwi gave Mr. Tejan a ride, and when Mr. Tejan came back after the gunshots, they drove away quickly in Mr. Fotachwi's car until Mr. Fotachwi dropped Mr. Tejan off.  (ECF No. 108, at 16-19, 37).  The evidence, however, showed that the Acura also drove off.  Mr. Ndi also testified that Mr. Tejan got back into the car with about a pound of marijuana and a gun.  (ECF No. 108, at 36-37).  Ms. Corbin, however, testified that on the day he was killed, the decedent left marijuana with his friend "Tubby" (also now deceased) because he did not want to drive into Maryland from Washington D.C. with it, and on October 4, Tubby called her to pick it up.  (ECF No. 111, at 49-50).  She did and then distributed it.  (ECF No. 111, at 50).  According to the defense, if the decedent gave the marijuana to "Tubby," Mr. Tejan could not have returned to Mr. Fotachwi's car with it.

The independent witness called by the defense was Annette Quick, who lived in the area.  She said that, on the night of the murder, she heard three or four shots and ran to her bathroom window to look out.  (ECF No. 121, at 191).  She saw about five

people on a path.  (ECF No. 121, at 192).  One ran to the back of the house and put something in a trash can and then ran into a home occupied by the Horns.  (*Id.*).  She recognized some of the individuals who lived in the Grant residence and another who lived in the Horn residence.  (ECF No. 121, at 193).  Police had raided the Grant residence several times.  (*Id.*).

### C. Sufficiency of the Evidence

The evidence was sufficient on all charges.  As pointed out by the Government, Mr. Ndi's testimony, if believed, coupled with video and other corroborating evidence, establishes Mr. Tejan's conspiracy with Mr. Freeland and Mr. Fotachwi to distribute controlled substances (fentanyl and marijuana), and the robbery, certainly of the Acura, as well as drugs and drug proceeds, and the use of a firearm during that robbery.  Mr. Freeland was a drug dealer who dealt in pills and marijuana, (ECF No. 111, at 9), and Mr. Tejan was to meet him to conduct a transaction on October 3, (ECF No. 111, at 22-23, 35).  As the Government argued, it was logical to conclude that Mr. Tejan took pills with him to the encounter with Mr. Freeland, intending to sell them. (ECF No. 122, at 104).  Ms. Corbin testified that cash was missing from the safe at her residence, implying that Mr. Freeland took it with him to purchase pills from Mr. Tejan, but it was not found after his murder.  The last address in the Acura's navigation system and the flurry of calls between Mr. Freeland and Mr. Tejan establish that

27

they were meeting that night.  (ECF Nos. 117, at 196-97; 121, at 53).  The evidence also supports the jury's conclusion that it was Mr. Tejan who shot Mr. Freeland.  There are no other clear suspects the defense could point to who logically could have shot Mr. Freeland.  Detective Hamlin found no link between the Grants and Horns and the decedent, and that their photos did not match with anyone on the surveillance videos.  Mr. Ndi credibly testified that Mr. Fotachwi told him he heard gunshots and then Mr. Tejan ran back to the car, and that Mr. Tejan himself told Mr. Ndi that he shot Mr. Freeland.  (ECF No. 108, at 16, 24).  The surveillance footage is consistent with the conclusion that Mr. Tejan shot Mr. Freeland, tried to drive away in the Acura, and then got back into Mr. Fotachwi's car when he realized the Acura would not drive any further.  The court concludes that the Government's evidence is sufficient to "'establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144 (1986)).

**D. New Trial Motion**

Nor will the court disturb the jury's verdict by granting a new trial.  A reluctant witness, Mr. Ndi, is not necessarily a lying witness.  Despite his reluctance and demonstrated animosity toward Mr. Tejan, his account of what Mr. Fotachwi said and what Mr. Tejan said and did rang true.  Certain other evidence corroborates the significant facts.  The discrepancies, such as

whether Mr. Tejan jumped immediately into Mr. Fotachwi's car or drove Mr. Freeland's car for a block or two before it stopped and then re-entered Mr. Fotachwi's car, are not significant.  Recall that Mr. Ndi is recounting what Mr. Fotachwi told him—not what he claims to have seen himself.  At some point, it is logical to conclude that Mr. Tejan got hurriedly into Mr. Fotachwi's car, probably after he realized that he could get no further in the car stolen from Mr. Freeland because the fob was not inside the car. The car Mr. Freeland arrived in was found some distance from his body.  It did not drive itself.  The car Mr. Tejan arrived in, driven by Mr. Fotachwi, was seen leaving the area, following the Acura.

The inconsistencies in Mr. Ndi's testimony to which the defense points do not seriously undermine his credibility.  First, that Mr. Ndi could not initially remember whether Mr. Fotachwi told him about the shooting in person or over the phone does not render his testimony unreliable given that the events occurred years prior.  Second, testifying on cross-examination but not on direct examination that Mr. Tejan returned to the car with a gun does not indicate that he lied on cross, only that he missed a detail.  Third, stating that he forgot what "swipes" are likely evinces a desire to avoid admitting criminal wrongdoing, not necessarily a lack of credibility.  Fourth, denying that he provided information to Detective Lee but also testifying that he

reached out to Detective Lee could represent a fear of being deemed a "snitch," and does not necessarily render his other testimony unreliable.  Finally, that Mr. Ndi rudely told Mr. Tejan to "enjoy his holiday" may indicate Mr. Ndi's animosity toward Mr. Tejan but does not necessarily undermine his credibility.

To the extent that there were inconsistencies in Ms. Corbin's testimony, they also do not seriously undermine her credibility. First, it is not necessarily false that the decedent both used her car and sometimes walked to drug deals.  Second, the testimony from Ms. Corbin about the marijuana left with someone else does not foreclose the possibility that there was another batch of marijuana that Mr. Tejan took from Mr. Freeland.  Third, that Ms. Corbin may have engaged in criminal activity herself does not undermine the Government's case.  Given that crime regularly goes unprosecuted, it is certainly not implausible, as Mr. Tejan contends, that she was involved in criminal activity but never charged.  To the contrary, the jury may reasonably have concluded that admitting to her own role in criminal activity helped establish her honesty.  Fourth, like Mr. Ndi's comment about the vacation, that Ms. Corbin yelled at Mr. Tejan after the verdict was read may indicate her animosity toward Mr. Tejan but does not necessarily undermine her credibility.

The defense does not identify any serious inconsistencies in Mr. Williams's or Detective Hamlin's testimony.  That there were

no eyewitnesses or DNA and that Detective Hamlin kept possession of the burner phone are not significant when so much other evidence links Mr. Tejan to the crimes.

The so-called independent witness also does not seriously undermine the Government's case.  She only saw some people in the area after the shots were heard.  That is not inconsistent with the conclusion that Mr. Tejan shot Mr. Freeland during their drug conspiracy encounter.  Without doubt Mr. Tejan was there, as was Mr. Freeland.  That other people in the neighborhood reacted to hearing the shots and anticipating police activity is not unexpected.

Given that the evidence does not weigh so heavily against the verdict that it would be unjust to enter judgment, the court will deny Mr. Tejan's motion for a new trial.  *United States v. Millender*, 970 F.3d 523 (4th Cir. 2020).

## III. Conclusion

For the foregoing reasons, Mr. Tejan's motion for judgment of acquittal or, in the alternative, for a new trial will be denied. A separate order will follow.

<div style="margin-left:50%">

_____  /s/

DEBORAH K. CHASANOW
United States District Judge
</div>