**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **No.    8:21-cr-00101** |
| **v.** | ) | |
| | ) | **Judge Deborah K. Chasanow** |
| **MADANI ILARA TEJAN** | ) | |

<u>**GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT
OF ITS MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, through Erek L. Barron, United States Attorney for the District of Maryland, and David L. Jaffe, Chief of the Violent Crime and Racketeering Section, U.S. Department of Justice, submits this Government's Supplemental Brief in Support of its Memorandum in Aid of Sentencing to further assist this Honorable Court in its sentencing determination regarding the Defendant Madani Ilara Tejan ("TEJAN" or "the Defendant").

On February 17, 2023, TEJAN was found guilty after trial on all counts in a Superseding Indictment alleging conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841 (Count Two); interference with interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count Three); and using, carrying, brandishing, and discharging a firearm during and in relation to, and possessing, brandishing, and discharging a firearm in furtherance of, a drug trafficking crime and a crime of violence, resulting in death, in violation of 18 U.S.C. §§ 924(c) and (j) (Count Four). [ECF No. 103]. On September 15, 2023, the Court issued a scheduling order setting a sentencing hearing for Wednesday, January 31, 2024, as well as respective deadlines for sentencing memoranda and other related filings. [ECF No. 135].

In response to the Court's order, on October 13, 2023, the United States Probation Office prepared a draft Presentence Investigation Report ("PSR") in anticipation of sentencing in this matter. [ECF No. 137].[1] In response, the parties submitted proposed corrections and objections to the Probation Office. On December 4, 2023, the Probation Office issued a final PSR. [ECF No. 138].

Thereafter, the parties submitted their respective memoranda in aid of sentencing – TEJAN's on December 14, 2023 ("Defendant's Memorandum"), and the Government's on December 15, 2023 ("Government's Memorandum"). [ECF Nos 139 and 140]. On January 5, 2023, the Government filed a Supplemental Sentencing Memorandum ("Government's Supplemental Memorandum"). [ECF No. 141].[2] That same day, TEJAN filed the Defendant's Response to the Government's Memorandum in Aid of Sentencing ("Defendant's Response") [ECF No. 142]. In reply to the Defendant's Response, the Government filed a motion to Present Victim Impact Evidence from certain family members at Sentencing. [ECF No. 143][3].

On January 26, 2024, the parties participated in a status conference with the Court to discuss outstanding issues raised in the PSR objections and opposing memoranda that needed addressing before sentencing [ECF No. 147]. On January 29, 2024, the Court vacated the current sentencing hearing date for January 31, 2024. [ECF No. 148].  On January 31, 2024, the parties engaged in further discussions with the Court, after which the Court issued a scheduling order setting deadlines for supplemental briefings, as well as the dates of February 27, 2024, for oral

---

[1]     An earlier draft PSR was prepared by U.S. Probation and provided to the parties electronically on or about March 31, 2023.

[2]     This Supplemental Memorandum specifically discussed restitution related issues previously raised in the Government's Memorandum.

[3]     The individuals specifically identified in this filing consisted of various relatives of Ferdinand Fotachwi, including his father, Mathias Fotachwi; his sister, Ernestine Fotachwi; as well as his brothers, Christian and Ernest Fotachwi (collectively, "Fotachwi Family Members").

arguments and March 5, 2024, for sentencing. [ECF No. 152]. The Government replies to the issues raised in the parties' discussions with the Court as follows:

## DISCUSSION AND ARGUMENT

### A. The Murder of Ferdinand Fotachwi is Relevant Conduct that the Court Should Consider at Sentencing

As discussed in the final PSR and the Government's Memorandum, information regarding the murder of Ferdinand Fotachwi was presented for this Court's consideration as relevant conduct when determining an appropriate sentence for TEJAN. [ECF No. 138, 8-9, ¶¶ 24-31; ECF No. 140, 12-13]. In particular, the Government asserts that in order to cover up the murder of Freeland, TEJAN lured Fotachwi (the only potential witness) to the District of Columbia where he (Fotachwi) was also killed. The Defendant objects to the inclusion of this information and has argued that it is not proper for the Court to consider at sentencing, [ECF No. 138, 28; ECF No. 139, 2]. In support of his argument, the Defendant claims that "there is no reliable evidence to establish relevant conduct…" [*Id.*]. The Government disagrees.

U.S.S.G. § 1B1.3(a)(2) requires that when determining the base offense level for certain offenses, "all acts and omissions… that were part of the same course of conduct or common scheme or plan as the offense of conviction," otherwise known as "relevant conduct," should be reflected. *Id.* Offenses are within the "same course of conduct" when "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *United States v. Hodge*, 354 F.3d 305, 313 (4th Cir. 2004). The notion of "'same course of conduct' does not require that acts be connected together by common participants or by an overall scheme.... [but] only that the defendant has engaged in an identifiable pattern of certain criminal activity." *Id.* Courts have relied upon several factors to determine whether offenses are part of the same course of conduct "includ[ing] the degree of

similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3, comment. (n. 9(B)); *see United States v. Pauley*, 289 F.3d 254, 259 (4th Cir. 2002) (explaining that to determine whether conduct outside the count of conviction is part of the same course of conduct, the sentencing court must consider several factors to decide whether they indicate a pattern of behavior: "the nature of the defendant's acts, his role, and the number and frequency of repetitions of [his] acts" (internal quotation marks omitted)), *vacated in part on reh'g*, 304 F.3d 335 (4th Cir. 2002) (per curiam), *cert. denied*, 537 U.S. 1178, (2003).

In determining "relevant conduct," the district court may consider any relevant and reliable evidence before it, including hearsay. *United States v. Bowman,* 926 F.2d 380, 381 (4th Cir. 1991). "The trial court may even properly consider uncorroborated hearsay evidence that the defendant had an opportunity to rebut or explain." *United States v. Love*, 134 F.3d 595, 607 (4th Cir.), *cert. denied,* 524 U.S. 932 (1998). It makes no difference whether the criminal conduct is charged in a count of conviction. *See, e.g., United States v. Pineda,* 770 F.3d 313, 319 (4th Cir. 2014) (affirming inclusion of uncharged sale of drugs and firearm which led to defendant's subsequent investigation and conviction as "relevant conduct"), *cert. denied,* 135 S. Ct. 1515 (2015). Base offense levels can be determined "based on 'all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendants,' as well as the reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity." *United States v. Bell,* 667 F.3d 431, 441 (4th Cir. 2011) (quoting U.S.S.G § 1B1.3(a)(1)(A), (B)). Sentences may also be based in part on facts found by a judge by a preponderance of the evidence. *Rita v. United States,* 551 U.S. 338, 350-52 (2007); *accord United States v. Grubs*, 585 F.3d 793, 798-99 (4th Cir. 2009), *cert. denied*, 559 U.S. 1022 (2010). Facts relevant to sentencing that may be found by a judge by a preponderance of the evidence include dismissed, acquitted, and even

4

uncharged conduct. *See, e.g., United States v. Davis,* 918 F.3d 397, 404-06 (4th Cir.) (drug quantity based in part on conspiracy for which defendant was acquitted), *cert. denied,* 140 S. Ct. 202 (2019); *United States v. Ellis,* 975 F.2d 1061 (4th Cir. 1992) (dismissed count); *United States v. Jinwright,* 683 F.3d 471, 484-85 (4th Cir. 2012) (uncharged and acquitted conduct), *cert. denied,* 568 U.S. 1093 (2013). Facts found by the district court by a preponderance of the evidence are reviewed on appeal for clear error. *United States v. Savage*, 885 F.3d 212, 225 (4th Cir.), *cert. denied*, 139 S.Ct. 238 (2018); *United States v. Battle*, 499 F.3d 315, 323 (4th Cir. 2007); *United States v. Tucker*, 473 F.3d 556, 560 (4th Cir. 2007).

The facts in *Pauley* are similar to those in the instant matter. In that case, the defendant was a member of a drug trafficking crew operating in and around Kanawha County, West Virginia. In order to supplement their supply of narcotics, crew members would conduct robberies of other drug dealers. In between May 1998 and March 1999, the defendant and other co-conspirators committed several drug robberies, including one that involved the shooting murder of two women on December 19, 1998. The defendant was subsequently arrested and charged in a ten count indictment. He entered a guilty plea to a single count charging him with aiding and abetting possession with intent to distribute methamphetamine and marijuana based on a drug robbery that occurred on May 10, 1998. After his plea, the remaining counts were dismissed. At sentencing, the court considered the December 19, 1998, murders as relevant conduct for determining an appropriate sentence. The court then applied the murder cross-reference contained in U.S.S.G. § 2D1.1(d)(1). The application of this cross-reference resulted in the defendant's Guidelines range increasing from 97-121 months to life imprisonment. On appeal, the defendant challenged the consideration of the murders and application of the cross-reference. After applying the several factors discussed *supra,* the circuit court found that the "thefts perpetrated by [the defendant] and

5

[his co-conspirators] to obtain drugs were part of the same course of conduct or common scheme or plan, and hence relevant conduct. Because the murders were committed during the course of one of the thefts, it too is relevant conduct." *Pauley*, 289 F.3d at 259.

Similarly, the murder of Fotachwi is relevant conduct to TEJAN's offenses of conviction that this Court should consider when sentencing TEJAN. This relevant conduct information was previously presented during a motions hearing on July 8, 2022, presided over by the Honorable United States District Judge George Hazel. [ECF No. 62]. The purpose of this hearing was to determine the admissibility of statements made by Fotachwi to other associates that implicated TEJAN in the crimes charged in this case. While the conduct presented was not charged in the instant indictment, the sources used to offer this information consisted of in-person live witness testimony, grand jury transcripts of other witnesses, as well as other records and documents. The witnesses and evidence presented were subject to vigorous cross-examination and other challenges by the Defendant. In addition, Judge Hazel considered significant filed briefings and oral arguments on the facts and issues raised. After careful consideration, Judge Hazel found the witnesses to be credible and then determined by "a preponderance of the evidence that the [D]efendant was responsible for the murder of the potential witness and that he committed or acquiesced in that murder in order to make the witness unavailable for trial." [ECF No. 116, 8, 12-14]. In making this determination, Judge Hazel specifically held that the murder of Fotachwi was in some way attributable to TEJAN, and that the evidence presented was not only relevant to TEJAN's charged offenses but also reliable information.[4] Applying Judge Hazel's rationale and

---

[4]     In asserting that there is no reliable evidence to establish probable cause, TEJAN challenges Judge Hazel's credibility determination as it relates to the witnesses who testified in the grand jury and at the motions hearing. However, the Fourth Circuit has held that "when a district court's factual finding is based upon assessments of witness credibility, such finding is deserving of the highest degree of appellate deference." *United States v. Thompson*, 554 F.3d 450, 452 (4th Cir. 2009) (internal quotations omitted). This is because, "[t]he trial court is uniquely qualified to determine which witnesses are most credible and to resolve conflicts among witnesses' testimony, for the simple

the standard discussed in *Pauley*, the murder of Fotachwi was part of the "same course of conduct" as the robbery and murder of Freeland in that it was committed to cover up TEJAN's role in those crimes. Based upon this, the Government submits that Fotachwi's murder is relevant conduct to TEJAN's counts of conviction and should be considered by this Court at sentencing.

### B. Certain Witnesses Should be Permitted to Present Statements at the Defendant's Sentencing Hearing

#### i.   These Statements Are Admissible Under the Crime Victims' Rights Act

The Crime Victims' Rights Act (CVRA), codified at 18 U.S.C. § 3771, guarantees crime victims certain rights, including "[t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." *Id.* at § 3771(a)(4). In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights. *Id.* at § 3771(b). A "crime victim" is defined as a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia. *Id.* at § 3771(e)(2)(A). Family members can assume the rights of a crime victim who is deceased. *Id.* at § 3771(e)(2)(B). The CVRA's definition of "crime victim" is "intentionally broad" meaning to ensure victims' rights "whether or not they are the victim of the count charged." *United States v. Sharp*, 463 F. Supp. 2d 556, 561 (E.D. Va. 2006).

The Fourth Circuit has not interpreted the definition of a crime victim under the CVRA. However, it has construed identical language of the Victim and Witness Protection Act of 1982 ("VWPA") and the Mandatory Victims Restitution Act of 1986 ("MVRA").  In doing so, it has held that "[a]n individual is only 'directly and proximately harmed' when the harm results from 'conduct underlying an element of the offense of conviction.'" *Id.* at 563; *United States v. Blake,*

---

reason that it has the benefit of observing the witnesses, and is thereby aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *United States Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 822 (4th Cir. 1992).

81 F.3d 498, 506 (4th Cir. 1996) (construing identical language of the VWPA); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708, (2008) ("A person is directly harmed, for purposes of the MVRA, when the harm results from conduct underlying an element of the offense of conviction."); *United States v. Cornett*, 515 F. Supp. 3d 367, 370–71 (E.D.N.C. 2021). As long as another party "suffers harm as a result of the crime's commission," it "may qualify as a victim." *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010). This victim status need only be proven by a preponderance of the evidence. *Id.* "A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm. [A person] is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). To determine "foreseeability…the closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists. Whether one seeking to be heard at a defendant's sentencing hearing is a 'victim' under the CVRA is, therefore, a fact-specific question." *Sharp*, 463 F. Supp. 2d at 565–66 (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 713, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (O'Connor, J., concurring) (internal citations omitted). "In making this determination, ... [courts] must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of that [f]ederal offense.'" *McNulty,* 597 F.3d at 351 (quoting *United States v. Atlantic States Cast Iron Pipe Co.,* 612 F. Supp. 2d 453, 536 (D.N.J. 2009)).

Applying these precedents to the facts of this case, the Fotachwi Family Members have demonstrable "victim status" under the CVRA. TEJAN was convicted of the offenses in Counts

Three and Four of the Indictment charging him with interference with interstate commerce by robbery, and using a firearm during and in furtherance of a crime of violence. As proven at trial, the Defendant robbed and killed Freeland, while Fotachwi was present as a witness. Law enforcement immediately began an active investigation of Freeland's murder, to include identifying and speaking with witnesses. Fotachwi was killed two weeks later in the District of Columbia to prevent him from speaking with authorities about the Freeland murder. The murder of Fotachwi assisted the Defendant in the commission of his federal offenses (the robbery and firearms related murder of Freeland) in that it eliminated a witness to the crimes and helped obstruct law enforcement's investigation. Therefore, the harm to Fotachwi (his death) was a "but-for" outcome or directly caused by the Defendant and a reasonably foreseeable outcome of the offenses of conviction. Fotachwi, as a result, is a crime victim and his family members can assume his rights.

The same can be argued for Candice Corbin. Corbin was in a romantic relationship with Freeland. Corbin and Freeland first met as teenagers in 2006 and had been dating on and off ever since. Prior to his death, Freeland and Corbin shared a household in the District of Columbia for approximately a year and a half. During those last few months of Freeland's life, Corbin was pregnant with his child. This child was subsequently born just a few months after Freeland's death. A jury has found that TEJAN killed Freeland. This murder is a significant loss that will reverberate throughout the lives of Corbin and this child. Based on this, Corbin and the minor child she shared with Freeland would be considered a crime victim under the CVRA because they are persons who have been "directly and proximately harmed" by TEJAN's federal crimes of conviction. 18 U.S.C. § 3771(2)(A). Additionally, according to the CRVA, for "a crime victim who is under 18 years of age… the legal guardians of the crime victim or family members… may assume the crime

victim's rights." *Id.* at § 3771(2)(B). Certainly, Corbin has her own crime victim rights under the CRVA. However, as the only living parent and legal guardian of Freeland's minor child, Corbin should also be eligible to assume this child's crime victim's rights and, among other things, present a victim impact statement at sentencing.

  ii. **Fotachwi and Corbin are not Participants in the Relevant Crimes of Conviction and are not Barred from Having Crime Victims' Rights**

  The Defendant contends that Fotachwi and Corbin are barred from having crime victim status. This is because "a person accused of the crime may not obtain any form of relief" under the CRVA. *Id.* at § 3771(d)(1). In making this argument, TEJAN asserts that Fotachwi was a co-conspirator or accessory after the fact to each of his (TEJAN's) offenses of conviction. The Defendant further extends this argument to Corbin – whom he says was a co-conspirator in the drug trafficking activities alleged in Count One.

  The purpose of the CRVA is to ensure that victims' rights are keenly affirmed and protected. *Id.* at § 3771. As already discussed, circuits around the country have often wrestled with the issue of who is a "crime victim." *Sharp*, 463 F. Supp. 2d at 563. This is evidenced by the careful and thoughtful analysis courts have undertaken to address this complicated issue by examining other sources for guidance, including the VWPA and MVRA. As noted above, determining victim status "is a fact-specific question." *Id.* at 565–66. Using this approach, the Government submits that both Fotachwi and Corbin qualify as crime victims.

  As it relates to Fotachwi, the Government again directs this Court's attention to the July 8, 2022, motions hearing in this matter. As noted in its pre-trial filings and oral argument, the Government argued that Fotachwi's statements were admissible at trial under two grounds: (1) as statements offered against a party that wrongfully caused the declarant's unavailability (forfeiture-

by-wrongdoing) pursuant to Federal Rule of Evidence 804(b)(6); and/or (2) as statements against

penal interest pursuant to Federal Rule of Evidence 804(b)(3).

While Judge Hazel ultimately granted the Government's motion regarding the forfeiture-

by-wrongdoing argument, he denied the statements against penal interest argument. In making that

ruling, Judge Hazel conducted a very fact-specific analysis that is relevant when considering the

Defendant's current challenge as to whether Fotachwi is a "crime victim." Specifically, Judge

Hazel found:

> "a statement against interest is defined as one where a reasonable person in
> the declarant's position would have made the statement only if the person
> believed it to be true because when made, it exposed the declarant to civil
> or criminal liability…. [Fotachwi said] he drove the defendant somewhere
> to conduct a swerve, and then when the defendant came back, [TEJAN] said
> [Freeland] tried to rob him…when the defendant came back, he said the
> decedent tried to rob him, and he shot him, and the defendant drove him
> away. Driving someone away who is claiming he shot someone in self-
> defense would not be a crime…"

[ECF No. 116, 12].

Based on the detailed record established during the motions hearing, Judge Hazel

determined that Fotachwi was not a participant in the murder, nor was he an accessory after the

fact.  This is because Fotachwi believed that if TEJAN had committed a shooting, it was a justified

use of force to protect himself (TEJAN) from harm. Objectively, this belief was reasonable because

Fotachwi, based on all accounts, did not see the shooting as it occurred and, therefore, had to rely

on the account of TEJAN – a presumed reliable and trusted friend. Fotachwi's subjective belief is

corroborated by other witness statements where it was explained that he (Fotachwi) later

questioned what happened and then confronted TEJAN about the veracity of his (TEJAN's)

account. [ECF No. 63, Ex. 4,  21-24; ECF No. 116, 11].

Though Fotachwi is an uncharged co-conspirator in TEJAN's drug trafficking conspiracy alleged in Count One, this analysis demonstrates that the same cannot be said for the crimes of conviction that ultimately resulted in his (Fotachwi's) own harm – Counts Three and Four. Fotachwi was killed because he could provide information to law enforcement about the circumstances surrounding Freeland's robbery and murder. The particular harm to Fotachwi – his death – is the result of these two crimes of conviction, which form the basis for his crime victim status. As such, any rights asserted on his behalf would be in relationship to these specific crimes.

Furthermore, as described *supra*, the VWPA and MVRA are relied upon significantly by courts when looking to interpret the appropriate resolution of issues involving the CVRA. This is because each of these statutes share similar language in their statutory construction. Looking to the MVRA for further guidance, it is clear that even if Fotachwi was an accessory after the fact to the robbery and murder of Freeland, he still would not be barred from being a crime victim.

In *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), a young woman ("victim") was found shot to death in the Deep Creek area of the Great Smoky Mountains National Park in Bryson City, North Carolina. Law enforcement determined that the victim had been previously seen with the defendant and two other co-defendants identified as Terrance Roach and Michael Slee. Law enforcement learned that Roach told Slee that the victim had stolen drugs from him (Roach) and owed a significant amount of money. Slee and Roach then picked up the victim in a vehicle and took her to the park. There, Roach took the victim into the woods. Slee then observed Roach shoot the victim and Slee ran back towards the vehicle. Roach then directed Slee to drive to the defendant's residence. Roach then admitted to the defendant that he (Roach) had killed the victim. Roach gave the defendant the murder weapon and told the defendant to get rid of it. The defendant later gave the weapon to another person to hold. Roach was charged with murder, while Slee and

the defendant were charged as accessories after the fact to first degree murder. The defendant pled guilty and was determined to be jointly and severally liable with Slee for restitution to the victim's estate. The defendant appealed the restitution judgement.

Relying on the MRVA,[5] the Fourth Circuit vacated the restitution judgment and remanded the case to the district court, holding that:

> "Here, neither Squirrel's nor Slee's offense conduct as an accessory-after-the-fact to Roach's murder of [the victim] directly or proximately caused any financial loss to [the victim's] estate. Indeed, the district court as the trier of fact regarding the underlying facts in determining if Squirrel and/or Slee should be ordered to pay restitution to [the victim's] estate found that neither Squirrel nor Slee planned or actively participated in [the victim's] murder. Moreover, the facts set forth in Squirrel's and Slee's PSRs, which the district court adopted as the factual bases for their respective pleas of guilty to being accessories-after-the-fact, did not contain any facts to the effect that Squirrel or Slee planned or knowingly participated in [the victim's] murder. Notably, while the district court expressly found that Squirrel's and Slee's offense conduct deliberately obstructed the murder investigation by law enforcement authorities and delayed the apprehension of Roach, the district court never made a finding that Squirrel's or Slee's

---

[5] The MVRA provides that:

> Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate…This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense… that is… a crime of violence…

18 U.S.C. §§ 3663A(a)(1) and (c)(1)(A)(i).

The MVRA further defines a victim as follows:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. §§ 3663A(a)(2).

> offense conduct directly and proximately caused loss to [the victim's] estate, understandably because Squirrel's and Slee's criminal activity occurred after [the victim's] murder, not before."

*Squirrel*, 588 F.3d at 216 (emphasis added).

Considering these very similar facts to those in the instant matter, even if Fotachwi was considered an accessory after the fact, his status as such would not have been the direct and proximate cause of Freeland's harm. This is because any criminal actions on Fotachwi's part would have occurred after the robbery and murder of Freeland. Like in *Squirrel*, there was no evidence adduced at trial or in any other hearing that Fotachwi planned or knowingly participated in the crimes. In fact, the findings of Judge Hazel during the July 8, 2023, motions hearing support the argument that Fotachwi had no intent to commit the crimes as they were occurring nor immediately after.

Because Fotachwi was not a co-conspirator or accessory after the fact to the robbery or murder, and he was not the direct or proximate cause of Freeland's harm, he (Fotachwi) is not an accused or defendant as contemplated under the CVRA. Therefore, his family members should be able to assume and exercise his crime victim rights at the Defendant's sentencing hearing, by providing statements for the Court's consideration.

The Defendant also argues that Corbin is not a "crime victim" because she is a co-conspirator with TEJAN and Freeland in the drug trafficking offense charged in Count One. The defendant makes this argument because at trial, there was testimony that Corbin knew about Freeland's drug dealing activity and he spoke with her about it, knew about the drug dealing between TEJAN and Freeland, was present for some drug deals conducted by Freeland, knew that Freeland stored drugs and drug proceeds in their shared residence, and at times allowed Freeland

to use her car to do drug deals. [ECF No. 111, 02/10/23, 9-11, 21-24, 35, 38-41, 43-45]. However, this testimony is not enough to demonstrate participation in a criminal conspiracy.

It is well settled that to prove a conspiracy, there must be "(1) an agreement to commit an offense between two or more people to commit a crime; (2) that the defendant knowingly and willfully participated in the conspiratorial endeavor; and (3) an overt act committed in furtherance of the conspiracy." *United States v. Vinson*, 852 F.3d 333, 352 (4th Cir. 2017) (quoting *United States v. Singh*, 518 F.3d 236, 252 (4th Cir. 2008)); *see United States v. McNeal*, 818 F.3d 141, 149 (4th Cir.), *cert. denied*, 137 S.Ct. 164 (2016). Here, there is no agreement between Corbin and anyone else to commit a crime. Though she was aware of Freeland's criminal activities, Corbin testified that she did not agree with or condone Freeland's drug dealing. [ECF No. 111, 02/10/23, 11, 43, 57]. Additionally, Corbin affirmatively stated that she did not know Freeland's drug customers, nor benefit from the drug proceeds that Freeland had, nor engage in the sale of drugs. [*Id.* at 38, 42-43, 56-57]. When cross examined on this topic, there was no evidence generated that Corbin knowingly or willfully participated in drug trafficking, or took affirmative steps in furtherance of drug trafficking.[6] Even while admitting to seeing Freeland facilitate and/or sell drugs [*id.* at 38], mere "[p]resence at a crime scene or accompanying someone who engages in criminal activity, …does not by itself establish probable cause of involvement in the criminal offense." *Robinson v. Miller*, 802 Fed. Appx. 741, 748 (4th Cir. 2020); *see Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) ("That one is merely present 'at the scene of a crime or in the

---

[6]      At trial, the Defendant elicited testimony about how after Freeland's death, Corbin was contacted by a Freeland associate named "Tubby" who had her come pick up items belonging to Freeland, including marijuana. [ECF No. 111, 02/10/23 at 50]. Corbin admitted picking the marijuana up, and then giving it and the firearms Freeland kept in their safe to other friends and family members of Freeland. [*Id.* at 51].  The Defendant hangs his hat on this information as evidence of Corbin's involvement in the drug conspiracy. However, it is the Government's position that Corbin did not want to keep items associated with Freeland in her residence once he was deceased. [*Id.* at 58]. The removal of these items is consistent with Corbin's repeated assertions that she did not condone or engage in drug trafficking, and these items were only in the residence because Freeland had them there.

company of a person engaging in criminal activity' is not, by itself, sufficient to establish probable cause." (*citing United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988)). Instead, one "must also show that the accused possessed 'at least the degree of criminal intent necessary for the substantive offense itself'…" *McNeal,* 818 F.3d at 149 (quoting *Ingram v. United States*, 360 U.S. 672, 678 (1959)). As discussed, there is no evidence demonstrating that Corbin had the intent required to commit a conspiracy to traffick drugs. Because Corbin did not agree or actively participate in the drug conspiracy, she was not a participant in the charged crime and should not be barred as a crime victim.

Assuming *arguendo* that Corbin was a co-conspirator in Count One, like Fotachwi, she still would not have been a co-conspirator in the offenses that are directly related to her harm – the robbery and murder of Freeland. This is because she did not participate in nor agree to the robbery or murder of Freeland in furtherance of the drug trafficking conspiracy; nor would Freeland's murder have been a reasonably foreseeable result of the conspiracy. In fact, TEJAN's robbery and murder of Freeland are arguably an affirmative action "to defeat or disavow the purpose of the conspiracy." *See United States v. Sheffer*, 896 F.2d 842, 844 (4th Cir. 1990). As a result, Corbin is not an accused or participant in the crime as prohibited under the CVRA. Instead, she would be considered a crime victim in her own right and/or should be able to assume the crime victim rights of her and Freeland's child. As either, she would be qualified to present a statement at the Defendant's sentencing hearing.

### iii.   If the Witnesses are Permitted to Testify, the Defendant Does Not Have the Right to Seek a Writ of Mandamus under the CVRA

On January 26, 2023, during a status call with the Court, the Defendant argued that should the Court rule against him on the issue of whether the Fotachwi's Family Members or Corbin are qualified as victims pursuant to the CVRA, he may petition the court of appeals for a writ of

mandamus. In support of this argument, the Defendant relies upon the enforcement section of the

statute that states in pertinent part:

> The rights described in subsection (a) shall be asserted in the district court
> in which a defendant is being prosecuted for the crime or, if no prosecution
> is underway, in the district court in the district in which the crime occurred.
> The district court shall take up and decide any motion asserting a victim's
> right forthwith. If the district court denies the relief sought, the movant may
> petition the court of appeals for a writ of mandamus. The court of appeals
> may issue the writ on the order of a single judge pursuant to circuit rule or
> the Federal Rules of Appellate Procedure. The court of appeals shall take
> up and decide such application forthwith within 72 hours after the petition
> has been filed, unless the litigants, with the approval of the court, have
> stipulated to a different time period for consideration. In deciding such
> application, the court of appeals shall apply ordinary standards of appellate
> review. In no event shall proceedings be stayed or subject to a continuance
> of more than five days for purposes of enforcing this chapter. If the court of
> appeals denies the relief sought, the reasons for the denial shall be clearly
> stated on the record in a written opinion.

18 U.S.C. § 3771(d)(3).

In *In re Redd*, 672 Fed. Appx. 278, 280 (4th Cir. 2016), this issue was addressed by the

Fourth Circuit.  In that matter, the petitioner had previously pled guilty, pursuant to a written plea

agreement, to one count of conspiracy to distribute and to possess with the intent to distribute

cocaine and 50 grams or more of cocaine base. Subsequently, he petitioned for a writ of mandamus

pursuant to the CVRA, arguing that he was entitled to relief as a result of alleged plea bargaining

abuse, and, among other things, should be allowed to reopen his plea and sentence. In considering

his petition, the Fourth Circuit held that:

> "Petitioner is not a crime victim under the CVRA… The CVRA defines a
> "crime victim" as a "person directly and proximately harmed as a result of
> the commission of a Federal offense or an offense in the District of
> Columbia." 18 U.S.C. § 3771(e)(2)(A). [Petitioner] clearly does not come
> within the statutory definition. The CVRA also provides that **'[a] person
> accused of the crime may not obtain any form of relief under this
> chapter.'**" 18 U.S.C. § 3771(d)(l).

*In re Redd*, 672 Fed. Appx. at 280 (emphasis added).

In *In re: Brown,* 932 F.3d 162 (4th Cir. 2019), the petitioner was the victim of a car accident caused by the defendant who was driving under the influence. As a result of the accident, the petitioner was left with several serious injuries requiring multiple surgeries. Ultimately, the defendant was charged and, thereafter, pled guilty to several offenses. At sentencing, the petitioner sought restitution as a condition of the defendant's probation for medical and insurance expenses. The district court sentenced the defendant to probation but denied the petitioner's request for restitution. Soon thereafter, the petitioner filed for a writ of mandamus pursuant to the CVRA. The defendant appealed, opposing the petition. In examining whether the court had subject matter jurisdiction, the Fourth Circuit found:

> "Under the plain terms of § 3771(d)(3), it is the "movant" who "may petition the court of appeals for a writ of mandamus" "[i]f the district court denies the relief sought." § 3771(d)(3). [The victim] is the "movant" under § 3771(d)(3) and is clearly accorded the right to petition under the statute. Congress' specific grant of this right to a 'movant' is unrelated to any appeal under § 3402 **and is plainly *not* a right granted to a defendant or limited to the Government**."

*In re Brown*, 932 F.3d at 169-70 (emphasis added).

TEJAN is currently designated as a defendant in the instant matter. His status as the accused places his interests in clear opposition to the intended purposes and goal of the CVRA. This is because, based upon the interpretations of the statute as outlined in *In re Redd* and *In re Brown*, it is abundantly clear that a defendant does not have the ability to enforce any rights under the CVRA by seeking a writ of mandamus. Instead, only a person who is legitimately qualified or designated as a crime victim would have these rights. Since these rights do not apply to him, TEJAN is prohibited from seeking a writ of mandamus under the CVRA.

**iv.    Alternatively, the Statements of the Fotachwi Family Members and Corbin are Admissible at Sentencing as General Information Concerning the Background, Character, and Conduct of the Defendant**

18 U.S.C. § 3661 states that "[n]o limitation shall be placed upon the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Accord Pepper v. United States,* 562 U.S. 476, 480-81 (2011) (recognizing the wide discretion sentencing courts have in deciding what evidence to consider); *United States v. Sesay,* 553 F.3d 732, 741-42 (4th Cir.) (discussing breadth of what a court may consider at sentencing "without regard to its admissibility under the rules of evidence applicable at trial"), *cert. denied,* 558 U.S. 850 (2009); *United States v. Nichols,* 438 F.3d 437, 439-40 (4th Cir. 2006) (discussing "wide latitude" district courts have traditionally been given in deciding what to consider at sentencing, and noting that "[t]his broad discretion has been preserved under the sentencing guidelines"). *See also* Fed. R. Evid. 1101(d)(3) (exempting sentencing proceedings from the Federal Rules of Evidence); U.S.S.G. § 6A1.3(a) (allowing sentencing courts to consider all relevant information regardless of admissibility at trial provided it has "sufficient indicia of reliability"). Therefore, courts do not have any reason to "invent a blanket prohibition against considering certain types of evidence at sentencing." *United States v. Elbaz*, 52 F.4th 593, 609 (4th Cir. 2022), *cert. denied,* 144 S. Ct. 278 (2023) (quoting *United States v. Watts*, 519 U.S. 148, 152 (1997)).

Here, the statements of the Fotachwi Family Members and Corbin fall squarely within the ambit of 18 U.S.C. § 3661, in that they provide general information concerning the background, character, and conduct of TEJAN that will be relevant at his sentencing. That these statements would be presented by individuals who are also potentially characterized as crime victims is

19

immaterial to their admission under § 3661. In fact, courts in this Circuit have routinely recognized that the statements of crime victims do not have to be mutually exclusive from the statements of general background, character, and conduct.

For example, in *United States v. Meyers*, 402 Fed. Appx. 844 (4th Cir. 2010), the defendant was charged and pled guilty to various offenses, including mail fraud and aiding and abetting mail fraud. At sentencing, the district court permitted the defendant's ex-wife to present a statement. After considering the statement and other relevant information, the defendant was sentenced to 71 months. The defendant appealed, arguing that "the district court committed procedural error in allowing his ex-wife to testify because she was not a 'crime victim' under the CVRA." *Id.* at 845. In response, the government argued that the ex-wife was in fact a crime victim because she was impacted by the defendant's crimes. The government further argued that even if the ex-wife was not a crime victim, her statement "was relevant to [the defendant's] background, conduct, and character, and could be properly admitted for the purpose of fashioning an appropriate sentence under 18 U.S.C. § 3661." *Id*. In ruling, the Fourth Circuit held that "[w]e need not determine, however, whether the witness was a crime victim under [the CVRA], as it is clear that her statement... was relevant to [the defendant's] background, character, and conduct, and was thus admissible for the purpose of imposing an appropriate sentence." *Id*.

Similarly, in *United States v. Spiwak*, 377 Fed. Appx. 319 (4th Cir. 2010), the defendant pled guilty to possession of child pornography. At sentencing, the government moved for an upward departure under the Sentencing Guidelines. In support thereof, the district court admitted the statement of an individual who claimed to have been sexually assaulted as a child by the defendant decades before, but who was not the identified victim of the defendant's past or current crimes of conviction, nor a charged victim in the defendant's case. The district court then granted

the government's motion and sentenced the defendant to 188 months imprisonment (which was 37 months above the top of his pre-departure advisory Guidelines range). The defendant appealed, arguing that the statement was improper as the individual was not a crime victim as defined under the CVRA. The government in response argued that "…nothing in the CVRA places restrictions on the district court's discretion to consider any reliable information at sentencing relevant to 'the background, character, and conduct of' an offender before the court for sentencing…" pursuant to 18 U.S.C. § 3661. *Id.* at 323. The Fourth Circuit affirmed the district court's decision, holding that "[b]earing in mind the considerable latitude that district courts enjoy at sentencing, as authorized by 18 U.S.C. § 3661… we cannot say that the district court abused its discretion." *Id.* at 324.

In *United States v. Cornett,* 515 F. Supp. 3d 367 (E.D.N.C. 2021), the defendant pled guilty to making a false statement during the purchase of a firearm and possession of a firearm by a prohibited person. At the time of the offense the defendant was subject to a domestic violence protective order that prohibited him from having contact with a former domestic partner. The government sought to admit statements from the domestic partner regarding how the defendant came to their (the domestic partner's) residence with a firearm in violation of the protective order. In particular, the government argued that the domestic partner was "a crime victim because '[b]ut for the commission of the Defendant's federal crimes, a violation of his [domestic violence protective order] would not have occurred.'" *Id.* at 372.  The district court concluded that the domestic partner was not a "crime victim" under the CVRA. Nevertheless, the court allowed the partner to testify under oath as a witness at the defendant's sentencing since "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person in determining a sentence." *Id.* at 373.

21

As discussed, both the Fotachwi Family Members and Corbin have general information about the Defendant. This information, if admitted, would provide this Court with additional insights into the Defendant, particularly as it relates to his character and conduct. While both can explain the impact that the Defendant's conduct has had on their lives, Corbin, in particular, can speak to her direct knowledge of the Defendant's illegal activities based on specific conversations with Freeland that she has overheard. This information is relevant and would be instructive in determining an appropriate sentence for the Defendant. Because this Court has the ability to receive any information about the Defendant, these statements are admissible irrespective of these witnesses' status as crime victims under the CVRA or not. Therefore, this Court should admit these statements and give them whatever weight it deems appropriate.

### C. The Government's Proposed Sentencing Guidelines Calculations for Count One are Properly Calculated

In the final PSR, the Probation Office calculated the Defendant's total offense level for the drug trafficking conspiracy charged in Count One as 30. [ECF No. 138, at 46]. The Government agreed with the PSR that a 4-level enhancement applied because marketing Fentanyl as another controlled substance was an object of the offense, U.S.S.G. § 2D1.1(b)(13), and that an additional 2-level enhancement applied because witness tampering and destruction of evidence were objects of the offense, U.S.S.G. § 2D1.1(b)(16)(D).  However, as explained in its Sentence Memorandum, the Government also asserted that an additional 2-level enhancement applied because TEJAN maintained a drug premises, U.S.S.G. § 2D1.1(b)(12), for a total offense level as to Count One of 32.  [ECF No. 140, at 15].

In response, the Defendant noted several objections to the PSR's and Government's proposed calculations. First, as it relates to the 2-level enhancement for maintaining a drug premises, the Defendant argued:

> "…that [TEJAN] did not have possessory interest in the premises. He also had little if any control over the premises…. that [TEJAN] was an overnight guest, and only a small amount of marijuana was recovered from the residence. The person that leased and controlled the premises testified that he smoked marijuana…. there is simply no evidence the defendant used this residence of another for the sole purpose of selling marijuana."

[ECF No. 138, Defendant's Objections, 29].   Furthermore, in addressing the Government's proposed 2-level enhancement for knowingly misrepresenting or knowingly marketing Fentanyl as another controlled substance, the Defendant argued "…that there is no evidence the Defendant knew the pills seized from him were not oxycodone, and that they looked like Oxycodone pills. Defense Counsel cites USSG §2D1.1(b)(13) which requires 'knowledge and knowing false marketing.'" [ECF No. 138, Defendant's Objections, at 29].

The Government has the burden of establishing the applicability of an increase in an offense level under the Sentencing Guidelines. *United States v. Abdi*, 342 F.3d 313, 317 (4th Cir.), *cert. denied*, 540 U.S. 1167 (2003) (citing *United States v. Solomon*, 274 F.3d 825, 828 n.2 (4th Cir. 2001)). On appeal, the Fourth Circuit will "review the district court's sentencing procedure for abuse of discretion, and must reverse if [it finds] error, unless [it] can conclude that the error was harmless." *United States v. Gomez-Jimenez*, 750 F.3d 370, 379 (4th Cir. 2014). In determining whether the district court properly applied the Sentencing Guidelines, the Fourth Circuit reviews "the district court's legal conclusions *de novo* and its factual findings for clear error." *Id*. at 379-80.

Pursuant to U.S.S.G § 2D1.1. Application Note 17, "subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the

purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." *Id.* In determining whether this enhancement applies, a court should consider several factors, including "(A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id*.

In the instant matter, the Government has sufficiently established that the Defendant maintained the Lottsford Road residence for the purpose of a drug premise. Evidence before this Court comes from a multitude of sources, including eyewitness statements, social media records, jail calls, and other evidence. In particular, an associate of Fotachwi, identified as J.E., testified that on October 15, 2018, he stopped by the Lottsford Road residence to meet Fotachwi, and TEJAN was the only apartment resident who occupied the location and was present. [ECF No. 106, 07/08/22, at 25-27 (J.E.)]. While J.E. was there, another unknown individual came to the residence and delivered a large, bulky package to TEJAN that J.E. believed contained marijuana; the delivery occurred right before Fotachwi and TEJAN left for Washington, D.C. to do a "swerve" (a street term meaning to "conduct business," i.e., drug trafficking) [*Id.* at 35-40, 45-47 (J.E.)]. Additionally, in several of social media messages, TEJAN facilitated drug deals, including one where he arranged for the customers to come to where he lived (the Lottsford Road residence) to complete a sale. [Government's Trial Exhibit 437]. In another message, TEJAN advised an associate that he stayed at the Lottsford Road residence. [Government's Trial Exhibit 438]. Also, an associate of TEJAN's named Keith Williams testified that the two lived together at the Lottsford

Road residence and TEJAN maintained personal items in a room at the residence. [ECF No. 118, 02/09/23, at 123-25, 136, 141 (Williams)]. Williams also testified that TEJAN would store small garbage-sized bags of "low quality" marijuana in the kitchen of the apartment, which he (TEJAN) sold to customers. [*Id.* at 137-39 (Williams)]. A subsequent search of the Lottsford Road location resulted in the seizure of various items, including 24.83 grams of marijuana and a Cricket Wireless cellular phone located inside a green army-style fanny pack/backpack (both of which were later determined to be TEJAN's). [ECF No. 117, 02/08/23, at 141-48 (Fowler); ECF No. 118, 02/09/23, at 80-81 (Cruz); ECF No. 121, 02/15/23, at 82, 85 (Hamlin)]. Furthermore, while awaiting trial on Freeland's murder, TEJAN participated in a recorded jail call conversation where he advised an associate that, prior to arrest, he (TEJAN) had been warned by apartment staff that law enforcement was looking for him (TEJAN). [ECF No. 121, 02/15/23, at 103, 120-22 (Hamlin); Government's Trial Exhibit 423]. TEJAN further said that, based on this warning, he was able to "clean up" (get rid of evidence) at the Lottsford Road residence. [ECF No. 121, 02/15/23, at 122-23 (Hamlin); Government's Trial Exhibit 423].[7] Based on the aforementioned, the Government has established that TEJAN held a possessory interest in the Lottsford Road residence; had significant control of the access to, or activities at, the Lottsford Road residence; and that the storage and distribution of controlled substances was one of TEJAN's primary or principal uses for the Lottsford Road residence. As a result, TEJAN maintained a drug premise and the application of the 2-level upward adjustment is appropriate, pursuant to U.S.S.G. § 2D1.1(b)(12).

---

[7]     Regarding the Government's proposed 2-level enhancement for witness tampering and destruction of evidence, pursuant to U.S.S.G § 2D1.1(b)(16)(D), the Defendant objected, stating "[t]here is no reliable evidence that Tejan destroyed evidence. Tejan should not be assessed 2 levels for this." [ECF No. 39, Defendant's Memorandum, at pg. 2]. The Government has already addressed this argument in the Government's Sentencing Memorandum [ECF No. 140, at pg. 11].

Finally, the Government has also produced substantial evidence demonstrating that the Defendant knew that he was engaged in the marketing of a controlled substance (oxycodone) as another controlled substance (fentanyl). While the Defendant asserts that he did not have knowledge, the evidence presented indicates otherwise. In establishing the Defendant's knowledge, the Government has relied upon various forms of evidence consisting of seized evidence, photographs, witness information, and social media messages. Specifically, the Government called Fernando Jaramillo as a drug expert in the case. After being qualified, Jaramillo explained that fentanyl is a stronger, more powerful drug that is sold cheaper than other controlled substances. [ECF No. 119, 02/10/23, at 137 (Jaramillo)]. While fentanyl comes in a powder form and is normally sold that way, in the Washington, D.C. area it is predominately sold as "pressed pills" with markings that indicate the pills are another substance, such as oxycodone. [*Id.* at 138]. Because of the strength of these fentanyl pills, they sold at a higher price between $20 to $30 dollars. [*Id.*]. Various exhibits and witness testimony established that the Defendant was engaged in the sale of pills that were described under different names, including "oxys," "oxycodone," and "perks." [Government's Trial Exhibits 443 and 446; ECF No. 111, 02/10/23, at 35]. This evidence was corroborated by the Defendant's arrest with approximately 1,013 fentanyl pills on August 15, 2018, that had markings on them indicating that they were supposed to be purely prescription pills. [ECF No. 119, 02/10/23, at 47, 54 (Tyson); ECF No. 119, 02/10/23, at 62-65 (Sheffey); Government's Trial Exhibits 10 and 249]. Witness testimony related to that arrest established that this was a significant amount of drugs. [ECF No. 119, 02/10/23, at 66 (Sheffey)]. Additionally, social media messages between the Defendant and others showed him either arranging or advertising pills for sale. [Government's Trial Exhibit 446]. The pills advertised had markings similar to oxycodone and were described as having come from

a doctor, but were contained in a prescription bottle that had labels that were partially removed. [*Id.*] The pills advertised were also described as having strong side effects, thereby indicating a better or increased quality. [*Id.*] The advertised strength of the pill is important to a drug trafficker because it helps drive the price per pill that one can charge. [*Id.*]. Based on the manner in which fentanyl pills were sold in the Washington metropolitan region, the Defendant's apparent experience possessing and selling significant amounts of drugs locally, the manner in which he described the quality of his product, the illegitimate manner in which his pills were maintained, and the prices associated with his pills, it is reasonable to believe that he knowingly was marketing one controlled substance (oxycodone) as another (fentanyl). As a result, the 4-level upward adjustment to the Defendant's offense level is appropriate, pursuant to U.S.S.G. § 2D1.1(b)(13).

Based on the aforementioned, the Government's proposed offense level for Count One is calculated properly and, therefore, the Defendant's total offense level should be a 32.

### D. Restitution is Appropriate under the MVRA

In the Government's Memorandum and the Government's Supplemental Memorandum, the Court was advised that, pursuant to the MVRA restitution should be imposed against TEJAN as a condition of any sentence for the robbery and murder of Freeland [ECF Nos. 140 and 141]. The Government has identified Freeland's mother, Annette Gladney, and Corbin as crime victims eligible for restitution. An order of restitution can require a defendant to pay for "damage to or loss or destruction of property", as well as "necessary funeral and related services." 18 U.S.C. at §§ 3663A(b)(1) and (3).

An itemized list of expenses is as follows:

- $3,950.00 – cemetery and burial expenses (Gladney);

- $3,850.00 – memorial reception costs (Gladney);

- $150.00 – damaged clothes (Gladney);

- $2,946.00 – mortuary services (Corbin); and

- $500.00 – automobile insurance deductible (Corbin)

Based on these figures, the total amount of expenses incurred by these victims is $11,369.00. Of this amount $7,923.00 is owed to Gladney.[8] However, in or about 2019, Gladney was provided with aid and assistance by the State of Maryland Criminal Injuries Compensation Board reimbursing Freeland's family in the amount of $5,000.00, for the funeral related expenses. Therefore, after considering this reimbursement, Gladney is owed restitution in the amount of $2,923.00. This restitution amount should be ordered paid to the Maryland Crime Victims' Resource Center, Incorporated, which represents Gladney and certain members of Freeland's family. A remaining amount of $3,446.00 should be ordered paid to Corbin.[9]

TEJAN objects to an award of restitution. First, the Defendant argues that Corbin is not a victim and, therefore is not eligible for restitution under the MVRA. Based on the requirements outlined in the MVRA, Corbin (and Gladney) are eligible for restitution under the MVRA as persons "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered" "a crime of violence" based upon TEJAN's conduct. *See* 18 U.S.C. §§ 3663A(a)(1), (2) and (c)(1)(A)(i). Specifically, as discussed *supra*, since Corbin is a qualified victim and is not an accused or participant in the crime, restitution is appropriate for her.

TEJAN further argues that Gladney's request for memorial reception expenses are not "necessary funeral and related expenses" as required under § 3663A(b)(1). *Id.* Specifically, the

---

[8]       The invoices for the cemetery and burial expenses, as well as the memorial reception costs are attached hereto as Government's Exhibit A.

[9]       The invoices for the mortuary services and automobile insurance deductible are attached hereto as Government's Exhibit B.

Defendant contends that funeral receptions and memorials are not an important or needed part of a funeral. In making this argument, the Defendant is asking this Court to apply a very narrow interpretation of the statute. The Government asks that this Court reject that argument. This is because the term "necessary" is ambiguous in § 3663A(3). It is not defined in the statutory language and when considering its common every day meaning there is no clarity here. The term is not one that has a specific interpretation to every reader, nor can it be easily explained in this particular circumstance. *See Yates v. United States*, 574 U.S. 528, 537 (2015) (discussing that when interpreting a statute ambiguity arises "[not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole."). The purpose or intent of the MVRA is to make qualified victims whole through mandatory restitution. *See Dolan v. United States*, 560 U.S. 605, 612 (2010). A narrow interpretation of its provisions flies in the face of the MVRA's intent and, therefore, frustrates its basic purpose.

It is without question, that a funeral is often considered a memorial or celebration of life service that helps grieving families and friends obtain some form of closure when processing the loss of a loved one. A common and regular part of that celebration of life includes a reception where those same individuals can gather and commune in support of each other. To contend that this is not an important or necessary component to a funeral and overall grieving process is gross and unacceptable; especially when the Defendant is the specific cause of the loss of life.  Here, Gladney and other family members and friends sought to grieve together one last time in memory of their loved one who was violently and unexpectedly taken from them. This type of memorial reception is a regular and or normal component of any funeral service. Courts have agreed with this proposition when considering expenses for similar services.  *See United States v. Iron Cloud*,

312 F.3d 379 (8th Cir. 2002) (determining $3,000.00 for traditional Native American giveaway ceremony in commemoration of a victim to be "necessary funeral or related service" under MVRA). As such, the costs associated with Freeland's memorial reception are necessary under the MVRA, and should be order to Gladney as a condition of the Defendant's sentence.

## CONCLUSION

For the reasons set forth above and in its previously filed memorandum in aid of sentencing [ECF No. 140][10], the Government respectfully requests that the Court impose a maximum Guidelines sentence for each of TEJAN's counts of conviction, including a sentence of life in prison for Count Four. Such a sentence is warranted in this case and would be appropriate under the factors set forth at 18 U.S.C. § 3553(a).

> Respectfully submitted,
>
> EREK L. BARRON
> United States Attorney
>
> By:   */s/ Kelly O. Hayes*
>       KELLY O. HAYES
>       Assistant United States Attorney
>       District of Maryland
>
>       DAVID L. JAFFE
>       Chief, Violent Crime and Racketeering Section
>       U.S. Department of Justice
>
> By:   */s/ Gerald A.A. Collins*
>       GERALD A.A. COLLINS
>       Trial Attorney, Violent Crime and Racketeering Section
>       U.S. Department of Justice

---

[10]   In the Government's Memorandum it was advised that TEJAN had "a significant institutional history demonstrating his failure to follow the authority of the Department of Corrections, its staff, and its rules" that was supported by Department of Corrections records demonstrating approximately twelve (12) infractions between the period of April 2019 and November 2021. [ECF No. 140, at 20]. In response, the Defendant objected to the admission of this information "[t]here was nothing attached to the Memo to support this allegation." [ECF No. 142 at 6]. These records were previously provided to the Defendant in pretrial discovery on April 22, 2022. as bates numbered pages USA_015186 through USA_015313. These records are attached as Exhibit C for the Court's consideration.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel of record, on February 9, 2024.

By:     */s/ Gerald A.A. Collins*
GERALD A.A. COLLINS
Trial Attorney, Violent Crime and Racketeering Section
U.S. Department of Justice

31